1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10

11    CLAUDIA ARIAS,                          CASE NO. 3:25-cv-05079-DGE

12                    Plaintiff,              ORDER GRANTING
                                             DEFENDANTS' MOTION TO
      v.                                     DISMISS (DKT. NO. 12)

13    UNIVERSITY OF WASHINGTON
      TACOMA et al.,

14

15                    Defendant.

16

        Plaintiff Claudia Arias is a former student of the social work program at the University of

17  Washington Tacoma campus.  She asserts a myriad of claims arising from a project assigned in

18  one of her required classes.  Plaintiff alleges a professor took offense to the subject matter of

19  Plaintiff's draft project, which set off events that ultimately led to Plaintiff's removal from the

20  social work program.  Plaintiff asserts the Defendants' actions were unlawfully motivated by

21  Plaintiff's religious and cultural beliefs.

22        Defendants move to dismiss all but one of Plaintiff's claims filed in this matter.  For the

23  reasons stated herein, Defendants' motion to dismiss (Dkt. No. 12) is GRANTED.

24

1

## I.    BACKGROUND

2

### A.  Factual allegations[1]

3    Plaintiff was formerly enrolled in the Bachelor of Art of Social Welfare ("BASW")

4    Program at the University of Washington Tacoma ("UWT").  (Dkt. No. 1-1 at 1.)  In March

5    2023, Plaintiff registered for a class titled, "Cultural Diversity and Social Justice."  (*Id*. at 5.)

6    Defendant Vern Harner taught this class, which was required for Plaintiff to graduate from the

7    BASW Program.  (*Id*.)  Harner is transgender and advocates to improve the lives of queer and

8    trans communities.  (*Id*.)

9    Harner assigned each student a "zine" project—a "mini-magazine format with illustrative

10    headlines of a social justice subject."  (*Id*.)  For her zine, Plaintiff focused on "women's rights in

11    prison."  (*Id*. at 6.)  Her draft zine cited a report that raised "concerns that individuals were

12    manipulating the [prison] system in order to have sex with female prison inmates."  (*Id*. at 13.)

13    On April 27, 2023, Plaintiff met with Harner to discuss the draft zine.  (*Id*.)  Harner

14    provided "negative feedback that was unclear" and characterized Plaintiff's zine as "targeting

15    transgender."  (*Id*.)  Plaintiff left this meeting "feeling disparaged, insulted, and ostracized" by

16    Harner's behavior.  (*Id*. at 14.)  Plaintiff subsequently asked Harner if they could meet again to

17    discuss her draft zine.  (*Id*.)  Harner did not offer a meeting a time.  (*Id*.)  Afterward, Harner sent

18    Plaintiff an email informing Plaintiff that Harner was unavailable and that Plaintiff should

19    contact Defendant Claudia Sellmaier, chair of the BASW Program, or Chris Barrans, Plaintiff's

20    faculty advisor, to discuss any further concerns or questions about the zine project.  (*Id*. at 15.)

21    Harner also informed Plaintiff that while violence against women is an important subject, Harner

22

23    _____
[1] The factual allegations taken in Plaintiff's complaint are taken as true for purposes of this
24    motion.

believed Plaintiff's "current discussion and framing of the topic . . . is harmful and not aligned with social work values & ethics[.]" (*Id*. at 15.) Harner further informed Plaintiff that in its current format, Plaintiff's zine would not be shared during the class's informal presentations the following week. (*Id*.) Plaintiff was left confused about Harner's email and the conclusions Harner voiced. (*Id*. at 15–16.)

On May 1, 2023 at 11:23 a.m., Plaintiff emailed Sellmaier requesting a meeting, which they scheduled for May 2, 2023 at 12:30 p.m. (*Id*. at 17.) However, at 11:59 a.m. on May 1, Defendant Andrea Hill emailed Plaintiff stating she was required to attend a Professional Standards Committee meeting. (*Id*. at 17.) Plaintiff responded to Hill's email informing Hill Plaintiff would make herself available and that Plaintiff already had a meeting scheduled with Sellmaier to discuss concerns about Harner. (*Id*. at 17–18.)

Plaintiff met with Sellmaier on May 2, 2023. (*Id*. at 18.) Sellmaier indicated she had spoken with Harner. (*Id*.) Plaintiff expressed confusion as to why a Professional Standards Committee meeting had been scheduled and that she had not reviewed any complaint from Harner. (*Id*.) During the meeting, Sellmaier repeatedly accused Plaintiff of being "transphobic," which offended Plaintiff. (*Id*.)

On May 16, 2023, Plaintiff met with the Professional Standards Committee comprised of Hill, Sellmaier, Harner, and a student advocate, Roseanne Martinez. (*Id*. at 19.) Hill stated Plaintiff's zine topic "was extremely transphobic." (*Id*.) Plaintiff informed the Committee she did not understand what she had done wrong. (*Id*.) Pronoun usage was discussed during this meeting as Plaintiff asserted that Spanish was her first language and that "Spanish only uses two pronouns." (*Id*.) Plaintiff also informed the Committee that "her religious beliefs influenced her viewpoint on gender identity." (*Id*.) Plaintiff "asked the committee to respect her religious and

cultural background." (*Id.* at 20.)  At the end of the meeting, the Committee "informed [Plaintiff] that she was transphobic and was not aligning with social work values or justice." (*Id.*)

On May 25, 2023, Hill sent Plaintiff an email containing "requirements for moving forward." (*Id.*)  Plaintiff was directed to "Provide Evidence of Reflection and Growth" by drafting two essays on 1) "Social Work's Responsibilities to Trans Individuals" and 2) "Ethical & Professional Behavior and Communication." (Dkt. No. 13 at 10.[2])  Hill provided Plaintiff specific instructions for each essay. (*Id.*)  Plaintiff was given until October 31, 2023, to submit the essays to the Professional Standards Committee. (*Id.* at 11.)  Once submitted, Plaintiff was required to meet with the Committee to discuss her "work, learning, and growth." (*Id.*)

On August 27, 2023, Plaintiff emailed Elavie Ndura,[3] Vice Chancellor of Equity and Inclusion, and Defendant Keva Miller, the Dean of the School of Social Work & Criminal Justice. (Dkt. No. 1-1 at 20.)  On August 29, 2023, Miller instructed Plaintiff to follow the instructions outlined in the May 24, 2023 instructions. (*Id.* at 20–21.)

On October 31 2023, Plaintiff "decided against writing the compelled essays[.]" (*Id.* at 21.)  Plaintiff asserts the essays "would otherwise discriminate against her religious and race-based beliefs" but does not identify how the essays would discriminate against her beliefs. (*Id.*)

---

[2] In reviewing a motion to dismiss under Rule 12(b)(6), a court may "consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F. 3d 449, 454 (9th Cir. 1994); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.").

[3] This individual was dismissed from this lawsuit on March 21, 2025. (Dkt. No. 16.)

1    Plaintiff emailed the Professional Standards Committee to inform them she would not draft the

2    essays.  (*Id*.)

3        On November 27, 2023, Plaintiff met by video with "Hill and the other faculty

4    members," presumably the Professional Standards Committee.  (*Id*.)  Plaintiff stated she never

5    received any clarification about the purpose for the essays.  (*Id*.)  Plaintiff told the Committee

6    "they were discriminating against her religious beliefs and culture and infringing on her first

7    Amendment rights."  (*Id*. at 22.)  On November 29, 2023, Plaintiff asserts "Defendants received

8    further information regarding [Plaintiff's] religious beliefs and the extreme importance of those

9    beliefs in guiding her actions," but does not identify what information Plaintiff provided

10    Defendants.  (*Id*.)

11        On December 8, 2023, Plaintiff was dropped from all classes and otherwise terminated

12    from participation in the BASW Program.  (*Id*. at 23.)

13    **B.  Procedural background**

14        Defendants removed Plaintiff's complaint to this Court on February 3, 2025 from the

15    Pierce County Superior Court.  (Dkt. No. 1.)  The complaint asserts the following causes of

16    action:  1) Washington Law Against Discrimination ("WLAD"); 2) violation of the Washington

17    State Constitution article I, section 11; 3) violation of 42 U.S.C. § 1983 – First Amendment

18    Right to Free Exercise of Religion, 4) violation of 42 U.S.C. § 1983 – First Amendment Right to

19    Freedom of Speech (Retaliation); 5) violation of 42 U.S.C. § 1983 – First Amendment Right to

20    Freedom of Speech (Compelled Speech); 6) violation of 42 U.S.C. § 1983 – Fourteenth

21    Amendment Procedural Due Process; 7) Outrage; 8) Negligent Infliction of Emotional Distress;

22    9) Tortious Interference with Business Expectancy; and 10) Negligence.  (*Id*.)

23

24

1    Except for Plaintiff's fourth cause of action, Defendants move to dismiss all claims

2    pursuant to Federal Rule of Civil Procedure 12(b)(6) and/or based on qualified immunity.

3                              **II.      LEGAL STANDARD**

4        Federal Rule of Civil Procedure 12(b) motions to dismiss may be based on either the lack

5    of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

6    theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988). Material

7    allegations are taken as admitted and the complaint is construed in the plaintiff's favor. *Keniston*

8    *v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983). "While a complaint attacked by a Rule 12(b)(6)

9    motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide

10   the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

11   formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v.*

12   *Twombly*, 550 U.S. 544, 554–55 (2007) (internal citations omitted). "Factual allegations must be

13   enough to raise a right to relief above the speculative level, on the assumption that all the

14   allegations in the complaint are true [even if doubtful in fact]." *Id*. at 555. The complaint must

15   allege "enough facts to state a claim to relief that is plausible on its face." *Id*. at 547. "The court

16   need not, however, accept as true allegations that contradict matters properly subject to judicial

17   notice or by exhibit. Nor is the court required to accept as true allegations that are merely

18   conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden*

19   *State Warriors*, 266 F.3d 979, 988 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187

20   (9th Cir. 2001) (internal citation omitted).

21                              **III.      ANALYSIS**

22   **A.  Washington Law Against Discrimination ("WLAD")**

23

24

1      Generally, the WLAD prohibits discrimination "in employment, in credit and insurance

2 transactions, in places of public resort, accommodation, or amusement, and in real property

3 transactions because of race, creed, color, national origin, citizenship or immigration status,

4 families with children, sex, marital status, sexual orientation, age, honorably discharged veteran

5 or military status," or disability.  Wash. Rev. Code §§ 49.60.010, 49.60.030.  Specifically,

6 Plaintiff claims Defendants violated Washington Revised Code § 49.60.215 by discriminating

7 against her "because of her religious beliefs and her race, ethnicity, and national origin."  (Dkt.

8 No. 1-1 at 28.)

9      To state a claim under § 49.60.215,

> a plaintiff must prove that (1) the plaintiff is a member of a protected class, (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the plaintiff's protected status was a substantial factor that caused the discrimination.

13 *Floeting v. Group Health Cooperative*, 434 P.3d 39, 41 (Wash. 2019).  In addition,

> [t]o be actionable, the asserted discriminatory conduct must be *objectively discriminatory.*  By this we mean that it must be of a type, or to a degree, that a reasonable person who is a member of the plaintiff's protected class, under the same circumstances, would feel discriminated against (as described in subsections [RCW 49.60].040(14) and .215(1)).  *This is an objective standard.*

17 *Id.* at 44 (quoting *Floating v. Group Health Cooperative*, 403 P.3d 559, 567 (Wash. Ct. App.

18 2017)).  A plaintiff must allege more than "mere rhetoric that is subjectively offensive." (*Id.*)

19 (internal quotation marks omitted).  Moreover, the objective test "requires a finding of a

20 particularized kind of treatment, consciously motivated by or based upon the person's" protected

21 class. *Evergreen Sch. Dist. No. 114 v. Washington State Hum. Rts. Comm'n, on Behalf of*

22 *Johnson*, 695 P.2d 999, 1004 (Wash. Ct. App. 1985), *opinion modified on denial of*

23 *reconsideration* (March 11, 1985).

1      Defendants assert the complaint "fails to allege any 'objectively discriminatory' conduct

2  that was 'consciously motivated'" by "Plaintiff's race, ethnicity, religion, creed, or gender."

3  (Dkt. No. 12 at 11.)  The Court agrees.  The complaint alleges that on April 27, 2023, Harner

4  believed Plaintiff's draft zine was inappropriate because Harner believed it to be "harmful and

5  not aligned with social work values & ethics." (Dkt. No. 1-1 at 15.)  But the complaint is void of

6  any facts indicating Harner's April 27, 2023 opinion as to the appropriateness of Plaintiff's draft

7  zine was motivated by Plaintiff's race, ethnicity, religion or creed.  Likewise, Plaintiff offers no

8  facts indicating the decision to initiate a Professional Standards Committee meeting was

9  motivated by Plaintiff's race, ethnicity, religion, or creed.  In fact, absent are any facts indicating

10  Harner had any knowledge of Plaintiff's race, ethnicity, religion or creed as of April 27, 2023

11  and how that knowledge motivated Harner's conduct.

12      Plaintiff also alleges that at the May 2, 2023 meeting with Sellmaier, Sellmaier

13  "repeatedly insulted [Plaintiff] with the offensive slur accusing [Plaintiff] of being transphobic"

14  (Dkt. No. 1-1 at 18).  But mere rhetoric that is subjectively offensive is insufficient to establish

15  the Defendants were motivated by Plaintiff's race, ethnicity, religion or creed.  *See Floeting*, 434

16  P.3d at 44.  Absent are any facts indicating Sellmaier's May 2, 2023 rhetoric was motivated by

17  Plaintiff's race, ethnicity, religion or creed.

18      Plaintiff also alleges that at the May 16, 2023 Professional Standards Committee meeting,

19  the Committee "had already assimilated Harner's hostile animus and accusatory tone." (Dkt. No.

20  1-1 at 19.)  But again, absent are any facts indicating the Committee's assimilation of Harner's

21  hostile animus was motivated by Plaintiff's race, ethnicity, religion or creed.

22      Plaintiff further alleges that during the May 16 meeting, Plaintiff explained Spanish was

23  her first language and that Spanish only uses two pronouns.  (*Id*.)  Plaintiff also told the

24

1    Committee for the first time that "her religious beliefs influenced her viewpoint on gender

2    identify." (*Id*.)  But this information does not establish Defendants initiated the Professional

3    Standards Committee because  Plaintiff's first language is Spanish or because of Plaintiff's

4    "religious beliefs."  Notably,  Plaintiff does identify what she explained to the Committee about

5    her religious beliefs.

6        Plaintiff also alleges the Committee instructed her to complete an essay assignment on

7    May 25, 2023.  (Dkt. Nos. 1-1 at 20; 13 at 10.)  But once more, absent are any facts indicating

8    the Defendant's decision to direct the essay assignment was objectively discriminatory or

9    subjectively motivated by Plaintiff's race, ethnicity, religion or creed.  Plaintiff further alleges on

10   October 31, 2023 she decided not to complete the essay assignment because "the expected

11   content would require an admission of wrongdoing, and would otherwise discriminate against

12   her religious and race-based beliefs."  (Dkt. No. 1-1 at 21.)  But Plaintiff told the Committee she

13   would not complete the assignment because "she could not author writings prompted by false

14   accusations of wrongdoing" (*id*.), not that the assignment discriminated against her religious or

15   raced-based beliefs.  Moreover, Plaintiff's complaint offers no facts identifying how the

16   assignment discriminated against her religious or race-based beliefs.

17       Lastly, Plaintiff states that on November 27, 2023, Plaintiff informed Hill and others

18   "they were discriminating against her religious beliefs and culture."  (Dkt. No. 1-1 at 22.)

19   Plaintiff further alleges that on November 29, 2023, "Defendants received further information

20   regarding [Plaintiff's] religious beliefs and extreme importance of those beliefs in guiding her

21   actions."  (*Id*.)  But these allegations do not establish Defendants engaged in objectively

22   discriminatory conduct that was consciously motivated by Plaintiff's race, ethnicity, religion or

23   creed.  Again, Plaintiff does not explain what information Plaintiff communicated to Defendants

24

about Plaintiff's religious beliefs or explain how such information, provided *after the fact*, motivated the *initiation* of the Professional Standards Committee or the Committee's ultimate conduct towards Plaintiff.

In short, Plaintiff's WLAD claim is DISMISSED for failure to state a claim.

**B.  Washington State Constitution – article I, section 11**

To challenge state action under article I, section 11 of the Washington State Constitution, a plaintiff must establish "that [a religious] belief is sincere and that the government action burdens the exercise of religion." *City of Woodinville v. Northshore United Church of Christ*, 211 P.3d 406, 410 (Wash. 2009).  Religious exercise is burdened "if the coercive effect of an enactment operates against a party in the practice of his religion." *Id.* (cleaned up).  The burden must "be substantial" and do more than "minimally affect[]'sentiment, belief [or] worship.'" *Id.* at 411.

Defendants assert the complaint fails to allege a nexus between their alleged conduct (e.g., labeling Plaintiff as transphobic, requiring the use of they/them pronouns, or imposing an essay assignment) and Plaintiff's sincerely held religious belief.  (Dkt. No. 12 at 15.)  Defendants further assert there are no facts establishing a substantial burden on Plaintiff's religious beliefs. (*Id.*)  Plaintiff offers no response to Defendants' arguments.  (*See generally* Dkt. No. 20.)

The Court agrees with Defendants.  Other than stating that Plaintiff is Catholic, holds conservative views, and that she believes gender is determined at birth (Dkt. No. 1-1 at 4, 30), the complaint does not identify *how* Defendants' alleged conduct conflicted with her Catholic beliefs or *how* it substantially burdened Plaintiff's exercise of her religious beliefs.

Accordingly, Plaintiff's Washington State Constitution article I, section 11 Free Exercise claim is DISMISSED.

1

**C.  § 1983 claims**

2

   1.  <u>First Amendment Free Exercise Claim</u>

3

   Plaintiff asserts Harner, Sellmaier, Hill, and Miller violated Plaintiff's free exercise of

4

religion.  (Dkt. No. 1-1 at 31.)  Plaintiff's § 1983 First Amendment Free Exercise claim fails for

5

the same reasons Plaintiff's Washington State Constitution article I, section 11 Free Exercise

6

claim fails.  Plaintiff does not identify how Defendants' actions were motivated by her religion

7

or how Defendants burdened her exercise of religion.  *See  supra* § III.B.

8

   Independently, these Defendants assert they are entitled to qualified immunity as to

9

Plaintiffs' First Amendment Free Exercise claim because there is no clearly established right (1)

10

prohibiting a student from being characterized as transphobic, (2) prohibiting faculty from

11

requiring a student to write an essay on issues related to transgender individuals, or (3)

12

prohibiting the removal of a student for failing to complete a writing assignment.  (Dkt. No. 12 at

13

19.)

14

   When evaluating qualified immunity at the motion-to-dismiss stage,[4] courts "consider

15

whether the complaint alleges sufficient facts, taken as true, to support the claim that the

16

officials' conduct violated clearly established constitutional rights of which a reasonable officer

17

would be aware 'in light of the specific context of the case.'"  *Keates v. Koile*, 883 F.3d 1228,

18

1234 (9th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  It is the plaintiff's

19

burden to demonstrate that the defendant "violated a federal statutory or constitutional right" and

20

21

[4] While resolving qualified immunity claims at the motion-to-dismiss stage can present "special problems for legal decision making," *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018), here the complaint identifies the instructions for the original zine project, her draft zine project, and a complete copy of Harner's email to Plaintiff about the draft zine project.  The Court also has been provided a complete copy of the essay assignment Plaintiff references in her complaint. The Court has been provided the sum and substance of Plaintiff's claims that contextualize Plaintiff's factual allegations.

22

23

24

1   "the unlawfulness of their conduct was clearly established at that time." *Moore v. Garnand*, 83

2   F.4th 743, 750 (9th Cir. 2023) (quoting *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022))

3   (internal quotation marks omitted).  A court "may begin the qualified immunity analysis by

4   considering whether there is a violation of clearly established law without determining whether a

5   constitutional violation occurred." *Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of*

6   *Higher Educ.*, 616 F.3d 963, 969 (9th Cir. 2010).  "To determine whether a constitutional right

7   has been 'clearly established' for qualified immunity purposes," the court "must 'survey the legal

8   landscape and examine those cases that are most like the instant case.'" *Id.* at 970 (quoting

9   *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996)).  To show that a right is "clearly

10  established," "existing precedent must have placed the statutory or constitutional question

11  beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Additionally, the right must

12  have been established "at the time of the alleged violation." *Moran v. State of Wash.*, 147 F.3d

13  839, 844 (9th Cir. 1998).  The Supreme Court has cautioned against defining "clearly established

14  right" with excessive generality.  *Plumhoff v. Rickard*, 572 U.S. 765, 778–779 (2014).

15        Plaintiff first confusingly states, "[q]ualified immunity has no place here where there is

16  no well-established right to compel transgender free speech." (Dkt. No. 20 at 22.)  This,

17  however, is not the standard for determining qualified immunity.  Instead, Plaintiff must identify

18  with some particularity the clearly established right Defendants allegedly violated using existing

19  precedent.  Plaintiff's assertion that "[t]here is existing, well-established law which prohibits

20  [Defendants'] conduct under the free exercise clause of the First Amendment" (*id*. at 22–23) is

21  too general a proposition.[5] *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975,

22

23  _____

    [5] In support of this general proposition Plaintiff provides a string cite without explaining how
    any of the decisions in the string cite involve circumstances like the circumstances in this case.
24  (*See id*. at 23.)

987 (9th Cir. 2011) (Plaintiff's "overbroad proposition cast at a high level of generality, is just the sort of sweeping statement of the law that is inappropriate for assessing whether qualified immunity applies." (internal quotations omitted)).

In short, for purposes of Plaintiff's First Amendment Free Exercise claim, Plaintiff fails to establish a clearly established constitutional right the individual Defendants violated when they allegedly labeled Plaintiff transphobic, required her to submit essays on issues related to transgender individuals, and removed her from the BSAW Program for not completing the written assignment.  Accordingly, Plaintiff's § 1983 First Amendment Free Exercise Claim is barred by qualified immunity.

2.  First Amendment Freedom of Speech (Compelled Speech) Claim

Plaintiff asserts Defendants Harner, Sellmaier, Hill and Millers sought to compel her "to speak contrary to her beliefs or be expelled."  (Dkt. No. 1-1 at 37–38.)  Specifically, Plaintiff asserts Defendants demanded Plaintiff "write an essay expressing ideas she did not agree with or be terminated from the [BASW] program."  (*Id*. at 38.)  From Plaintiff's perspective, the assignment required her to "espouse a certain viewpoint as her own."  (*Id*.)

Defendants argue Plaintiff's compelled speech claim fails because Defendants "have broad authority to exercise control over . . . speech that is supervised by faculty members and designed to impart particular knowledge or skills to students."  (Dkt. No. 12 at 19) (citing *Hazelwood Sch. Dist. v. Kuhmlmeier*, 484 U.S. 260, 271 (1988)).  They cite Varner's April 27, 2023 email to support their position that the essay assignment "sought to ensure Plaintiff's understanding of and adherence to ethical standards applicable to the profession" and that the assignment did not "compel Plaintiff to change her personal beliefs but instead only to demonstrate her understanding of professional standards."  (*Id*. at 21.)

It is correct that faculty "may require a student to write a paper from a particular viewpoint, even it is a view-point with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose." *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002); *Hazelwood*, 484 U.S. at 273. Such assignments are consistent with the First Amendment if they "are part of the teachers' curricular mission to encourage critical thinking . . . and to conform to professional norms[.]" *Id.* However, Defendants' lone citation to Harner's April 27, 2023, without further explanation from competent witnesses as to the reasons and purpose for the essay assignment, is insufficient at this stage to conclude the essay assignment falls within the *Brown/Hazelwood* umbrella. The Court can evaluate whether such conclusion can be drawn only after a full record is presented to the Court.

Separate and apart, however, the individual Defendants assert Plaintiff's compelled speech claim is barred by qualified immunity because "[t]here is no clearly established law that students cannot be compelled to write essays." (Dkt. No. 12 at 21.) Plaintiff responds by asserting that "[i]t is well established and has been for many years that you may not squelch protected speech in a public higher education environment." (Dkt. No. 20 at 23.) Once more though, such an overbroad proposition is too general for evaluating a claim of qualified immunity. *Farnan*, 654 F.3d at 987. Moreover, Plaintiff's broad proposition pertains to "squelch[ing] protected speech," not to whether characterizing a student as being transphobic or requiring the student to write essays on transgender issues violate a clearly established right.

In the absence of Plaintiff identifying a clearly established right that Defendants violated, the individual Defendants are entitled to qualified immunity on Plaintiff's First Amendment Freedom of Speech (Compelled Speech) claim.

       3.  <u>Fourteenth Amendment Procedural Due Process Claim</u>

Plaintiff alleges Defendants Harner, Sellmaier, Hill and Miller violated Plaintiff's procedural due process rights by having her participate in a Professional Standards Committee meeting, being instructed to write essays, and then ultimately removing Plaintiff from the BASW Program for refusing to write the essays. (Dkt. No. 1-1 at 39–40.) Defendants assert they are entitled to qualified immunity because it is not clearly established that Plaintiff has a property or liberty interest in continued enrollment in the BASW Program. (Dkt. No. 12 at 22.)

> A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. In seeking to defeat a claim of qualified immunity, the plaintiff bears the burden of proving not only that both elements of his claim are resolved in his favor, but also that both elements are 'clearly established' in his favor.

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). "Because the Due Process Clause does not create freestanding property interests, a plaintiff must identify a cognizable property interest based on an 'independent source such as state law.'" *Doe v. White*, 859 F. App'x 76, 77 (9th Cir. 2021) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Plaintiff asserts Washington recognizes a "protected property interest in her degree program" because it is "generally accepted that the relationship between a student and a university is primarily contractual in nature." (Dkt. No. 20 at 24) (quoting *Marquez v. Univ. of Washington*, 648 P.2d 94, 96 (Wash. Ct. App. 1982)). Defendant identifies, however, that Washington courts have "dismissed cases in similar circumstances," citing *Becker v. Univ. of Washington*, 266 P.3d 893 (Wash. Ct. App. 2011). (Dkt. No. 12 at 23–24.)

In *Marquez*, a student claimed his university breached its promise to provide "formal structurized tutorial assistance program" as required by the university's student handbook. 648 P.2d at 96. *Marquez* involved a breach of contract claim, not a due process claim. While the

court acknowledged it is "generally accepted that the relationship between a student and a university is primarily contractual in nature" (*id*.), it also explained that the "student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category" and that contract law need not be "rigidly applied in all its aspects." (*Id*.) (quoting *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977)).  Accordingly, "[e]ven though every contract may confer some legal rights under state law, that fact alone need not place all contracts within federal due process protection." *San Bernardino Physicians' Services, Medical Group, Inc. v. San Bernadino Cnty.*, 825 F.2d 1404, 1408 (9th Cir. 1987).  Importantly, "the law regarding procedural due process claims 'can rarely be considered "clearly established" at least in the absence of closely corresponding factual and legal precedent.'" *Brewster*, 149 F.3d at 983 (quoting Baker v. Racansky, 887 F.2d 183, 187 (9th Cir.1989)).  Because *Marquez* did not involve a due process claim, it offers no guidance as to whether Washington recognizes a liberty or property interest in completing a degree program based on a contractual theory.

On the other hand, *Becker* involved a due process claim and the application of qualified immunity.  At issue was whether the Plaintiff could "demonstrate her academic dismissal deprived her of a liberty interest or property interest recognized by state law." *Becker*, 266 P.3d at 904.  The court found no authority supporting the proposition that the "decision to dismiss her for academic reasons deprives her of a liberty interest." (*Id*.)  The court found "courts have generally declined to find deprivation of a liberty interest where a dismissal is academic as opposed to disciplinary," as well as the absence of any "authority for [plaintiff's] assumption that state law recognizes a property interest in continued enrollment in a PhD program at a public university." (*Id*.)

1    Plaintiff distinguishes *Becker* from the present case by noting that it involved a plaintiff

2    "with a poor academic record who had violated specific stated provisions of generally applicable

3    academic policies." (Dkt. No. 20 at 25.) But even accepting this distinction as true, Plaintiff

4    does not identify any Washington decision clearly establishing a liberty or property interest in

5    continued participation in an academic program based on an alleged contractual relationship.

6    Because Plaintiff fails to identify a clearly established liberty or property interest in

7    continued participation in an academic program, it is immaterial whether Defendants comported

8    with due process in withdrawing Plaintiff from the BASW Program. Defendants are entitled to

9    qualified immunity. Plaintiff's due process claim is DISMISSED.

10   **D.  Outrage**

11   A claim for outrage requires "(1) extreme and outrageous conduct, (2) intentional or

12   reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional

13   distress." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003). "The first element requires proof

14   that the conduct was "'so outrageous in character, and so extreme in degree, as to go beyond all

15   possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

16   community.'"" *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002) (quoting *Dicomes v.*

17   *State*, 782 P.2d 1002 (Wash. 1989)). "'[M]ere insults, indignities, threats, annoyances, petty

18   oppressions, or other trivialities'" are insufficient to support an outrage claim. *Grimsby v.*

19   *Samson*, 530 P.2d 291, 295 (Wash. 1975) (quoting *Restatement (Second) of Torts* § 46 cmt. d).

20   Plaintiff alleges Defendants engage in extreme and outrageous conduct by "repeatedly

21   using offensive slurs . . . , denigrating and belittling her religious beliefs, bringing punitive action

22   against her for her sincerely-held religious beliefs, and expelling her from the BASW program."

23   (Dkt. No. 1-1 at 40–41.)

24

As to the issue of offensive slurs, the only "offensive slur" identified in Plaintiff's complaint is the word "transphobic," which is defined as being "hostile towards, prejudiced against, or (less commonly) fearful of transgender people."[6]  While the Court does not question that Plaintiff was offended by this term, use of the word transphobic, at most, might be characterized as an insult and insults are insufficient to support an outrage claim.  *Grimsby*, 530 P.2d at 295.

Regarding the alleged denigration and belittling of Plaintiff's religious beliefs, Plaintiff does not identify *how* Defendants denigrated or belittled her religious beliefs.  Plaintiff cites only that she holds conservative values, that Plaintiff informed the Defendants her religious beliefs influenced her viewpoint on gender identity, and that Defendants called her transphobic after Plaintiff expressed her belief that Plaintiff equates birth anatomy with gender.  (Dkt. No. 20 at 27.)  But these allegations do not identify what each Defendant said or did to denigrate or belittle Plaintiff's religious beliefs other than call her transphobic.  Characterizing conduct as denigrating or belittling, without describing the actual conduct, is conclusory and insufficient to support Plaintiff's outrage claim.

As for initiating punitive action that resulted in ultimate expulsion from the BASW Program based on Plaintiff's religious beliefs, the Court has determined Plaintiff's complaint fails to establish that Defendants engaged in objectively discriminatory conduct that was consciously motivated by Plaintiff's race, ethnicity, religion or creed.  *See supra* Section III.A.

Accordingly, the complaint fails to state a claim for outrage; that claim is DISMISSED.

**E.  Negligence and Negligent Infliction of Emotional Distress**

---

[6] *Transphobic*, Oxford English Dictionary, https://www.oed.com/dictionary/transphobic_adj?tab=meaning_and_use#292829371 (last visited Aug. 8, 2025).

1    "In a negligence action the threshold question is whether the defendant owed a duty of

2    care to the injured plaintiff."[7] *Schooley v. Pinch's Deli Mkt., Inc.*, 951 P.2d 749, 752 (Wash.

3    1998); *Martinez v. Washington State Univ.*, 562 P.3d 802, 813 (Wash. Ct. App. 2025).  Whether

4    a duty exists depends on "mixed considerations of logic, common sense, justice, policy, and

5    precedent."  *Snyder v. Medical Service Corp. of Eastern Washington*, 35 P.3d 1158, 1164 (Wash.

6    2001) (internal quotations omitted); *Martinez*, 562 P.3d at 813.  "'Where appropriate, a cause of

7    action may be implied from a statutory provision when the legislature creates a right or

8    obligation without a corresponding remedy.'"  *Martinez*. at 813 (quoting *Ducote v. Dep't of Soc.*

9    *& Health Servs.*, 222 P.3d 785, 787 (Wash. 2009)).  To determine if there is an implied cause of

10    action, courts consider:

> first, whether the plaintiff is within the class for whose 'especial' benefit the statue was
> enacted; second, whether the legislative intent, explicitly or implicitly, supports creating
> or denying a remedy; and third, whether implying a remedy is consistent with the
> underlying purpose of the legislation.

*Bennett v. Hurdy*, 784 P.2d 1258, 1261–62 (Wash. 1990).

      Here, Plaintiff's complaint asserts UWT owed a duty of care "derived from the student-

university relationship."  (Dkt. No. 1-1 at 44.)  Plaintiff states that "[a]spects of this duty are

elucidated in" UWT's Mission Statement, it Race & Equity Initiative, and Diversity Blueprint, as

well as in Washington Revised Code § 28B.10.145.  (*Id.* at 3–4, 44–46.)  In response to the

motion to dismiss, Plaintiff identifies Washington Revised Code § 28B.20.020, Washington

Administrative Code §§ 478-124-010 and 478-124-020, and additional UTW policies to further

support the existence of a duty of care.  (Dkt. No. 20 at 28–29.)

---

[7] "To maintain an actionable negligence claim, a plaintiff must also establish a breach of that
duty, resulting injury, and the breach was a proximate cause of the injury."  *Martinez*, 562 P.2d
at 813 n.27.

With regard to the statutes and administrative code Plaintiff cites to support the existence of a duty, Plaintiff neither identifies nor applies any of the *Bennett* factors to the statutes or administrative codes cited. Notably, none of them contain language indicating they were intended to create an actionable duty of care independent of or in conjunction with other actionable statutes, such as the WLAD. The Court does not find such statutes and codes create an actionable duty of care.

As for the various UWT policies Plaintiff references to support the existence of a duty of care, Plaintiff offers no authority indicating a duty of care is created by adopting internal policies. Moreover, as Plaintiff has pointed out, it is "generally accepted that the relationship between a student and a university is primarily contractual in nature." (Dkt. No. 20 at 24) (quoting *Marquez*, 648 P.2d at 96). Plaintiff's reliance on internal policies applicable to students sounds in contract, not tort.

Citing *Martinez*, Plaintiff also argues a duty of care arises out of a "special relationship between student/teacher and student/administrator." (Dkt. 20 at 30.) But *Martinez* identified that the special relationship between a university and its students "'is defined and anchored in the common law as provided in *Restatement (Second) of Torts* § 344 (Am. Law Inst. 1965)' not in § 315(b)"[8] of the *Restatement*. 562 P.3d at 819 (quoting *Barlow v. State*, 540 P.3d 783, 788 (Wash. 2024)). "The duty, arising from this special relationship, 'exists where a student is on campus, similar to a business invitee, or involved in university sponsored activities.'" *Id.* (quoting *Barlow*, 540 P.3d at 785). But this duty focuses on "physical harm caused by the

---

[8] The special relationship identified in § 315(b) involves "situation[s] where [a] person is 'helpless, totally dependent, or under the complete control of someone else for decisions relating to their safety." *Barlow*, 540 P.3d at 788 (quoting *Turner v. Department of Social & Health Services*, 493 P.3d 117, 126 (Wash. 2021)). "No similar duty exists between a university and its students under which a *Restatement (Second)* § 315(b) special relationship is implicated." *Id.*

accidental negligent, or intentionally harmful acts of third persons or animals and by the failure

of the possessor to exercise reasonable care to" discover or give adequate warning.

RESTATEMENT (SECOND) OF TORTS § 344 (Am. Law Inst. 1965).  Plaintiff's negligence and

negligent infliction of emotional distress claims do not involve claims of physical harm caused

by third persons.  Thus, the "special relationship" discussed in *Martinez* is irrelevant and

otherwise does not support the existence of a duty of care in this case.

 Similarly, Plaintiff also claims that "[a]nti-bullying policies provide the requisite duty

owed a student in an academic environment."  (Dkt. No. 20 at 29) (citing *Quynn v. Bellevue*

*School Dist.*, 383 P.3d 1053 (Wash. Ct. App. 2016)).  But Plaintiff acknowledges that this type

of duty "arose under premises doctrine" (*id*. at n.1), seemingly acknowledging that such duty is

based on *Restatement (Second) of Torts* § 344—which as already discussed, relates to physical

harm caused by third parties.

 In summary, Plaintiff fails to state negligence and negligent infliction of emotional

distress claims because Plaintiff fails to state an actionable duty of care.  These claims are

DISMISSED.

### F.  Tortious Interference with Business Expectancy

 Plaintiff alleges UWT, through Harner, Sellmaier, Hill and Miller "tortiously interfered

with [Plaintiff's] business expectancies and her contractual interests in her internship."  (Dkt. 1-1

at 42.)  At the time of her removal from the BASW Program, Plaintiff had already been placed in

a practicum with her current employer, which if successfully completed "would likely have

[resulted in] a future job opportunity" as a social worker.  (*Id*. at 43.)

 Defendants argue Plaintiff fails to allege the existence of a valid contractual relationship

(Dkt. No. 12 at 24) and that Plaintiff must show that any "future business opportunities 'are a

1    reasonable expectation and not merely wishful thinking.'" (Dkt. No. 23 at 10) (quoting *Caruso v.*

2    *Local Union No. 690*, 653 P.2d 638, 643 (Wash. Ct. App. 1982), *rev'd on other grounds*, 670

3    P.2d 240 (Wash. 1983)).  Plaintiff responds that, "'[a]ll that is needed is a relationship between

4    parties contemplating a contract, with at least a reasonable expectation of fruition.'"  (Dkt. No.

5    20 at 31) (quoting *Scymanski v. Dufault*, 491 P.2d 1050, 1055 (Wash. 1971)).

6           A claim for tortious interference with a business expectancy requires: 1) the existence of

7    a valid contractual relationship or business expectancy, 2) a defendant's knowledge of the

8    relationship, 3) an intentional interference causing a breach or termination of that relationship or

9    expectancy, 4) that the defendant interfered for an improper purpose or used improper means,

10   and 5) resultant damages.  *Commodore v. University Mechanical Contractors, Inc.*, 839 P.2d

11   314, 322 (Wash. 1992).  "Washington . . . does not require the existence of an enforceable

12   contract or breach of one to support an action." *Id*.  "'All that is needed is a relationship between

13   parties contemplating a contract, with at least a reasonable expectation of fruition." *Skymanski*,

14   491 P.2d at 1055.  This includes "any prospective contractual or business relationship that would

15   be of pecuniary value." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc.*,

16   52 P.3d 30, 33 (Wash. Ct. App. 2002).

17          In *Skymanski*, the contractual relationship was such that, "[a]ll that remained to be done

18   to complete [the parties'] transaction was the execution of the . . . agreement."  491 P.2d at 1055.

19   In *Newton*, the business expectancy was based on noncompete agreements in which the

20   defendant continued to contact the plaintiff's customers to transfer those customer accounts to

21   defendant.  52 P.3d at 33.  The court determined the plaintiff "had a valid business expectancy in

22   all of its customers" including the customers subject of the noncompete agreement that the

23   defendant sought to transfer.  *Id*.

24

The present facts are unlike *Skymanski* or *Newton*.  Here, Plaintiff does not allege an actual social work employment relationship whereby the only thing remaining was for Plaintiff to accept an offer of employment.  Nor does this matter involve a pecuniary interest associated with the loss of potential customers.  Instead, Plaintiff alleges only that had she completed her practicum and graduated from the BASW Program "she would likely have a future job opportunity" and that Defendants knew she "would have fewer career and economic opportunities without a social work degree," including "less opportunities [with her current employer] and elsewhere."  (Dkt. No. 1-1 at 43.)  "Likely hav[ing]" a "future" job "opportunity" requires the Court to speculate about Plaintiff's potential future employment and negates the conclusion that Plaintiff maintained a reasonable expectation of fruition of an employment relationship.[9]

Accordingly, Plaintiff's tortious interference with a business expectancy claim is DISMISSED.

## IV.    CONCLUSION

Having considered Defendants' motion, the briefing of the parties, and the remainder of the record, and for the reasons stated herein, the Court finds and ORDERS that Defendants Motion to Dismiss is GRANTED.

With the exception of Plaintiff's fourth cause of action, violation of 43 U.S.C. § 1983 – First Amendment Right to Freedom of Speech (Retaliation), all of Plaintiff's claims are DISMISSED.

---

[9] Defendants also raise in their reply the argument that Plaintiff failed to allege sufficient facts establishing that "Defendants dropped Plaintiff from the BASW program with an improper motive or through an improper means."  (Dkt. No. 23 at 11.)  As this argument was raised for the first time in Defendants' reply, the Court does not address this argument.

Dated this 11th day of August, 2025.

David G. Estudillo
United States District Judge