THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CLAUDIA ARIAS, an individual,

Plaintiff,

v.

STATE OF WASHINGTON –
UNIVERSITY OF WASHINGTON
TACOMA ("UWT"), a state educational
institute; VERN HARNER, officially and
individually; CLAUDIA SELLMAIER,
officially and individually; ANDREA HILL,
officially and individually; KEVA MILLER,
officially and individually; and ELAVIE
NDURA, officially and individually

Defendants.

Case No.: 3:25-cv-05079

**DECLARATION OF JOAN K. MELL
ATTACHING EXHIBITS IN OPPOSITION
TO SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
Monday, March 23, 2026

I, JOAN K. MELL, make the following statement under oath subject to penalty of perjury under the laws of the State of Washington and the United States of America:

1.1 I am over the age of eighteen and competent to testify in this matter.

1.2 I am the attorney of record for the plaintiff Clauda Arias.

1.3 The following documents and deposition transcripts are true and correct copies of

documents produced in discovery.  Claudia Arias has authenticated certain exhibits

by cross reference in her declaration.

MELL DECLARATION ATTACHING
EXHIBITS FOR CLAUDIA ARIAS' RESPONSE TO MOTION
FOR SUMMARY JUDGMENT
Case No. 3:25-cv-05079 - 1 of 3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510

INDEX TO MELL EXHIBITS

| Ex. No. | Date | Item |
|---|---|---|
| Ex. 1 | 12.11.2023 | Letter Closing Practicum |
| Ex. 2 | 12.08.2023 | Expulsion Letter/Email Enc. |
| Ex. 3 | 12.05.2023 | Email.Hill.Edits |
| Ex. 4 | 12.05.2023 | Email Hill to Miller and PSC |
| Ex. 5 | 11.30.2023 | Email Miller Email Muddy Conv |
| Ex. 6 | 11.20.2023 | Email Political |
| Ex. 7 | 11.20.2023 | Email Consejo Restorative |
| Ex. 8 | 11.13.2023 | Email Toothaker to Kim |
| Ex. 9 | 11.03.2023 | Emails re 2nd PSC |
| Ex. 10 | 11.03.2023 | Email Check on how doing |
| Ex. 11 | 11.02.2023 | Email Hill have to have mech |
| Ex. 12 | 11.02.2023 | Email Hill to PSC |
| Ex. 13 | 11.01.2023 | Email Miller insisting auth |
| Ex. 14 | 11.01.2023 | Email Miller to Arias in part |
| Ex. 15 | 10.31.2023 | Email Arias Request for Alternative Relief |
| Ex. 16 | 05.28.2023 | Email 2nd Anonymous |
| Ex. 17 | 08.29.2023 | Email Arias to Miller Bullying Complaint |
| Ex. 18 | 08.23.2023 | Email Hill Arias Questions |
| Ex. 19 | 08.22.2023 | Email Another mtg |
| Ex. 20 | 08.15.2023 | Email Hill Miller Ethics |
| Ex. 21 | 08.15.2023 | Email Hill Miller Problem |
| Ex. 22 | 08.11.2023 | Email Miller Already heard about student |
| Ex. 23 | 08.10.2023 | Email Sellmaier to PSC |
| Ex. 24 | 08.10.2023 | Email PSC.Reminder Anonymous email |
| Ex. 25 | 08.10.2023 | Email Butt PSC |
| Ex. 26 | 07.24.2023 | Email Sellmaier Torn |
| Ex. 27 | 05.24.2023 | Email Harner PSC Input |
| Ex. 28 | 05.24.2023 | Email PSC Corrective Action Ltr |
| Ex. 29 | 05.16.2023 | Email PSC Mtg. Notes |
| Ex. 30 | 05.16.2023 | Email Sellmaier Harner Follow to PSC |
| Ex. 31 | 05.10.2023 | Email Barrans scheduling |
| Ex. 32 | 05.01.2023 | Email PSC Referral |
| Ex. 33 | 05.01.2023 | Email Arias Firs PSC |
| Ex. 34 | 05.01.2023 | Email Mtg Sellmaier |
| Ex. 35 | 04.27.2023 | Email Harner Not Aligned |
| Ex. 35a | 04.27.2023 | Email Harner Complaint and Email |
| Ex. 36 | 04.20.2023 | Email Noch eine weitere |
| Ex. 37 | 04.11.2023 | Anonymous Email |
| Ex. 37a | 04.11.2023 | Anonymous Email |
| Ex. 38 | 03.27.2023 | Harner Calendar |
| Ex. 39 | 03.21.2023 | Class Announcement |
| Ex. 40 | 02.16.2023 | Intern Referral |
| Ex. 41 | | Harner Zine |
| Ex. 42 | | Zine |
| Ex. 43 | | Zine Assignment Descript |
| Ex. 44 | | Altered Zine Rubric |
| Ex. 45 | | Initial Rubric |
| Ex. 46 | | Intern Eval |
| Ex. 47 | | NASW Code of Ethics |

MELL DECLARATION ATTACHING
EXHIBITS FOR CLAUDIA ARIAS' RESPONSE TO MOTION
FOR SUMMARY JUDGMENT
Case No. 3:25-cv-05079 - 2 of 3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510

| Ex.48 | | Professional Standards Committee Guidelines |
|---|---|---|
| Ex.49 | | Program Manual |
| Ex. 50 | | Social Work Speaks |
| Ex. 51 | | UWT Responses to RFA |
| Ex. 52 | | UWT RFA |
| Ex. 53 | | Essential SW Skills |
| Ex. 54 | | Columbia University Resolution Agreement |
| Ex. 55 | | Course Description |
| Ex. 55b | | Harner Zine Assignment |
| Ex. 56 | | Student Eval (In Camera) |
| Ex. 57 | | Student Eval (In Camera) |
| Ex. 58 | | Harner Referral PSC |
| Ex. 59 | | Arias Class Notes |
| Ex. 60 | 09.22.2025 | Excerpts Deposition Claudia Arias |
| Ex. 61 | 01.26.2026 | Excerpts Deposition Allison Osborne |
| Ex. 62 | 01.22.2026 | Excerpts Deposition Marianne Yoshioka |
| Ex. 63 | 01.23.2026 | Excerpts Deposition Nancy Kuhuski |
| Ex. 64 | 01.14.2026 | Excerpts Deposition Ricky Butt |
| Ex. 65 | 10.06.2025 | Excerpts Deposition Vern Harner |
| Ex.66 | 10.13.2025 | Excerpts Deposition Andrea Hill |
| Ex.67 | 10.15.2025 | Excerpts Deposition Keva Miller |
| Ex.68 | 10.10.2025 | Excerpts Deposition Claudia Sellmaier |

The above information is true and correct to the best of my abilities.

Dated this 17th day of March, 2026 at Pima County, AZ

III Branches, PLLC

_____
Joan K. Mell, #21319

MELL DECLARATION ATTACHING
EXHIBITS FOR CLAUDIA ARIAS' RESPONSE TO MOTION
FOR SUMMARY JUDGMENT
Case No. 3:25-cv-05079 - 3 of 3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510

# EXHIBIT 1

 **Outlook**

## Re: Practicum

**From** Claudia Arias <arias1@uw.edu>

**Date**  Fri 12/15/2023 6:44 PM

**To**    Nancy Kuhuski <nkuhuski@uw.edu>

Thank you Professor.

On Fri, Dec 15, 2023 at 4:03 PM Nancy Kuhuski <nkuhuski@uw.edu> wrote:

> Hi,
>
> Collette got your eval officially submitted, so your hours are all documented there and I was able to submit your grade!
>
> Thanks and again, I do wish you all the best.
>
> Nancy
>
> ---
>
> **From:** Claudia Arias <arias1@uw.edu>
> **Sent:** Tuesday, December 12, 2023 3:04 PM
>
> **To:** Nancy Kuhuski <nkuhuski@uw.edu>
> **Subject:** Re: Practicum
>
> Thank you Professor, I will do that.
>
> Will it be okay if I send you the hours tomorrow? Its approximately 150
>
> Thank you,
>
>
> On Tue, Dec 12, 2023 at 1:25 PM Nancy Kuhuski <nkuhuski@uw.edu> wrote:
>
>> Thank you Claudia.
>>
>>
>> Please let me know if you have any additional practicum questions. Also, please don't forget to send me you final count of hours for this quarter.
>>
>>
>> Nancy

UWT_002483

Mail - Nancy Kuhuski - Outlook

**From:** Claudia Arias <arias1@uw.edu>
**Sent:** Monday, December 11, 2023 7:50 AM
**To:** Nancy Kuhuski <nkuhuski@uw.edu>
**Subject:** Re: Practicum

Hello Professor,

Nancy,

Their decision is extremely disheartening. It's evident from Dr. Hill's email that there's a lack of professionalism within the institution, as her recent letter comes across as deceitful.

I would like to express my gratitude for your assistance as a Professor. Your dedication and time devoted to us as students are truly appreciated.

I've discussed with Colette, and I plan to deliver the items today.

Thank you
Claudia Arias
2225570

On Fri, Dec 8, 2023 at 3:46 PM Nancy Kuhuski <nkuhuski@uw.edu> wrote:

> Hi Claudia,
>
> I was informed today that you were notified you are being dropped from the program effective today. This means you are no longer eligible to be in practicum.
>
> I know this was not the outcome you were hoping for.
>
> You have accrued enough hours in practicum for TSOCWF 415 – your practicum course, and will receive a grade of credit (as this is a credit/no credit course). Please send me your final number

UWT_002484

of hours accrued so I can document appropriately.

If you have any equipment, badges etc. from Consejo that need to be returned, please coordinate bringing those items to me and I will ensure they get back to the agency. Or if you are at practicum today, you can go ahead and leave them with Colette or another designated person at the agency.

Please let me know if you have any questions about closing out your practicum at Consejo.

I truly wish you the best,

Nancy

**Nancy Kuhuski, MSW (She/her)**

**Assistant Teaching Professor & Field Education Faculty**

**School of Social Work & Criminal Justice**

**University of Washington Tacoma**

**Phone: 253-692.4891**

**Office: WCG-116E**

**STAR access: http://star.ssw.washington.edu**

**W UNIVERSITY of WASHINGTON | TACOMA**

UWT_002485

# EXHIBIT 2

Ex 31

| | |
|---|---|
| **From:** | Andrea L. Hill <andhill@uw.edu> |
| **Sent:** | Friday, December 8, 2023 2:42 PM PST |
| **To:** | Claudia Arias <arias1@uw.edu> |
| **Subject:** | Professional Standards Committee Communication |
| **Attachments:** | Professional Standards Committee Decision Letter - Claudia Arias.pdf |

Hello Claudia,

Attached here please find communication from the Professional Standards Committee of the School of Social Work and Criminal Justice. A copy of this letter has also been mailed to the address you have on file with the university.

Thank You,

Dr. Hill


--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000880

# W SCHOOL OF SOCIAL WORK & CRIMINAL JUSTICE

### UNIVERSITY *of* WASHINGTON | TACOMA

December 8, 2023

Dear Ms. Arias,

This letter is to inform you that the School of Social Work and Criminal Justice at The University of Washington Tacoma Professional Standards Committee recommends that you are dropped from the Bachelor of Arts in Social Welfare program due to noncompliance with requirements established by the committee. This recommendation has been received and upheld by the Dean for the School of Social Work and Criminal Justice.

The purpose for convening the Professional Standards Committee was to share concerns about your selected Mini-Zine project topic for the TSOCWF 404, Cultural Diversity and Social Justice course, which you took with Dr. Vern Harner in the Spring of 2023.

On April 20, 2023, you indicated that you wanted to focus your 'Zine class assignment on the issue of "trans" people faking transgender identity to gain access to women's prisons and commit sexual assault. As explained in email communications and in-person conversations with several faculty members in the School of Social Work and Criminal Justice, your argument through the class 'Zine assignment posed concerns and presented assertation about a population that is in direct contrast with social work values, ethical principles, and ethical standards as outlined in the National Association of Social Work (NASW) Code of Ethics. The assertion that individuals with transgender identities are feigned so that they may gain access to facilities to sexually assault biological women portrays transgender women as predatory and violent.

The proposed topic raises several concerns regarding the NASW Code of Ethics values, ethical principles, and ethical standards. The concerns include the lack of adherence to the following:

- Value: *Social Justice*
  Ethical Principle: *Social Workers Challenge Social Injustice*
  Ethical Standard 1.05: *Cultural Competence and Social Diversity*
  Social workers are expected to promote social justice and demonstrate cultural competence through an understanding of the diverse backgrounds and experiences of individuals. Social workers are expected to demonstrate awareness and cultural humility by engaging in critical self-reflection, which includes understanding one's own bias and engaging in self-correction when necessary. Accusations against "trans" individuals such as those in your chosen Mini-Zine project topic perpetuate harmful stereotypes and reinforce biases. Your refusal to accept feedback and reflect on the implications of advancing such beliefs demonstrate an unwillingness to engage in reflexive work that is expected of social work students and professionals.

- Value: *Dignity and Worth of Persons*
  Ethical Principle: *Social Workers Respect the Inherent Dignity and Worth of a Person*
  Ethical Standard 1.05: *Cultural Competence and Social Diversity*
  Ethical Standard 6.04: *Social and Political Action*

UWT_000881

Social workers are to treat each person in a respectful manner and remain mindful of individual differences and cultural and ethnic diversity. Social workers are expected to prevent and eliminate domination of, exploitation of, and discrimination against any person, group, or class based on race, ethnicity, national origin, color, sex, sexual orientation, gender identity or expression, age, marital status, political belief, religion, immigration status, or mental or physical ability. It is imperative that social workers reflect and approach discussions involving all individuals, including transgender people with respect for their humanity, rather than perpetuating the notion that transgender people are dishonest about their identity for the purpose of perpetrating harm on others.

Despite several opportunities over a span of six months to demonstrate a willingness and capability to adhere to professional expectations and standards, you remained unwilling to engage in any reflection of the value and ethical concerns presented in your 'Zine assignment. Outlined are the in-person conversations and email communications faculty had with you about concerns with your topic and unwillingness to reflect.

When you first introduced the topic in class on April 20, 2023, Dr. Harner affirmed that although the issue of violence against women in prison is absolutely important and one that could be considered for the project, the specific angle you suggested—that transgender people were "pretending to be trans" to be housed in prisons with women in order to sexually assault them—was not an appropriate topic because it was a harmful narrative to transgender communities and in conflict with social work values, ethical principles, and ethical standards.

During individual student check-ins during class on April 27, 2023, Dr. Harner learned that you had not modified your topic at all, despite earlier instruction. You were again informed that this topic was not appropriate and was not aligned with social work professional values and ethics. When Dr. Harner told you that the conversation would have to continue outside of class because they had additional students to check-in with that day, you told them that you would stop by their office and left the class. You did not stop by Dr. Harner's office to continue the conversation, and Dr. Harner sent you a follow-up email on April 27, 2023 that explained why the chosen topic was not appropriate and shared links to additional resources to review. Included in the links were NASW resources, specifically as they relate to transgender communities.

When conversations did not lead to a reconsideration of your topic and you did not arrange to stop by Dr. Harner's office to discuss the matter further, on April 27, 2023, Dr. Harner submitted a referral to the Professional Standards Committee. On May 1, 2023, you received notification of the pending Professional Standards Committee meeting.

Between May 1, 2023 and May 16, 2023, you engaged in additional conversations with social work faculty regarding the problematic nature of your topic. During your meeting with Dr. Claudia Sellmaier on May 2, 2023, you showed her your 'Zine draft and she explained why it was problematic. On May 11, 2023, you met with your Faculty Advisor, Assistant Teaching Professor Chris Barrans, who gave you feedback on your selected topic as it relates to social work values. In addition, Professor Barrans shared information regarding the Professional Standards Committee process.

The time period between your initial introduction of the 'Zine topic on April 20, 2023 and convening of the Professional Standards Committee meeting on May 16th, three Social Work faculty members engaged in a conversation with you on five separate occasions. Dr. Harner discussed this issue with you twice in class and once via email. Dr. Sellmaier and Professor Barrans discussed the issue with you in two separate meetings. Each interaction included discussions about the problematic nature of your topic choice and ways in which it conflicted with NASW values, ethical principles, and ethical standards.

2

UWT_000882

The first Professional Standards Committee meeting was convened on May 16, 2023. In attendance were committee co-chair, Dr. Andrea Hill, committee member Dr. Claudia Sellmaier, Dr. Vern Harner (referring professor), Ms. Roseann Martinez (your selected student advocate), and yourself. Committee member Professor Rick Butt was unable to attend. The committee gave you an opportunity to speak so they may learn from you directly. The Committee discussed their concerns and explained that your choice of assignment does not align with social work's professional values regarding gender, inclusive of trans individuals. Noting that ethical social work practice requires a self-awareness and willingness to acknowledge and take responsibility for behavior and to practice respectful, professional communication at all times, the committee expressed concerns that multiple conversations with faculty were met an unwillingness to engage in the professional reflective communication expected of social work students. The committee also expressed concerns that in the meeting there was not a willingness to engage in self-reflection nor acknowledge of how the topic potentially perpetrates a harmful narrative about the transgender community.

In the Professional Standards Committee meeting conversation, the committee members explained that you would be given the opportunity to demonstrate professionalism and growth via the completion of two essays. The first essay was to focus on social work profession's responsibilities to transgender individuals and the second was to focus on ethical professional behavior and communication. You were informed that you would receive a formal letter outlining the essay requirements and told that completion would be required for degree progress. When, at the close of the meeting, you were asked if you had any additional questions or concerns, and you indicated that you did not, the meeting ended.

On May 24, 2023, you received a formal letter from the Professional Standards Committee outlining the May 16, 2023 meeting proceedings and detailing the two essays' requirements. This letter included links to all necessary resources and information that would be required to complete the required essays, which were to be submitted no later than October 31, 2023. The purpose of these essays was to give you an opportunity to demonstrate reflexivity, learning, and growth by reflecting on social work's responsibilities to transgender people through:

1) An essay discussing the "Social Work Speaks" discussion of the NASW's stated commitments to trans issues, the issues faced by incarcerated transgender individuals, and your own understandings of this community and
2) An essay discussing the importance of ethical and professional behavior and communication in educational settings and in your own practice and future academic work.

The purpose of the Professional Standards Committee process and required essays was to move forward in a fertile and productive way that deepened your own practice as a social work student and built your understanding of the discipline's ethical standards and commitments.

During the summer of 2023, you emailed the Professional Standards Committee twice more to again question why your selected topic was problematic. This was a question that had been answered multiple times in conversations with Dr. Harner, Dr. Sellmaier, Professor Barrans, and the Professional Standards Committee. Moreover, the questions you posed over the summer were questions that could have been answered by doing the reading intended to assist you with the completion of the first essay requirement. Replies to you over the summer referred you to previous communications and essay requirements as stipulated in the letter you received on May 24, 2023.

On October 31, 2023, you informed the Professional Standards Committee via email that you would not fulfill the requirements established during the May 16, 2023 meeting. Your email did not include any acknowledgement of the concerns raised about your topic selection nor other issues discussed in conversations with social work faculty and the Professional Standards Committee.

3

UWT_000883

The Professional Standards Committee reconvened on November 27, 2023 to discuss your refusal to fulfill the essay requirements. In attendance were committee co-chair Dr. Andrea Hill, committee member Dr. Claudia Sellmaier, committee member Professor Rick Butt, and you. During the meeting, you continued to refuse to reflect on the potential harmful nature of your chosen topic. You adamantly insisted that the problem was never explained to you, despite the many documented conversations that took place during spring 2023. After a nearly 45-minute conversation, the committee informed you that they would deliberate to discuss next steps. You were informed that the committee would be in contact once a recommendation about your status in the program was determined. At the close of the meeting, you were asked if you had additional questions or concerns. You indicated that you did not and the meeting was adjourned.

The decision to recommend a student be dropped from a social work program is not taken lightly and is based on careful and thoughtful consideration. Our commitment to maintaining standards of professional conduct and ethical practice is essential in preparing students for careers in social work. As part of our program, students are expected to demonstrate adherence to social work professional values, ethical principles, and ethical standards that reflect the values and ethics as outline in the NASW Code of Ethics. You were provided a link to the NASW Code of Ethics through the BASW Acceptance and Pre-requisite Form prior to acceptance into the BASW program. You agreed to adhere to the Code as a social work student by your initials on the BASW Acceptance and Pre-requisite Form.

Students graduating from the School of Social Work and Criminal Justice's social welfare program enter a professional field. The ability to articulate and apply social work values, ethics, and standards, engage in professional communication, and perform self-reflection are fundamental requirements and responsibilities in the social work profession. When there are concerns regarding ethical professionalism, students work with the Professional Standards Committee to find a way forward through communication and reflexivity. The process is intended to be non-punitive and a mechanism to give students a chance to learn and grow. Your continued refusal to complete the required essays that would allow you to demonstrate your practice readiness raises serious concerns. Therefore, the Professional Standards Committee concluded that it would be most appropriate to recommend that you are dropped from the Bachelor of Arts in Social Welfare program. The Dean for the School of Social Work has received this recommendation and upholds the decision and has signed this letter in support of the decision.

In making this decision, we consider the impact on your academic and professional future. It is important to note that being dropped from the Bachelor of Arts in Social Welfare major does not preclude you from pursuing other academic paths within the university. We encourage you to schedule a meeting with a university academic advisor to discuss alternative majors or academic options that align with your goals and interests.

Sincerely,

Andrea L. Hill, PhD
Co-Chair, Professional Standards Committee
Associate Teaching Professor
School of Social Work and Criminal Justice

Keva M. Miller, PhD, MSSW
Dean and Professor
School of Social Work and Criminal Justice

cc:    Dr. JaeRan Kim, BASW Program Chair
       Mr. Ryan Kernan, Social Work Program Advisor
       Student file

4

UWT_000884

EXHIBIT 3

EXH−1
Jan 14 2026

 **Outlook**

---

## Re: New PSC Letter Draft

---

**From** Andrea L. Hill <andhill@uw.edu>

**Date** Tue 12/5/2023 11:14 AM

**To** Rick L. Butt <rickbutt@uw.edu>

**Cc** Claudia Sellmaier <sellmaic@uw.edu>

📎 2 attachments (388 KB)

MOST RECENT Letter with Revisions.doc; Screenshot 2023-12-05 at 10.58.16 AM.png;

Hi Rick and Claudia,

I am sending you both the latest draft of the PSC letter before I send it back to Keva...I just accepted all of her changes and didn't really change anything except for one small thing....(In fact, it's ALL her version, except for the things in RED, which are my changes). I just have one thing which I'd appreciate your feedback on:

-- I do have a record that Chris spoke with Claudia regarding her topic (see screenshot of attached email from Chris over the summer), so I went ahead and changed the language in the letter back to the way I had it in the original....

However, I also realize that the nature of this situation is particularly challenging for non-tenure track faculty like Chris (and me) and, MOST importantly, for faculty from marginalized groups backgrounds like Chris---and, given that he seemed to have spoken to Claudia only somewhat briefly regarding the topic, it could be reasonable to not mention it at all....

I honestly hate to drag Chris into this mess, but the fact that he did speak with her about it does strengthen the record that many MANY faculty tried to talk to her about this....

However, we couldn't claim that she REFUSED to talk about it with him the way that Keva has it in her version.... So I guess I'm just asking if it's right to keep it the way that I have it in this newest version?

Any thoughts would be great, I appreciate you both so much!

PS-- Do either of you have a different SSWCJ letterhead that I should use for this? Keva wanted me to delete the header/footer from the original letter, which I did....but I hate the idea of just sending this out on NO official letterhead at all, so I'm not sure if there is some kind of different letterhead that I'm supposed to be using or something. If you know, send it my way--otherwise, I'll check around and see what I can find.

Thanks so much,
Andrea

UWT_000596

On Mon, Dec 4, 2023 at 1:19 PM Andrea L. Hill <andhill@uw.edu> wrote:

Great--thank you both so much for the feedback... I agree with your changes, Claudia, and I made them (changed the citations where needed and added footnotes as well as removed the sentence about the accusations she made during our most recent PSC meeting).

I am going to send this draft to Keva right now and will keep in your comment about adding a sentence regarding the Dean upholding this decision---I feel like this is language Keva should add..... I will CC you both on the email. Thanks again so much for your help!

Best,
Andrea

On Mon, Dec 4, 2023 at 11:10 AM Rick L. Butt <rickbutt@uw.edu> wrote:

Great work Andrea! Very thorough as Claudia stated. It was very clear as to the concerns and reasoning for our recommendation.

I don't have any changes but support the ones mentioned by Claudia.

Thanks

Rick

**From:** Claudia Sellmaier <sellmaic@uw.edu>
**Sent:** Monday, December 4, 2023 10:27 AM
**To:** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: New PSC Letter Draft

Hello Andrea,

Thank you so much for all your work on this. This is a very thorough draft, and I don't have anything substantial to add. I only had some minor edit suggestions and two questions about the wording. Feel free to take it or leave it.
Thank you,
Claudia


Claudia Sellmaier, PhD, MSW, MA

Associate Professor

MSW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Friday, December 1, 2023 5:52 PM

UWT_000597

**To:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: New PSC Letter Draft

Hi Rick and Claudia,

I have another draft for you (not for you over the weekend, PLEASE enjoy your weekend!!--I just wanted to get it done so that I could enjoy MY weekend!)

This one is a LOT longer and hopefully better....lots more explanation of why it was such a problem and more explanation of the PSC process/why it would have been very easy for her to avoid this conclusion.... I included principles from the NASW code of ethics and quotes for that NASW speaks on transgender issues (which she was assigned to read for one of the essays!)--I am hoping that this letter does the job of laying it all out.... If you can get back to me early next week (Monday/Tuesday) with thoughts, I'll send it over to Keva. I have a very big headache now, so I'm calling it quits for the night. Have a good weekend, and thanks again for all of your help!

Thanks,
Andrea

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street

UWT_000598

Tacoma, WA 98402

253-692-4943

UWT_000599

# EXHIBIT 4

 **Outlook**

## Re: Letter

| | |
|---|---|
| **From** | Andrea L. Hill <andhill@uw.edu> |
| **Date** | Tue 12/5/2023 5:20 PM |
| **To** | Rick L. Butt <rickbutt@uw.edu> |
| **Cc** | Keva M. Miller <kevamill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu> |

📎 1 attachment (57 KB)

12.5.23 Letter Draft.doc;

Hi Keva and All,

Thanks so much for your feedback and work on this..... I've implemented all of the suggested changes and updates and have made 2 substantive changes to the latest draft (attached here--the changes are simply in red font, to make it easier...everything else is exactly as was in the last version you sent, Keva).

1) Added an earlier sentence regarding this recommendation having been seen/upheld by the Dean

2) Added the info about Chris' conversation with the student back to the letter.... I have an email from Chris from this summer in which he recalls their May meeting, explaining "*I am Claudia's faculty advisor. I've met with her once and it was about the PSC referral before the meeting. It didn't go very well. She was combative and spent most of the time trying to convince me of the validity of her topic and argue her points. I tried to engage in a constructive conversation and provide feedback, but I don't think any of my attempts landed with her. Finally, I had to shut that part of the conversation down especially once it started to feel personal. We transitioned to me giving context for the PSC process and my recommendations about how to prepare and approach the meeting, but she wasn't very open to my feedback.*"

--As much as I am VERY hesitant to drag Chris given his postition has a contingent faculty member from an underrepresented group that's specifically being questioned/focused on in relation to this general student issue, because I <u>do</u> have that email, it is evidence that even more of these conversations did happen....(Unless you know something different, Keva...if so, please feel free to let me/us know). And it's also a record that it might not be entirely accurate to say that they never discussed this at all/that she refused to discuss the topic. Again, unless the conversation was different than the email record I have.... Given the information that I have, I decided to change the language regarding conversations regarding to the original.

Finally, I did delete the headers and the footers from the draft---they were actually the SSWCJ letterhead....I do think this has to be sent on SSWCJ letterhead, right? I don't really feel comfortable sending it with my name/signature otherwise, so I'm not sure if there's some other letterhead or something I should be using...

UWT_000589

Thanks for all the work and feedback, everyone--as soon as I hear this is good to go, I will see about sending an email copy as well as a mail copy.

Best,
Andrea


On Tue, Dec 5, 2023 at 11:11 AM Rick L. Butt <rickbutt@uw.edu> wrote:

> This seems good to me. I don't have any changes. Great work everyone.
>
> Rick
>
> ---
>
> **From:** Keva M. Miller <kevamill@uw.edu>
> **Sent:** Monday, December 4, 2023 5:46 PM
> **To:** Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
> **Subject:** Re: Letter
>
> Hi Andrea, Claudia, and Rick,
>
> Please review the attached draft with my recommended edits. Please turn on "all markup" to see my edits. I am happy to continue to review additional drafts/recommendations and want to review one last time before the final is sent on Friday.
>
> Thank you all,
> Keva
>
> **KEVA M. MILLER, Ph.D., M.S.S.W**
> Dean & Professor
> School of Social Work & Criminal Justice
>
> University of Washington Tacoma
> 1900 Commerce Street
> Tacoma, WA 98402-3100
> Phone: 253.692.5820 Fax: 253.692.5825
>
> www.tacoma.uw.edu/uwt/swcj

W UNIVERSITY *of* WASHINGTON | TACOMA

UWT_000590

**From:** Keva M. Miller <kevamill@uw.edu>
**Sent:** Monday, December 4, 2023 4:56 PM
**To:** Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Letter

Hi all,

I am still working on the letter and will continue to work on it tomorrow. In addition, the letter needs to go out on Friday. There are a few timing factors I need to consider. Happy to discuss later.

Thank you,
Keva


**KEVA M. MILLER, Ph.D., M.S.S.W**
Dean & Professor
School of Social Work & Criminal Justice

University of Washington Tacoma
1900 Commerce Street
Tacoma, WA 98402-3100
Phone: 253.692.5820 Fax: 253.692.5825

www.tacoma.uw.edu/uwt/swcj



---

**From:** Keva M. Miller <kevamill@uw.edu>
**Sent:** Monday, December 4, 2023 1:44 PM
**To:** Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Letter

Hi Andrea, Claudia, and Rick,

Please note that I am communicating in a separate thread. The letter looks very good. I plan to delete some of the language that suggests any hint of the political arguments or stances. The letter will need to simply focus on how the student refused to do any reflection on how their stance could be potentially harmful.

I will make some recommendations in the draft and return the letter to you shortly.

UWT_000591

7/9/25, 1:55 PM
Case 3:25-cv-05079-DGE
Document 105
Ret Letter - Rick Butt Outlook
Filed 03/17/26
Page 23 of 446

Thank you,
Keva


**KEVA M. MILLER, Ph.D., M.S.S.W**

Dean & Professor

School of Social Work & Criminal Justice


University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825


www.tacoma.uw.edu/uwt/swcj




--

**Andrea L. Hill, PhD**

Associate Teaching Professor

School of Social Work and Criminal Justice

University of Washington Tacoma

Box 358425

1900 Commerce Street

Tacoma, WA 98402

253-692-4943

UWT_000592

EXHIBIT 5

EXH-4
Jan 14 2026

Attorney Client

█████████████████████████████████

---------- Forwarded message ---------
From: **Keva M. Miller** <kevamill@uw.edu>
Date: Thu, Nov 30, 2023 at 9:49 AM
Subject: Sample Letters
To: Andrea L. Hill <andhill@uw.edu>, Claudia Sellmaier <sellmaic@uw.edu>, Rick L. Butt <rickbutt@uw.edu>


Good morning Andrea, Claudia, and Rick,

My apologies for the delay but I had to find the attached letters on an old computer at home.

As a follow-up from yesterday morning's discussion, attached are examples of performance review (professional standards) and appeal letters. There is one document that is simply a timeline addendum. You will notice that some letters are very detailed. In particular, my appeal letter is long due to the student's inability to take accountability and muddy conversations and timelines. Does that sound familiar? Though I don't expect our letter to be as detailed, we do need to support our actions and final decision.

Do not hesitate to reach out if you have questions or need further assistance.

Thank you,

Keva

**KEVA M. MILLER, Ph.D., M.S.S.W**

Dean & Professor

School of Social Work & Criminal Justice

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825


www.tacoma.uw.edu/uwt/swcj

**W UNIVERSITY of WASHINGTON | TACOMA**

**CONFIDENTIAL**

Hill_000194

--
**Andrea L. Hill, PhD**

Associate Teaching Professor

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

**CONFIDENTIAL**

EXHIBIT 6

| From: | Dr. Sheila E Lange <sredward@uw.edu> |
|---|---|
| Sent: | Tuesday, July 8, 2025 1:08 PM PDT |
| To: | Seth Berntsen <sethb@SummitLaw.com> |
| Subject: | FW: Claudia Arias BASW UW Tacoma |



Attorney Client

**From:** Keva M. Miller <kevamill@uw.edu>
**Sent:** Monday, November 20, 2023 2:58 PM
**To:** Dr. Sheila E Lange <sredward@uw.edu>
**Subject:** Re: Claudia Arias BASW UW Tacoma

It is going through our internal Professional Standards Committee process. We have consulted with Surtida. I am happy to discuss but the committee, professor, chair, and I have asked the student to reflect on very concerning beliefs that go against the National Association for Social Work (NASW) Code of Ethics and Council on Social Work Education (CSWE) compentency standards.

In the meantime, I will forward the total picture. What Claudia Rudoph sent was the student's version of events. I can't tell you how many times this has come to my attention. I have serious concerns about the student's ability to reflect and practice social work.

Keva

**KEVA M. MILLER, Ph.D., M.S.S.W**
Dean & Professor
School of Social Work & Criminal Justice

UWT_000761

University of Washington Tacoma
1900 Commerce Street

Tacoma, WA 98402-3100
Phone: 253.692.5820 Fax: 253.692.5825

www.tacoma.uw.edu/uwt/swcj



---

**From:** Dr. Sheila E Lange <sredward@uw.edu>
**Sent:** Monday, November 20, 2023 2:48 PM
**To:** Keva M. Miller <kevamill@uw.edu>; atharris <atharris@uw.edu>
**Subject:** FW: Claudia Arias BASW UW Tacoma

Keva

I had lunch with Catherine Rudolph from the Pierce county executive office today.   She brought this case up and asked that I look into it.  Is it going through the student conduct process?


*Dr. Sheila Edwards Lange (she/her)*
*Chancellor*
*University of Washington Tacoma*
*GWP 312 Box 358430*
*1900 Commerce Street*
*Tacoma, WA  98402*
*(253) 692-5646*



**TOGETHER WE WILL**

---

**From:** Catherine Rudolph <catrudolph@icloud.com>
**Sent:** Monday, November 20, 2023 2:40 PM

**To:** Dr. Sheila E Lange <sredward@uw.edu>
**Subject:** Fwd: Claudia Arias BASW UW Tacoma

**This Message Is From an Untrusted Sender**
You have not previously corresponded with this sender.
See https://itconnect.uw.edu/email-tags for additional information. Please contact the UW-IT Service Center, help@uw.edu 206.221.5000, for assistance.

Per our conversation.

Sent from my iPhone

Begin forwarded message:

**From:** Gabriel Sachwitz <gabrielsachwitz@gmail.com>
**Date:** November 1, 2023 at 8:55:25 PM PDT
**To:** Catherine Rudolph <catrudolph@icloud.com>
**Subject: Claudia Arias BASW UW Tacoma**

Attached are the questions we have emailed to everyone involved. None of the questions have been answered.

Below are the details of what has happened, and the first email sent to the dean of BASW (Keva M. Miller), minus the dean's response and yesterday's email with a follow up response.

.................................................................................................

On Thursday April 27, 2023 at about 11:30 am, I brought into class a (Draft mini-zine) assignment for review and feedback. Professor Harner reviewed the assignment and said you have to write about a community response. Next, I was shown examples on powerpoint slides projected to the class.

I responded to Professor Harner, "I am confused, I don't understand how this is not a community response, this is a social justice issue, it's something that is happening to

UWT_000763

women in prison". I then repeated, "I don't understand, I'm confused as to what I'm doing wrong"

Professor Harner, rapidly stood up, with a flared arm and in a loud tone said "This is targeting transgender" and quickly backed into the desk/podium. Another student asked for help, and Professor Harner said "not right now, give me a minute".

I gathered my belongings and left the classroom to go to my 1:00 pm class. On the way to my other class, I remembered I had an assignment to turn into Prof Harner and walked back to the class. I then asked Professor Harner if I could have my Draft Zine reviewed later that day. Professor Harner said, "I am unavailable for additional meetings this afternoon." I then asked if I could schedule a feedback for the following Tuesday, and was told by Professor Harner, "I am not sure right now".

On Thursday April 27, 2023 at 2:37, I read an email from Professor Harner, which advised me to contact Dr. Sellmaier or Chris Barrans if I had any more questions or concerns. Professor Harner, hastily accused me of "being harmful and not aligning with social work values & ethics" in that email.

On Monday, May 1, 2023 at 11:23 am, I sent an email to Dr. Sellmaier asking to meet. A meeting was set for May 2, 2023 at 12:30 pm right before my next class.

On that same Monday, May 1, 2023 at 11:59 am, I received an email from Mrs. Andrea Hill, PhD re: Professional Standards Committee- Your Attendance Required.

On May 2, 2023 at 12:30 pm. I sat with Dr. Claudia Sellmeir. At the beginning of this meeting she informed me that she spoke with Professor Harner, and was already aware of the situation. As I talked about the "Draft zine", I attempted to explain to her that I did not understand why I was being sent to the PSC since I did not have an opportunity to review this with Professor Harner.

Dr. Sellmeir then accused me of being transphobic and disregarded anything I was trying to tell her. When I presented the PSC standards/policy to her, the response

was that the document was basically irrelevant, stating "Don't follow what's on here". I asked her to put the correct information for me in writing, but she disregarded my request and said, "It is not the end of the world". During the meeting Dr. Sellmaier continuously patronized me and suppressed my speech by telling me what I had to say. Lastly, I asked Dr. Sellmaier how do other students and myself file a grievance, and with a snarky remark she tilted her head and said, "With me. Or the dean".

On Monday, May 15, at approximately 9 am, I met with Roseanne Martinez (Student Advocate).

I explained the situation, during the conversation she responded with "when you go to the zoom meeting you have to make sure to be humble, and apologetic because the one's attending the meeting all have PhD's and they have the power". Also, she continuously patronized me and suppressed my speech by telling me how to speak and what to say.

The meeting was scheduled for Tuesday May 16, 2023 @ 12:20 pm.

Zoom meeting took place with the following:

Andrea L. Hill, Phd

Dr. Claudia Sellmaier, PhD

Professor Vern Harner, PhD

Rick (unknown) Did not show to meeting

Roseanne Martinez (Student Advocate)

Claudia Arias (myself)

At the beginning of the meeting, I requested that the zoom meeting be recorded. Dr. Hill denied my request. Dr. Hill then made the statement that the topic was extremely transphobic without having seen the "Draft Zine"

Professor Harner spoke first and claimed that the topic was not aligned with social work values. Professor Harner never stated how my assignment did not align with social work values.

I informed everyone in the zoom meeting that I was not given an opportunity to resolve the issue with Professor Harner before being referred to the PSC. I also informed them that according to the University of Washington Tacoma's Social Work and Criminal Justice Professional Standards Committee, "Those individuals who are directly involved should make a concerted effort to resolve the concern prior to a referral to the PSC". As noted above, I was not given the right or the opportunity to speak to anyone about my "Draft Zine" prior to immediately being sent to the PSC.

I also expressed to them that my ability to learn is being shut down, and that I don't understand what it is that I have done wrong. Then, Dr. Hill began to patronize me, and directed me to speak a certain way.

The attendees left into a private chat room for approximately ten minutes, and upon return, informed me that I was transphobic and not aligning with social work values or justice. Dr. Sellmaier stated that I needed to be reflective of my actions and behavior and that I should correct it.

On May 25, 2023, @4:21 I received a response for "requirements moving forward". I did not agree with the decision, and had several questions that continued to be dismissed. All faculty members involved avoided answering the questions, and were evasive and condescending with their responses.

I feel that my voice is not being heard. I feel that I am being targeted as a First Gen Hispanic Student. I feel that I was belittled as a student and as a human being. I am a productive member of my community, as a volunteer Rescue Firefighter. This type of treatment to any student should be unacceptable. I will continue to advocate for myself or anyone of the other students who were also being intimidated, coerced, or bullied during Professor Harner's class.

I believe this could have been handled differently and professionally by the Professor and the faculty members involved. I feel that Professor Harner was vindictive in grading the new assignment, and I felt that I was being cornered and coerced into admitting wrong doing for something I didn't do.

UWT_000766

Attached are the following unanswered questions in a word doc and PSC letter for your review. Please let me know if you would like me to forward all emails to you. Thank you.

UWT_000767

EXHIBIT 7

 **Outlook**

---

### Re: follow-up

---

**From** Colette Hellenkamp <chellenkamp@consejocounseling.org>

**Date** Mon 11/20/2023 7:22 PM

**To** Nancy Kuhuski <nkuhuski@uw.edu>

Thank you very much, Nancy.

In gratitude,
Colette

**Colette Hellenkamp, MSW, MHP, LSWAIC** (she/her/ella)
**Mental Health Therapist**
**Consejo Counseling & Referral Service**
**C** 253.290.7714 | **P** 253.414.7461 x 1803
**F** 253.627.8387 <u>chellenkamp@consejocounseling.org</u>
5915 Orchard St. W.
Tacoma, WA 98467
**www.consejocounseling.org**

This email and its attachments may contain privileged and confidential information and/or protected health information (PHI) intended solely for the use of Consejo Counseling & Referral Service and the recipient(s) named above. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing or copying of this email message and/or any attachments is strictly prohibited.  If you have received this transmission in error, please notify the sender immediately at 253-290-7714 and permanently delete this email and any attachments.

> On Nov 20, 2023, at 4:28 PM, Nancy Kuhuski <nkuhuski@uw.edu> wrote:
>
> This email originated from outside your organization.
> Hi Colette,
>
> Thank you for reaching out. It was wonderful to meet you in person.
>
> This is indeed a very sensitive and complex situation and I too hope it will have a positive resolve.
>
> I will follow up with you after we hear next steps following the meeting Claudia spoke of. However, please do not hesitate to reach out if you have questions or concerns prior to that.
>
> Thank you again,
> Nancy

UWT_002523

**Nancy Kuhuski, MSW (She/her)**
**Assistant Teaching Professor & Field Education Faculty**
**School of Social Work & Criminal Justice**
**University of Washington Tacoma**
**Phone: 253-692.4891**
**Office: WCG-116E**
**STAR access:** http://star.ssw.washington.edu
<image006.png>

---

**From:** Colette Hellenkamp <chellenkamp@consejocounseling.org>
**Sent:** Friday, November 17, 2023 5:37 PM
**To:** Nancy Kuhuski <nkuhuski@uw.edu>
**Subject:** follow-up
**Importance:** High

Hi Nancy,

I just wanted to reiterate that it was a pleasure meeting you today.

I also wanted to thank you for being a safe person for Claudia.

I am obviously new to the situation that was discussed today, as it seems you may be too. But for what it's worth - I just wanted to express that I hope this situation can be resolved in a *restorative* way and seen as an opportunity for learning and growth for all involved. I can only begin to imagine how sensitive of a situation this is, and I am sure I do not have the whole story. But I do feel it would be quite an unfortunate and missed [valuable] opportunity for all involved to dig in and do the hard work - modeling curiosity, understanding, humility (from all parts involved), healing, vulnerability, active and compassionate listening, and respecting all people's inherent worth.

Claudia is a hugely valuable asset to our community (and all those she may some day support through her social work), and it would be a loss to all - not to mention a blow to her - if this story ended like this. I have the stark impression that there is still a great lack of understanding about why this was even a problem to begin with - yet I also sense a sincere desire to understand.

Anyway...all that to say, I hope something can be done (someone can be spoken with?) to help resolve this situation in a healing, restorative way - in which this learning opportunity is not missed, and people are given the chance to repair harm that has been done.

Thank you so much for your presence. Your warm, smiling eyes are a gift. I can tell you're amazing at what you do. ☺

Have a great weekend,
Colette

**Colette Hellenkamp, MSW, MHP, LSWAIC** (she/her/ella) more on pronouns here
**Mental Health Therapist**
**Consejo Counseling & Referral Service**

UWT_002524

**C** 253.290.7714 | **F** 253.627.8387
chellenkamp@consejocounseling.org
5915 Orchard St. W.
Tacoma, WA 98467
**www.consejocounseling.org**

cid:image002.png@01D75785.A3918990

<image001.png>
<image002.png>
<image003.png>
<image004.png>
<image005.png>

This email and its attachments may contain privileged and confidential information and/or protected health information (PHI) intended solely for the use of Consejo Counseling & Referral Service and the recipient(s) named above. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing or copying of this email message and/or any attachments is strictly prohibited.  If you have received this transmission in error, please notify the sender immediately at 253-290-7714 and permanently delete this email and any attachments.

UWT_002525

 **Outlook**

## PSC

**From** Nancy Kuhuski <nkuhuski@uw.edu>

**Date** Tue 11/21/2023 5:26 PM

**To**   Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>

**Cc**   JaeRan Kim <kimjr@uw.edu>

Hello Professional Standards Committee Members (& JaeRan as Dept. Chair),

I am reaching out about Claudia Arias. I currently have her in practicum.

As I missed that last section meeting and student of concern information is not listed in the notes for our meetings, I just on Fri. became aware of where the PSC process is and hearing that the student has not complied with what the committee has asked of her. From what I understand in the section meeting there was some discussion and an ask for ideas.

This ship may have already sailed, and if that is the case that is fine. However, if you are still looking for ideas, I wanted to let you know that I would be willing to lean in with this student around a couple of specific identified areas of needed growth – Competency 1 & 2, professionalism & ethical behavior, and diversity & difference in practice – as well as understanding bias.

I don't know that I have anything special to offer, other than I do sit in a position of being largely unaware of what has or has not happened and what this process has been, and I do know that I have the respect of this student which puts me in a unique place to speak into her learning and come alongside helping her to grow. 10+ years of supervising teams of social workers has also given me a lot of practice at coming alongside and mentoring up or mentoring out.

I have no desire to get in the middle of what has transpired with my colleague that I respect, nor in any way infer that this committee has not worked very hard to bring this to resolve,  but as this students field faculty, I am very invested in her growth and helping her connect dots. From the conversation I had with her last Fri. at her practicum site visit, I don't believe she is connecting the dots.

All this to say, if I can be of help in some way, please reach out.

Thanks,
Nancy

Nancy Kuhuski, MSW (She/her)
Assistant Teaching Professor & Field Education Faculty
School of Social Work & Criminal Justice
University of Washington Tacoma
Phone: 253-692-4891
Office: WCG-116E
STAR access: http://star.ssw.washington.edu
UNIVERSITY of WASHINGTON | TACOMA

UWT_002491

Case 3:25-cv-05079-DGE        Document 105      Filed 03/17/26      Page 40 of 446

Sent from Mail for Windows

UWT_002492

EXHIBIT 8

 **Outlook**

---

**Re: Professional Standards Committee - FYI Fw: TSOCWF 405 & DEI Lecture 11/9**

**From** Andrea L. Hill <andhill@uw.edu>
**Date** Wed 11/15/2023 3:11 PM
**To** JaeRan Kim <kimjr@uw.edu>
**Cc** Claudia Sellmaier <sellmaic@uw.edu>

Thanks for this, JaeRan....the process is still ongoing and we're actually going to be meeting with Claudia again on 11/27, followed by a meeting with Keva to discuss everything on 11/29, so all of this info is helpful.... Greatly appreciated!

Thanks,
Andrea

On Wed, Nov 15, 2023 at 12:51 PM JaeRan Kim <kimjr@uw.edu> wrote:
Hi Andrea and Claudia,

I'm not sure where things stand right now with Claudia Arias, but I thought I would pass this on from Megan. As of the last discussion we had about this student, Megan had said she was watching for anything that might come up in class and as of early November there was nothing to give her concern. I don't know if this is helpful for the next steps, but I did want to keep you both informed. Let me know how I can be helpful.

Best,


JaeRan Kim (she/her)
Associate Professor
BASW Program Chair, Social Work Division Chair
School of Social Work and Criminal Justice, University of Washington Tacoma
Box 358425, 1900 Commerce Street, Tacoma, WA 98402-3100
Office: WCG 223E    Phone: 253.692.5623
Schedule an appointment: https://calendly.com/kimjr


*I write to record what others erase when I speak, to re-write the stories others have miswritten about me, about you. - Gloria Anzaldúa*

All of us at UW Tacoma learn, live, and work on the traditional lands of the Puyallup Tribe. I acknowledge the histories of genocide, dispossession, and forced removal of indigenous peoples. Land acknowledgments and statements are only one small part of taking responsibility, therefore I invite you to join me in my commitment to actively supporting and working for justice for indigenous people.

---

**From:** Megan N Toothaker <megant03@uw.edu>
**Sent:** Monday, November 13, 2023 9:13 PM
**To:** JaeRan Kim <kimjr@uw.edu>
**Subject:** TSOCWF 405 & DEI Lecture 11/9

UWT_000381

Hi JaeRan,

I hope this finds you well.

As I mentioned in our last SSW meeting, I had Hermenia and former CWTAP member, Keli Drake, guest lecture last Thursday in TSOCWF 405. The lecture was around privilege and oppression and focused primarily on racial inequities but discussed gender dynamics also. Student, Claudia Arias, was in attendance and at the time, I felt the guest lecture and class participation were appropriate.

However, upon leaving and without knowing her by name or being aware of the situation, Hermenia inquired about Claudia. She let me know that Claudia had an angry face and crossed arms the entire guest lecture, which unfortunately wasn't in my view during that time. When I pivoted to instructing on cultural humility after the guest lecture, I noticed that Claudia had her laptop out and I believe it was out during the guest lecture but I would need to check with Hermenia. It's not common for Claudia to have her laptop out so while I hesitate to suggest this, I am concerned that with everything there could have been recordings happening. Claudia left shortly after the guest lecture, which I believe was unrelated as she has had family emergencies lately, but I am unsure.

I spoke with a few folks and they suggested providing you this information just in case anything arises. Please let me know if there is any other information you need from me regarding this.

Thanks,

**Megan Toothaker, MSW**

She/Her/Hers

Assistant Teaching Professor & Field Faculty

School of Social Work and Criminal Justice

Phone: 253-692-4703

Email: Megant03@uw.edu

Office: WCG 116D

**STAR access:** http://star.ssw.washington.edu

**W** UNIVERSITY *of* WASHINGTON   TACOMA

UWT_000382

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000383

EXHIBIT 9

Case 3:25-cv-05079-DGE   Document 105   Filed 03/17/26   Page 46 of 446

 **Outlook**

---

## Re: Convening a PSC Meeting for Arias

---

**From** Andrea L. Hill <andhill@uw.edu>

**Date** Fri 11/3/2023 1:33 PM

**To**  Claudia Sellmaier <sellmaic@uw.edu>

**Cc**  Rick L. Butt <rickbutt@uw.edu>

Hi Claudia and Rick,

OK, I've made a PSC meeting for us for Monday, November 6th at 12:30--see below for a link to the Zoom meeting for Monday.... I will send out a Google Calendar invite right after this as well.

Because I have a feeling it is going to be very challenging to get a meeting with Claudia scheduled, I went ahead and made us another Doodle poll---this has as many meeting options as I was able to provide for the next few weeks. I'm hoping that we can settle on a few options to provide for her so that she can select something and we can get the process underway....Whenever you get a chance, I'd appreciate it if you could fill out this new Doodle poll...

Thanks so much!

Andrea


Andrea L. Hill is inviting you to a scheduled Zoom meeting.

Topic: Professional Standards Committee Meeting
Time: Nov 6, 2023 12:30 PM Pacific Time (US and Canada)

Join Zoom Meeting
https://washington.zoom.us/j/96596025105

Meeting ID: 965 9602 5105

---

One tap mobile
+12532158782,,96596025105# US (Tacoma)
+12063379723,,96596025105# US (Seattle)

---

Dial by your location
• +1 253 215 8782 US (Tacoma)
• +1 206 337 9723 US (Seattle)

UWT_000528

- +1 346 248 7799 US (Houston)
- +1 602 753 0140 US (Phoenix)
- +1 669 219 2599 US (San Jose)
- +1 669 900 6833 US (San Jose)
- +1 720 928 9299 US (Denver)
- +1 971 247 1195 US (Portland)
- +1 213 338 8477 US (Los Angeles)
- +1 646 876 9923 US (New York)
- +1 651 372 8299 US (Minnesota)
- +1 786 635 1003 US (Miami)
- +1 267 831 0333 US (Philadelphia)
- +1 301 715 8592 US (Washington DC)
- +1 312 626 6799 US (Chicago)
- +1 470 250 9358 US (Atlanta)
- +1 470 381 2552 US (Atlanta)
- +1 646 518 9805 US (New York)

Meeting ID: 965 9602 5105

Find your local number: https://washington.zoom.us/u/a3jVDNVN

---

Join by SIP
- 96596025105@zoomcrc.com

---

Join by H.323
- 162.255.37.11 (US West)
- 162.255.36.11 (US East)
- 221.122.88.195 (China)
- 115.114.131.7 (India Mumbai)
- 115.114.115.7 (India Hyderabad)
- 213.19.144.110 (Amsterdam Netherlands)
- 213.244.140.110 (Germany)
- 103.122.166.55 (Australia Sydney)
- 103.122.167.55 (Australia Melbourne)
- 209.9.211.110 (Hong Kong SAR)
- 64.211.144.160 (Brazil)
- 69.174.57.160 (Canada Toronto)
- 65.39.152.160 (Canada Vancouver)
- 207.226.132.110 (Japan Tokyo)
- 149.137.24.110 (Japan Osaka)

Meeting ID: 965 9602 5105

On Fri, Nov 3, 2023 at 10:48 AM Andrea L. Hill <andhill@uw.edu> wrote:

UWT_000529

Good point, Claudia, I wasn't sure that we would be scheduling with Claudia at all because I wasn't sure what the PSC could/couldn't recommend, but I just re-read the PSC document, and you're right.... we will ultimately have to schedule with her no matter what, so it does make sense for the 3 of us to meet sooner--- Let's do 11/6 from 12:30-1:30..... I will make an invitation/send around a Zoom link after I teach my class today. Thanks for bringing that to my attention!

Andrea

On Fri, Nov 3, 2023 at 10:38 AM Claudia Sellmaier <[sellmaic@uw.edu](mailto:sellmaic@uw.edu)> wrote:

> Hi Andrea,
>
> One quick question, will this next meeting include Claudia? I was wondering if it would make sense for the three of us to meet briefly and discuss options. Maybe we would do that this Monday 11-06, since all of us seemed to have time then? I am also ok with either 11-13 or 11-14., earlier is maybe better?
> Claudia
>
>
> Claudia Sellmaier, PhD, MSW, MA
> Associate Professor
> MSW Program Chair
> Pronouns: She/her/hers
> University of Washington, Tacoma
> School of Social Work & Criminal Justice
> 1900 Commerce St. Box 358425
> Tacoma, WA 98402
>
> ---
>
> **From:** Andrea L. Hill <[andhill@uw.edu](mailto:andhill@uw.edu)>
> **Sent:** Friday, November 3, 2023 10:26 AM
> **To:** Rick L. Butt <[rickbutt@uw.edu](mailto:rickbutt@uw.edu)>
> **Cc:** Claudia Sellmaier <[sellmaic@uw.edu](mailto:sellmaic@uw.edu)>
> **Subject:** Re: Convening a PSC Meeting for Arias
>
> I think that's a good idea, Claudia, and I agree with you both that the info would be helpful. Given how difficult it is to coordinate schedules, though, because we did find a time that worked for all 3 of us, it's probably a good idea for us to hold it on our calendars.
>
> It looks like 2:30-3:30 on Monday, 11/13 is the best time for us. I know that is right before the SSWCJ open house, so the 2nd option that works is Tuesday, 11/14, 12:30-1:30. I'm OK with either.... Maybe after your SW meeting today, you can email and let me know your thoughts and we can decide on which day is best?
>
> Thanks so much for making a not-easy-at-all process as easy as it can be, guys, I really appreciate it!!
>
> Andrea
>
> On Fri, Nov 3, 2023 at 10:09 AM Rick L. Butt <[rickbutt@uw.edu](mailto:rickbutt@uw.edu)> wrote:
>
> > I think having that information would be helpful.
> >
> > Rick

UWT_000530

On Nov 3, 2023 10:55 AM, Claudia Sellmaier <sellmaic@uw.edu> wrote:
Thank you, Andrea, for organizing everything. If it's ok with everyone, I was thinking to check with faculty today at our degree meeting how Claudia is doing this quarter? She has started practicum and I thought it might be good information for us knowing how she's doing there. But I can hold off if you'd prefer that.
Claudia


Claudia Sellmaier, PhD, MSW, MA

Associate Professor

MSW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, November 2, 2023 5:20 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Convening a PSC Meeting for Arias

Hi Folks,
Well, no matter what is gonna happen, I guess we do need to convene a PSC meeting to discuss and figure out what to do…. I haven't emailed Claudia yet to tell her that we'd be convening a meeting because I wanted to wait until we got something on the calendar, so I guess it's for us to do a (sigh) Doodle Poll!

I've just made a Doodle Poll for us for the next two weeks based on my calendar at the moment---hopefully something here will work…. if none of these times/dates work, please just reply to me with days/times that are better for you and I can move things around on my schedule and we can figure something out. Looking forward to a resolution and some closure!


Doodle Poll Link: https://doodle.com/meeting/participate/id/aAmoKg1a

Thanks,
Andrea


--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000531

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000532

# EXHIBIT 10

EXH-12
Oct 10 2025

| | |
|---|---|
| **From:** | Claudia Sellmaier |
| **Sent:** | Friday, November 3, 2023 9:54 AM PDT |
| **To:** | Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu> |
| **Subject:** | Re: Convening a PSC Meeting for Arias |

Thank you, Andrea, for organizing everything. If it's ok with everyone, I was thinking to check with faculty today at our degree meeting how Claudia is doing this quarter? She has started practicum and I thought it might be good information for us knowing how she's doing there. But I can hold off if you'd prefer that.

Claudia

Claudia Sellmaier, PhD, MSW, MA
Associate Professor
MSW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, November 2, 2023 5:20 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Convening a PSC Meeting for Arias

Hi Folks,

Well, no matter what is gonna happen, I guess we do need to convene a PSC meeting to discuss and figure out what to do.... I haven't emailed Claudia yet to tell her that we'd be convening a meeting because I wanted to wait until we got something on the calendar, so I guess it's for us to do a (sigh) Doodle Poll!

I've just made a [Doodle Poll](https://doodle.com/meeting/participate/id/aAmoKg1a) for us for the next two weeks based on my calendar at the moment---hopefully something here will work.... if none of these times/dates work, please just reply to me with days/times that are better for you and I can move things around on my schedule and we can figure something out. Looking forward to a resolution and some closure!

Doodle Poll Link: https://doodle.com/meeting/participate/id/aAmoKg1a

Thanks,
Andrea

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

EXHIBIT 11

| | |
|---|---|
| **From:** | SSWCJ Dean |
| **Sent:** | Thursday, November 2, 2023 11:30 AM PDT |
| **To:** | Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu> |
| **CC:** | Rick L. Butt <rickbutt@uw.edu> |
| **Subject:** | Re: Claudia Arias 2225570 |

Hi Andrea,

Thank you for taking this on as the former chair. I am stepping into a meeting so my response will be brief. I would like to meet and discuss this with Surtida though I do not think it is necessary to vet it through the university. If there is any push back, I will be sure to explain that social work programs (maybe CJ) must have a mechaniism for removing students who present with unethical behavior(s) or values. As an accredited program we have no choice. I have discussed this with the other deans from professional schools. They clearly have a process for dismissal as they too must adhere to ethical standards determined by the profession.

I will email you in a bit so we can coordinate a meeting if deemed necessary. I will be discussing this further with the leadership team so all are clear about our responsibilities as a professional program.

Thank you,

Keva

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, November 2, 2023 8:49 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Cc:** SSWCJ Dean <sswcjdean@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Hi Everyone,

Thank you so much, Keva, for your guidance here and for your response to Claudia (student). The clarity of your explanation to her is both instructive and incredibly effective, and so very greatly appreciated.

As to the question regarding the extent of the PSC's power, I am unsure....Keva, you're completely right that the PSC document is VERY clear that the committee definitely has the power to recommend dismissal if it chooses to do so.

However, in working with Randy to alter our CJ admissions requirements this year, I've also been told that the PSC has essentially no 'enforcement' power of any kind (as such, we are altering some of our language in the CJ admissions documents), so I'm somewhat confused.

**IDEA:** *Shall I share the PSC document with Surdita Shelton in the Office of Student Conduct and Academic Integrity and ask her if we do, indeed, have the power to make the recommendation?* I know this document is internal to our program, but it would be good to know if it's aligned with university policy...I just want to be sure that it's OK to share it. If you could maybe just share your thoughts on this Keva, that would be great (and then we can take you off of this email chain if you want, as I know you have a lot going on and don't need to be on every part of this!!)

I know that I'm not technically on the PSC this year, but given this issue is arising from the student case from last year, I feel it's my responsibility to try and see it through to completion as much as possible, including figuring out the PSC power issue.

UWT_001387

Thanks everyone, for working on this---bureaucratic confusion and complex students are always easier to manage collaboratively!
Andrea

On Wed, Nov 1, 2023 at 4:03 PM Claudia Sellmaier <sellmaic@uw.edu> wrote:
Hello everyone,
I did not see earlier emails so maybe this question has already been answered, but as a committee member I am not sure what our options for next steps/outcomes are. In previous cases, students followed the committee's recommendations, or they left the program. I am not aware of a mechanism for us as school to dismiss an undergraduate student (we have different mechanisms for graduate students). The process for dismissal would follow a student conduct report, which would be investigated by the student conduct officer. I am not sure this incident is sufficient from the perspective of student conduct. It is my understanding that the student passed the class and is in practicum already. Long story short, I am unclear what tools/authority we as PSC have to hold the student accountable if they don't voluntarily participate. Any input or advise would be appreciated.
Thank you,
Claudia
Claudia Sellmaier, PhD, MSW, MA
Associate Professor
MSW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402
**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Wednesday, November 1, 2023 3:29 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Hi Andrea,
The next step is for you to notify the student that the PSC will convene a meeting to determine an outcome. I encourage the committee to meet within the next couple of weeks.
I will provide a brief response to the student in the next hour or two. The email will:

1. acknowledge receipt,
2. continue to redirect her to seek assistance through the UWT's bias incident reporting or grievance processes, and
3. explain that her NASW reference pertains to school social workers (k-12), not Schools of Social Work.

Please let me know if you have questions.
Thank you,
Keva
**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

UWT_001388

University of Washington Tacoma

Adjunct Professor

School of Social Work

University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

www.tacoma.uw.edu/uwt/swcj

**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Tuesday, October 31, 2023 2:46:03 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Thank you, Andrea. I'll be in contact soon.
**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

University of Washington Tacoma

Adjunct Professor

School of Social Work

University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

www.tacoma.uw.edu/uwt/swcj

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Tuesday, October 31, 2023 2:37:49 PM
**To:** SSWCJ Dean <sswcjdean@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

UWT_001389

Thank you for the guidance, Keva, it's GREATLY appreciated! I have included 3 attachments here---the original Professional Standards Committee letter to Claudia Arias from May (this has all of the language regarding the essays/instructions) and, in case it's helpful, two PDF's of emails sent to her in response to her questioning regarding the process over the summer.... If I can share any additional information or context, please let me know.

And, because you're now just being added to this conversation, Rick and Claudia, I believe that you'll quite quickly be brought up to speed if you just read through the previous emails....

If there is any additional info I can share or anything that I can do to be useful, please just let me know, everyone, and thanks, all, for your guidance and support in working through this together....this is definitely something I've never experienced before, so I really appreciate the support.

Best,

Andrea


--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001390

# EXHIBIT 12

 **Outlook**

---

### Re: Claudia Arias 2225570

---

**From** Andrea L. Hill <andhill@uw.edu>

**Date** Thu 11/2/2023 8:50 AM

**To** Claudia Sellmaier <sellmaic@uw.edu>

**Cc** SSWCJ Dean <sswcjdean@uw.edu>; Rick L. Butt <rickbutt@uw.edu>

Hi Everyone,

Thank you so much, Keva, for your guidance here and for your response to Claudia (student). The clarity of your explanation to her is both instructive and incredibly effective, and so very greatly appreciated.

As to the question regarding the extent of the PSC's power, I am unsure....Keva, you're completely right that the PSC document is VERY clear that the committee definitely has the power to recommend dismissal if it chooses to do so.

However, in working with Randy to alter our CJ admissions requirements this year, I've also been told that the PSC has essentially no 'enforcement' power of any kind (as such, we are altering some of our language in the CJ admissions documents), so I'm somewhat confused.

**IDEA:** *Shall I share the PSC document with Surdita Shelton in the Office of Student Conduct and Academic Integrity and ask her if we do, indeed, have the power to make the recommendation?* I know this document is internal to our program, but it would be good to know if it's aligned with university policy...I just want to be sure that it's OK to share it. If you could maybe just share your thoughts on this Keva, that would be great (and then we can take you off of this email chain if you want, as I know you have a lot going on and don't need to be on every part of this!!)

I know that I'm not technically on the PSC this year, but given this issue is arising from the student case from last year, I feel it's my responsibility to try and see it through to completion as much as possible, including figuring out the PSC power issue.

Thanks everyone, for working on this---bureaucratic confusion and complex students are always easier to manage collaboratively!

Andrea

On Wed, Nov 1, 2023 at 4:03 PM Claudia Sellmaier <sellmaic@uw.edu> wrote:

> Hello everyone,
>
> I did not see earlier emails so maybe this question has already been answered, but as a committee member I am not sure what our options for next steps/outcomes are. In previous cases, students followed the committee's recommendations, or they left the program. I am not aware of a mechanism for us as school to dismiss an undergraduate student (we have different mechanisms for graduate students). The process for dismissal would follow a student conduct report, which would be investigated by the student conduct officer. I am not sure this

UWT_000516

incident is sufficient from the perspective of student conduct. It is my understanding that the student passed the class and is in practicum already. Long story short, I am unclear what tools/authority we as PSC have to hold the student accountable if they don't voluntarily participate. Any input or advise would be appreciated.

Thank you,

Claudia

Claudia Sellmaier, PhD, MSW, MA

Associate Professor

MSW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Wednesday, November 1, 2023 3:29 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Hi Andrea,

The next step is for you to notify the student that the PSC will convene a meeting to determine an outcome. I encourage the committee to meet within the next couple of weeks.

I will provide a brief response to the student in the next hour or two. The email will:

1. acknowledge receipt,
2. continue to redirect her to seek assistance through the UWT's bias incident reporting or grievance processes, and
3. explain that her NASW reference pertains to school social workers (k-12), not Schools of Social Work.

Please let me know if you have questions.

Thank you,
Keva

**KEVA M. MILLER, Ph.D., MSSW**
Dean & Professor
School of Social Work & Criminal Justice
University of Washington Tacoma

Adjunct Professor
School of Social Work

UWT_000517

University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

[www.tacoma.uw.edu/uwt/swcj](www.tacoma.uw.edu/uwt/swcj)

---

**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Tuesday, October 31, 2023 2:46:03 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Thank you, Andrea. I'll be in contact soon.

**KEVA M. MILLER, Ph.D., MSSW**
Dean & Professor
School of Social Work & Criminal Justice
University of Washington Tacoma

Adjunct Professor
School of Social Work
University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

[www.tacoma.uw.edu/uwt/swcj](www.tacoma.uw.edu/uwt/swcj)

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Tuesday, October 31, 2023 2:37:49 PM
**To:** SSWCJ Dean <sswcjdean@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

UWT_000518

Thank you for the guidance, Keva, it's GREATLY appreciated! I have included 3 attachments here---
the original Professional Standards Committee letter to Claudia Arias from May (this has all of the
language regarding the essays/instructions) and, in case it's helpful, two PDF's of emails sent to her
in response to her questioning regarding the process over the summer.... If I can share any
additional information or context, please let me know.

And, because you're now just being added to this conversation, Rick and Claudia, I believe that you'll
quite quickly be brought up to speed if you just read through the previous emails....

If there is any additional info I can share or anything that I can do to be useful, please just let me
know, everyone, and thanks, all, for your guidance and support in working through this
together....this is definitely something I've never experienced before, so I really appreciate the
support.

Best,
Andrea

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000519

EXHIBIT 13

EXH-16
Oct 15 2025

| | |
|---|---|
| **From:** | SSWCJ Dean |
| **Sent:** | Wednesday, November 1, 2023 4:33 PM PDT |
| **To:** | Claudia Sellmaier <sellmaic@uw.edu>; Andrea L. Hill <andhill@uw.edu> |
| **CC:** | Rick L. Butt <rickbutt@uw.edu> |
| **Subject:** | Re: Claudia Arias 2225570 |

Hi All,

If what Claudia outlines here is the case, this must be remedied by the start of next year. I am happy to work with the ADs office to ensure we can dismiss undergraduate and graduate students when necessary. However, I have read the PSC documents and firmly believe we can dismiss an undergraduate CJ or SW student. I am not aware of any social work program that does not regulate undergraduate students' status. We should not graduate students who are determined potentially harmful, unethical, or otherwise. CSWE and NASW would agree.

Keva

**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

University of Washington Tacoma

Adjunct Professor

School of Social Work

University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

www.tacoma.uw.edu/uwt/swcj

**From:** Claudia Sellmaier <sellmaic@uw.edu>
**Sent:** Wednesday, November 1, 2023 4:02:51 PM
**To:** SSWCJ Dean <sswcjdean@uw.edu>; Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Hello everyone,

I did not see earlier emails so maybe this question has already been answered, but as a committee member I am not sure what our options for next steps/outcomes are. In previous cases, students followed the committee's recommendations, or they left the program. I am not aware of a mechanism for us as school to dismiss an undergraduate student (we have different mechanisms for graduate students). The process for dismissal would follow a student conduct report, which would be investigated by the student conduct officer. I am not sure this incident is sufficient from the perspective of student conduct. It is my understanding that the student passed the class and is in practicum already. Long story short, I am unclear

what tools/authority we as PSC have to hold the student accountable if they don't voluntarily participate. Any input or advise would be appreciated.
Thank you,
Claudia
Claudia Sellmaier, PhD, MSW, MA
Associate Professor
MSW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402
**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Wednesday, November 1, 2023 3:29 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Hi Andrea,
The next step is for you to notify the student that the PSC will convene a meeting to determine an outcome. I encourage the committee to meet within the next couple of weeks.
I will provide a brief response to the student in the next hour or two. The email will:

1. acknowledge receipt,
2. continue to redirect her to seek assistance through the UWT's bias incident reporting or grievance processes, and
3. explain that her NASW reference pertains to school social workers (k-12), not Schools of Social Work.

Please let me know if you have questions.
Thank you,
Keva
**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

University of Washington Tacoma

Adjunct Professor

School of Social Work

University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825


www.tacoma.uw.edu/uwt/swcj

UWT_001376

**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Tuesday, October 31, 2023 2:46:03 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Thank you, Andrea. I'll be in contact soon.
**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

University of Washington Tacoma

Adjunct Professor

School of Social Work

University of Washington

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825


www.tacoma.uw.edu/uwt/swcj


**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Tuesday, October 31, 2023 2:37:49 PM
**To:** SSWCJ Dean <sswcjdean@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Thank you for the guidance, Keva, it's GREATLY appreciated! I have included 3 attachments here---the original Professional Standards Committee letter to Claudia Arias from May (this has all of the language regarding the essays/instructions) and, in case it's helpful, two PDF's of emails sent to her in response to her questioning regarding the process over the summer.... If I can share any additional information or context, please let me know.
And, because you're now just being added to this conversation, Rick and Claudia, I believe that you'll quite quickly be brought up to speed if you just read through the previous emails....
If there is any additional info I can share or anything that I can do to be useful, please just let me know, everyone, and thanks, all, for your guidance and support in working through this together....this is definitely something I've never experienced before, so I really appreciate the support.
Best,

Andrea

UWT_001378

# EXHIBIT 14

EXH-7

Oct 15 2025

| From: | SSWCJ Dean |
|---|---|
| Sent: | Tuesday, July 2, 2024 11:51 AM PDT |
| To: | Jonathan S Litner <jsl29@uw.edu> |
| Subject: | Fwd: Claudia Arias 2225570 |

Attorney Client



**From:** SSWCJ Dean <sswcjdean@uw.edu>
**Sent:** Wednesday, November 1, 2023 2:42 PM
**To:** Claudia Arias <arias1@uw.edu>
**Cc:** Andrea L. Hill <andhill@uw.edu>
**Subject:** Re: Claudia Arias 2225570

Good afternoon Claudia,

I acknowledge receipt of your email and have noted your decision. The Professional Standards Committee will convene a meeting to determine an outcome of your status as a BASW student. The determination will be based, in part, on your decision to not comply with the essay requirements that was due October 31, 2023.

The NASW document you reference is the National Association for Social Work (NASW) Standards for School Social Work Services, which are ethical standards for practicing school social workers in K-12 settings. The ethical standards are not for schools of social work. Schools of social work adhere to student educational standards set by the Council on Social Work

UWT_001767

Education (CSWE). The CSWE requires schools of social work to ensure students are prepared for social work practice upon graduation through their demonstration to meet professional competencies.

If you feel that you are being treated unfairly or experiencing bias, you are encouraged to utilize the resources provided, such as the UW Tacoma Bias Incident Reporting or the academic grieving process outlined in the BASW Student Handbook.

Sincerely,
Dean Miller

**KEVA M. MILLER, Ph.D., M.S.S.W**

Dean & Professor

School of Social Work & Criminal Justice

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

[www.tacoma.uw.edu/uwt/swcj](http://www.tacoma.uw.edu/uwt/swcj)



**From:** Claudia Arias <arias1@uw.edu>
**Sent:** Tuesday, October 31, 2023 12:25 PM
**To:** Andrea L. Hill <andhill@uw.edu>; Vern (they) via Canvas Notifications <reply+fa294578a064fef5-10~1065345787-1685384566@notifications.canvaslms.com>; Roseann Martinez <roseann@uw.edu>; SSWCJ Dean <sswcjdean@uw.edu>
**Subject:** Claudia Arias 2225570

To Whom It May Concern,

Andrea Hill, PhD

Vern Harner, PhD

Claudia Sellmeir, PhD

UWT_001768

Roseann Martinez, MSW LICSW

I hope this message reaches you with the utmost urgency.

My name is Claudia Arias, I am currently a senior undergraduate at the University of Washington (Tacoma).

I am writing to express my concerns and grievances regarding the re-evaluation process for the social work program due on October 31, 2023. Please note, I have made several attempts to communicate, and ask several questions with unsuccessful responses from academic leadership. Therefore, I have decided not to take the (opportunity/punishment) your department has offered. I find the requirement of composing two essays to demonstrate my eligibility to remain on the program unduly burdensome and unjust.

Furthermore, I must address the false accusations made against me of being harmful and labeled as transphobic. I want to emphasize that I vehemently oppose all forms of discrimination, including transphobia. My principles are rooted in inclusivity, equity, diversity and cultural competence, which are fundamental to the field of social work. As a student, I would expect the same in return from professionals who have already attained a degree in the Social Work field.

What has been most distressing as a student, as a mother, as a Latina from El Salvador who escaped a Civil War, and as a first responder, is the notion of being treated with disregard and in a condescending manner. Especially, in these particular instances where University professors, often possessing PhD qualifications, engage in behaviors that undermine, discriminate, intimidate, and suppress student speech. The unjust treatment that I have

UWT_001769

experienced, has led me to face a pattern of microaggressions and discrimination from several academic professors, some of whom openly expressed pride in their German white heritage. Subsequently, when Dr. Claudia Sellmaier disclosed, "I am a cisgender woman from Germany," it raised questions about the relevance of such information in a professional context. The situation turned even more concerning during the meeting when It was suggested to "disregard the (PSC) Professional Standards committee...because everything on here is being worked on and will be revised, don't worry it is not the end of the world" emerged. During several of these encounters, I also received guidance that struck a dismissive and unjust chord. When speaking to the student advocate Roseanne Martinez and being told "Be humble, & apologetic when going on the zoom meeting, because the professors have PhD's, they hold the power," this seemed to emphasize a hierarchy that potentially stifles open discourse and intimidation. Further, impacting my experience as a student, by diminishing academic confidence, reducing participation in class discussions, feeling intimidated, undermining my voice, limiting my opportunity for free expression and ideas, as well as discrediting student learning without adequate consideration. I have felt suppressed and undermined by the perceived authority associated with a PhD. These power dynamics within the academic setting should not be acceptable or tolerated.

In accordance with NASW standards, "School social workers shall demonstrate self awareness, knowledge, and practice skills consistent with the NASW Standards for Cultural Competence in Social Work Practice. School social workers shall continue to develop specialized knowledge and understanding about client groups they serve and culturally appropriate resources. This understanding shall be applied in a manner that results in a positive school climate that respects and

values differences. School social workers shall use evidence-informed practices, skills, and techniques that reflect the worker's understanding of the role of culture in the helping process. School social workers shall recognize barriers to academic progress relating to cultural issues within the local education agency, while supporting an environment that honors and celebrates the cultures of the population within the school" (NASW). It is unethical for a professor to take any assignments personally, and react in a manner that undermines a students curiosity, passion, learning progress and credibility, without "making a concerted effort to effectively communicate and address the issue" (PSC).

This institution is meant to be a space for intellectual growth, open dialogue, and respect for diverse perspectives. Furthermore, a place for professors to maintain and establish an inclusive and supportive learning environment. Emphasizing fairness, equality, and respect for all students. However, this experience has led to university professors, who hold significant authority due to their advanced degrees, engage in behaviors that hinder these ideals.

Unfortunately, these experiences have left me feeling marginalized, isolated, fearful, belittled, and subjected to systemic biases that have no place in an institution committed to social justice. It is my fervent belief that diversity should not merely be acknowledged but protected, celebrated, and that every student, regardless of their racial or ethnic background, deserves fair and dignified treatment. Moreover, the stress from this situation and the ongoing re-evaluation process that began during Spring 2023, with the above-mentioned, has taken a severe toll on my mental and physical health. I am currently struggling with my health and well-being due to the distress this situation has caused. Considering the gravity of these concerns, I am actively seeking legal representation and other resources, not with the intention of creating discord, but

UWT_001771

to protect my rights to ensure that any repercussions from my refusal to complete these punishment essays will be ethically resolved.

Your prompt attention to this matter shall construct a resolution that addresses these pressing issues, fostering a more equitable and just academic environment. Please note, I would expect everyone to handle this situation in an ethical and professional manner.

https://www.socialworkers.org/Practice/NASW-Practice-Standards-Guidelines/NASW-Standards-for-School-Social-Work-Services

https://www.tacoma.uw.edu/sites/default/files/2022-02/professional-standards-committee_160506.pdf

UWT_001772

EXHIBIT 15



| From: | SSWCJ Dean |
|---|---|
| Sent: | Wednesday, November 1, 2023 2:42 PM PDT |
| To: | Claudia Arias <arias1@uw.edu> |
| CC: | Andrea L. Hill <andhill@uw.edu> |
| Subject: | Re: Claudia Arias 2225570 |

Good afternoon Claudia,

I acknowledge receipt of your email and have noted your decision. The Professional Standards Committee will convene a meeting to determine an outcome of your status as a BASW student. The determination will be based, in part, on your decision to not comply with the essay requirements that was due October 31, 2023.

The NASW document you reference is the National Association for Social Work (NASW) Standards for School Social Work Services, which are ethical standards for practicing school social workers in K-12 settings. The ethical standards are not for schools of social work. Schools of social work adhere to student educational standards set by the Council on Social Work Education (CSWE). The CSWE requires schools of social work to ensure students are prepared for social work practice upon graduation through their demonstration to meet professional competencies.

If you feel that you are being treated unfairly or experiencing bias, you are encouraged to utilize the resources provided, such as the UW Tacoma Bias Incident Reporting or the academic grieving process outlined in the BASW Student Handbook.

Sincerely,

Dean Miller

**KEVA M. MILLER, Ph.D., M.S.S.W**

Dean & Professor

School of Social Work & Criminal Justice


University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825


www.tacoma.uw.edu/uwt/swcj

# **W** UNIVERSITY *of* WASHINGTON | TACOMA

From: Claudia Arias <arias1@uw.edu>
Sent: Tuesday, October 31, 2023 12:25 PM
To: Andrea L. Hill <andhill@uw.edu>; Vern (they) via Canvas Notifications <reply+fa294578a064fef5-10~1065345787-1685384566@notifications.canvaslms.com>; Roseann Martinez <roseann@uw.edu>; SSWCJ Dean <sswcjdean@uw.edu>
Subject: Claudia Arias 2225570

To Whom It May Concern,

Andrea Hill, PhD

Vern Harner, PhD

Claudia Sellmeir, PhD

Roseann Martinez, MSW LICSW

I hope this message reaches you with the utmost urgency.

My name is Claudia Arias, I am currently a senior undergraduate at the University of Washington (Tacoma).

I am writing to express my concerns and grievances regarding the re-evaluation process for the social work program due on October 31, 2023. Please note, I have made several attempts to communicate, and ask several questions with unsuccessful responses from academic leadership. Therefore, I have decided not to take the (opportunity/punishment) your department has offered. I find the requirement of composing two essays to demonstrate my eligibility to remain on the program unduly burdensome and unjust.

Furthermore, I must address the false accusations made against me of being harmful and labeled as transphobic. I want to emphasize that I vehemently oppose all forms of discrimination, including transphobia. My principles are rooted in inclusivity, equity, diversity and cultural competence, which are fundamental to the field of social work. As a student, I would expect the same in return from professionals who have already attained a degree in the Social Work field.

What has been most distressing as a student, as a mother, as a Latina from El Salvador who escaped a Civil War, and as a first responder, is the notion of being treated with disregard and

UWT_000872

in a condescending manner. Especially, in these particular instances where University professors, often possessing PhD qualifications, engage in behaviors that undermine, discriminate, intimidate, and suppress student speech. The unjust treatment that I have experienced, has led me to face a pattern of microaggressions and discrimination from several academic professors, some of whom openly expressed pride in their German white heritage. Subsequently, when Dr. Claudia Sellmaier disclosed, "I am a cisgender woman from Germany," it raised questions about the relevance of such information in a professional context. The situation turned even more concerning during the meeting when It was suggested to "disregard the (PSC) Professional Standards committee...because everything on here is being worked on and will be revised, don't worry it is not the end of the world" emerged. During several of these encounters, I also received guidance that struck a dismissive and unjust chord. When speaking to the student advocate Roseanne Martinez and being told "Be humble, & apologetic when going on the zoom meeting, because the professors have PhD's, they hold the power," this seemed to emphasize a hierarchy that potentially stifles open discourse and intimidation. Further, impacting my experience as a student, by diminishing academic confidence, reducing participation in class discussions, feeling intimidated, undermining my voice, limiting my opportunity for free expression and ideas, as well as discrediting student learning without adequate consideration. I have felt suppressed and undermined by the perceived authority associated with a PhD. These power dynamics within the academic setting should not be acceptable or tolerated.

In accordance with NASW standards, "School social workers shall demonstrate self awareness, knowledge, and practice skills consistent with the NASW Standards for Cultural Competence in

UWT_000873

Social Work Practice. School social workers shall continue to develop specialized knowledge and understanding about client groups they serve and culturally appropriate resources. This understanding shall be applied in a manner that results in a positive school climate that respects and values differences. School social workers shall use evidence-informed practices, skills, and techniques that reflect the worker's understanding of the role of culture in the helping process. School social workers shall recognize barriers to academic progress relating to cultural issues within the local education agency, while supporting an environment that honors and celebrates the cultures of the population within the school" (NASW). It is unethical for a professor to take any assignments personally, and react in a manner that undermines a students curiosity, passion, learning progress and credibility, without "making a concerted effort to effectively communicate and address the issue" (PSC).

This institution is meant to be a space for intellectual growth, open dialogue, and respect for diverse perspectives. Furthermore, a place for professors to maintain and establish an inclusive and supportive learning environment. Emphasizing fairness, equality, and respect for all students. However, this experience has led to university professors, who hold significant authority due to their advanced degrees, engage in behaviors that hinder these ideals. Unfortunately, these experiences have left me feeling marginalized, isolated, fearful, belittled, and subjected to systemic biases that have no place in an institution committed to social justice. It is my fervent belief that diversity should not merely be acknowledged but protected, celebrated, and that every student, regardless of their racial or ethnic background, deserves fair and dignified treatment. Moreover, the stress from this situation and the ongoing re-evaluation process that began during Spring 2023, with the above-mentioned, has taken a severe toll on

UWT_000874

my mental and physical health. I am currently struggling with my health and well-being due to the distress this situation has caused. Considering the gravity of these concerns, I am actively seeking legal representation and other resources, not with the intention of creating discord, but to protect my rights to ensure that any repercussions from my refusal to complete these punishment essays will be ethically resolved.

Your prompt attention to this matter shall construct a resolution that addresses these pressing issues, fostering a more equitable and just academic environment. Please note, I would expect everyone to handle this situation in an ethical and professional manner.

https://www.socialworkers.org/Practice/NASW-Practice-Standards-Guidelines/NASW-Standards-for-School-Social-Work-Services

https://www.tacoma.uw.edu/sites/default/files/2022-02/professional-standards-committee_160506.pdf

UWT_000875

EXHIBIT 16



EXH-14
Oct 10 2025



Vern Harner <vharner@uw.edu>

## Help Me Understand
4 messages

---

**L J** <justbecause4469@hotmail.com>                                    Thu, Mar 28, 2024 at 2:40 PM
To: "vharner@uw.edu" <vharner@uw.edu>

**This Message Is From an Untrusted Sender**

You have not previously corresponded with this sender.

See https://itconnect.uw.edu/email-tags for additional information. Please contact the UW-IT Service Center, help@uw.edu 206.221.5000, for assistance.

Help me understand why you're such a hatful and closed minded person please. What happened to you to make you so negative and unwelcoming? It is so tragic that you manipulate your influence to professionally harm others. You're pathetic, and ugly inside. You need to change

---

**Vern Harner** <vharner@uw.edu>                                         Thu, Mar 28, 2024 at 3:39 PM
To: "Keva M. Miller" <KevaMill@uw.edu>

Hi Dean Miller, I'm forwarding this email I just received, I believe from the same email I received another anonymous comment from prior.
Vern

[Quoted text hidden]

---

**Keva M. Miller** <kevamill@uw.edu>                                     Thu, Mar 28, 2024 at 3:43 PM
To: Vern Harner <vharner@uw.edu>

Hi Vern,

Please forward this email to IT and UW Campus Safety. Copy me on the email and ask that they look into this because you have received prior messages from this address.

Keva


**KEVA M. MILLER, Ph.D., M.S.S.W**

Dean & Professor

School of Social Work & Criminal Justice


University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825


www.tacoma.uw.edu/uwt/swcj




---

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Thursday, March 28, 2024 3:39 PM
**To:** Keva M. Miller <kevamill@uw.edu>
**Subject:** Fwd: Help Me Understand

Harner_000878

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                          Thu, Mar 28, 2024 at 4:12 PM
To: TACOMA HELP <tachelp@uw.edu>, uwtsafe@uw.edu
Cc: "Keva M. Miller" <KevaMill@uw.edu>, sdjames@uw.edu

Hello,
I am forwarding the below harassing email on and attaching a harassing email I received on 4/12/2023 from the same email (nearly a year ago).
Dean Miller asked to be copied on this, as I have now received two harassing emails from this address. The first email (attached) indicates it was likely a student in my Spring 2023 class (TSOCWF 404). Please let me know what next steps are in regards to this matter.
Thank you,
Vern

--
**Vern Harner, PhD**
Assistant Professor | UWT School of Social Work & Criminal Justice
Co-Chair | LGBTQ Caucus of Faculty/Students in Social Work
VernHarner.com | pronoun: they
Schedule a time to chat by clicking here

Phone: 253-692-5701
Email: vharner@uw.edu
Office: WCG 233

Latest publication: Trans Patient Preferences When Discussing Gender in Health Care Settings, *JAMA Network Open*

---------- Forwarded message ---------
From: **L J** <justbecause4469@hotmail.com>
Date: Thu, Mar 28, 2024 at 2:41 PM
Subject: Help Me Understand
To: vharner@uw.edu <vharner@uw.edu>

[Quoted text hidden]

---

📄 **UW Mail - A student of yours.pdf**
215K

Harner_000879

# EXHIBIT 17

Ex 26

| | |
|---|---|
| **From:** | SSWCJ Dean |
| **Sent:** | Tuesday, August 29, 2023 11:22 AM PDT |
| **To:** | Claudia Arias <arias1@uw.edu>; Elavie Ndura <endura@uw.edu> |
| **Subject:** | Re: Claudia Arias, I am being Intimidated & Bullied by UW Professors |

Good morning Claudia,

I am replying to acknowledge receipt of your email. Dr. Ndura will meet with you to discuss your concerns about discrimination.

I was made aware of the classroom assignment along with other classroom dynamics in spring. The Professional Standards Committee (PSC) and Dr. Sellmaier have kept me informed this summer. You are strongly encouraged to follow the requirements as laid out in the letter from the PSC. I understand you have posed several questions--most of which you are required to reflect upon and answer independently based on the communications with Dr. Harner, Dr. Sellmaier, and the PSC.

As a professional degree program, all social work students in every social work program across the country are required to adhere to social work values and ethics. In addition, all students in every social work program across the country must demonstrate nine educational competencies. When they do not, a program must take steps to ensure students are given the opportunity to demonstrate that they will be able to practice ethically and competently in the profession. As you have been instructed, please review the NASW Code of Ethics and Council on Social Work Education (CSWE) competencies for additional guidance.

I wish you the best in the upcoming year.

Dr. Miller

**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

**From:** Claudia Arias <arias1@uw.edu>
**Sent:** Sunday, August 27, 2023 9:19:32 PM
**To:** SSWCJ Dean <sswcjdean@uw.edu>; Elavie Ndura <endura@uw.edu>
**Subject:** Claudia Arias, I am being Intimidated & Bullied by UW Professors

Hello,

My name is Claudia Arias, my student number is 2225570. This email is to report bullying and intimidation.

On Thursday April 27, 2023 at about 11:30 am, I brought into class a (Draft mini-zine) assignment for review and feedback. Professor Harner reviewed the assignment and said you have to write about a community response. Next, I was shown examples on powerpoint slides projected to the class.

UWT_000858

I responded to Professor Harner, "I am confused, I don't understand how this is not a community response, this is a social justice issue, it's something that is happening to women in prison". I then repeated, "I don't understand, I'm confused as to what I'm doing wrong"

Professor Harner, rapidly stood up, with a flared arm and in a loud tone said "This is targeting transgender" and quickly backed into the desk/podium. Another student asked for help, and Professor Harner said "not right now, give me a minute".

I gathered my belongings and left the classroom to go to my 1:00 pm class. On the way to my other class, I remembered I had an assignment to turn into Prof Harner and walked back to the class. I then asked Professor Harner if I could have my Draft Zine reviewed later that day. Professor Harner said, "I am unavailable for additional meetings this afternoon." I then asked if I could schedule a feedback for the following Tuesday, and was told by Professor Harner, "I am not sure right now".

On Thursday April 27, 2023 at 2:37, I read an email from Professor Harner, which advised me to contact Dr. Sellmaier or Chris Barrans if I had any more questions or concerns. Professor Harner, hastily accused me of "being harmful and not aligning with social work values & ethics" in that email.

On Monday, May 1, 2023 at 11:23 am, I sent an email to Dr. Sellmaier asking to meet. A meeting was set for May 2, 2023 at 12:30 pm right before my next class.

On that same Monday, May 1, 2023 at 11:59 am, I received an email from Mrs. Andrea Hill, PhD re: Professional Standards Committee- Your Attendance Required.

On May 2, 2023 at 12:30 pm. I sat with Dr. Claudia Sellmeir. At the beginning of this meeting she informed me that she spoke with Professor Harner, and was already aware of the situation. As I talked about the "Draft zine", I attempted to explain to her that I did not understand why I was being sent to the PSC since I did not have an opportunity to review this with Professor Harner.

Dr. Sellmeir then accused me of being transphobic and disregarded anything I was trying to tell her. When I presented the PSC standards/policy to her, the response was that the document

UWT_000859

was basically irrelevant, stating "Don't follow what's on here". I asked her to put the correct information for me in writing, but she disregarded my request and said, "It is not the end of the world". During the meeting Dr. Sellmaier continuously patronized me and suppressed my speech by telling me what I had to say. Lastly, I asked Dr. Sellmaier how do other students and myself file a grievance, and with a snarky remark she tilted her head and said, "With me. Or the dean".

On Monday, May 15, at approximately 9 am, I met with Roseanne Martinez (Student Advocate).
I explained the situation, during the conversation she responded with "when you go to the zoom meeting you have to make sure to be humble, and apologetic because the one's attending the meeting all have PhD's and they have the power". Also, she continuously patronized me and suppressed my speech by telling me how to speak and what to say.

The meeting was scheduled for Tuesday May 16, 2023 @ 12:20 pm by Dr. Hill.

Zoom meeting took place with the following:
Andrea L. Hill, Phd
Dr. Claudia Sellmaier, PhD
Professor Vern Harner, PhD
Rick (unknown) Did not show to meeting
Roseanne Martinez (Student Advocate)
Claudia Arias (myself)

At the beginning of the meeting, I requested that the zoom meeting be recorded. Dr. Hill denied my request. Dr. Hill then made the statement that the topic was extremely transphobic without having seen the "Draft Zine"

Professor Harner spoke first and claimed that the topic was not aligned with social work values. Professor Harner never stated how my assignment did not align with social work values.

I informed everyone in the zoom meeting that I was not given an opportunity to resolve the issue with Professor Harner before being referred to the PSC. I also informed them that according to the University of Washington Tacoma's Social Work and Criminal Justice Professional Standards Committee, "Those individuals who are directly involved should make a concerted

UWT_000860

effort to resolve the concern prior to a referral to the PSC". As noted above, I was not given the right or the opportunity to speak to anyone about my "Draft Zine" prior to immediately being sent to the PSC.

I also expressed to them that my ability to learn is being shut down, and that I don't understand what it is that I have done wrong. Then, Dr. Hill began to patronize me, and directed me to speak a certain way.

The attendees left into a private chat room for approximately ten minutes, and upon return, informed me that I was transphobic and not aligning with social work values or justice. Dr. Sellmaier stated that I needed to be reflective of my actions and behavior and that I should correct it.

On May 25, 2023, @4:21 I received a response for "requirements moving forward". I did not agree with the decision, and had several questions that continued to be dismissed. All faculty members involved avoided answering the questions, and were evasive and condescending with their responses.

I feel that my voice is not being heard. I feel that I am being targeted as a First Gen Hispanic Student. I feel that I was belittled as a student and as a human being. I am a productive member of my community, as a volunteer Rescue Firefighter. This type of treatment to any student should be unacceptable. I will continue to advocate for myself or anyone of the other students who were also being intimidated, coerced, or bullied during Professor Harner's class.

I believe this could have been handled differently and professionally by the Professor and the faculty members involved. I feel that Professor Harner was vindictive in grading the new assignment, and I felt that I was being cornered and coerced into admitting wrong doing for something I didn't do.

Attached are the following unanswered questions in a word doc and PSC letter for your review. Please let me know if you would like me to forward all emails to you. Thank you.
Claudia Arias
2225570

UWT_000861

# EXHIBIT 18

| From: | Andrea L. Hill <andhill@uw.edu> |
|---|---|
| Sent: | Wednesday, August 23, 2023 10:59 AM PDT |
| To: | Claudia Arias <arias1@uw.edu> |
| Subject: | Re: Professional Standards Committee--Next Steps |

Hello Claudia,

I encourage you to review the communications that you've had with the PSC as well as Dr. Harner regarding this issue---you'll find that these communications contain answers to your questions. For example, the email sent to you by Dr. Harner on April 27, 2023 is a good reflection of the multiple communications there have been regarding this issue. This reflects the discussion that we had during our PSC meeting, and clearly outlines the ways in which your proposed topic conflicted with the NASW's stance on advocating for transgender individuals. Again, the email communications you've had regarding this issue and the documents and resources included in the May 24 letter from the PSC are reflective of the several conversations that have been had regarding this issue and these communications address the questions you've presented. *As detailed in the May 24 communication from the Professional Standards Committee, we anticipate your essays by October 31, 2023.*

And, importantly, once again, if you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, we encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.


Thank You,
Dr. Andrea Hill

On Wed, Aug 9, 2023 at 10:30 PM Claudia Arias <arias1@uw.edu> wrote:
Hello Dr. Hill

Thank you for your response, but I need more clarification pertaining to the following questions. My previous questions were not completely answered. I appreciate your attention and patience in this matter.

There were no "specific concerns" shared with me during class or in emails, or with any faculty members. What are these specific concerns that you are referring to?

What were the "original topic conflicts with social work values"? I need you to please clarify if I have done something wrong and what it is? I never had an opportunity to discuss the rough-draft assignment with the professor, or to compare and contrast what was wrong with it.

What is the "conflict between" the "topic choice and the discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities"?

Please understand, nobody has explained to me why I must complete these "opportunities"/punishment, and no one has explained to me what I've done wrong.

UWT_000840

If this is an opportunity and not a punishment, then what is the consequence if I refuse to complete this "opportunity"/punishment?

Do I need to "demonstrate" my "social work competencies" because I am a first-generation Hispanic student?

Lastly, I still want to understand: How did my Rough-Draft Mini-Zine not align with Social Work's professional communication regarding the topic? How did the project topic and communication raise concerns related to professionalism and development? How was I not practicing respectful, Professional Communication at all times?

Thank you again,

Claudia Arias
Fire/Rescue Firefighter

On Wed, Aug 9, 2023 at 10:33 AM Andrea L. Hill <andhill@uw.edu> wrote:
Hello Claudia,

As outlined in the letter sent to you on May 24, 2023, during the May 16, 2023 session in which you met with the School of Social Work and Criminal Justice's Professional Standards Committee, we discussed issues related to your topic selection for a project in TSOCWF 404 and communication concerns stemming from discussion of that topic selection.

As co-chair of the PSC and facilitator of the May 16 meeting, I opened the meeting by explaining the nature and purpose of the SSWCJ PSC. The PSC is a body of faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation. This is an internal Social Work and Criminal Justice Program review committee for social welfare, social work, and criminal justice students. Other University procedures can and will be used when appropriate. The purpose of the PSC is to provide a mechanism for discussing issues and finding a way forward. During our May meeting, Dr. Harner and PSC members spent time discussing these issues and listening to your perspective and thoughts.

If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. The specific concerns were shared with you during class time and in emails, in individual conversations with faculty members and during the PSC meeting. Since professional and ethical social work practice is grounded in social justice, the PSC recommended that you use the resources provided to you to reflect on why your original topic conflicts with social work values. The essay is not a punishment but an opportunity for you to demonstrate your social work competencies.

Therefore, if you have any questions regarding the conflict between your topic choice and your discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities, please refer to any of the multiple resources from the NASW

that you've been given by Dr. Harner or any of the multiple references that were linked to the PSC letter sent to you on May 24, 2023. If you have any questions regarding the appropriate communicative conduct expected of a BASW student, please also refer to the multiple resources linked to the PSC letter sent to you in May.

Ethical and effective Social Work practice requires a commitment to disciplinary values and professional communication, and BASW students are expected to model these in their work and interactions at all times. In our May 16th meeting and conversation with you, the Professional Standards Committee agreed that the circumstances related to your project topic and communications raised concerns related to professionalism and thus shared the requirements outlined in the letter sent to you on May 24, 2023. *The conclusions and requirements established in that communication remain unchanged.*

If you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

Thank You,

Dr. Andrea Hill

On Tue, Aug 1, 2023 at 1:14 PM Claudia Arias <arias1@uw.edu> wrote:
Hello,

Excellent, I will be waiting.

Thank you
Claudia Arias
2225570

On Tue, Aug 1, 2023 at 1:04 PM Andrea L. Hill <andhill@uw.edu> wrote:
Hello Claudia,

Thank you for your email.

It is important that you understand that 1) It has been over two months since the final Professional Standards Committee decision letter containing the committee's conclusions was emailed to you and 2) Faculty are not on regular schedules during non-academic periods such as the summer. As such, it will take some time to pull together all members of the PSC to fashion a reply.

Thank you.

On Tue, Aug 1, 2023 at 12:28 PM Claudia Arias <arias1@uw.edu> wrote:

Hello,

After reviewing the email, I have a few questions:

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, Jul 24, 2023 at 10:30 AM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello,

After reviewing the email, I have a few questions:

UWT_000843

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?


Respectfully,

Claudia Arias
Student ID 2225570




On Thu, May 25, 2023 at 4:22 PM Andrea L. Hill <andhill@uw.edu> wrote:
Hi Claudia,
Thanks for attending the meeting of the Professional Standards Committee on May 16th. As mentioned during that meeting, I am sending you a write-up of our discussion regarding requirements for moving forward (attached as a PDF here). This letter represents the conclusions that we discussed with you at the meeting and outlines next steps. If you have any questions at all, please don't hesitate to be in touch.

Be well and take good care,

Dr. Hill
--
**Andrea L. Hill, PhD**
Associate Teaching Professor

UWT_000844

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000845

EXHIBIT 19



EXH–10
Oct 10 2025

Delete    Archive    Report ⌄    Move to ⌄    ↩ ↩ ↪ ⌄    Zoom

## Re: Follow-Up Email to Claudia Arias

**CS**

Claudia Sellmaier<sellmaic@uw.edu> ↩ ↩ ↪ ⊡ ⌄ ◈ ⊞ •••

To: ⊗ Rick L. Butt;  ⊗ Andrea L. Hill      Tue 8/22/2023 3:54 PM

Hi Andrea,

Thank you for all your ongoing work with this. I like your response and would agree with Rick to take out the second paragraph. I don't think we want to encourage another meeting to discuss exactly the same issues. I am also worried that this would push out the timeline further, especially if we need to take additional steps. Maybe we can add a sentence at the end like "We are looking forward to receiving your reflection essays by..."
Claudia


Claudia Sellmaier, PhD, MSW, MA

Assistant Professor

MSW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** Rick L. Butt <rickbutt@uw.edu>
**Sent:** Tuesday, August 22, 2023 1:28 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Follow-Up Email to Claudia Arias

Hi Andrea,

I like your response except I would remove the second paragraph in its entirety. I dont think we should give her the option for another PSC meeting.

Thanks again

UWT_000558

EXHIBIT 20

EXH-13
Oct 15 2025

| From: | SSWCJ Dean <sswcjdean@uw.edu> |
|---|---|
| Sent: | Tuesday, August 15, 2023 2:31 PM PDT |
| To: | Andrea L. Hill <andhill@uw.edu>; Keva M. Miller <kevamill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu> |
| Subject: | Re: Significant Student Concern---Professional Standards Committee Unsure About Next Steps |

Hello Andrea,

Thank you for reaching out. I am aware of the situation and have serious concerns about this student's values and problematic thinking of a vulnerable population. I have come up against these situations and found that it is absolutely the role of a school to determine whether a student is suited for a profession. If a student were to express these thoughts in an application, they would/should not be admitted. What is even more concerning is their inability to reflect and consider the potentiality for harm in her thinking. Further, her claim that she is being discrimated is unfounded and an avoidance of the issue at hand.

I am leaving town but will return this weekend. Give me some time to think through this though I am inclined to encourage the committee to move forward with in-person communications followed by written documentation. Your concerns about an outside entity or group watching/listening is not unfounded. There is not much we can do if a student engages someone from the outside. What we must focus on is the suitability of a student potentially holding a social work degree. What potential harm may they inflict? What happens if we knowingly place a student in field or graduate them into the profession after they expressed with clarity that they are unwilling to move from a harmful position?

In the meantime, please be prepared to respond and inform the student of available to share their concerns about discrimination. We are covered as there is no evidence of discrimination and no identity that excuses this type of harmful thinking about a vulnerable population.

Thank you for your patience. I will provide direction Monday.

Keva

**KEVA M. MILLER, Ph.D., MSSW**

Dean & Professor

School of Social Work & Criminal Justice

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Tuesday, August 15, 2023 1:20:21 PM
**To:** Keva M. Miller <kevamill@uw.edu>; SSWCJ Dean <sswcjdean@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Significant Student Concern---Professional Standards Committee Unsure About Next Steps

Hi Keva,

I hope this email finds you well and staying as cool as possible during this heat wave! I'm reaching out in my capacity as co-chair of the Professional Standards Committee due to an issue that the PSC has been grappling with since Spring. The committee collectively agreed that reaching out to you before making any moves would be the best approach, and the other members of the committee (Claudia and Rick) are CC'd on this email. I ended up handling this

UWT_001283

issue because the student in question was enrolled in two of the SW PSC co-chair's (Ronnie) courses, so he needed to recuse himself…

A summary of what's been going on (I apologize that it's necessarily long, just to get you up to speed....hopefully the bullet-points to make it easier to follow! The REAL source of our concern right now is towards the end if you want to skip ahead....)

**INITIAL ISSUE**
*(To make it easier, I have attached a copy of the PSC letter sent to Arias and in the student's file)*

- Dr. Harner referred Claudia Arias, a BSW student in their Spring TSOCWF 404, *Cultural Diversity and Social Justice* to the Professional Standards Committee on 4/27/23 due to an "extremely anti-trans topic for a class project" proposed by Arias. From our understanding, Arias chose a topic which portrayed transgender individuals as "faking" identities in carceral contexts in order to be housed with CIS women and assault them and called for biologically segregated housing.

- Despite two in-person conversations and two emails from Dr. Harner regarding the topic, Arias did not "believe the topic is not aligned with social work values and sees women's and trans rights and competency issues." (Quotes from original PSC referral from Dr. Harner).

- Arias was connected with the BASW chair (Claudia) and her faculty advisor (Chris). However, both report that these conversations were not productive, and Arias remained resistant to the understanding that this was an inappropriate topic.

- Given that there was no progress being made in discussions, we convened on May 16. In attendance were myself, Claudia (PSC member) and Claudia Arias (student) as well as Vern (referring faculty) and Roseann Martinez (invited by Arias in her capacity as student advocate). Rick was at a conference and couldn't make the meeting.

- During the meeting, we discussed the issue and listened to Arias' perspective. More than anything, she seemed confused and defensive, largely worried about continuing in the program. When the conflict between her proposed topic and SW values was explained, she didn't protest, and when the PSC explained the idea of her writing two essays and checking back in during the Fall, she agreed to those conditions. As co-chair, I wrote up the PSC proceedings and conclusions and emailed the letter to Arias and to Terri on May 25th

**CURRENT CAUSE OF CONCERN/WHY WE'RE REACHING OUT:**

*(I've attached a PDF of the email exchanges with Arias, just to give you a sense of what I'm talking about)*

UWT_001284

- Arias emailed me on July 24th with questions regarding everything that was discussed during the PSC meeting that challenged the idea that her chosen topic conflicted with SW values and challenged the conclusions reached during the PSC meeting.

- The PSC put together a reply to Arias and emailed it to her on August 9th, responding to many of her questions…. She immediately replied the next day, expressing dissatisfaction with our response and, again, challenging the answers she's been given.

At this point, we're just not quite sure what to do and we're a little concerned and feeling really cautious about replying---The actual problem was definitely explained to Arias several times—in person by Dr. Harner, over email, during meetings with her advisor, and during the PSC meeting.
Her claim that this was never explained just *isn't true*. Also, her most recent email included a question that inferred suspicion that she is being treated differently because she is a first-generation Hispanic student, which, of course, is something that is incredibly concerning and untrue.

The several-months gap between the PSC meeting (in which she agreed to the conclusions reached during that meeting) and her communication with us and her repeated refusal to acknowledge the answers she has been given make it really difficult to know how to continue to reply to her.
Given the current hyper-politicized environment in which we've seen outside activists weaponize student issues to harm academic programs and personnel, the PSC is really feeling VERY cautious about replying. None of us want our emails to become the subject of right-wing attacks in the media, and these emails very much feel like someone is trying to "get it in writing" somehow or "catch us" or something....Not that there's anything TO catch us on, but in this environment, caution is paramount....
**Reason for Reaching Out:** At this point, we just aren't sure exactly what to do and **are wondering if you have any suggestions about moving forward**.

- ***Is this something that should be moved to another arena, or is something that perhaps university legal representatives should look at?*** This situation is really unlike anything that any of us have experienced, and we want to be thoughtful and careful moving forward.... If you know how to best proceed or if there is another place we should take these concerns to, any thoughts/feedback would be greatly appreciated!

Thanks so much, Keva! So sorry for the lengthy email, and there's no rush to respond....I know this is a complicated issue----Please just let me (or RIck or Claudia) know if you have any questions or need any additional information!
Thanks,
Andrea
--
**Andrea L. Hill, PhD**
Associate Teaching Professor

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001286

EXHIBIT 21

EXH-10
Oct 13 2025

| | |
|---|---|
| **From:** | Andrea L. Hill <andhill@uw.edu> |
| **Sent:** | Tuesday, August 15, 2023 1:20 PM PDT |
| **To:** | Keva M. Miller <kevamill@uw.edu>; SSWCJ Dean <sswcjdean@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu> |
| **Subject:** | Re: Significant Student Concern---Professional Standards Committee Unsure About Next Steps |
| **Attachments:** | Arias PSC Letter.pdf, Arias PSC Summer Communication.pdf |

Hi Keva,

I hope this email finds you well and staying as cool as possible during this heat wave! I'm reaching out in my capacity as co-chair of the Professional Standards Committee due to an issue that the PSC has been grappling with since Spring. The committee collectively agreed that reaching out to you before making any moves would be the best approach, and the other members of the committee (Claudia and Rick) are CC'd on this email. I ended up handling this issue because the student in question was enrolled in two of the SW PSC co-chair's (Ronnie) courses, so he needed to recuse himself…

A summary of what's been going on (I apologize that it's necessarily long, just to get you up to speed....hopefully the bullet-points to make it easier to follow! The REAL source of our concern right now is towards the end if you want to skip ahead....)

**INITIAL ISSUE**
*(To make it easier, I have attached a copy of the PSC letter sent to Arias and in the student's file)*

- Dr. Harner referred Claudia Arias, a BSW student in their Spring TSOCWF 404, *Cultural Diversity and Social Justice* to the Professional Standards Committee on 4/27/23 due to an "extremely anti-trans topic for a class project" proposed by Arias. From our understanding, Arias chose a topic which portrayed transgender individuals as "faking" identities in carceral contexts in order to be housed with CIS women and assault them and called for biologically segregated housing.

- Despite two in-person conversations and two emails from Dr. Harner regarding the topic, Arias did not "believe the topic is not aligned with social work values and sees women's and trans rights and competency issues." (Quotes from original PSC referral from Dr. Harner).

- Arias was connected with the BASW chair (Claudia) and her faculty advisor (Chris). However, both report that these conversations were not productive, and Arias remained resistant to the understanding that this was an inappropriate topic.

- Given that there was no progress being made in discussions, we convened on May 16. In attendance were myself, Claudia (PSC member) and Claudia Arias (student) as well as Vern (referring faculty) and Roseann Martinez (invited by Arias in her capacity as student advocate). Rick was at a conference and couldn't make the meeting.

- During the meeting, we discussed the issue and listened to Arias' perspective. More than anything, she seemed confused and defensive, largely worried about continuing in the program. When the conflict between her proposed topic and SW values was explained, she didn't protest, and when the PSC explained the idea of her writing two essays and checking back in during the Fall, she agreed to those conditions. As co-chair, I wrote up the PSC proceedings and conclusions and emailed the letter to Arias and to Terri on May 25th

**CURRENT CAUSE OF CONCERN/WHY WE'RE REACHING OUT:**

*(I've attached a PDF of the email exchanges with Arias, just to give you a sense of what I'm talking about)*

- Arias emailed me on July 24th with questions regarding everything that was discussed during the PSC meeting that challenged the idea that her chosen topic conflicted with SW values and challenged the conclusions reached during the PSC meeting.

- The PSC put together a reply to Arias and emailed it to her on August 9th, responding to many of her questions…. She immediately replied the next day, expressing dissatisfaction with our response and, again, challenging the answers she's been given.

At this point, we're just not quite sure what to do and we're a little concerned and feeling really cautious about replying---The actual problem was definitely explained to Arias several times—in person by Dr. Harner, over email, during meetings with her advisor, and during the PSC meeting.

Her claim that this was never explained just *isn't true*. Also, her most recent email included a question that inferred suspicion that she is being treated differently because she is a first-generation Hispanic student, which, of course, is something that is incredibly concerning and untrue.

The several-months gap between the PSC meeting (in which she agreed to the conclusions reached during that meeting) and her communication with us and her repeated refusal to acknowledge the answers she has been given make it really difficult to know how to continue to reply to her.

Given the current hyper-politicized environment in which we've seen outside activists weaponize student issues to harm academic programs and personnel, the PSC is really feeling VERY cautious about replying. None of us want our emails to become the subject of right-wing attacks in the media, and these emails very much feel like someone is trying to "get it in writing" somehow or "catch us" or something....Not that there's anything TO catch us on, but in this environment, caution is paramount....

**Reason for Reaching Out:** At this point, we just aren't sure exactly what to do and **are wondering if you have any suggestions about moving forward**.

UWT_001276

- ***Is this something that should be moved to another arena, or is something that perhaps university legal representatives should look at?*** This situation is really unlike anything that any of us have experienced, and we want to be thoughtful and careful moving forward.... If you know how to best proceed or if there is another place we should take these concerns to, any thoughts/feedback would be greatly appreciated!

Thanks so much, Keva! So sorry for the lengthy email, and there's no rush to respond....I know this is a complicated issue----Please just let me (or RIck or Claudia) know if you have any questions or need any additional information!

Thanks,
Andrea

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001277

EXHIBIT 22

| | |
|---|---|
| **From:** | Claudia Sellmaier |
| **Sent:** | Friday, August 11, 2023 10:44 AM PDT |
| **To:** | Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu> |
| **Subject:** | Re: Professional Standards Committee--Next Steps |

That sounds like a good plan. Unfortunately, this seems exactly some of the communication concerns she also showed in class, following Vern around and continually asking why the zine was problematic. Keva has also already heard about the student and some of the issues, so hopefully that will make the summarizing easier.

Thank you, Andrea.

Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 5:05 PM
**To:** Rick L. Butt <rickbutt@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Thanks, Rick, I think you're completely right.... As much as I want to just get this taken care of, I think I will wait on replying to Claudia (the student) until I have a chance to email Keva. It'll probably be early next week, as it'll take me a little bit of time to try and put everything together/summarize/explain the situation. I'll be sure to cc both of you guys on the email.
 I appreciate the response, Rick---it helped me hold off on my natural inclination to try and "clear my inbox"!! An empty inbox isn't very useful if it just fills up again with even more and more challenging email.... Agree, this one is concerning--definitely could use some outside eyes at this point.

Thanks,
Andrea

On Thu, Aug 10, 2023 at 4:48 PM Rick L. Butt <rickbutt@uw.edu> wrote:

Hi Andrea,

Thanks again for all of your work. I still think that the continuous satisfying outcome" for the student, we should bring in Keva and/or our legal folks for consultation. I am concerned she may claim we are violating one of her freedoms and/or discriminating against her due to her ethnicity. I am hoping I am wrong.

I like the email response. I highlighted in yellow where I think it is missing the word "see."

UWT_001265

I am wondering if we should remove the example. I feel the paragraph before is clear and not sure we need to give that example. I also feel that statement/example could continue to fuel the conversation and maybe what she is wanting in print. It's NASW Code of ethics vs her rights, beliefs and freedoms. I don't think she is seeing how they may conflict.

This one really has me worried.

Rick

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 4:21 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Hi Everyone,

This is what I've put together as a reply to Claudia's latest email....(See below). At this point, I'm just really not sure what else to add---I would like to put some sort of stop/pause to this, however, as it's getting a little aggressive and out-of-hand....my closing in the email was just my best effort at figuring out what to do---if either of you have other suggestions, please let me know.....and I can email Keva next week to let her know what's happening....

Hello Claudia,

The email sent to you by Dr. Harner on April 27, 2023 is a good reflection of the multiple communications there have been regarding this issue. This reflects the discussion that we had during our PSC meeting, and clearly outlines the ways in which your proposed topic conflicted with the NASW's commitment to advocating for transgender individuals.

For example, the topic that you proposed for your zine called for facilities segregated according to biological sex. Such a call is in conflict with NASW policy, as you'll when you refer to the NASW Speaks statement on Transgender and Gender Identity issues, which states *"NASW encourages the repeal of laws and discriminatory practices that impede individuals in their identification with, and their expression of, the gender that matches their sense of themselves, in all areas of the public arena, especially employment, health care, education, and housing, including in custodial settings."*

Again, the email communications you've had regarding this issue and the documents and resources included in the May 24 letter from the PSC are reflective of the several conversations that have been had regarding this issue.

It's not evident that continued email engagement in this manner will prove productive. If you are unsatisfied by the answers that you have received via these multiple communications with the Professional Standards Committee, you may request to re-convene the committee. This would consist of a repeat of the 5/16/23 meeting, including a repetition of an account of what happened, the concerning nature of the proposed topic, the importance of professional communication, and next steps (all outlined in the 5/24/23 letter). The meeting would once again require your attendance and would convene early after the Autumn quarter begins. And, once again, if you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

On Thu, Aug 10, 2023 at 1:59 PM Claudia Sellmaier <sellmaic@uw.edu> wrote:

Hello everyone,

Caution might be in order, especially since Vern received an anonymous email from someone in that course. This doesn't mean it was sent by Claudia but the climate in that course was overall challenging. Checking in with Keva might be a good idea considering everything.

I think we could refer Claudia to said earlier email and we could include the call for separate facilities as one example that is clearly not aligned with the NASW Speaks policy statement. This seems to be a "safe" example. She can also get started on her reflection papers, since these don't require any reference to the specific incident.

Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 12:01 PM
**To:** Rick L. Butt <rickbutt@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Thanks for the feedback, Claudia and Rick....I'm feeling somewhat similarly, Rick. Given the numerous, numerous discussions that have been had with Claudia about this, I'm concerned by her response as well and I'm feeling particularly cautious regarding responding.... It seems as if there's something specific that she is looking for, in writing, and that is worrying to me. Given this somewhat willfully resistant response, I'm not even completely certain that the description that I drafted yesterday is necessarily a good idea. I don't want to be "caught" emailing anything that could be inaccurate or somehow problematic....

In looking through all of the notes/files I have related to this, I DO have a copy of an email between Claudia and Vern that Vern forwarded to me before our earlier meeting in May--I've attached it here.

Given that this was an email that had already been exchanged and does seem to indicate evidence of discussion of the problem itself, I could reply to Claudia by asking her to please look through her email and access the email she received from Vern on April 27.... Not sure what you all think?

Given that we're sharing some feelings of concern by the direction Claudia's questions are heading, maybe it makes the most sense to 1) Email Claudia and tell her to look at the email from April 27 and reflect on the resources etc. she's been given...In that email, I can also include the language from yesterday's draft email regarding the topic choice if you all think it's OK....and 2) If that doesn't satisfy, either re-convene the PSC to do this entire discussion again or take the issue to Keva.....

I'm open to whatever the consensus is---I just really do agree that we need to be cautious....I don't want any of us facing one of those coordinated 'attacks' one of those transphobic outside

groups that have been going around the country trying to weaponize issues like this at all kinds of schools and institutions.....

On Thu, Aug 10, 2023 at 11:09 AM Rick L. Butt <rickbutt@uw.edu> wrote:

This is very concerning to me. Information has been shared and discussed with this student on a couple occasions, yet she is not comprehending the concerns. I wonder if there is another reason she wants to get things in writing. I would be concerned about how/what we communicate moving forward. Maybe I am making this bigger than it is but there are a lot of red flags here.

I have never experienced anything like with any prior PSC meetings. And I am not sure of next steps. I am wondering at this juncture if we need to bring this to Keva.

And totally agree with Claudia that this is confusing, and we do not see any accountability or self-reflection.

Rick

**From:** Claudia Sellmaier <sellmaic@uw.edu>
**Sent:** Thursday, August 10, 2023 9:59 AM
**To:** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Hi Andrea and Rick,

I am really confused here. I met with Claudia before the PSC meeting, and we had this conversation about why the topic is problematic. We also talked about it in our PSC meeting. It is worrisome that she doesn't seem to hear what we have said so far. I think it makes sense to send her the language you already developed, sorry my changes made this actually more complicated. I would also encourage her again to start reading the material we sent her and to start working on her reflection papers, since these hopefully would help her understand why we were concerned in the first place. This is her work, and so far, I have unfortunately not seen any effort for self-reflection.

Thank you for dealing with this.

Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 9:06 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Fwd: Professional Standards Committee--Next Steps

Good morning, Claudia and Rick,

UWT_001268

I've received another response from Claudia regarding the PSC communication I sent her yesterday. In thinking about it, I realized that I should be keeping these emails to PSC members at the moment instead of involving Chris and Vern (no need to add stress to them), so I just wanted to get this to the two of you.....

I'm not sure what the next steps are here.... If you all think it's best, I could reply with the language from my previous email regarding the topic choice-- *"If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. By arguing that transgender identity is 'faked' and weaponized to enable violence against incarcerated individuals, and by advocating for biologically segregated facilities, this topic diminished transgender identities by portraying them as somehow not real and demeaned transgender people by portraying them as inherently violent. This choice in topic directly contravenes established Social Work values and ethical standards. As discussed during our May meeting, conversations and communications regarding your chosen topic were felt to be unprofessional and unproductive, as you were unresponsive and did not engage in the appropriate communicative conduct expected of a BASW student."*

Otherwise, I'm just not sure---would it be best to re-convene the PSC with Claudia to have this meeting again? If so, I believe this would probably need to happen in the fall at this point....Whatever the consensus is is fine with me---given that I'm an outsider when it comes to SW norns, I just don't quite know what to do. Thanks, as always, for your insights!
Andrea

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Wed, Aug 9, 2023 at 10:30 PM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>


Hello Dr. Hill
Thank you for your response, but I need more clarification pertaining to the following questions. My previous questions were not completely answered. I appreciate your attention and patience in this matter.

There were no "specific concerns" shared with me during class or in emails, or with any faculty members. What are these specific concerns that you are referring to?

What were the "original topic conflicts with social work values"? I need you to please clarify if I have done something wrong and what it is? I never had an opportunity to discuss the rough-draft assignment with the professor, or to compare and contrast what was wrong with it.

What is the "conflict between" the "topic choice and the discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities"?

Please understand, nobody has explained to me why I must complete these "opportunities"/punishment, and no one has explained to me what I've done wrong.

If this is an opportunity and not a punishment, then what is the consequence if I refuse to complete this "opportunity"/punishment?

Do I need to "demonstrate" my "social work competencies" because I am a first-generation Hispanic student?

UWT_001269

Lastly, I still want to understand: How did my Rough-Draft Mini-Zine not align with Social Work's professional communication regarding the topic? How did the project topic and communication raise concerns related to professionalism and development? How was I not practicing respectful, Professional Communication at all times?
Thank you again,
Claudia Arias
Fire/Rescue Firefighter

On Wed, Aug 9, 2023 at 10:33 AM Andrea L. Hill <andhill@uw.edu> wrote:
Hello Claudia,

As outlined in the letter sent to you on May 24, 2023, during the May 16, 2023 session in which you met with the School of Social Work and Criminal Justice's Professional Standards Committee, we discussed issues related to your topic selection for a project in TSOCWF 404 and communication concerns stemming from discussion of that topic selection.

As co-chair of the PSC and facilitator of the May 16 meeting, I opened the meeting by explaining the nature and purpose of the SSWCJ PSC. The PSC is a body of faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation. This is an internal Social Work and Criminal Justice Program review committee for social welfare, social work, and criminal justice students. Other University procedures can and will be used when appropriate. The purpose of the PSC is to provide a mechanism for discussing issues and finding a way forward. During our May meeting, Dr. Harner and PSC members spent time discussing these issues and listening to your perspective and thoughts.

If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. The specific concerns were shared with you during class time and in emails, in individual conversations with faculty members and during the PSC meeting. Since professional and ethical social work practice is grounded in social justice, the PSC recommended that you use the resources provided to you to reflect on why your original topic conflicts with social work values. The essay is not a punishment but an opportunity for you to demonstrate your social work competencies.

Therefore, if you have any questions regarding the conflict between your topic choice and your discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities, please refer to any of the multiple resources from the NASW that you've been given by Dr. Harner or any of the multiple references that were linked to the PSC letter sent to you on May 24, 2023. If you have any questions regarding the appropriate communicative conduct expected of a BASW student, please also refer to the multiple resources linked to the PSC letter sent to you in May.

Ethical and effective Social Work practice requires a commitment to disciplinary values and professional communication, and BASW students are expected to model these in their

UWT_001270

work and interactions at all times. In our May 16th meeting and conversation with you, the Professional Standards Committee agreed that the circumstances related to your project topic and communications raised concerns related to professionalism and thus shared the requirements outlined in the letter sent to you on May 24, 2023. ***The conclusions and requirements established in that communication remain unchanged.***

If you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

Thank You,

Dr. Andrea Hill

On Tue, Aug 1, 2023 at 1:14 PM Claudia Arias <arias1@uw.edu> wrote:
  Hello,
  Excellent, I will be waiting.
  Thank you
  Claudia Arias
  2225570

On Tue, Aug 1, 2023 at 1:04 PM Andrea L. Hill <andhill@uw.edu> wrote:
  Hello Claudia,
  Thank you for your email.
  It is important that you understand that 1) It has been over two months since the final Professional Standards Committee decision letter containing the committee's conclusions was emailed to you and 2) Faculty are not on regular schedules during non-academic periods such as the summer. As such, it will take some time to pull together all members of the PSC to fashion a reply.
  Thank you.

  On Tue, Aug 1, 2023 at 12:28 PM Claudia Arias <arias1@uw.edu> wrote:
    Hello,

    After reviewing the email, I have a few questions:
    1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?
    2. How did the project topic and communication raise concerns related to professionalism and development?
    3. How was I not practicing respectful, professional communication at all times? Please clarify.
    4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

UWT_001271

5. Have I done something wrong? If so, what is it, what am I being accused of?
6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, Jul 24, 2023 at 10:30 AM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello,

After reviewing the email, I have a few questions:
1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?
2. How did the project topic and communication raise concerns related to professionalism and development?
3. How was I not practicing respectful, professional communication at all times? Please clarify.
4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?
5. Have I done something wrong? If so, what is it, what am I being accused of?
6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

UWT_001272

On Thu, May 25, 2023 at 4:22 PM Andrea L. Hill <andhill@uw.edu> wrote:
Hi Claudia,
Thanks for attending the meeting of the Professional Standards Committee on May 16th. As mentioned during that meeting, I am sending you a write-up of our discussion regarding requirements for moving forward (attached as a PDF here). This letter represents the conclusions that we discussed with you at the meeting and outlines next steps. If you have any questions at all, please don't hesitate to be in touch.
Be well and take good care,
Dr. Hill
--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street

UWT_001273

Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001274

EXHIBIT 23

 Outlook

## Re: Professional Standards Committee--Next Steps

**From** Claudia Sellmaier <sellmaic@uw.edu>

**Date** Thu 8/10/2023 1:59 PM

**To** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>

Hello everyone,

Caution might be in order, especially since Vern received an anonymous email from someone in that course. This doesn't mean it was sent by Claudia but the climate in that course was overall challenging. Checking in with Keva might be a good idea considering everything.

I think we could refer Claudia to said earlier email and we could include the call for separate facilities as one example that is clearly not aligned with the NASW Speaks policy statement. This seems to be a "safe" example. She can also get started on her reflection papers, since these don't require any reference to the specific incident.

Claudia

Claudia Sellmaier, PhD, MSW, MA

Assistant Professor

MSW Program Chair

Interim BASW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>

**Sent:** Thursday, August 10, 2023 12:01 PM

**To:** Rick L. Butt <rickbutt@uw.edu>

**Cc:** Claudia Sellmaier <sellmaic@uw.edu>

**Subject:** Re: Professional Standards Committee--Next Steps

Thanks for the feedback, Claudia and Rick....I'm feeling somewhat similarly, Rick. Given the numerous, numerous discussions that have been had with Claudia about this, I'm concerned by her response as well and I'm feeling particularly cautious regarding responding.... It seems as if there's something specific that she is looking for, in writing, and that is worrying to me.

Given this somewhat willfully resistant response, I'm not even completely certain that the description that I drafted yesterday is necessarily a good idea. I don't want to be "caught" emailing anything that could be inaccurate or somehow problematic....

In looking through all of the notes/files I have related to this, I DO have a copy of an email between Claudia and Vern that Vern forwarded to me before our earlier meeting in May--I've attached it here.

UWT_000639

Given that this was an email that had already been exchanged and does seem to indicate evidence of discussion of the problem itself, I could reply to Claudia by asking her to please look through her email and access the email she received from Vern on April 27.... Not sure what you all think?

Given that we're sharing some feelings of concern by the direction Claudia's questions are heading, maybe it makes the most sense to 1) Email Claudia and tell her to look at the email from April 27 and reflect on the resources etc. she's been given...In that email, I can also include the language from yesterday's draft email regarding the topic choice if you all think it's OK....and 2) If that doesn't satisfy, either re-convene the PSC to do this entire discussion again or take the issue to Keva.....

I'm open to whatever the consensus is---I just really do agree that we need to be cautious....I don't want any of us facing one of those coordinated 'attacks' one of those transphobic outside groups that have been going around the country trying to weaponize issues like this at all kinds of schools and institutions.....

On Thu, Aug 10, 2023 at 11:09 AM Rick L. Butt <[rickbutt@uw.edu](mailto:rickbutt@uw.edu)> wrote:

> This is very concerning to me. Information has been shared and discussed with this student on a couple occasions, yet she is not comprehending the concerns. I wonder if there is another reason she wants to get things in writing. I would be concerned about how/what we communicate moving forward. Maybe I am making this bigger than it is but there are a lot of red flags here.
>
> I have never experienced anything like with any prior PSC meetings. And I am not sure of next steps. I am wondering at this juncture if we need to bring this to Keva.
>
> And totally agree with Claudia that this is confusing, and we do not see any accountability or self-reflection.
>
> Rick
>
> ---
>
> **From:** Claudia Sellmaier <[sellmaic@uw.edu](mailto:sellmaic@uw.edu)>
> **Sent:** Thursday, August 10, 2023 9:59 AM
> **To:** Andrea L. Hill <[andhill@uw.edu](mailto:andhill@uw.edu)>; Rick L. Butt <[rickbutt@uw.edu](mailto:rickbutt@uw.edu)>
> **Subject:** Re: Professional Standards Committee--Next Steps
>
> Hi Andrea and Rick,
>
> I am really confused here. I met with Claudia before the PSC meeting, and we had this conversation about why the topic is problematic. We also talked about it in our PSC meeting. It is worrisome that she doesn't seem to hear what we have said so far. I think it makes sense to send her the language you already developed, sorry my changes made this actually more complicated. I would also encourage her again to start reading the material we sent her and to start working on her reflection papers, since these hopefully would help her understand why we were concerned in the first place. This is her work, and so far, I have unfortunately not seen any effort for self-reflection.
>
> Thank you for dealing with this.
> Claudia

UWT_000640

Claudia Sellmaier, PhD, MSW, MA

Assistant Professor

MSW Program Chair

Interim BASW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 9:06 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Fwd: Professional Standards Committee--Next Steps

Good morning, Claudia and Rick,

I've received another response from Claudia regarding the PSC communication I sent her yesterday. In thinking about it, I realized that I should be keeping these emails to PSC members at the moment instead of involving Chris and Vern (no need to add stress to them), so I just wanted to get this to the two of you.....

I'm not sure what the next steps are here.... If you all think it's best, I could reply with the language from my previous email regarding the topic choice-- "*If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. By arguing that transgender identity is 'faked' and weaponized to enable violence against incarcerated individuals, and by advocating for biologically segregated facilities, this topic diminished transgender identities by portraying them as somehow not real and demeaned transgender people by portraying them as inherently violent. This choice in topic directly contravenes established Social Work values and ethical standards. As discussed during our May meeting, conversations and communications regarding your chosen topic were felt to be unprofessional and unproductive, as you were unresponsive and did not engage in the appropriate communicative conduct expected of a BASW student.*"

Otherwise, I'm just not sure---would it be best to re-convene the PSC with Claudia to have this meeting again? If so, I believe this would probably need to happen in the fall at this point....Whatever the consensus is is fine with me---given that I'm an outsider when it comes to SW norns, I just don't quite know what to do. Thanks, as always, for your insights!

Andrea

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Wed, Aug 9, 2023 at 10:30 PM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

UWT_000641

Hello Dr. Hill

Thank you for your response, but I need more clarification pertaining to the following questions. My previous questions were not completely answered. I appreciate your attention and patience in this matter.

There were no "specific concerns" shared with me during class or in emails, or with any faculty members. What are these specific concerns that you are referring to?

What were the "original topic conflicts with social work values"? I need you to please clarify if I have done something wrong and what it is? I never had an opportunity to discuss the rough-draft assignment with the professor, or to compare and contrast what was wrong with it.

What is the "conflict between" the "topic choice and the discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities"?

Please understand, nobody has explained to me why I must complete these "opportunities"/punishment, and no one has explained to me what I've done wrong.

If this is an opportunity and not a punishment, then what is the consequence if I refuse to complete this "opportunity"/punishment?

Do I need to "demonstrate" my "social work competencies" because I am a first-generation Hispanic student?

Lastly, I still want to understand: How did my Rough-Draft Mini-Zine not align with Social Work's professional communication regarding the topic? How did the project topic and communication raise concerns related to professionalism and development? How was I not practicing respectful, Professional Communication at all times?

Thank you again,

Claudia Arias
Fire/Rescue Firefighter

On Wed, Aug 9, 2023 at 10:33 AM Andrea L. Hill <andhill@uw.edu> wrote:

> Hello Claudia,
>
> As outlined in the letter sent to you on May 24, 2023, during the May 16, 2023 session in which you met with the School of Social Work and Criminal Justice's Professional Standards Committee, we discussed issues related to your topic selection for a project in TSOCWF 404 and communication concerns stemming from discussion of that topic selection.
>
> As co-chair of the PSC and facilitator of the May 16 meeting, I opened the meeting by explaining the nature and purpose of the SSWCJ PSC. The PSC is a body of faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation. This is an internal Social Work and Criminal Justice Program review committee for social welfare, social work, and criminal justice students. Other University procedures can and will be used when appropriate. The purpose of the PSC is to provide a mechanism for discussing issues and finding a way forward. During our

UWT_000642

May meeting, Dr. Harner and PSC members spent time discussing these issues and listening to your perspective and thoughts.

If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. The specific concerns were shared with you during class time and in emails, in individual conversations with faculty members and during the PSC meeting. Since professional and ethical social work practice is grounded in social justice, the PSC recommended that you use the resources provided to you to reflect on why your original topic conflicts with social work values. The essay is not a punishment but an opportunity for you to demonstrate your social work competencies.

Therefore, if you have any questions regarding the conflict between your topic choice and your discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities, please refer to any of the multiple resources from the NASW that you've been given by Dr. Harner or any of the multiple references that were linked to the PSC letter sent to you on May 24, 2023. If you have any questions regarding the appropriate communicative conduct expected of a BASW student, please also refer to the multiple resources linked to the PSC letter sent to you in May.

Ethical and effective Social Work practice requires a commitment to disciplinary values and professional communication, and BASW students are expected to model these in their work and interactions at all times. In our May 16th meeting and conversation with you, the Professional Standards Committee agreed that the circumstances related to your project topic and communications raised concerns related to professionalism and thus shared the requirements outlined in the letter sent to you on May 24, 2023. ***The conclusions and requirements established in that communication remain unchanged.***

If you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

Thank You,

Dr. Andrea Hill

On Tue, Aug 1, 2023 at 1:14 PM Claudia Arias <arias1@uw.edu> wrote:
> Hello,
>
> Excellent, I will be waiting.
>
> Thank you
> Claudia Arias
> 2225570
>
> On Tue, Aug 1, 2023 at 1:04 PM Andrea L. Hill <andhill@uw.edu> wrote:
>> Hello Claudia,
>>
>> Thank you for your email.
>>
>> It is important that you understand that 1) It has been over two months since the final Professional Standards Committee decision letter containing the committee's conclusions was

UWT_000643

emailed to you and 2) Faculty are not on regular schedules during non-academic periods such as the summer. As such, it will take some time to pull together all members of the PSC to fashion a reply.

Thank you.

On Tue, Aug 1, 2023 at 12:28 PM Claudia Arias <arias1@uw.edu> wrote:

Hello,

After reviewing the email, I have a few questions:

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, Jul 24, 2023 at 10:30 AM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello,

After reviewing the email, I have a few questions:

UWT_000644

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?


Respectfully,

Claudia Arias
Student ID 2225570




On Thu, May 25, 2023 at 4:22 PM Andrea L. Hill <andhill@uw.edu> wrote:
> Hi Claudia,
> Thanks for attending the meeting of the Professional Standards Committee on May 16th.
> As mentioned during that meeting, I am sending you a write-up of our discussion
> regarding requirements for moving forward (attached as a PDF here). This letter
> represents the conclusions that we discussed with you at the meeting and outlines
> next steps. If you have any questions at all, please don't hesitate to be in touch.
>
> Be well and take good care,
>
> Dr. Hill
> --
> **Andrea L. Hill, PhD**
> Associate Teaching Professor
> School of Social Work and Criminal Justice
> University of Washington Tacoma
> Box 358425
> 1900 Commerce Street
> Tacoma, WA 98402
> 253-692-4943

UWT_000645

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000646

EXHIBIT 24

 Outlook

EXH-8
Oct 10 2025

## Re: Professional Standards Committee--Next Steps

**From** Claudia Sellmaier <sellmaic@uw.edu>

**Date** Thu 8/10/2023 1:59 PM

**To** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>

Hello everyone,

Caution might be in order, especially since Vern received an anonymous email from someone in that course. This doesn't mean it was sent by Claudia but the climate in that course was overall challenging. Checking in with Keva might be a good idea considering everything.
I think we could refer Claudia to said earlier email and we could include the call for separate facilities as one example that is clearly not aligned with the NASW Speaks policy statement. This seems to be a "safe" example. She can also get started on her reflection papers, since these don't require any reference to the specific incident.

Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 12:01 PM
**To:** Rick L. Butt <rickbutt@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Thanks for the feedback, Claudia and Rick....I'm feeling somewhat similarly, Rick. Given the numerous, numerous discussions that have been had with Claudia about this, I'm concerned by her response as well and I'm feeling particularly cautious regarding responding.... It seems as if there's something specific that she is looking for, in writing, and that is worrying to me.

Given this somewhat willfully resistant response, I'm not even completely certain that the description that I drafted yesterday is necessarily a good idea. I don't want to be "caught" emailing anything that could be inaccurate or somehow problematic....

In looking through all of the notes/files I have related to this, I DO have a copy of an email between Claudia and Vern that Vern forwarded to me before our earlier meeting in May--I've attached it here.

UWT_000639

Given that this was an email that had already been exchanged and does seem to indicate evidence of discussion of the problem itself, I could reply to Claudia by asking her to please look through her email and access the email she received from Vern on April 27.... Not sure what you all think?

Given that we're sharing some feelings of concern by the direction Claudia's questions are heading, maybe it makes the most sense to 1) Email Claudia and tell her to look at the email from April 27 and reflect on the resources etc. she's been given...In that email, I can also include the language from yesterday's draft email regarding the topic choice if you all think it's OK....and 2) If that doesn't satisfy, either re-convene the PSC to do this entire discussion again or take the issue to Keva.....

I'm open to whatever the consensus is---I just really do agree that we need to be cautious....I don't want any of us facing one of those coordinated 'attacks' one of those transphobic outside groups that have been going around the country trying to weaponize issues like this at all kinds of schools and institutions.....

On Thu, Aug 10, 2023 at 11:09 AM Rick L. Butt <rickbutt@uw.edu> wrote:

> This is very concerning to me. Information has been shared and discussed with this student on a couple occasions, yet she is not comprehending the concerns. I wonder if there is another reason she wants to get things in writing. I would be concerned about how/what we communicate moving forward. Maybe I am making this bigger than it is but there are a lot of red flags here.
>
> I have never experienced anything like with any prior PSC meetings. And I am not sure of next steps. I am wondering at this juncture if we need to bring this to Keva.
>
> And totally agree with Claudia that this is confusing, and we do not see any accountability or self-reflection.
>
> Rick
>
> ---
>
> **From:** Claudia Sellmaier <sellmaic@uw.edu>
> **Sent:** Thursday, August 10, 2023 9:59 AM
> **To:** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
> **Subject:** Re: Professional Standards Committee--Next Steps
>
> Hi Andrea and Rick,
>
> I am really confused here. I met with Claudia before the PSC meeting, and we had this conversation about why the topic is problematic. We also talked about it in our PSC meeting. It is worrisome that she doesn't seem to hear what we have said so far. I think it makes sense to send her the language you already developed, sorry my changes made this actually more complicated. I would also encourage her again to start reading the material we sent her and to start working on her reflection papers, since these hopefully would help her understand why we were concerned in the first place. This is her work, and so far, I have unfortunately not seen any effort for self-reflection.
>
> Thank you for dealing with this.
> Claudia

UWT_000640

Claudia Sellmaier, PhD, MSW, MA

Assistant Professor

MSW Program Chair

Interim BASW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 9:06 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Fwd: Professional Standards Committee--Next Steps

Good morning, Claudia and Rick,

I've received another response from Claudia regarding the PSC communication I sent her yesterday. In thinking about it, I realized that I should be keeping these emails to PSC members at the moment instead of involving Chris and Vern (no need to add stress to them), so I just wanted to get this to the two of you.....

I'm not sure what the next steps are here.... If you all think it's best, I could reply with the language from my previous email regarding the topic choice-- *"If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. By arguing that transgender identity is 'faked' and weaponized to enable violence against incarcerated individuals, and by advocating for biologically segregated facilities, this topic diminished transgender identities by portraying them as somehow not real and demeaned transgender people by portraying them as inherently violent. This choice in topic directly contravenes established Social Work values and ethical standards. As discussed during our May meeting, conversations and communications regarding your chosen topic were felt to be unprofessional and unproductive, as you were unresponsive and did not engage in the appropriate communicative conduct expected of a BASW student."*

Otherwise, I'm just not sure---would it be best to re-convene the PSC with Claudia to have this meeting again? If so, I believe this would probably need to happen in the fall at this point....Whatever the consensus is is fine with me---given that I'm an outsider when it comes to SW norns, I just don't quite know what to do. Thanks, as always, for your insights!

Andrea

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Wed, Aug 9, 2023 at 10:30 PM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

UWT_000641

Hello Dr. Hill

Thank you for your response, but I need more clarification pertaining to the following questions. My previous questions were not completely answered. I appreciate your attention and patience in this matter.

There were no "specific concerns" shared with me during class or in emails, or with any faculty members. What are these specific concerns that you are referring to?

What were the "original topic conflicts with social work values"? I need you to please clarify if I have done something wrong and what it is? I never had an opportunity to discuss the rough-draft assignment with the professor, or to compare and contrast what was wrong with it.

What is the "conflict between" the "topic choice and the discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities"?

Please understand, nobody has explained to me why I must complete these "opportunities"/punishment, and no one has explained to me what I've done wrong.

If this is an opportunity and not a punishment, then what is the consequence if I refuse to complete this "opportunity"/punishment?

Do I need to "demonstrate" my "social work competencies" because I am a first-generation Hispanic student?

Lastly, I still want to understand: How did my Rough-Draft Mini-Zine not align with Social Work's professional communication regarding the topic? How did the project topic and communication raise concerns related to professionalism and development? How was I not practicing respectful, Professional Communication at all times?

Thank you again,

Claudia Arias
Fire/Rescue Firefighter

On Wed, Aug 9, 2023 at 10:33 AM Andrea L. Hill <andhill@uw.edu> wrote:

> Hello Claudia,
>
> As outlined in the letter sent to you on May 24, 2023, during the May 16, 2023 session in which you met with the School of Social Work and Criminal Justice's Professional Standards Committee, we discussed issues related to your topic selection for a project in TSOCWF 404 and communication concerns stemming from discussion of that topic selection.
>
> As co-chair of the PSC and facilitator of the May 16 meeting, I opened the meeting by explaining the nature and purpose of the SSWCJ PSC. The PSC is a body of faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation. This is an internal Social Work and Criminal Justice Program review committee for social welfare, social work, and criminal justice students. Other University procedures can and will be used when appropriate. The purpose of the PSC is to provide a mechanism for discussing issues and finding a way forward. During our

UWT_000642

May meeting, Dr. Harner and PSC members spent time discussing these issues and listening to your perspective and thoughts.

If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. The specific concerns were shared with you during class time and in emails, in individual conversations with faculty members and during the PSC meeting. Since professional and ethical social work practice is grounded in social justice, the PSC recommended that you use the resources provided to you to reflect on why your original topic conflicts with social work values. The essay is not a punishment but an opportunity for you to demonstrate your social work competencies.

Therefore, if you have any questions regarding the conflict between your topic choice and your discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities, please refer to any of the multiple resources from the NASW that you've been given by Dr. Harner or any of the multiple references that were linked to the PSC letter sent to you on May 24, 2023. If you have any questions regarding the appropriate communicative conduct expected of a BASW student, please also refer to the multiple resources linked to the PSC letter sent to you in May.

Ethical and effective Social Work practice requires a commitment to disciplinary values and professional communication, and BASW students are expected to model these in their work and interactions at all times. In our May 16th meeting and conversation with you, the Professional Standards Committee agreed that the circumstances related to your project topic and communications raised concerns related to professionalism and thus shared the requirements outlined in the letter sent to you on May 24, 2023. ***The conclusions and requirements established in that communication remain unchanged.***

If you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

Thank You,

Dr. Andrea Hill

On Tue, Aug 1, 2023 at 1:14 PM Claudia Arias <arias1@uw.edu> wrote:
> Hello,
>
> Excellent, I will be waiting.
>
> Thank you
> Claudia Arias
> 2225570
>
> On Tue, Aug 1, 2023 at 1:04 PM Andrea L. Hill <andhill@uw.edu> wrote:
>> Hello Claudia,
>>
>> Thank you for your email.
>>
>> It is important that you understand that 1) It has been over two months since the final Professional Standards Committee decision letter containing the committee's conclusions was

UWT_000643

emailed to you and 2) Faculty are not on regular schedules during non-academic periods such as the summer. As such, it will take some time to pull together all members of the PSC to fashion a reply.

Thank you.

On Tue, Aug 1, 2023 at 12:28 PM Claudia Arias <arias1@uw.edu> wrote:

Hello,

After reviewing the email, I have a few questions:

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, Jul 24, 2023 at 10:30 AM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello,

After reviewing the email, I have a few questions:

UWT_000644

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?


Respectfully,

Claudia Arias
Student ID 2225570




On Thu, May 25, 2023 at 4:22 PM Andrea L. Hill <andhill@uw.edu> wrote:
> Hi Claudia,
> Thanks for attending the meeting of the Professional Standards Committee on May 16th.
> As mentioned during that meeting, I am sending you a write-up of our discussion
> regarding requirements for moving forward (attached as a PDF here). This letter
> represents the conclusions that we discussed with you at the meeting and outlines
> next steps. If you have any questions at all, please don't hesitate to be in touch.
>
> Be well and take good care,
>
> Dr. Hill
> --
> **Andrea L. Hill, PhD**
> Associate Teaching Professor
> School of Social Work and Criminal Justice
> University of Washington Tacoma
> Box 358425
> 1900 Commerce Street
> Tacoma, WA 98402
> 253-692-4943

UWT_000645

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000646

# EXHIBIT 25

Case 3:25-cv-05079-DGE    Document 105    Filed 03/17/26    Page 138 of 446

 Outlook

EXH-2
Jan 14 2026

## Re: Professional Standards Committee--Next Steps

**From** Rick L. Butt <rickbutt@uw.edu>

**Date** Thu 8/10/2023 4:48 PM

**To**    Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>

Hi Andrea,

Thanks again for all of your work. I still think that the continuous satisfying outcome" for the student, we should bring in Keva and/or our legal folks for consultation. I am concerned she may claim we are violating one of her freedoms and/or discriminating against her due to her ethnicity. I am hoping I am wrong.

I like the email response. I highlighted in yellow where I think it is missing the word "see." I am wondering if we should remove the example. I feel the paragraph before is clear and not sure we need to give that example. I also feel that statement/example could continue to fuel the conversation and maybe what she is wanting in print. It's NASW Code of ethics vs her rights, beliefs and freedoms. I don't think she is seeing how they may conflict.

This one really has me worried.

Rick

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 4:21 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Hi Everyone,

This is what I've put together as a reply to Claudia's latest email....(See below). At this point, I'm just really not sure what else to add---I would like to put some sort of stop/pause to this, however, as it's getting a little aggressive and out-of-hand....my closing in the email was just my best effort at figuring out what to do---if either of you have other suggestions, please let me know.....and I can email Keva next week to let her know what's happening....

UWT_000657

Hello Claudia,

The email sent to you by Dr. Harner on April 27, 2023 is a good reflection of the multiple communications there have been regarding this issue. This reflects the discussion that we had during our PSC meeting, and clearly outlines the ways in which your proposed topic conflicted with the NASW's commitment to advocating for transgender individuals.

For example, the topic that you proposed for your zine called for facilities segregated according to biological sex. Such a call is in conflict with NASW policy, as you'll when you refer to the NASW Speaks statement on Transgender and Gender Identity issues, which states *"NASW encourages the repeal of laws and discriminatory practices that impede individuals in their identification with, and their expression of, the gender that matches their sense of themselves, in all areas of the public arena, especially employment, health care, education, and housing, including in custodial settings."*

Again, the email communications you've had regarding this issue and the documents and resources included in the May 24 letter from the PSC are reflective of the several conversations that have been had regarding this issue.

It's not evident that continued email engagement in this manner will prove productive. If you are unsatisfied by the answers that you have received via these multiple communications with the Professional Standards Committee, you may request to re-convene the committee. This would consist of a repeat of the 5/16/23 meeting, including a repetition of an account of what happened, the concerning nature of the proposed topic, the importance of professional communication, and next steps (all outlined in the 5/24/23 letter). The meeting would once again require your attendance and would convene early after the Autumn quarter begins. And, once again, if you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

On Thu, Aug 10, 2023 at 1:59 PM Claudia Sellmaier <sellmaic@uw.edu> wrote:

> Hello everyone,
>
> Caution might be in order, especially since Vern received an anonymous email from someone in that course. This doesn't mean it was sent by Claudia but the climate in that course was overall challenging. Checking in with Keva might be a good idea considering everything.
> I think we could refer Claudia to said earlier email and we could include the call for separate facilities as one example that is clearly not aligned with the NASW Speaks policy statement. This seems to be a "safe" example. She can also get started on her reflection papers, since these don't require any reference to the specific incident.
>
> Claudia
>
> Claudia Sellmaier, PhD, MSW, MA
> Assistant Professor
> MSW Program Chair
> Interim BASW Program Chair
> Pronouns: She/her/hers
> University of Washington, Tacoma
> School of Social Work & Criminal Justice

UWT_000658

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 12:01 PM
**To:** Rick L. Butt <rickbutt@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Thanks for the feedback, Claudia and Rick....I'm feeling somewhat similarly, Rick. Given the numerous, numerous discussions that have been had with Claudia about this, I'm concerned by her response as well and I'm feeling particularly cautious regarding responding.... It seems as if there's something specific that she is looking for, in writing, and that is worrying to me.

Given this somewhat willfully resistant response, I'm not even completely certain that the description that I drafted yesterday is necessarily a good idea. I don't want to be "caught" emailing anything that could be inaccurate or somehow problematic....

In looking through all of the notes/files I have related to this, I DO have a copy of an email between Claudia and Vern that Vern forwarded to me before our earlier meeting in May--I've attached it here.

Given that this was an email that had already been exchanged and does seem to indicate evidence of discussion of the problem itself, I could reply to Claudia by asking her to please look through her email and access the email she received from Vern on April 27.... Not sure what you all think?

Given that we're sharing some feelings of concern by the direction Claudia's questions are heading, maybe it makes the most sense to 1) Email Claudia and tell her to look at the email from April 27 and reflect on the resources etc. she's been given...In that email, I can also include the language from yesterday's draft email regarding the topic choice if you all think it's OK....and 2) If that doesn't satisfy, either re-convene the PSC to do this entire discussion again or take the issue to Keva.....

I'm open to whatever the consensus is---I just really do agree that we need to be cautious....I don't want any of us facing one of those coordinated 'attacks' one of those transphobic outside groups that have been going around the country trying to weaponize issues like this at all kinds of schools and institutions.....

On Thu, Aug 10, 2023 at 11:09 AM Rick L. Butt <rickbutt@uw.edu> wrote:

> This is very concerning to me. Information has been shared and discussed with this student on a couple occasions, yet she is not comprehending the concerns. I wonder if there is another reason she wants to get things in writing. I would be concerned about how/what we communicate moving forward. Maybe I am making this bigger than it is but there are a lot of red flags here.
>
> I have never experienced anything like with any prior PSC meetings. And I am not sure of next steps. I am wondering at this juncture if we need to bring this to Keva.

UWT_000659

And totally agree with Claudia that this is confusing, and we do not see any accountability or self-reflection.

Rick

---

**From:** Claudia Sellmaier <sellmaic@uw.edu>
**Sent:** Thursday, August 10, 2023 9:59 AM
**To:** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Hi Andrea and Rick,

I am really confused here. I met with Claudia before the PSC meeting, and we had this conversation about why the topic is problematic. We also talked about it in our PSC meeting. It is worrisome that she doesn't seem to hear what we have said so far. I think it makes sense to send her the language you already developed, sorry my changes made this actually more complicated. I would also encourage her again to start reading the material we sent her and to start working on her reflection papers, since these hopefully would help her understand why we were concerned in the first place. This is her work, and so far, I have unfortunately not seen any effort for self-reflection.

Thank you for dealing with this.
Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Thursday, August 10, 2023 9:06 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Fwd: Professional Standards Committee--Next Steps

Good morning, Claudia and Rick,

I've received another response from Claudia regarding the PSC communication I sent her yesterday. In thinking about it, I realized that I should be keeping these emails to PSC members at the moment instead of involving Chris and Vern (no need to add stress to them), so I just wanted to get this to the two of you.....

I'm not sure what the next steps are here.... If you all think it's best, I could reply with the language from my previous email regarding the topic choice-- *"If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. By arguing that transgender identity is 'faked' and weaponized to enable violence against incarcerated individuals, and by advocating for*

UWT_000660

*biologically segregated facilities, this topic diminished transgender identities by portraying them as somehow not real and demeaned transgender people by portraying them as inherently violent. This choice in topic directly contravenes established Social Work values and ethical standards. As discussed during our May meeting, conversations and communications regarding your chosen topic were felt to be unprofessional and unproductive, as you were unresponsive and did not engage in the appropriate communicative conduct expected of a BASW student.*"

Otherwise, I'm just not sure---would it be best to re-convene the PSC with Claudia to have this meeting again? If so, I believe this would probably need to happen in the fall at this point....Whatever the consensus is is fine with me---given that I'm an outsider when it comes to SW norns, I just don't quite know what to do. Thanks, as always, for your insights!

Andrea

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Wed, Aug 9, 2023 at 10:30 PM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello Dr. Hill

Thank you for your response, but I need more clarification pertaining to the following questions. My previous questions were not completely answered. I appreciate your attention and patience in this matter.

There were no "specific concerns" shared with me during class or in emails, or with any faculty members. What are these specific concerns that you are referring to?

What were the "original topic conflicts with social work values"? I need you to please clarify if I have done something wrong and what it is? I never had an opportunity to discuss the rough-draft assignment with the professor, or to compare and contrast what was wrong with it.

What is the "conflict between" the "topic choice and the discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities"?

Please understand, nobody has explained to me why I must complete these "opportunities"/punishment, and no one has explained to me what I've done wrong.

If this is an opportunity and not a punishment, then what is the consequence if I refuse to complete this "opportunity"/punishment?

Do I need to "demonstrate" my "social work competencies" because I am a first-generation Hispanic student?

Lastly, I still want to understand: How did my Rough-Draft Mini-Zine not align with Social Work's professional communication regarding the topic? How did the project topic and communication

UWT_000661

raise concerns related to professionalism and development? How was I not practicing respectful, Professional Communication at all times?

Thank you again,

Claudia Arias
Fire/Rescue Firefighter

On Wed, Aug 9, 2023 at 10:33 AM Andrea L. Hill <andhill@uw.edu> wrote:

> Hello Claudia,
>
> As outlined in the letter sent to you on May 24, 2023, during the May 16, 2023 session in which you met with the School of Social Work and Criminal Justice's Professional Standards Committee, we discussed issues related to your topic selection for a project in TSOCWF 404 and communication concerns stemming from discussion of that topic selection.
>
> As co-chair of the PSC and facilitator of the May 16 meeting, I opened the meeting by explaining the nature and purpose of the SSWCJ PSC. The PSC is a body of faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation. This is an internal Social Work and Criminal Justice Program review committee for social welfare, social work, and criminal justice students. Other University procedures can and will be used when appropriate. The purpose of the PSC is to provide a mechanism for discussing issues and finding a way forward. During our May meeting, Dr. Harner and PSC members spent time discussing these issues and listening to your perspective and thoughts.
>
> If you recall, concerns stemmed from your selection of a topic for a Mini-Zine project for TSOCWF 404. The specific concerns were shared with you during class time and in emails, in individual conversations with faculty members and during the PSC meeting. Since professional and ethical social work practice is grounded in social justice, the PSC recommended that you use the resources provided to you to reflect on why your original topic conflicts with social work values. The essay is not a punishment but an opportunity for you to demonstrate your social work competencies.
>
> Therefore, if you have any questions regarding the conflict between your topic choice and your discipline's commitment to recognizing, valuing, and advocating for transgender individuals and communities, please refer to any of the multiple resources from the NASW that you've been given by Dr. Harner or any of the multiple references that were linked to the PSC letter sent to you on May 24, 2023. If you have any questions regarding the appropriate communicative conduct expected of a BASW student, please also refer to the multiple resources linked to the PSC letter sent to you in May.
>
> Ethical and effective Social Work practice requires a commitment to disciplinary values and professional communication, and BASW students are expected to model these in their work and interactions at all times. In our May 16th meeting and conversation with you, the Professional Standards Committee agreed that the circumstances related to your project topic and communications raised concerns related to professionalism and thus shared the requirements outlined in the letter sent to you on May 24, 2023. ***The conclusions and requirements established in that communication remain unchanged.***
>
> If you believe you are being subjected to treatment that is somehow targeted or is in any way unfair, I encourage you to take the appropriate next steps, which may include utilizing UWT's Bias

UWT_000662

Incident Reporting or accessing the academic grievance process outlined in the BASW handbook.

Thank You,

Dr. Andrea Hill

On Tue, Aug 1, 2023 at 1:14 PM Claudia Arias <arias1@uw.edu> wrote:
> Hello,
>
> Excellent, I will be waiting.
>
> Thank you
> Claudia Arias
> 2225570
>
> On Tue, Aug 1, 2023 at 1:04 PM Andrea L. Hill <andhill@uw.edu> wrote:
>> Hello Claudia,
>>
>> Thank you for your email.
>>
>> It is important that you understand that 1) It has been over two months since the final Professional Standards Committee decision letter containing the committee's conclusions was emailed to you and 2) Faculty are not on regular schedules during non-academic periods such as the summer. As such, it will take some time to pull together all members of the PSC to fashion a reply.
>>
>> Thank you.
>>
>> On Tue, Aug 1, 2023 at 12:28 PM Claudia Arias <arias1@uw.edu> wrote:
>>> Hello,
>>>
>>> After reviewing the email, I have a few questions:
>>>
>>> 1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?
>>>
>>> 2. How did the project topic and communication raise concerns related to professionalism and development?
>>>
>>> 3. How was I not practicing respectful, professional communication at all times? Please clarify.
>>>
>>> 4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?
>>>
>>> 5. Have I done something wrong? If so, what is it, what am I being accused of?

UWT_000663

6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, Jul 24, 2023 at 10:30 AM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello,

After reviewing the email, I have a few questions:

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

UWT_000664

On Thu, May 25, 2023 at 4:22 PM Andrea L. Hill <<u>andhill@uw.edu</u>> wrote:

Hi Claudia,

Thanks for attending the meeting of the Professional Standards Committee on May 16th. As mentioned during that meeting, I am sending you a write-up of our discussion regarding requirements for moving forward (attached as a PDF here). This letter represents the conclusions that we discussed with you at the meeting and outlines next steps. If you have any questions at all, please don't hesitate to be in touch.

Be well and take good care,

Dr. Hill
--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**

UWT_000665

Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_000666

EXHIBIT 26

DKT #5
Jan 14 2026

| | |
|---|---|
| **From:** | Claudia Sellmaier |
| **Sent:** | Monday, July 24, 2023 2:50 PM PDT |
| **To:** | Vern Harner <vharner@uw.edu>; Andrea L. Hill <andhill@uw.edu> |
| **CC:** | Chris Barrans <barransc@uw.edu>; Rick L. Butt <rickbutt@uw.edu> |
| **Subject:** | Re: Professional Standards Committee--Next Steps |

Hello everyone,

I am a little bit torn. On the one hand I also lean towards a short response saying that this has been discussed in the PSC meeting. On the other hand, we didn't include the details of our PSC discussion in the letter. If you only look at the letter, the questions she poses are not answered. I know we talked about it, but there is no record of our conversation except for this letter. Maybe we should draft a brief response saying like as discussed in the meeting the zine doesn't align with SW values because of... (for example it portrays transgender individuals as violent, since the zine argued that men only pretended to be transgender it sends a message that being transgender is not real, calls for exclusion/separate facilities all of these are not aligned with SW Speaks policy statement or SW values of social justice) and communication was not professional because of that... Vern's initial referral might contain that information already. I wouldn't answer questions #4 through #6, but maybe we can write a few sentences summarizing the specifics of the concerns that resulted in the PSC meeting (#1-3). Looking at our grievance processes, I would think that this is either an academic grievance, and she should write a written complaint to the dean, or she feels it's unfair treatment then she could file a bias incident report. I don't think it makes much sense to refer her with concerns to anyone she has already talked to, since there's not really anything new/different we can say.

Just my thoughts.

Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Monday, July 24, 2023 2:26 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Chris Barrans <barransc@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Thanks, all -- Andrea, your plan sounds good to me, too (re referring her back to the conversation we had and the letter). As we discussed when PSC convened, Claudia's questions had already been discussed with her multiple times before PSC and during the meeting, as well. I appreciate your caution around this. I'm also not sure who it'd be recommended she contact -- Dr. Sellmaier, Dean Miller, someone outside the school...I wish I could be more helpful! the Social Work Speaks reading (which Claudia has been sent twice already, including linked in the letter following the PSC meeting) specifically outlines social work's stance on the issue (her questions #1 and 2).

I appreciate you all,

Vern

UWT_001191

--
**Vern Harner, PhD**
pronoun: they

On Mon, Jul 24, 2023 at 2:07 PM Andrea L. Hill <andhill@uw.edu> wrote:

Thanks so much for weighing in, Chris and RIck, I appreciate it... Ultimately,I think that I agree with you, Chris, about a reply. I don't believe that it should be your job, or the job of the PSC to re-answer or re-litigate these issues, given that we'd reached a conclusion at the meeting. She agreed to the conclusion and didn't have any questions at the time.... nor have we heard from her since, until now.

Given the environment, I feel very cautious about every step forward---there are too many examples of external groups weaponizing students (and issues) like this to attack academics.....As such, I wonder if it might be best to reply by:

1) Just referring Claudia to the letter and reminding her of our conversation during the meeting, as the PSC letter does note "*The committee agrees that the circumstances related to project topic and communication raise concerns related to professionalism and development—concerns raised during the PSC meeting on Tuesday, May 16. Moreover, we also agree that effective and ethical Social Work practice requires a self-aware willingness to acknowledge and take responsibility for mistakes and to practice respectful, professional communication at all times*"

and

2) Recommending that she contact .... ??? if she has concerns (this is where I'm drawing a blank--the SW undergraduate chair? Or would it be better for it to go outside of SSWCJ at this point?). Maybe the Office of Student Advocacy and Support---Roseanne Martinez was at the PSC meeting in June, so that might be useful..... I am beginning to think that, given how relatively small the overall SW program is (Claudia will have contact/has had contact with pretty much all SW faculty at some point), we might need an external voice.

There's definitely NO big rush on this, obviously (Claudia didn't get back to us for 2 months...and the deadline for her to complete this work isn't until late October anyway), so I'll wait until we get more voices/ideas about how to proceed.... Thanks so much for the replies---I really appreciate the two of you!!

Andrea

On Mon, Jul 24, 2023 at 1:13 PM Chris Barrans <barransc@uw.edu> wrote:

Hi everyone,
Thanks for sharing this update, Andrea. I'm sorry that this issue continues on after so many weeks.
I am Claudia's faculty advisor. I've met with her once and it was about the PSC referral before the meeting. It didn't go very well. She was combative and spent most of the time trying to convince me of the validity of her topic and argue her points. I tried to engage in a constructive conversation and provide feedback, but I don't think any of my attempts landed with her. Finally, I had to shut that part of the conversation down especially once it started to feel personal. We transitioned to me giving context for the PSC process and my recommendations about how to prepare and approach the meeting, but she wasn't very open to my feedback. So, I'm not sure how supported Claudia would feel by meeting with me again.
I'm happy to go over the PSC process in general with Claudia again but I don't feel equipped to discuss the specifics of the PSC meeting or her concerns without more information since I didn't attend the PSC meeting and I'm not up to date on what has taken place through Claudia's PSC process or the outcomes of the meeting. I don't think I've seen the final PSC letter. Let me know if you'd like to check in about this.

UWT_001192

I'm also more than willing to participate in the process of answering her questions via email if helpful. My opinion is that the PSC isn't required to respond to each of these questions given that she was onboard at the meeting or at least agreed to the outcome and that it has been two months since the conclusion of the PSC. I wonder if a general response referring Claudia back to the PSC letter and agreements made at the meeting is sufficient. I'm not a part of the PSC and don't have experience being on the PSC so feel free to disregard.
Let me know how I can assist. Thanks all.
Chris
Chris Barrans, MSW
*He/Him/His*
Director of Field Education/Assistant Teaching Professor
School of Social Work & Criminal Justice
University of Washington Tacoma
Phone: 253-692-5823
Office: WCG-203J
**STAR access:** http://star.ssw.washington.edu


**From:** Rick L. Butt <rickbutt@uw.edu>
**Sent:** Monday, July 24, 2023 11:39 AM
**To:** Andrea L. Hill <andhill@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>; Vern Harner <vharner@uw.edu>; Chris Barrans <barransc@uw.edu>
**Subject:** Re: Professional Standards Committee--Next Steps

Andrea,
Wow, there seems to be a disconnect between the issues that brought Claudia to the PSC and what was discussed at the meeting with the questions she is now asking. I am at a loss also.
I know I was not at the PSC but I know you follow the same format/structure and would have discussed the reason, heard from all parties and identified a plan of action - which you did in the letter that was sent.
For Claudia to send these questions it is like she doesn't recall any of the above or just went through the motions of the PSC without saying what she really felt. Puzzling!
I like your suggestion of maybe her advisor reviewing the process/concerns, what was discussed and addressing the questions she is posing - that takes it out of our hands and hopefully hearing from her advisor would be less intimidating. Otherwise, the other option would be we come together or through email to answer her questions.
This is definitely a first for me while being on this committee.
Rick
**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Monday, July 24, 2023 10:50 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Vern Harner

UWT_001193

<vharner@uw.edu>; Chris Barrans <barransc@uw.edu>
**Subject:** Fwd: Professional Standards Committee--Next Steps

Good morning, everyone, and I hope that you're all having a great summer! Unfortunately, I've just received an email that could possibly make your summer a little less great (forwarded here).... As you'll see below, I've *JUST* received this email from Claudia with a series of questions that seem to be challenging what I assumed was a concluded issue.
I have to admit, I'm really at a loss as to how to answer. It was my understanding that these issues were resolved during our PSC meeting and that the final letter was evidence of that. At the conclusion of our meeting, she agreed to all the terms established---I just don't know how to respond here....I'm forwarding this along because I believe that this might be better handled by Claudia's advisor or the SW undergraduate chair. Please just let me know how you'd like to proceed. Sigh.
Thanks so much, everyone,
Andrea

---------- Forwarded message ---------
From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, Jul 24, 2023 at 10:30 AM
Subject: Re: Professional Standards Committee--Next Steps
To: Andrea L. Hill <andhill@uw.edu>

Hello,

After reviewing the email, I have a few questions:

1. How did my Draft Mini-Zine not align with Social Work's professional communication regarding the topic?

2. How did the project topic and communication raise concerns related to professionalism and development?

3. How was I not practicing respectful, professional communication at all times? Please clarify.

4. Why am I being targeted to produce an extracurricular activity of reflexivity, learning and growth that other students have not done?

5. Have I done something wrong? If so, what is it, what am I being accused of?

6. What is the reason for this discipline? Am I being punished?

Respectfully,

Claudia Arias
Student ID 2225570

UWT_001194

On Thu, May 25, 2023 at 4:22 PM Andrea L. Hill <andhill@uw.edu> wrote:

Hi Claudia,

Thanks for attending the meeting of the Professional Standards Committee on May 16th. As mentioned during that meeting, I am sending you a write-up of our discussion regarding requirements for moving forward (attached as a PDF here). This letter represents the conclusions that we discussed with you at the meeting and outlines next steps. If you have any questions at all, please don't hesitate to be in touch.

Be well and take good care,

Dr. Hill

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

EXHIBIT 27

**EXH-1**
Oct 06 2025

| | |
|---|---|
| **From:** | Andrea L. Hill <andhill@uw.edu> |
| **Sent:** | Wednesday, May 24, 2023 4:35 PM PDT |
| **To:** | Rick L. Butt <rickbutt@uw.edu> |
| **CC:** | Vern Harner <vharner@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu> |
| **Subject:** | Re: Important Questions for PSC Next Steps |
| **Attachments:** | Updated Draft - Arias PSC Letter.doc |

Thanks for sending these, Vern, I think they look great....I agree with Rick--very thorough....I also feel like they are useful for addressing the primary concerns that we raised with Claudia and in our discussions as a committee. Unless there are any objections, I feel like these are ready to go. I went ahead and updated the draft of the letter, including these two prompts and the end-of-October deadline---I have attached it here.

If the letter looks good to everyone, I will go ahead and finalize the letter and send it to Claudia--I will BCC all members of the committee (and referring faculty) when I send the email....I'll wait until I get a final "OK" from the three of you before actually sending it. Just let me know if you spot any changes that need to be made!

As far as page length, formatting, etc., I believe it's all a matter of committee choice....The 4 pgs/double-spaced criteria was just part of the previous prompt we used last year, established by Erin. There's no set length or anything, so if anyone feels like we should change the required length (or any other requirements) for this student, please let me know--I have no strong feelings either way.

In my experience on the PSC, if a student fails to fulfill requirements, the PSC convenes again to discuss the issue and steps forward, including the possibility of elevating the issue beyond the PSC.... I believe that we will meet again to discuss next steps, then meet with the student to outline what will happen.

As far as assessment goes, when the student submits the essays, the PSC (and referring faculty) read them and meet to discuss....and then we set up a time to again meet with the student of concern. From my understanding, there are no established criteria by which the essays are evaluated....

Ultimately, I have never actually been a member of the PSC for a student that had to take these steps....Last year's student that was supposed to write an essay and submit it to the PSC actually ended up leaving the program, so there was never any follow-through. As such, my answers here are my best guesses, based on the PSC charge and my own experience---if anyone has any additional information, please don't hesitate to correct me on process!

Thanks,
Andrea

On Wed, May 24, 2023 at 2:21 PM Rick L. Butt <rickbutt@uw.edu> wrote:

I like your prompts and list of resources. Very thorough! I will check out these myself.

UWT_001142

Thanks

Rick

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Wednesday, May 24, 2023 12:36 PM
**To:** Andrea L. Hill <andhill@uw.edu>
**Cc:** Rick L. Butt <rickbutt@uw.edu>; Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: Important Questions for PSC Next Steps

Thanks all -- I don't believe Claudia is registered for classes this summer.

here is a draft of prompts -- I would love feedback on these, as it's my first time writing prompts for this reason. These are expected to be four pages each, double spaced?

I am also wondering: what happens if a student does not complete the assignments provided by the PSC? or what happens if they complete the assignments, but their work is not satisfactory / there are still problematic and harmful viewpoints represented? How is their work assessed?

thank you!!
Vern

Prompts for essays

(1) Provide Evidence of Reflection and Growth: You will demonstrate learning and growth via

the completion of two brief essays that provide clear evidence that you have taken time to

UWT_001143

reflect and deepen your understandings of self, practice, and communication with colleagues.

Each essay will be informed by the substantive areas of concern that came up during our

discussion. More specifically, in at least four pages each (double-spaced), please respond to the following prompts:

Please use the NASW Code of Ethics, Social Work Speaks chapter regarding transgender and gender nonconforming people, the BASW Program Manual, the CSWE EPAS, as well as other external sources.

- ESSAY ONE - Social Work's Responsibilities to Trans Individuals (4 pages)

  o Summarize the Social Work Speaks chapter regarding transgender and gender nonconforming individuals

  o Discuss 2 of the examples (pages 332-334) and the specific roles of social workers in achieving/implementing them

  o Briefly summarize the experiences of transgender people in prisons

  o Describe how you will continue to grow your understanding of the experiences of transgender people and social work's responsibility to this community

- ESSAY TWO - Ethical & Professional Behavior and Communication (4 pages)

  o Using the BASW Program Manual, the NASW Code of Ethics, and the CSWE EPAs, Summarize the essential skills, values, and competencies for social work students as they relate to professional behavior/communication, social justice, and diversity

  o Discuss 2-3 ways that these skills, values, and competencies may show up in an educational setting

  o Discuss how these topics relate to engaging appropriately with feedback

  o Describe how you will apply these skills, values, and competencies in your behavior and communication in your future academic work

Additional optional resources:

UWT_001144

- [Trans people deserve better journalism: How the anti-trans movement took over legacy media](#)

-  [Social Work and Health Care Practice with Transgender and Nonbinary Individuals and Communities: Voices for Equity, Inclusion, and Resilience](#)

- [COMING OUT OF CONCRETE CLOSETS](#)

- [Incarcerated LGBTQ+ Adults and Youth](#)

- [OVERREPRESENTATION OF PEOPLE WHO IDENTIFY AS LGBTQ+ IN THE CRIMINAL LEGAL SYSTEM](#)

- [UNJUST: HOW THE BROKEN CRIMINAL JUSTICE SYSTEM FAILS TRANSGENDER PEOPLE](#)

- [LGBTQ PEOPLE BEHIND BARS](#)

- [ENDING ABUSE OF TRANSGENDER PRISONERS](#)

- [LGBTQ Policy Spotlight: Bans on Medical Care for Transgender People](#)

- [Under Fire Series: The War on LGBTQ People in America](#)

- [Transgender Women of Color Face Crushing Rates of Incarceration, Solitary Confinement, and Abuse](#)

- [The Experience of Transgender Women Prisoners Serving a Sentence in a Male Prison: A Systematic Review and Meta-Synthesis](#)

- [Health Implications of Housing Assignments for Incarcerated Transgender Women](#)

- [Same Difference: The "Dilemma of Difference" and the Incarceration of Transgender Prisoners](#)

- [The Hundred Years' War: The Etiology and Status of Assaults on Transgender Women in Men's Prisons](#)

- ["We're like community": Collective identity and collective efficacy among transgender women in prisons for men](#)

- [The "double punishment" of transgender prisoners: a human rights-based commentary on placement and conditions of detention](#)

You will submit the completed essays to me, a co-chair of the Professional Standards

Committee ( [andhill@uw.edu](mailto:andhill@uw.edu) ), by the end of the Autumn 2023 quarter--no later than December

1, 2023. This essay will be reviewed by the full Professional Standards Committee.

UWT_001145

Following submission, you will meet again with the Professional Standards Committee to discuss your work, learning, and growth. This meeting will take place before the start of the Winter 2024 quarter.

\-\-

**Vern Harner, PhD**
pronoun: they

On Tue, May 23, 2023 at 5:14 PM Andrea L. Hill <andhill@uw.edu> wrote:

Thanks, all, for your feedback...I agree that it would be best to send the prompts with the letter itself, just to make the process clearer/more straightforward. I will wait for the prompts before sending this letter to Claudia. I also think the timeline of having the essays due during Fall quarter makes the most sense. Having them due at the end of the quarter so we can reconvene before Winter gives her enough time to complete them without doing them over summer--we can't really require students to do things over the summer unless they are enrolled. Again, I really appreciate the feedback--I know this is a really busy time, so your help/advice about moving forward is really useful. Once I receive prompts, I'll update the letter draft and re-send, and we can go from there.

Thanks,

Andrea

On Tue, May 23, 2023 at 3:03 PM Rick L. Butt <rickbutt@uw.edu> wrote:

Great point Claudia – if not in school over the summer we will need to have the essays due in Autumn quarter. If we can include the prompts now I would recommend that. I think Vern is going to work on that and share.

UWT_001146

Thanks

Rick

---

**From:** Claudia Sellmaier <sellmaic@uw.edu>
**Sent:** Tuesday, May 23, 2023 2:57 PM
**To:** Andrea L. Hill <andhill@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Vern Harner <vharner@uw.edu>
**Subject:** Re: Important Questions for PSC Next Steps

Hi everyone,

I don't know that I can add any additional insights here. Rick, you are definitely the most experienced PSC member here.

I think sending the prompts with the letter would make sense, if we can come up with prompts in a timely manner. Otherwise, we should send them separately later.

I would stick with the timeline used previously. BASW students don't have required courses over the summer, so I don't think we can ask for anything before autumn quarter. Faculty are also not necessarily on contract, so we couldn't re-convene the PSC until autumn quarter anyway. We could move the deadline up to end of October, so we can convene the PSC in autumn quarter instead of dragging it into winter quarter.

Claudia

Claudia Sellmaier, PhD, MSW, MA

Assistant Professor

MSW Program Chair

Interim BASW Program Chair

Pronouns: She/her/hers

University of Washington, Tacoma

UWT_001147

School of Social Work & Criminal Justice

1900 Commerce St. Box 358425

Tacoma, WA 98402

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Tuesday, May 23, 2023 7:55 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Vern Harner <vharner@uw.edu>
**Subject:** Fwd: Important Questions for PSC Next Steps

(Sorry for the duplicate, Vern--I accidentally replied to you only initially...but we're all on this one now!)

Thanks, Vern and Rick for your feedback--extremely helpful! I'll certainly make the suggested change regarding "gender identity"--thanks, Vern.

I was also wondering about the timeline myself, as I thought the one that we used for last year's issue seemed a bit extended...At the same time, I'm not sure if Claudia will be in classes over the summer and, if she isn't, I'm not sure that we're allowed to require her to do work when not enrolled in classes---not sure how the BASW program works as far as progress toward degree, so wanted to check in with Claudia (colleague).

I'm teaching all of today until late afternoon, but will be able to update/check in after 4....Thanks again, everyone, for your help!

Thanks,

Andrea

On Mon, May 22, 2023 at 6:46 PM Vern Harner <vharner@uw.edu> wrote:

  Thanks, all -- here are my thoughts:

UWT_001148

- can it be reframed from "gender identity" to "gender, inclusive of transgender individuals"? or something else speaking directly to trans inclusion (perhaps that also will be addressed in the prompts)
- I wonder about the due date for the essays -- if she is registered for summer classes, would by the end of summer be appropriate?
- I'm happy to send prompts now or in a few weeks -- I will start drafting some and will hope to follow up tomorrow

I'm looking forward to Claudia S's thoughts, as this is my first go-around with the PSC

Thank you,
Vern

--

**Vern Harner, PhD**

pronoun: <u>they</u>

On Mon, May 22, 2023 at 2:31 PM Rick L. Butt <<u>rickbutt@uw.edu</u>> wrote:

Thanks Andrea. I like the idea of the two essays and hope this enables self-reflection and growth. I will defer the decision of which letter to Vern and (our) Claudia given I was not there.

Claudia/Vern if you need any help with the prompts, please let me know.

Thanks

Rick

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Monday, May 22, 2023 11:54 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>; Vern Harner <vharner@uw.edu>; Rick L. Butt <rickbutt@uw.edu>
**Subject:** Important Questions for PSC Next Steps

Hi Claudia, Rick, and Vern,

I hope that you all had a nice weekend and got a chance to enjoy the lovely weather! Even though you weren't able to make it to the PSC meeting last week, Rick, I wanted to loop you in on this in case you have additional feedback (feel free to weigh in or not...just wanted to be sure you had the chance in case you wanted it!)

I've drafted a letter to send to Claudia and submit for her file, but I have a few questions to pose to the group before I'm able to finalize the letter and send it to Claudia..... to check with you all first just to make sure that everything looks OK and that what I've written reflects our discussion and the conclusions we reached last week. Ultimately, the decision was for Claudia to write 2 essays--one on SW values related to gender identity (from a "Social Work Speaks" article?), and one focused on professional communication.

When I was co-chairing the PSC last year and we recommended an essay as the 'next step' for the student being referred, we left it to the SW faculty (Erin) to devise the essay prompt itself----As SW faculty familiar with the NSASW code of ethics and professional norms in your discipline, so you all are far better suited to articulate exactly what it is that you're looking for from the student.... I also don't have any insight into Claudia's (student) progress towards her degree, so I'm not sure what the best timeline for her getting this work done would be.... So, basically, I'm seeking your feedback on 1) Essay Prompts and 2) Response Timeline.

**I've attached 2 drafts of a letter for Claudia here, each of which represents a slightly different approach to getting the essay prompts out---please let me know your preference.**

**1) <u>DRAFT ONE</u>:** This follows the approach that we used in a case of academic integrity at the exact same time (late May) last year--it informs Claudia of the decision and lets her know that essay prompts will be sent in a few weeks (Erin sent me the essay prompts, I sent them to student). <span style="color:red">**Questions for PSC and Vern:**</span>

- ***Do you prefer this approach (send prompts later)*? If so,**

- ***Is this an appropriate timeline for this requirement?*** (this is the same timeline also used last year, updated for 2023--it's highlighted in red)

- ***If you prefer this approach but would like to see changes, what changes are needed?***

***If the PSC prefers this approach, I will update this letter draft and send it to Claudia-- I'll then reach out to you in about a week to request that you send essay prompts for me to send to Claudia.***

**2) <u>DRAFT TWO:</u>** This is similar to Draft One, but just leaves some space for me to actually include the actual essay prompts in this letter itself. **Questions for PSC and Vern:**

- ***If this is the preferred approach, can you please send me the language for an essay prompt for each required essay?*** (including page length).

  - o I went ahead and pasted the prompt that Erin sent last year as an example (this was an issue of plagiarism, but I thought the overall example could be helpful).

- ***Is this an appropriate timeline for this requirement?*** (this is the same timeline also used last year, updated for 2023--it's highlighted in red)

- ***If you prefer this approach but would like to see changes, what changes are needed?***

Please just let me know what you're thinking when you have the chance, and feel free to make any suggestions regarding any changes--- I'm 100% open to corrections, so don't hesitate to let me know if you think anything needs to be changed!

I know additional work is definitely not easy at such a busy time, so I really appreciate your work, patience, and flexibility!

Thanks,
Andrea

--

**Andrea L. Hill, PhD**

Associate Teaching Professor

UWT_001151

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**

Associate Teaching Professor

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**

Associate Teaching Professor

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001152

--

**Andrea L. Hill, PhD**

Associate Teaching Professor

School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001153

EXHIBIT 28





# SOCIAL WORK & CRIMINAL JUSTICE
UNIVERSITY OF WASHINGTON | TACOMA

May 24, 2023

Ms. Arias,

As you know, the SSWCJ Professional Standards Committee (PSC)— myself (Andrea Hill, Associate Teaching Professor) and Dr. Claudia Sellmaier, Program Chair for our MSW & BASW programs and Graduate Program Coordinator—met on Tuesday, May 16, to discuss issues related to project selection and communication in TSOCWF 404, *Cultural Diversity and Social Justice* during the Spring 2023 quarter. More specifically, our discussion focused on the choice of an assignment topic that does not align with Social Work's professional values regarding gender, inclusive of trans individuals, as well as issues related to professional communication regarding this topic. The committee appreciated the opportunity to learn more about the situation from referring faculty Dr. Vern Harner, and to hear your perspective.

The committee agrees that the circumstances related to project topic and communication raise concerns related to professionalism and development—concerns raised during the PSC meeting on Tuesday, May 16. Moreover, we also agree that effective and ethical Social Work practice requires a self-aware willingness to acknowledge and take responsibility for mistakes and to practice respectful, professional communication at all times. Taking these concerns into consideration, the PSC recommends that progress toward degree completion continue, following your fulfillment of specific requirements related to Social Work values and professional communication, and a demonstration of reflexivity, learning and growth. ***In continuing progress towards degree completion, you will:***

**Provide Evidence of Reflection and Growth**: You will demonstrate learning and growth via the completion of two brief essays that provide clear evidence that you have taken time to reflect and deepen your understandings of self, practice, and communication with colleagues. Each essay will be informed by the substantive areas of concern that came up during our discussion. ***Using the*** <u>***NASW Code of Ethics***</u>***,*** <u>***Social Work Speaks chapter regarding transgender and gender nonconforming people***</u>***,*** <u>***the BASW Program Manual***</u>***,*** <u>***the CSWE EPAS***</u>***, please write an essay in response to*** <u>***each***</u> ***of following prompts:***

**ESSAY ONE - Social Work's Responsibilities to Trans Individuals (4 pages).** *In this essay, please:*
- Summarize the Social Work Speaks chapter regarding transgender and gender nonconforming individuals;
- Discuss 2 of the examples (pages 332-334) and the specific roles of social workers in achieving and implementing them;
- Briefly summarize the experiences of transgender people in prisons; and
- Describe how you will continue to grow your understanding of the experiences of transgender people and social work's responsibility to this community.

**ESSAY TWO - Ethical & Professional Behavior and Communication (4 pages).** *In this essay, please:*
- Utilize the <u>BASW Program Manual</u>, the <u>NASW Code of Ethics</u>, and the <u>CSWE EPAs</u>, to summarize essential skills, values, and competencies for social work students as they relate to professional behavior/communication, social justice, and diversity;
- Discuss 2-3 ways that these skills, values, and competencies may show up in an educational setting;
- Discuss how these topics relate to engaging appropriately with feedback; and
- Describe how you will apply these skills, values, and competencies in your behavior and communication in your future academic work.

Box 358425  1900 Commerce Street  Tacoma, WA 98402-9947

253.692.5820  fax 253.692.5825  tsocial@uw.edu  www.tacoma.uw.edu/social-work

UWT_000820

# W SOCIAL WORK & CRIMINAL JUSTICE
UNIVERSITY OF WASHINGTON | TACOMA

Please don't hesitate to reach out to myself, Dr. Sellmaier, Dr. Harner, or your faculty advisor, Chris Barrans If you find that you have questions or are in need of support as you're working on these essays

You will submit the completed essays to me, a co-chair of the Professional Standards Committee (andhill@uw.edu), by *no later than October 31, 2023*. These essays will be reviewed by the full Professional Standards Committee.

- Following submission, you will meet again with the Professional Standards Committee to discuss your work, learning, and growth. ***This meeting will take place before the start of the Winter 2024 quarter.***

If the requirements outlined above are not fulfilled, the PSC will convene to discuss further action which may include including elevating these issues to the Office of Student Conduct and Academic Integrity. As you engage in the work of fulfilling of these requirements, you are invited to respond in writing regarding your understanding of these issues or any concerns you may have. *Please also recall that the discussion during our May 16th meeting of the PSC is to remain confidential.* If you have more to share, please don't hesitate to be in touch with your thoughts.

Sincerely,

*Andrea L. Hill*

Andrea L. Hill, PhD, Co-Chair, Professional Standards Committee
Associate Teaching Professor, School of Social Work and Criminal Justice
The University of Washington Tacoma, Campus Box 358425
1900 Commerce Street, Tacoma, WA 98402

UWT_000821

EXHIBIT 29

PROFESSIONAL STANDARDS COMMITTEE

EXH-3
Oct 13 2025

① PSC PURPOSE + PROTOCOL: SSWCJ faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation. PSC determines corrective action and issues sanctions, including up to dismissal. Internal to SSWCJ... other university procedures used when appropriate.

- I will read request to convene
- Then you can provide information you believe is necessary, Claudia, and Dr. Harner,
- Then all non-PSC will go to the waiting room while PSC discusses to determine action.
- Then you'll come back to discuss decision
- I'll then send you a letter by ~~Friday~~ Early next week
  • Will outline decision
  • Will be sent to Program Administrator + Program Director, put in File.
  • You'll have chance to respond in writing.
  • Follow-up to ensure recommendations are followed.
  • Failure to comply could lead to removal.

② MEETING IS CONFIDENTIAL WITHIN REASONABLE LIMITATIONS

③ READ REQUEST TO CONVENE

④ ALVARO SHARE, CHRIS SHARE

⑤ NON-PSC LEAVE
⑥ NON-PSC RETURN

Hill_000141

EXHIBIT 30



**EXH-8**
Oct 13 2025

**Vern Harner <vharner@uw.edu>**

## Follow-Up from Today's PSC Meeting

3 messages

**Andrea L. Hill** <andhill@uw.edu>          Tue, May 16, 2023 at 4:31 PM
To: Vern Harner <vharner@uw.edu>

<span style="color:red">Insert text here</span>

Hey Vern,
This afternoon, I was reflecting on our PSC meeting today and I realized that I think that I owe you an apology. I'm sorry for taking it upon myself to correct Claudia regarding your pronouns--I realize that it isn't my place to do that and that I should check with you regarding how best to approach situations like that. I didn't mean to be patronizing, and I apologize if it came off that way. I was unhappy with what I perceived as Claudia's overarching TERF-y perspective and approach, and I heard her using the incorrect pronouns as part of the transphobia I heard from her--it felt like even more than a microaggression in my mind, and I felt that as the facilitator of the meeting, I was in a position to put a stop to it.

While well-intended on my part, I do recognize that I shouldn't assume that my saying something to her was the right thing to do. Had you not been there, then yes, I think calling out inaccurate use of pronouns definitely IS the right thing to do. But I definitely recognize that it's a different situation when the person being mis-gendered is actually present, and I'm really sorry if my correcting Claudia was patronizing or condescending or will further increase tensions between you two.

In all honesty, I don't often have students that are so willfully transphobic (a product of my CIS privilege for sure) and so it didn't even occur to me that I should think twice and check with you first. I'm pretty sure that I didn't do the right thing by calling her out that way, and I'm really sorry. Going forward, I will be sure to be more thoughtful regarding how I approach situations like this, and I'm so sorry that my 'learning moment' had to come at your expense. Please just be in touch if you'd like to discuss it more....

Thanks,
Andrea

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

**Vern Harner** <vharner@uw.edu>          Tue, May 16, 2023 at 9:41 PM
To: "Andrea L. Hill" <andhill@uw.edu>

Hi Andrea,
I appreciate the follow up! I did, though, very much appreciate that you corrected Claudia. Dr. Sellmaier had also corrected the misgendering when they met one-on-one, and I am very open with my students about my pronouns. We did also have a week about LGBTQ issues where we talked about pronouns, and my students have access to resources about pronouns, including the pronouns 'they', on Canvas. For me, it's very awkward when everyone can see my pronouns in Zoom and they are not corrected. Normally, I would be more comfortable correcting it myself (though it is also awkward when it is people with seniority over me who are correcting me and could, for example, be voting on my tenure/promotion), but given the situation I was biting my tongue.

A lot of the time with students who are newer to trans issues, but who are respectful in all other ways, I do not directly correct pronouns in the classroom / in a big group ("praise in public, correct in private" works best for this, I find...at least to start). But in a smaller group, and especially when we are addressing transphobia, I think it's important and provides insight to another component to the situation.

This is my 9th year teaching (including 2 in Arizona), and the first time I have had a student who is so directly/openly and persistently transphobic. I very much appreciate that you and Dr. Sellmaier corrected the misgendering and are (trying to)

Harner_000035

address the broader issues. I don't think that it's the addressing of the transphobia that is making things tense between myself and Claudia, but the transphobia itself.

All that to say -- I appreciate you and am grateful for how you navigated the meeting today.
Vern
--
**Vern Harner, PhD**
pronoun: they

[Quoted text hidden]

---

**Andrea L. Hill** <andhill@uw.edu>                                      Fri, May 19, 2023 at 10:21 AM
To: Vern Harner <vharner@uw.edu>

Hi Vern,
So sorry for my delayed reply--yesterday was my teaching day, so between the open house and classes and a later committee meeting, I had absolutely zero time to read this, let alone reply (Given you're ending your first year here, I'm sure you know exactly what I mean!). I know that I often over-think things, but I think it's probably better to be *more* of an over-thinker than less of an over-thinker---so much more harm comes from thoughtlessness, I think (not using the word think anymore in this email, promise).

I appreciate your perspective on the ways to engage students in surrounding things like just showing the base/simplest level of respect that is addressing people as they want to be addressed. I'm in my millionth year of teaching (it feels like) and in my 9th year at UWT, and I have to say that, overall, students' openness to changing norms surrounding pronouns has been one of the quickest changes I've seen since I started teaching. Each quarter, it feels like more and more students are using a spectrum of pronouns and referents (for themselves and for each other) by default....it's been actually such a pleasant surprise for me to witness and hear it happening without any instruction from my part. I'm thankful that Claudia's transphobia is increasingly LESS common among our students....

And I appreciate the insight on the best approach to correction--it's really helpful. It's so increasingly rare that it's necessary for me to do it with students, and when I do, it's almost always me correcting a mistake rather than challenging purposeful transphobia like Claudia was displaying, so I was really uncertain. I hate the idea of letting intentionally transphobic actions like that slide by but also hate the idea of being a patronizing lib that speaks on behalf of people, if that makes any sense. So, all of that is to say that I appreciate your perspective--thank you!

While I'm emailing you, thanks, too, for the follow-up from your 5/17 class. I am working on the PSC letter and will have it to you, Claudia, and RIck on Monday, and we'll be able to get it sent to Claudia (student) by the end of Monday..... Until then, I hope you have a good weekend!

Andrea
[Quoted text hidden]
--
[Quoted text hidden]

Harner_000036

# EXHIBIT 31

EXH-3
Jan 15 2026

**From:** Chris Barrans
**To:** Rebecca Singleton
**Subject:** Fw: Checking in
**Date:** Thursday, January 15, 2026 11:19:16 AM

Chris Barrans, MSW
*He/Him/His*

**PRISM access: https://steps.exxat.com/**

**From:** Claudia Arias <arias1@uw.edu>
**Sent:** Wednesday, May 10, 2023 4:34 PM
**To:** Chris Barrans <barransc@uw.edu>
**Subject:** Re: Checking in

Great, see you tomorrow.

Thank you.
On Wed, May 10, 2023 at 4:27 PM Chris Barrans <barransc@uw.edu> wrote:

> Hi Claudia,
>
> Thanks for your quick response. I am free tomorrow at 12:30 pm. I've got it on my calendar. I'll see you then.
>
> Have a good evening,
> Chris
>
> Chris Barrans, MSW
> *He/Him/His*
> Director of Field Education/Assistant Teaching Professor
> School of Social Work & Criminal Justice
> University of Washington Tacoma
> Phone: 253-692-5823
> Office: WCG-203J
> **STAR access:** http://star.ssw.washington.edu

> **From:** Claudia Arias <arias1@uw.edu>
> **Sent:** Wednesday, May 10, 2023 2:49 PM
> **To:** Chris Barrans <barransc@uw.edu>
> **Subject:** Re: Checking in
>
> Hello Chris,
>
> Thank you for your message. I had been trying to set something up with you, but time did not permit. Not on your part , just mine.
>
> I will be meeting with someone on Monday. However, I can stop by tmrw between 12:15- 1.

If you're not available it's okay, no worries.

I really do appreciate your email.

Thank you
Claudia Arias
2225570

On Wed, May 10, 2023 at 2:30 PM Chris Barrans <barransc@uw.edu> wrote:

Hi Claudia,

I hope you are doing well today and enjoying the sunshine.

I've heard from my colleagues, Anita and Paripa, that you have tried to swing by my office to meet a couple times recently but caught me while I was in meetings. I'm happy to schedule a time to meet with you in the office so that you know I'll be available. If that's something you're interested in, just let me know what your availability looks like and we'll get it on the scheduled.

Talk to you soon,
Chris

Chris Barrans, MSW
*He/Him/His*
Director of Field Education/Assistant Teaching Professor
School of Social Work & Criminal Justice
University of Washington Tacoma
Phone: 253-692-5823
Office: WCG-203J
**STAR access:** http://star.ssw.washington.edu

EXHIBIT 32

EXH-2
Jan 15 2026

| | |
|---|---|
| **From:** | Chris Barrans |
| **To:** | Andrea L. Hill; Ronald San Nicolas |
| **Cc:** | Claudia Sellmaier; Rick L. Butt |
| **Subject:** | Re: Fw: URGENT - Professional Standards Committee Issue |
| **Date:** | Monday, May 1, 2023 10:08:30 AM |
| **Attachments:** | Outlook-0pvezhlo.png |
| | Outlook-noifkfjk.png |

Hi Andrea,

I'm not sure if I'm meant to be a part of the committee meeting for Vern's student. I'm their faculty advisor but the student hasn't responded to my messages in the past and I haven't met them before. If I'm needed at the meeting here is my availability based on the times you shared:

- **Wednesday, 5/3:** 2-3
- **Thursday, 5/4:** 12:30-1:30, 3:30-4:30
- **Friday, 5/5:** 12-1

Feel free to disregard if I'm not needed. Thanks so much.

Chris

Chris Barrans, MSW
*He/Him/His*
Director of Field Education/Assistant Teaching Professor
School of Social Work & Criminal Justice
University of Washington Tacoma
Phone: 253-692-5823
Office: WCG-203J
**STAR access:** http://star.ssw.washington.edu

---

**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Monday, May 1, 2023 9:44 AM
**To:** Ronald San Nicolas <sannirj@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Chris Barrans <barransc@uw.edu>
**Subject:** Re: Fw: URGENT - Professional Standards Committee Issue

Hi All,

(I know you're recusing yourself, Ronnie, but wanted to make sure that you're aware of how this is proceeding).

I'm just now reading Vern's referral and I better understand your point about 'time urgency,' Chris.... I also see that Vern said they're available to meet this week---I'm wondering if we should try and put together meeting options for this week as well? I wanted to check to see if we were able to find some options for this week before emailing Vern.

**Availability for PSC meeting this week:**

- **Wednesday, 5/3:** 10-11 11-12, 12-1, 1-2, 2-3
- **Thursday, 5/4:** 12:30-1:30, 3:30-4>30

- **Friday, 5/5:** 10-11 11-12, 12-1

For those who will be on this PSC meeting, if you could reply and let me know if/which any of the above options work for you (or just let me know if none do), I'll put together an email for Vern and then for the student.

Thanks,
Andrea


On Mon, May 1, 2023 at 9:28 AM Ronald San Nicolas <sannirj@uw.edu> wrote:

FYI

Ronald J. San Nicolas, PhD, MSW

Assistant Teaching Professor &

Coordinator, Simon Family Endowment Autism MSW Fellowship

Liaison, Ballmer Behavioral Health Workforce Development Initiative

Mental Health Coordinator, AAPI THRIVE at UW Tacoma

1900 Commerce Street - Box# 358425

Tacoma, WA 98402-3100

Office: WCG 223.1

Office Phone: 253-692-5702



*I recognize that at UW Tacoma we learn, teach, and live on or near the ancestral homelands of the Coast Salish people. We at UW Tacoma are specifically situated on the traditional territory of the Puyallup. We have a responsibility to acknowledge our indigenous connections, as well as, histories of dispossession and forced removal that have allowed for the growth and survival of this institution.*



**From:** Vern Harner <vharner@uw.edu>
**Sent:** Thursday, April 27, 2023 2:50 PM
**To:** Ronald San Nicolas <sannirj@uw.edu>
**Subject:** URGENT - Professional Standards Committee Issue

Hi Ronnie,

I've attached the form to convene the professional standards committee because of an ongoing but developing issue in my 404B class.

A student has proposed a very harmful and problematic topic (there are other adjacent topics she could choose or she could discuss her current topic in a way that is not harmful) and, after two conversations between us, is not recognizing the concern. Her topic is violence against women in prison, but making the argument that, essentially, trans women should be in men's prisons because trans women are assaulting cis women. I have restated multiple times that topics must be aligned with social work values and ethics, but it is her perception that (because it has to do with trans people / anti-transness) that I am "shutting down" any conversations or viewpoints that are different than my own. She seems to believe that her topic, sources, etc are aligned with social work values/ethics.

In class today, we discussed the appropriate topic scope (i.e., a response to a social issue, not the social issue itself) but, after attempting to clarify re: SW values, stated the boundary that we would not be able to continue that discussion in class and would follow up afterwards about it. I had to restate this boundary multiple times and told her I would send her an email to follow up. A few minutes later, she told me she would stop by my office after class at 3pm. I've sent her the attached email.

I did not note any curiousity or seeking to understand WHY her proposed topic was harmful to trans people. She came to class today with a drafted project that was full of harmful/problematic language (ie TERF dog whistles). I told her that she did not need to mention trans people at all, but that her topic shouldn't be actively harmful to trans people or inappropriately targeting trans people.

Our course content next week is on trans liberation. Dr. Sellmaier and I debriefed a little bit, and she affirmed that, if the student is saying things in class that cross the line, I might have to ask her to leave class for the day. To be clear, I am absolutely willing and able to discuss trans issues in good faith, but the student has been very firm in her beliefs/viewpoint and framing of the issue. I am not the only trans person in this classroom.

This is my first time sending something to the professional standards committee, so please let me know what else is needed.

Thank you,
Vern


--
**Vern Harner, PhD**
Assistant Professor | UWT School of Social Work & Criminal Justice
Co-Chair | LGBTQ Caucus of Faculty/Students in Social Work
VernHarner.com | pronoun: they


--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425

1900 Commerce Street
Tacoma, WA 98402
253-692-4943

EXHIBIT 33



From: **Claudia Arias** <arias1@uw.edu>
Date: Mon, May 1, 2023 at 7:49 PM
Subject: Re: Professional Standards Committee - Your Attendance Required
To: Andrea L. Hill <andhill@uw.edu>


Hello,

In
response to your email dated May 1, 2023. I would like to inform you that I will not be able to select any of the dates provided, due to a scheduling conflict. However, I would like to schedule a date after I have the ability to clear my schedule, and secure an advocate of my choosing per your instructions on paragraph two of your letter.

Please
note that I will be meeting with Dr. Sellmaier (chair of the BASW program) tomorrow to review the assignment that is in question.

Thank
you for your time,
Claudia
Arias
2225570



On Mon, May 1, 2023 at 12:00 PM Andrea L. Hill <andhill@uw.edu> wrote:
Hi Claudia,
I'm Dr. Andrea Hill, an associate teaching professor of Criminal Justice in the School of Social Work and Criminal Justice (SSWCJ). I'm getting in touch with you in my capacity as co-chair of the SSWCJ Professional Standards Committee (PSC). There has been a request to convene the Committee to discuss some issues related to TSOCWF404.
At this meeting, you will meet with members of the committee and the referring member of faculty to openly discuss these issues and work on moving forward. You are welcome to invite your faculty advisor or a faculty advocate of your choosing to join you for this meeting.

The PSC will convene (on Zoom) to discuss the situation, and your attendance is required at this meeting. It's important that we all meet soon, and I realize that coordinating to find a time everyone can meet isn't easy, so I've worked to identify more than one date/time in order to give you options.

UWT_001837

**Please select one of the options from the list below and reply to let me know which you'll attend to discuss the issue:**

- **Wednesday, 5/3:** 2:00 - 3:00
- **Thursday, 5/4:** 12:30 - 1:30
- **Friday, 5/5:** 12:00-1:00
- **Monday, 5/8:** 2:30 - 3:30

Please pick one of these windows for discussion and get back to me as soon as you're able. Once I hear from you, I will set up a Zoom session for everyone and send you a link. Thank you in advance for your attention to this issue and your response--it's greatly appreciated.

Best,
Dr. Hill
--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943


--
**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_001838

EXHIBIT 34

*Ex 24*

From: Claudia Arias <arias1@uw.edu>
Sent: Monday, May 1, 2023 5:36 PM PDT
To: Claudia Sellmaier <sellmaic@uw.edu>
Subject: Re: Claudia Arias

Yes, 12:30 sounds great. See you then.

Thank you,
Claudia A.

On Mon, May 1, 2023 at 5:26 PM Claudia Sellmaier <sellmaic@uw.edu> wrote:
Hello Claudia,
12.30PM would be the earliest I can make happen. My office is WCG 226.
Claudia Sellmaier
Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402
From: Claudia Arias <arias1@uw.edu>
Sent: Monday, May 1, 2023 5:21 PM
To: Claudia Sellmaier <sellmaic@uw.edu>
Subject: Re: Claudia Arias

Hello,
Is it possible to meet with you anytime between 12:15 & 1:00 pm. My class ends at 12:10 and my other class begins at 1 pm.
This is an important matter.
Thank you for your time,
Claudia Arias.

On Mon, May 1, 2023 at 5:18 PM Claudia Sellmaier <sellmaic@uw.edu> wrote:
Hello Claudia,
I could meet tomorrow 05-02 at 9.30AM on Zoom or after 1PM in my office on campus.
Please let me know if this would work for you. I will send a Zoom link should we meet in the morning.
Claudia Sellmaier
Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

UWT_000814

**From:** Claudia Arias <arias1@uw.edu>
**Sent:** Monday, May 1, 2023 11:23 AM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Claudia Arias

Hello,
I would like to know if I can meet with you this upcoming Tuesday, before class. Class begins at 10 am.
This past week, Professor Vern sent you a message. I would like to follow up with you in regards to the message sent.
Thank you
Claudia Arias
2225570

UWT_000815

EXHIBIT 35

*Ex 20*



Vern Harner <vharner@uw.edu>

## Following up from class today (404B)

5 messages

**Vern Harner** <vharner@uw.edu>                                                          Thu, Apr 27, 2023 at 2:12 PM
To: arias1@uw.edu
Cc: Claudia Sellmaier <sellmaic@uw.edu>, Chris Barrans <barransc@uw.edu>

Hi Claudia,

I am unavailable for additional meetings this afternoon. If you'd like to talk about any concerns or questions you have, you can email Dr. Sellmaier (chair of the
BASW program) or Chris Barrans (your faculty advisor) -- I've copied both of them on this email.

To reiterate from our conversation in class today: violence against women is an important topic and there are many ways that community members have responded
to this issue. However, the current discussion and framing of the topic that I saw in your project today is harmful and not aligned with social work values & ethics
(source 1, source 2, source 3).

While it is your choice of whether to continue with this topic or make adjustments, the current language/framing in your project (that I saw today) means that it is not
a zine that will be able to be shared during our informal presentations next week on Thursday.

As social workers and social work students, the expectation is that we approach topics we are unfamiliar with by seeking to understand and striving to align our
practice skills and knowledge with our professional values and standards. This includes conversations and discussions in the classroom. There is more information
in the links above and I am always happy to provide more resources or talk about the intersection of trans rights and women's rights when that conversation is
approached appropriately and in good faith.

Dr. Vern

--
Vern Harner, PhD
Assistant Professor | UWT School of Social Work & Criminal Justice
Co-Chair | LGBTQ Caucus of Faculty/Students in Social Work
VernHarner.com | pronoun: they

**Vern Harner** <vharner@uw.edu>                                                          Mon, May 1, 2023 at 9:08 PM
To: arias1@uw.edu

Hi Claudia,

I hope that you have given some thought on how to adjust your topic. There are countless examples of how individuals and communities have responded to the
issue of violence against women -- both in and out of prison. I know that you put effort into the draft that you showed me, so wanted to be sure you were set up to
switch topics if you so chose -- below are just some of the options that may work. These are in no particular order and, again, there are so many options in
addition to these:

Harner_000823

- #MeToo
- Violence Against Women Act
- 16 Days of Activism Against Gender-Based Violence (and a 2nd link)
- Protests in South Africa (2021)
- Protests in Spain (2021)
- International Women's Day
- Protests in Istanbul (2021)
- March in France (2021)
- The Seneca Falls Convention (1848)
- Protest against conditions/violence in women's prison in Michigan (2022)
- Take Back The Night
- Responses to Harlem's women's jail (multiple options in this article, as it goes over some history)
- Protests against violence in NJ women's prison (2021)
- While it wouldn't be a good fit for a topic itself, this 2020 report looks like it has a ton of helpful background information and statistics (link)
- The National Organization of Women has this website, which also has a lot more options (link)

See you tomorrow,
Dr. Vern
--
**Vern Harner**
pronoun: they


[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                      Mon, May 1, 2023 at 9:08 PM
To: Claudia Sellmaier <sellmaic@uw.edu>

fyi
--
**Vern Harner**
pronoun: they


[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                      Tue, May 2, 2023 at 1:12 PM
To: Claudia Sellmaier <sellmaic@uw.edu>

Claudia was in class today (topic was LGBTQ justice/liberation, we spent half the class watching a documentary) and did not say anything in the large group. She did submit an appropriate question on a notecard (I handed a notecard out to each student).

Case 3:25-cv-05079-DGE   Document 105   Filed 03/17/26   Page 192 of 446

She did come up after class with two new drafts of zine projects that were much more appropriate. One of them is still covering multiple responses to a social issue (the focus should be on a specific response). And both of them are plagiarising content -- quoting directly from sources without using quotation marks and without directly connecting the cited material. I discussed all this with her and I hope that it landed, though I'm still unsure. She still seemed to be a bit on edge during that interaction and quick to provide justifications when I gave her feedback (ie., the content was okay because it was "coming directly from the source"), but her behavior was appropriate today. I stated a couple times that I want to hear HER voice in the project, not just direct quotes from sources. I hope your meeting goes well!
--
**Vern Harner**
pronoun: they

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                                                 Wed, May 17, 2023 at 8:41 AM
To: "Andrea L. Hill" <andhill@uw.edu>, Claudia Sellmaier <sellmaic@uw.edu>, "Rick L. Butt" <rickbutt@uw.edu>

Hi all --
see below for additional context. In the below emails, I give Claudia additional resources, offer to discuss the topic etc, and document that I told her that we want HER voice in the project, not just direct quotes from sources. She didn't reply to either of the below emails I sent to her.
thanks,
Vern
[Quoted text hidden]

Harner_000825

EXHIBIT 35a

| | |
|---|---|
| **From:** | Chris Barrans <barransc@uw.edu> |
| **Sent:** | Thursday, January 15, 2026 12:20 PM PST |
| **To:** | Paige Heine <paigeh@SummitLaw.com> |
| **Subject:** | Fw: Fw: URGENT - Professional Standards Committee Issue |

Chris Barrans, MSW
*He/Him/His*
**PRISM access: https://steps.exxat.com/**
**From:** Chris Barrans <barransc@uw.edu>
**Sent:** Monday, May 1, 2023 10:24 AM
**To:** Andrea L. Hill <andhill@uw.edu>
**Subject:** Re: Fw: URGENT - Professional Standards Committee Issue

Great! We are on the same page. I'll keep an eye out for an invite in case either Vern or the student make a request, but I won't plan on attending.
I got the impression that the last couple years I've been the one referring students to the PSC. That's a big bummer but I think it has to do with practicum being the place where we see some problematic behaviors or patterns emerge. I'm excited about the work the PSC is doing to rebrand and look at the purpose of the committee. I appreciate your leadership especially when you've gone above and beyond for social work referrals. Thank you.
Chris
Chris Barrans, MSW
*He/Him/His*
Director of Field Education/Assistant Teaching Professor
School of Social Work & Criminal Justice
University of Washington Tacoma
Phone: 253-692-5823
Office: WCG-203J
**STAR access:** http://star.ssw.washington.edu


**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Monday, May 1, 2023 10:19 AM
**To:** Chris Barrans <barransc@uw.edu>
**Subject:** Re: Fw: URGENT - Professional Standards Committee Issue

Hi Chris,
Thanks for saying it because I wasn't sure either! While you've been on all of the PSC meetings we had before, now that I think about it, I think it's because they involved you in some way/shape/form...,According to the actual PSC protocol, I don't think you're  to be at this one unless requested by Vern or the student, so I think I'll just go with the options you've given me here, just in case Vern/the student requests that you attend....But, unless you hear anything from me/Vern/the student, I think you can put this specific PSC referral aside, if that makes sense. If not/if you have any questions, please just let me know!
Thanks,
Andrea

On Mon, May 1, 2023 at 10:08 AM Chris Barrans <barransc@uw.edu> wrote:
  Hi Andrea,

UWT_002468

I'm not sure if I'm meant to be a part of the committee meeting for Vern's student. I'm their faculty advisor but the student hasn't responded to my messages in the past and I haven't met them before. If I'm needed at the meeting here is my availability based on the times you shared:

- **Wednesday, 5/3:** 2-3
- **Thursday, 5/4:** 12:30-1:30, 3:30-4:30
- **Friday, 5/5:** 12-1

Feel free to disregard if I'm not needed. Thanks so much.
Chris
Chris Barrans, MSW
*He/Him/His*
Director of Field Education/Assistant Teaching Professor
School of Social Work & Criminal Justice
University of Washington Tacoma
Phone: 253-692-5823
Office: WCG-203J
**STAR access:** http://star.ssw.washington.edu


**From:** Andrea L. Hill <andhill@uw.edu>
**Sent:** Monday, May 1, 2023 9:44 AM
**To:** Ronald San Nicolas <sannirj@uw.edu>
**Cc:** Claudia Sellmaier <sellmaic@uw.edu>; Rick L. Butt <rickbutt@uw.edu>; Chris Barrans <barransc@uw.edu>
**Subject:** Re: Fw: URGENT - Professional Standards Committee Issue

Hi All,
(I know you're recusing yourself, Ronnie, but wanted to make sure that you're aware of how this is proceeding).

I'm just now reading Vern's referral and I better understand your point about 'time urgency,' Chris.... I also see that Vern said they're available to meet this week---I'm wondering if we should try and put together meeting options for this week as well? I wanted to check to see if we were able to find some options for this week before emailing Vern.
**Availability for PSC meeting this week:**

- **Wednesday, 5/3:** 10-11 11-12, 12-1, 1-2, 2-3
- **Thursday, 5/4:** 12:30-1:30, 3:30-4>30
- **Friday, 5/5:**  10-11 11-12, 12-1


For those who will be on this PSC meeting, if you could reply and let me know if/which any of the above options work for you (or just let me know if none do), I'll put together an email for Vern and then for the student.
Thanks,
Andrea

On Mon, May 1, 2023 at 9:28 AM Ronald San Nicolas <sannirj@uw.edu> wrote:

FYI
Ronald J. San Nicolas, PhD, MSW
Assistant Teaching Professor &
Coordinator, Simon Family Endowment Autism MSW Fellowship
Liaison, Ballmer Behavioral Health Workforce Development Initiative
Mental Health Coordinator, AAPI THRIVE at UW Tacoma
1900 Commerce Street - Box# 358425
Tacoma, WA 98402-3100
Office: WCG 223.1
Office Phone: 253-692-5702

**SCHOOL OF SOCIAL WORK & CRIMINAL JUSTICE**
UNIVERSITY of WASHINGTON | TACOMA

*I recognize that at UW Tacoma we learn, teach, and live on or near the ancestral homelands of the Coast Salish people. We at UW Tacoma are specifically situated on the traditional territory of the Puyallup. We have a responsibility to acknowledge our indigenous connections, as well as, histories of dispossession and forced removal that have allowed for the growth and survival of this institution.*



April is Autism Awareness Month

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Thursday, April 27, 2023 2:50 PM
**To:** Ronald San Nicolas <sannirj@uw.edu>
**Subject:** URGENT - Professional Standards Committee Issue

Hi Ronnie,
I've attached the form to convene the professional standards committee because of an ongoing but developing issue in my 404B class.
A student has proposed a very harmful and problematic topic (there are other adjacent topics she could choose or she could discuss her current topic in a way that is not harmful) and, after two conversations between us, is not recognizing the concern. Her topic is violence against women in prison, but making the argument that, essentially, trans women should be in men's prisons because trans women are assaulting cis women. I have restated multiple times that topics must be aligned with social work values and ethics, but it is her perception that (because it has to do with trans people / anti-transness) that I am "shutting down" any conversations or viewpoints that are different than my own. She seems to believe that her topic, sources, etc are aligned with social work values/ethics.
In class today, we discussed the appropriate topic scope (i.e., a response to a social issue, not the social issue itself) but, after attempting to clarify re: SW values, stated the boundary that we would not be able to continue that discussion in class and would follow up afterwards about it. I had to restate this boundary multiple times and told her I would send her an email to follow up. A few minutes later, she told me she would stop by my office after class at 3pm. I've sent her the attached email.

UWT_002470

I did not note any curiousity or seeking to understand WHY her proposed topic was harmful to trans people. She came to class today with a drafted project that was full of harmful/problematic language (ie TERF dog whistles). I told her that she did not need to mention trans people at all, but that her topic shouldn't be actively harmful to trans people or inappropriately targeting trans people.

Our course content next week is on trans liberation. Dr. Sellmaier and I debriefed a little bit, and she affirmed that, if the student is saying things in class that cross the line, I might have to ask her to leave class for the day. To be clear, I am absolutely willing and able to discuss trans issues in good faith, but the student has been very firm in her beliefs/viewpoint and framing of the issue. I am not the only trans person in this classroom.

This is my first time sending something to the professional standards committee, so please let me know what else is needed.

Thank you,

Vern

--

**Vern Harner, PhD**
Assistant Professor | UWT School of Social Work & Criminal Justice
Co-Chair | LGBTQ Caucus of Faculty/Students in Social Work
VernHarner.com | pronoun: they

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

--

**Andrea L. Hill, PhD**
Associate Teaching Professor
School of Social Work and Criminal Justice
University of Washington Tacoma
Box 358425
1900 Commerce Street
Tacoma, WA 98402
253-692-4943

UWT_002471

EXHIBIT 36





Vern Harner <vharner@uw.edu>

## noch eine weitere Anfrage...

4 messages

---

**Vern Harner** <vharner@uw.edu>                Thu, Apr 20, 2023 at 10:13 PM
To: Claudia Sellmaier <sellmaic@uw.edu>

Hi Claudia,

I'm wondering if you have any time to chat (on Zoom or in person) tomorrow or Monday? I am curious how to navigate a student's proposed topic for their assignment (the topic is transphobic and I am not sure if this is the student I heard from last week...).

I'm available tomorrow from 10:30am-noon if needed, 1:30-4pm or Monday from 10am-3pm or 3-5pm if needed. Also happy to send more details via email!

in appreciation,
Vern

--
**Vern Harner, PhD**
Assistant Professor | UWT School of Social Work & Criminal Justice
Co-Chair | LGBTQ Caucus of Faculty/Students in Social Work
VernHarner.com | pronoun: they

---

**Claudia Sellmaier** <sellmaic@uw.edu>              Fri, Apr 21, 2023 at 11:23 AM
To: Vern Harner <vharner@uw.edu>

Hi Vern,

I could meet and talk on Monday at 2 or 3PM. Yes, feel free to send the topic proposal so I can look at it before we meet.

Hope your week and your course eval was otherwise fine.
Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Thursday, April 20, 2023 10:13 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** noch eine weitere Anfrage...

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                Fri, Apr 21, 2023 at 12:18 PM
To: Claudia Sellmaier <sellmaic@uw.edu>

2pm on Monday would be great!

They haven't had to submit a formal proposal for the topic, but the student came up to me during co-working time in class with this article (link) pulled up, asking if she could do her zine project on the issue of "trans" people sexually assaulting others in prison --- there are so many issues with this (ie, the Daily Mail as a source, the fact that if cis men are pretending to be trans to do this then its not trans people doing this, etc etc) coupled with the fact that there have been nearly 500 anti trans policies proposed in the US so far this year (link). The Daily Mail article is (unfortunately unsurprisingly) full of TERF and far right dog whistles and talking points and lacking in sources for their data and claims.

I was really taken aback by seeing this article pulled up on her laptop, but reaffirmed that violence against women, including and definitely in prison, was a serious issue and one that she could use to find a topic for this project. However, she continued to say that she wanted to focus on the issue of trans people 'pretending to be trans' to be housed in prisons with women in order to sexually assault them. If you aren't familiar, this

Harner_000004

(broadly, not only re: prison, but also bathrooms etc) is a huge talking point from the far right and a justification for all sorts of anti-trans policies, behaviors, etc.

Here is the assignment overview (we are also talking about how she has to find a way that the community has responded to the issue -- the zine isn't to be about the issue itself, but the way the community is responding to it):

> Students will create a mini-zine (booklet) about a community response to a social justice related issue. This may be a protest, a rally, individual or collective action, grassroots organization, petition, or something else. While these will be completed primarily during class time, students will be expected to bring at least 6 copies on Thursday during week 6. (then specific prompts are given)

Here is what I included in the follow up announcement to the full class yesterday -- I mentioned to this student that I would include a source about assessing source reliability. This student also, on Tuesday, questioned whether Black boys and men 'really' are arrested, charged, and sentenced at higher rates. I am always happy to provide citations, sources, and more information so often do so in class announcements. Based on the mid quarter feedback, I'm also questioning if it was this student who wrote the anonymous email.

- When using sources for this project or any of your assignments, **make sure that you are using reputable sources**. This interactive media bias chart .can be helpful when trying to figure out if news sources provide reliable information, what kind of bias they might have, if there's big variability in their reliability, and so on. Basically,  if the news source has a reliability score of 40+ on this chart, it's likely a reliable source of information. Reliability scores between 24-40 indicate a range of possibilities, and scores below 24 are no good.
- On Tuesday, I mentioned the **adultification of Black boys**, as well as more severe sentencing and higher rates of being charged or found guilty for Black men. Here is some more information on that: link 1 (podcast), link 2, link 3, link 4

This week's topic was sexism and gender-based oppression with a focus on women -- in week 6 we will focus on trans liberation and gender-based oppression against trans folks and others.

Thank you for all of your support this quarter -- I've certainly had students use topics I didn't agree with or see eye to eye on before, but I have never had a student propose such a clearly super anti-trans topic.
--
**Vern Harner**
pronoun: they

[Quoted text hidden]

---

**Claudia Sellmaier** <sellmaic@uw.edu>                                    Fri, Apr 21, 2023 at 2:46 PM
To: Vern Harner <vharner@uw.edu>

Thank you for the additional background. To be honest, I am speechless right now, but hope to have some more coherent thoughts on Monday. I sent the calendar invite, and the second version should even include the Zoom link (https://washington.zoom.us/j/97074966526)

Hope you will have a good weekend.
Claudia

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

---

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Friday, April 21, 2023 12:18 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: noch eine weitere Anfrage...

[Quoted text hidden]

Harner_000005

# EXHIBIT 37

| | |
|---|---|
| **From:** | L J <justbecause4469@hotmail.com> |
| **Sent:** | Tuesday, April 11, 2023 2:39 PM PDT |
| **To:** | vharner@uw.edu |
| **Subject:** | A student of yours |

This Message Is From an Untrusted Sender
You have not previously corresponded with this sender.
See https://itconnect.uw.edu/email-tags for additional information. Please contact the UW-IT
Service Center, help@uw.edu 206.221.5000, for assistance.

 I am one of your students and I feel I need to email this because, I do not feel able to discuss things with you directly. Also, that and other things I am going to tell you are felt by others in the class as well. First, your foul language you use in class is terribly inappropriate, offensive, and unprofessional in this line of work. Ever stop to think some of the foul language you use might be a trigger word for some? Especially, our future clients we will serve in our professions. Second, you leave no room for discussion, debate, or question. Your teaching, your opinion and your way are not the only ways of the world. Third, you tell us not to interrupt, yet you always interrupt us. When you do open us up to ask questions, you cut us off as if we are not allowed to ask a tough question. Fourth, why do you hate on white people? Is it not okay to be white? When you yourself are white. You cannot relate to a POC on any level with your high education and past experiences. Stop being a hypocrite and making others feel like that you are the only white person who can relate. You are a discouraging professor and the one I have enjoyed the least. You tell us that if we stay quiet we are part of the problem. Well, then, Why cut us off? Why prevent us from speaking up, even if it makes you a little uncomfortable. I went to college to expand my mind, not to be shut down, or forced to see things one way. Do you want to blend the world better or divide it more? Right now, you are causing many of us to roll our eyes and only attend your class for the credit. Not to mention, your pov that a disabled trans is worse off than a disabled non-trans. Cant we love all? Why does one need to be shot down to lift others? I also heard you may not have gotten as far as you have if you didn't threaten discrimination against you as leverage to gain position. I truly feel you are full of hate, and I don't like it. I hope people speak up during end of course surveys.

Harner_001522

EXHIBIT 37a



Vern Harner <vharner@uw.edu>

## A student of yours
8 messages

**L J** <justbecause4469@hotmail.com>                                  Tue, Apr 11, 2023 at 2:39 PM
To: "vharner@uw.edu" <vharner@uw.edu>

---

**This Message Is From an Untrusted Sender**

You have not previously corresponded with this sender.

See https://itconnect.uw.edu/email-tags for additional information. Please contact the UW-IT Service Center,
help@uw.edu 206.221.5000, for assistance.

---

I am one of your students and I feel I need to email this because, I do not feel able to discuss things with you directly. Also, that and other things I am going to tell you are felt by others in the class as well. First, your foul language you use in class is terribly inappropriate, offensive, and unprofessional in this line of work. Ever stop to think some of the foul language you use might be a trigger word for some? Especially, our future clients we will serve in our professions. Second, you leave no room for discussion, debate, or question. Your teaching, your opinion and your way are not the only ways of the world. Third, you tell us not to interrupt, yet you always interrupt us. When you do open us up to ask questions, you cut us off as if we are not allowed to ask a tough question. Fourth, why do you hate on white people? Is it not okay to be white? When you yourself are white. You cannot relate to a POC on any level with your high education and past experiences. Stop being a hypocrite and making others feel like that you are the only white person who can relate. You are a discouraging professor and the one I have enjoyed the least. You tell us that if we stay quiet we are part of the problem. Well, then, Why cut us off? Why prevent us from speaking up, even if it makes you a little uncomfortable. I went to college to expand my mind, not to be shut down, or forced to see things one way. Do you want to blend the world better or divide it more? Right now, you are causing many of us to roll our eyes and only attend your class for the credit. Not to mention, your pov that a disabled trans is worse off than a disabled non-trans. Cant we love all? Why does one need to be shot down to lift others? I also heard you may not have gotten as far as you have if you didn't threaten discrimination against you as leverage to gain position. I truly feel you are full of hate, and I don't like it. I hope people speak up during end of course surveys.

---

**Vern Harner** <vharner@uw.edu>                                  Tue, Apr 11, 2023 at 2:44 PM
To: Claudia Sellmaier <sellmaic@uw.edu>

Hi Claudia,
Week 3 is the week we talk about Racial Justice in 404 -- include about whiteness, the construction thereof, white supremacy, etc. I don't know who this student is and don't think it's helpful for me to go point-by-point defending myself or trying to clarify any misunderstandings, but would love to check in with you about how to proceed.
I'm around the rest of the day aside from a student meeting at 4:30 and am free tomorrow aside from an 11am and 3am meeting.
thanks,
Vern

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                  Tue, Apr 11, 2023 at 3:03 PM
To: Janelle Hawes <jmhawes@uw.edu>

--
**Vern Harner**
pronoun: they

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                  Tue, Apr 11, 2023 at 4:02 PM
To: "Keva M. Miller" <KevaMill@uw.edu>

Hi Dean Miller,
If Claudia doesn't have time to chat tomorrow, do you perhaps have some time? My classes meet Tuesdays and Thursdays at 8am and 10:10am, so I will have these students again on Thursday. I'm not sure if the best route, given the anonymity, is to point them to Claudia / whoever if they have these serious concerns about my teaching and expertise/credentials
--
**Vern Harner**

Harner_001524

pronoun: they

[Quoted text hidden]

---

**Claudia Sellmaier** <sellmaic@uw.edu>                                    Tue, Apr 11, 2023 at 4:44 PM
To: Vern Harner <vharner@uw.edu>

Hello Vern,

First, I am sorry you received this email, this must be quite stressful. Second, Keva and I were in a meeting when your email came in, so we chatted about it. I can meet tomorrow after 2PM, would that still work for you? In general, we thought to not respond to the email, since it's from a non-UW email address. You could send a general reminder email to all students to please use their UW email address and that we are not responding to outside email addresses following UW protocol, and then wait and see if the student follows up.
Happy to chat more tomorrow.
Claudia

---

## UW Tacoma Email Policy | Information Technology | University of Washington Tacoma

The following policy statements concern the conditions under which faculty, staff and students are expected to use the University of Washington email system. They do not prevent faculty, sta...

[www.tacoma.uw.edu](http://www.tacoma.uw.edu)

---

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Tuesday, April 11, 2023 2:44 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Fwd: A student of yours

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                          Tue, Apr 11, 2023 at 5:43 PM
To: Claudia Sellmaier <sellmaic@uw.edu>

Thanks, Claudia -- would you prefer at 2pm (or 2:05pm or 2:15 if youd like a buffer) or at 4pm?
--
**Vern Harner**
pronoun: they

[Quoted text hidden]

---

**Claudia Sellmaier** <sellmaic@uw.edu>                                   Wed, Apr 12, 2023 at 8:37 AM
To: Vern Harner <vharner@uw.edu>

2PM works for me. Here is a Zoom link https://washington.zoom.us/j/91426284930

Claudia

Harner_001525

11/20/23, 9:48 PM
Case 3:25-cv-05079-DGE    Document 105    Filed 03/17/26    Page 206 of 446
UW Mail - A student of yours

Claudia Sellmaier, PhD, MSW, MA
Assistant Professor
MSW Program Chair
Interim BASW Program Chair
Pronouns: She/her/hers
University of Washington, Tacoma
School of Social Work & Criminal Justice
1900 Commerce St. Box 358425
Tacoma, WA 98402

---

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Tuesday, April 11, 2023 5:43 PM
**To:** Claudia Sellmaier <sellmaic@uw.edu>
**Subject:** Re: A student of yours

[Quoted text hidden]

---

**Vern Harner** <vharner@uw.edu>                                         Wed, Apr 12, 2023 at 10:23 AM
To: Claudia Sellmaier <sellmaic@uw.edu>

see you then!

--
**Vern Harner**
pronoun: they

[Quoted text hidden]

Harner_001526

EXHIBIT 38



Harner_003318

EXHIBIT 39

*Ex9*

# TSOCWF 404 SPR23

## Announcements

Created Mar 21, 2023 6:05pm| Posted Mar 21, 2023 6:05pm
UnsubscribedManage Discussion

**Discussion Topic: 💥 Welcome to 404!💥 Welcome to 404!**
Hi everyone,

I'm Vern Harner, your instructor for TSOCWF 404 (Cultural Diversity & Societal Justice) this Spring quarter. Please call me Dr. Vern, Vern, or Professor ("Prof" is also acceptable) and use the pronoun "they" to refer to me (example: "Dr. Vern is our instructor for 404. They have a rescue dog named Rook. Their dog is the cutest dog in Tacoma, and I'm going to tell them that the first day of class.")

I am reaching out to you primarily so that your experience can be as affirming and comfortable as possible in my class. Our lives include many facets of personal identity, dis/ability, names we use, genders, and more, all of which deserve recognition and inclusion in the classroom (not to mention the impact of the current global pandemic and events). To that end, please complete the brief pre-class survey (click hereLinks to an external site.) as soon as possible.

Please also note that, at some point during Spring Quarter, the UWT campus will have lockdown drills. I do not know when these will be, but I will share what information I have on the first day of class. UWT does have these resources online: link 1, link 2

Here are some notes on other things you might be wondering about prior to our first day of class:

## WHAT TO DO BEFORE THE FIRST DAY

1. Please complete the brief pre-class survey (click hereLinks to an external site.) (most important)
2. Read/skim the syllabus (click hereLinks to an external site.)

UWT_000142

3. Skim "Leaning In" (  click here

Actions
) (Lowest priority of these three -- please get some rest this Spring Break if possible!)

## SYLLABUS & CANVAS

There might be tiny updates to the syllabus or the Canvas as the quarter progresses, but they are mostly set. I will bring printed copies of the syllabus for all of you on the first day of class. The Canvas sites are now published! If you notice any errors on Canvas or the Syllabus, please don't hesitate to email me or bring it up in class.

There is no required textbook for this class--You'll be able to find all assigned materials under the 'modules' tab in Canvas. All readings/materials should be accessible to screen readers and/or be captioned, so please let me know if any non-accessible materials have managed to slip through so I can correct it.

I am really looking forward to meeting you all and getting this quarter started! Please let me know if there is any other way I can support you.

Dr. Vern
vharner@uw.edu

Created Mar 27, 2023 1:30pm| Posted Mar 27, 2023 1:30pm
UnsubscribedManage Discussion

**Discussion Topic: Brief reminders - see y'all tomorrow!Brief reminders - see y'all tomorrow!**

Hi everyone,

I hope everyone was able to get some rest in over break! I'm excited to see you all tomorrow morning -- here are some quick reminders:

1. Please complete the brief pre-class survey (click here) (most important)
2. Read/skim the syllabus (click here.)
3. Skim "Leaning In" (click here)

See you tomorrow,
Dr. Vern

UWT_000143

Created Mar 28, 2023 3:11pm| Posted Mar 28, 2023 3:11pm
UnsubscribedManage Discussion

**Discussion Topic: Week one is...halfway done!☐Week one is...halfway done!☐**

Hi class,

Thanks for a great first day together! There is always so much to hold together in a social work classroom, but I trust that we will all do our best with the tools/information we have at the time and not shy away from learning and developing deeper understandings.

Here are some things I'm following up on after our class:

- There are many ways to get one's computer to read a PDF out loud! Here is <u>one way.</u> and <u>another way .</u>If you've got another favorite screen reader, feel free to comment on this announcement and let us know!


- My drop -in hours are Tuesdays from 12:30-1:30pm  I also always have snacks, coffee, and tea in my office (WCG 233) - everyone is always welcome to drop by to grab a snack/drink, no chatting required.


- I uploaded the sign-ups for reading summaries <u>hereLinks to an external site.</u>, which can also be found under the <u>assignment resources module</u>.
  o Remember -- you are expected to read **all** required materials, whether or not you are writing a summary about it. Each student will submit **three** summaries throughout the quarter.
  o Remember to submit that summary to <u>the Canvas assignment</u> before class next week and be ready for the "so, what was that reading about??" question in class.
  o We will finish summary sign-ups on Thursday, so if you weren't able to come to class today or the second go-round didn't make it to you -- don't worry!


- The safety drill will be from 10am-10:30am on Monday, April 3rd and **Thursday, April 6th**. Those of us who signed up for the UW Alert system will get an alert via text and/or email and we will identify the route we would take to evacuate and/or how we would hunker down in class.

Please let me know if I let anything fall between the cracks. See y'all Thursday!
Vern

UWT_000144

Created Mar 30, 2023 12:55pm| Posted Mar 30, 2023 12:55pm
UnsubscribedManage Discussion

**Discussion Topic: Week 1 remindersWeek 1 reminders**

Hi class,

Here are some things I'm following up on after our first week:

- My drop -in hours are Tuesdays from 12:30-1:30pm  I also always have snacks, coffee, and tea in my office (WCG 233) - everyone is always welcome to drop by to grab a snack/drink, no chatting required.


- I updated the sign-ups for reading summaries here, which can also be found under the assignment resources module.
- o Remember -- you are expected to read **all** required materials, whether or not you are writing a summary about it. Each student will submit **three** summaries throughout the quarter.
- o Remember to submit that summary to the Canvas assignment before class next week and be ready for the "so, what was that reading about??" question in class.
- o **If you were not able to sign up for reading summaries in class this week, please message me with the THREE readings you'd like to summarize this quarter. See the sign up sheet for available readings.**
- The safety drill will be from 10am-10:30am on Monday, April 3rd and **Thursday, April 6th**. Those of us who signed up for the UW Alert system will get an alert via text and/or email and we will identify the route we would take to evacuate and/or how we would hunker down in class.


- I will upload a graphic of the social justice post-it note map y'all made today under module one before Tuesday.

Please let me know if I let anything fall between the cracks. See y'all Tuesday!
Vern

Created Apr 4, 2023 3:37pm| Posted Apr 4, 2023 3:37pm
2 Replies, 1 Unread
2 Replies, 1 Unread
UnsubscribedManage Discussion

**Discussion Topic: ◀ゆClass moving online (asynchronous) for Thursday!◀ゆClass moving online (asynchronous) for Thursday!**

UWT_000145

Hi class,

A few of your peers let me know during office hours that the other class that most of y'all are in is not meeting this Thursday. As I know that means many of you might have had to come to campus for just our class, **I am moving our class to be asynchronous and online for this Thursday only.**

**I will be posting a recorded lecture before 8am on Thursday and each of you will be expected to watch and engage with it, including leaving comments before the end of the weekend. I will post more details around this when I share the lecture.**

Please feel free to mention this to others if you see them this afternoon - I know sometimes these announcements slip by.

Worksheets can still be submitted by 8pm on Thursday - either slip it under my office door or submit it via the Canvas assignment page.

-Vern

Created Apr 5, 2023 4:23pm| Posted Apr 5, 2023 4:23pm
UnsubscribedManage Discussion

**Discussion Topic: Upcoming SJ related event on campus - register today!Upcoming SJ related event on campus - register today!**

Hi class,

Please consider attending this upcoming event on campus -- registration deadline is in five days! **Attending this event can take the place of submitting one of your five worksheets this quarter.** There will be a sign in sheet for our class at the staffed welcome table and I will be at the event, as well.
-Vern


## Social Justice Visions for Tacoma

Tuesday, April 18, 2023
4-6:30 pm in William Philip Hall (WPH)

Local Expert Panel, followed by Reception with Light Refreshments! *All UWT students, staff, & faculty are invited.*
**For pizza & refreshments, <u>register by noon on 4/10.</u>**Links to an external site.

Hear about activism and social justice-informed work that's happening in Tacoma and how YOU can engage in this work, personally & professionally.

UWT_000146

**Local Social Justice Experts:**
Judge Dee Sontag – *Tacoma Municipal Council*
Tisha Wosencroft – *Legally Black*
Bunchy Carter – *The Black Panther Party*
Terrence Howard – *Activist/Youth Mentor*
Jamika Scott – *Tacoma Action Collective*


Event sponsored by the Equity and Inclusion Committee of the School of Social Work and Criminal Justice. For accommodation requests related to a disability, please contact Disability Resources for Students (drsuwt@uw.edu or 253-692-4508).

Thanks!

-On behalf of the SSWCJ E&I Committee

Janelle Hawes, Ph.D. (she/her/hers)
Assistant Professor
School of Social Work and Criminal Justice
University of Washington Tacoma

Created Apr 5, 2023 7:33pm| Posted Apr 5, 2023 7:33pm
UnsubscribedManage Discussion

**Discussion Topic: 🔊Asynchronous lecture POSTED - watch by the end of the weekend🔊Asynchronous lecture POSTED - watch by the end of the weekend**

Hi everyone,

**you can watch this session's recorded lecture under <u>the week 2 module</u> or at <u>this link</u>.**

- The total runtime is 40 minutes, though you can speed it up or slow it down by clicking on the "1x" in the bottom left corner


- Click the arrow in the bottom right to advance to the next slide and the play (sideways triangle) in the bottom left to play my comment on that slide.


- You can click the (+) button that is centered along the bottom to leave questions/comments directly on a slide. There are a couple points in the lecture where I ask questions. You can also respond to a classmate's comment! Everyone

UWT_000147

is expected to leave at least **ONE** comment, question, or reply before the weekend is over in order to earn this session's participation points.

- **Either make a free account or sign your name (and last initial) so I know who is commenting :)**

- You can click the square in the upper right corner of it to view it in full screen

- You can enable captions by clicking the [CC] button in the top right (they are being auto-generated but then I will clean them up)

- <u>Here are some more details</u> on how to navigate a VoiceThread

- and please let me know if there are any questions or issues accessing this!

See y'all Tuesday,
Vern

Created Apr 9, 2023 12:09pm| Posted Apr 9, 2023 12:09pm
UnsubscribedManage Discussion

**Discussion Topic: Reminder: Engage with asynchronous lecture by the end of todayReminder: Engage with asynchronous lecture by the end of today**

Hi everyone,

this is a gentle reminder to watch the posted asynchronous lecture (found under the week 2 module) by the end of tonight -- in order to earn the participation point for Thursday's class, you must leave at least one comment on it. More details about the lecture logistics can be found in the prior announcement.

See y'all Tuesday!
Vern

Created Apr 12, 2023 5:32pm| Posted Apr 12, 2023 5:32pm
UnsubscribedManage Discussion

**Discussion Topic: Reminders for tomorrow - bring your mug! ☕Reminders for tomorrow - bring your mug! ☕**

UWT_000148

Hi everyone,

We are mid-way through week 3! I wanted to offer some reminders as we navigate the quarter tomorrow:

- While most class sessions I can bring either coffee or tea, tomorrow I will be bringing **both** -- please bring a reusable mug/cup/vessel if you'd like some.

- Tomorrow we will wrap up the large group discussion / lecture from yesterday and start digging into the Zine assignment.

- Next week is week 4 already! If you've had me as a professor before, you might remember that this means there will be an opportunity to provide informal mid-quarter feedback. We'll discuss this more in class together next week.

- Here are the upcoming summaries that are due:
- Lastly, as I wrangle my various accounts, please continue to use Canvas messages or your UW email to get in touch with me. This is in line with not only what is helpful for me, but also official UW protocol. Though it's rare that this happens, if you've messaged me and it's longer than 24-48 hours before you receive a response (not including weekends/holidays), a reminder email/message is always welcome. **If you notice a broken link on Canvas or a required reading that is not in the Canvas modules, please do notify me right away so I can fix it.** Thanks!

See y'all tomorrow,

Vern

Created Apr 17, 2023 6:21pm| Posted Apr 17, 2023 6:21pm
UnsubscribedManage Discussion

**Discussion Topic: Reminder for tomorrow class - bring your cell phone or laptop**
🖥️**Reminder for tomorrow class - bring your cell phone or laptop** 🖥️

Hi class,

**the main point of this announcement is to ask y'all to bring (if possible) a cell phone or laptop to class tomorrow.** To meet everyone's communication styles and preferences, I am pilot testing some Poll Everywhere (interactive digital polls) during tomorrow's class.

UWT_000149

Here are some other things that are related to our class content:

- Some follow up on Country Music's response to gun law reform (lack thereof) and anti-trans legislationLinks to an external site.
- Why Nature (big fancy academic journal) is updating its advice to authors on reporting race or ethnicityLinks to an external site.
- Links to an external site.Related to that & some insight into other cultural contexts: Diversity in German science: researchers push for missing ethnicity dataLinks to an external site.
- Free talk on Thursday at 6pm just down the street re: race & labor in the British EmpireLinks to an external site.
- This is the institute I mentioned in class last week: Indigenous Wellness Research InstituteLinks to an external site.
- Lastly, here are some articles about the representatives in Tennessee I mentioned: link 1Links to an external site., link 2Links to an external site.

See y'all tomorrow! I'll bring tea -- thanks to whoever added to our tea collection last week!
Vern

Created Apr 18, 2023 3:42pm| Posted Apr 18, 2023 3:42pm
1 Reply
1 Reply
UnsubscribedManage Discussion

**Discussion Topic: Reminder: Social Justice Panel todayReminder: Social Justice Panel today**

Hi class,
I'll see some of y'all soon at the panel -- if you'd like to use this to replace one of your worksheets, please **1)** be sure to sign in on the pink sign in form at the front table (if attending virtually, send me a screenshot of the screen) and **2)** submit a 4-6 sentence summary of one or more of the takeaways from the panel discussion (for example, what was something that was impactful for you? what was interesting? what was a point that was made and how does it apply to social work)? Please attend at least one hour of this 2.5 hour event for worksheet credit.

-Vern

**Social Justice Visions for Tacoma**

Tuesday, April 18, 2023
4-6:30 pm in William Philip Hall (WPH)

UWT_000150

Local Expert Panel, followed by Reception with Light Refreshments! *All UWT students, staff, & faculty are invited.*
Hear about activism and social justice-informed work that's happening in Tacoma and how YOU can engage in this work, personally & professionally.
<u>Zoom link click here</u><u>Links to an external site.</u>

**<u>Local Social Justice Experts:</u>**
Judge Dee Sontag – *Tacoma Municipal Council*
Tisha Wosencroft – *Legally Black*
Bunchy Carter – *The Black Panther Party*
Terrence Howard – *Activist/Youth Mentor*
Jamika Scott – *Tacoma Action Collective*


Event sponsored by the Equity and Inclusion Committee of the School of Social Work and Criminal Justice. For accommodation requests related to a disability, please contact Disability Resources for Students (<u>drsuwt@uw.edu</u> or 253-692-4508).

Created Apr 20, 2023 5:14pm| Posted Apr 20, 2023 5:14pm
UnsubscribedManage Discussion

**Discussion Topic: Week 4 is becoming Week 5! ☐ Some reminders are inside -- Week 4 is becoming Week 5! ☐ Some reminders are inside --**

Hi class,

Thanks for another super generative week! Here are some notes as we start to approach week 5 of our quarter:

- If you were planning to use Tuesday's panel in place of one worksheet, make sure you either signed in or took a screenshot and submit the 4-6 sentences on any of your remaining worksheet assignments on Canvas by 8pm tonight. Once the recording goes out, I'll let y'all know.


- Many of the organizations that the panelists mentioned are **potential topics for your zine assignment.** Some of these organizations include: LegallyBLACK, Black Panthers, Tacoma Action Collective, Young Black & Brilliant, Tacoma Urban League, Peoples Assembly (in Hilltop), Mercy House, certain programs at the Tacoma Public Library, Tacoma Creates, Artful Tacoma, to name some of them.

UWT_000151

- If you haven't landed on a **zine topic** yet, be sure to sure have one by Tuesday. I'm available in office hours, by appointment, and by Canvas message or email if I can help brainstorm or narrow things down. Next Thursday, I'll share how I would grade that sample zine I made using the rubric and we will have hands-on time to work on zines (I'll even remember to bring my markers!).

- On Tuesday, we'll debrief **midquarter feedback** and any improvements and adjustments we can make at this point in the quarter. Then, we will dig into **Health Justice**.

- Here is the link to the UW Library databases that focus on **primary sources**: click here (You can search within these by using the search bar on the page while filtering for databases with primary sources)

- When using sources for this project or any of your assignments, **make sure that you are using reputable sources**. This interactive media bias chart Links to an external site.can be helpful when trying to figure out if news sources provide reliable information, what kind of bias they might have, if there's big variability in their reliability, and so on. Basically,  if the news source has a reliability score of 40+ on this chart, it's likely a reliable source of information. Reliability scores between 24-40 indicate a range of possibilities, and scores below 24 are no good.

- On Tuesday, I mentioned the **adultification of Black boys**, as well as more severe sentencing and higher rates of being charged or found guilty for Black men. Here is some more information on that: link 1 (podcast)Links to an external site., link 2Links to an external site., link 3Links to an external site., link 4Links to an external site..

- For the **Canva zine template**, be sure to click file--->viewing settings and select 'view guides' (these guides will show where the pages/folds will be but won't print)

- Lastly, a reminder about **attendance** -- at UWT, we do not grade based on attendance alone. However, as we are an accredited social work program, there is an expectation that, in order to be sure y'all are receiving and learning the content in

UWT_000152

our class, that you attend <u>at least</u> 70% of in class sessions (14/20 class sessions). If you've missed 3 or more sessions at this point and we **haven't** had an opportunity to check in about it, please do come see me during office hours or send me a Canvas message! There are details about the School's expectations around participation in the student handbook (<u>here</u>) which you can find on the BASW student resources page (<u>here</u>).

- Lastly, lastly -- here are the upcoming reading summaries that are due.
Please let me know if I forgot anything! I'll see y'all Tuesday --
Vern

Created Apr 26, 2023 9:55am| Posted Apr 26, 2023 9:55am
UnsubscribedManage Discussion

**Discussion Topic: ◀ᴼReminders for tomorrow's class: zine topic!◀ᴼReminders for tomorrow's class: zine topic!**

Hi class,

Tomorrow we will wrap up the conversation around health justice and have most of the class time to discuss and work on <u>the zine assignment</u>.

- **Please be sure to have your <u>topic</u> identified by class tomorrow and check in with me about it. If you are "stuck", I will also have a list of potential topics that align with the social issues we discuss in class. The topic must be about an actual <u>response</u> to a social justice issue, not about the social justice issue (or what our response *should* be) itself.**

- Using the <u>rubric</u>
Actions
, we will briefly go over how I would grade the sample zine (about the civil rights movement) that I made.

- Though your sources aren't required to be academic, they must be reputable, trustworthy sources -- there are a variety of organizations and tools online that can help discern this, including this <u>oneLinks to an external site.</u>.

UWT_000153

EXHIBIT 40

EXH-13

Jan 22 2026

2/16/2023


To whom it may concern,


I currently have Claudia Arias in my social welfare policy and advocacy course at University of Washington School of Social Works and Criminal Justice. Claudia is enrolled in our BASW program where she is thriving.

Claudia has shown great critical thinking, takes differing perspectives and lens's into consideration and applies them to our subject matter around policy work. Claudia consistently contributes to our class discussions bringing up points and perspectives that help her classmates grow. She also is able to hear her classmates and consider their perspectives which helps her to grow.

Claudia is almost halfway through her BASW program where she is working to further develop her skills in helping others to access resources, finding and growing confidence in their own voices, and the art and science of journeying alongside someone right where they are as a helping professional. She has already had the opportunity to engage in advocacy activities during our current legislative session to advocate for a bill currently under consideration.

Starting fall quarter of next year, Claudia will engage in community based learning as a practicum student, where I will have the privilege of also overseeing her practical application to learning.

I have watched Claudia not only find her voice, but grow confidence in utilizing it, not only for the things she is passionate about, but on behalf of those who may not be as empowered to speak up. Claudia is a leader and holds a genuine curiosity about others and why things are as they are. These are both great assets which will take her far in her social work career.

As a 24 year social work veteran who has hired many social workers over the years, I see so many amazing qualities manifested in Claudia. I have no doubt she will be an incredible asset not only to her community, but our profession as a whole, especially as a strong and skilled Latina social worker.


Nancy Kuhuski, MSW

Assistant Teaching Professor & Field Education Faculty

School of Social Work & Criminal Justice

University of Washington Tacoma

UWT_002507

# EXHIBIT 41



# THEY

Over half of the world's languages don't use gendered pronouns...at all! (*World Atlas of Language Structures*)

Genders in addition to man/woman have existed for all of recorded history! (*PBS Gender Diverse Cultures Map*)

Even English has changed over the years -- "you" used to be plural. "They" has been used as a singular pronoun for hundreds of years, mostly when speaking but also sometimes in texts.

## HISTORY

→ many erased or harmed by colonization

## MIND YOUR MANNERS

Changing the way we use language can be hard. Sometimes we resist it because it also means changing the way we think. If you're resistant to using "they" as a singular pronoun...why do you think that is?

You don't have to sign every petition or march in every parade. Using the pronoun "they" for someone who asks you to can make a big impact in their life. It's the nice thing to do.

## GENDER & IDENTITY

We learn that men and women are different when we are young...but not all people use (only) the words "man"/"woman" to describe themselves. For some people, the idea of being a man or woman just doesn't fit.

Folks who aren't men or women might use words like non-binary, two spirit, genderqueer, genderfluid, agender, bigender, demigender, or others. Some might not have found a word to describe their gender that fits yet.

## EXPRESSION

We are also taught that you can tell if someone is a man or woman by looking at them. Men look one way and women look another. But this isn't always true!

### AESTHETICS

This also isn't true for trans/non-binary people who use the pronoun "they". Trans & non-binary folks of all/no genders can be femme, masc, androgynous, butch, feminine, or any other gender expression.

I don't have a "woman's body" cuz I'm not a woman!

## PRACTICE

Being thoughtful about using language a new way can take a bit for your brain to get used to. To practice, narrate what your pets, plants, or partner(s) are doing in third person.

If you mess up, no need to make a huge deal! *Correct yourself, move on, and keep practicing.*

If you have a friend whose pronoun is "they", don't assume they want you to always correct others on it. Ask them what you can do to support them!

## EXAMPLES

Because of the complex ways that identity, expression, language, and experiences interact, you might consider using "they" as the default pronoun for folks you don't know. And definitely use it for anyone who asks you to!

Vern loves their dog Rook. Rook loves them back, and shows it by cuddling their face every morning.

EXH-1
Jan 22 2026

Case 3:25-cv-05079-DGE   Document 105   Filed 03/17/26   Page 226 of 446

## MIND YOUR MANNERS

### IDENTITY

We learn that men and women are different when we are young...but not all people use (only) the words "man"/"woman" to describe themselves.

For some people, the idea of being a man or woman just doesn't fit.

Folks who aren't men or women might use words like non-binary, two spirit, genderqueer, genderfluid, agender, bigender, demigender, or others. Some might not have found a word to describe their gender that fits yet.

It's the nice thing to do.

...can make a big impact in their life. It's the nice thing to do.

someone who asks you to pronoun "they" for every parade. Using the every petition or march to You don't have to sign

Why do you think that is? singular pronoun... as a to using "they" as a think. If you're resistant changing the way we because it also means Sometimes we resist it Language can be hard.

**Changing the way we use:**

### HISTORY

### EXPRESSION

We are also taught that you can tell if someone is a man or woman by looking at them. Men look one way and women look another. But this isn't always true!

This also isn't true for trans/non-binary people who use the pronoun "they". Trans & non-binary folks of all/no genders can be femme, masc, androgynous, butch, feminine, or any other gender expression.

universe Cultures Map) history! (PBS Gender for all of recorded man/woman have existed Genders in addition to

sometimes in texts. when speaking but also hundreds of years, mostly singular pronoun for has been used as a used to be plural. "They" over the years -- "you" Even English has changed

Language Structures) all! (World Atlas of gendered pronouns...at languages don't use Over half of the world's

### THEY

### EXAMPLES

Because of the complex ways that identity, expression, language, and experiences interact, you might consider using "they" as the default pronoun for folks you don't know. And definitely use it for anyone who asks you to!

Here are some examples of how:

Vern loves their dog Rook. Rook loves them back, and shows it by cuddling their face every morning.

lovingly crafted by Vern Harner ✨
tiny.cc/VernHarner

Please copy & distribute freely! 2018

### NEXT? sawh

Being thoughtful about using language a new way can take a bit for your brain to get used to. To practice, narrate what your pets, plants, or partner(s) are doing in third person.

If you mess up, no need to make a huge deal! Correct yourself, move on, and keep practicing.

If you have a friend whose pronoun is "they", don't assume they want you to always correct others on it. Ask them what you can do to support them!

EXHIBIT 42

EXH–6
Oct 10 2025





Gross Violation

Indifference
treatment  Well-being
Assault
Abuse    Health
opportunities
Rape   Equality

opportunities
Vulnerability
Differences
Accommodations

Footage inside Washington's State's Correctional Center for Women shows a distresssed inmate sounding off about the prison's transgender friendly policy. As a result of the policy violent male offenders are put in positions where they can take advantage of female inmates including in the same cell.

Okeefemediagroup.com
Insider Footage Shows Inmate Distressed Over Transgender Assaults on Women
https://www.youtube.com/watch?v=OBFobuNLMoM

Example: Woman in Prison
Poor infrastructure, unsatisfactory prison living conditions, the possibility of physical or sexual abuse, solitary confinement, intimidation and harassment by correctional officers, inadequate trauma care, and restricted access to counseling services and social support are conditions that build upon one another and exacerbate negative health outcomes for female inmates.

https://sph.umich.edu/pursuit/2019posts/inadequate-healthcare-a-significant-problem-affecting-incarcerated-women.html

The Eighth Amendment to the U.S. Constitution prohibits the infliction of "cruel and unusual punishments."

Example: Transgender
Denying her medically necessary therapeutic doses of hormone therapy and medically necessary gender expression allowances, including access to permanent hair removal, female undergarments, female canteen items, and accommodations for a female hairstyle and grooming standards, which fall short of the adequate medical care.
Ashley Diamond vs. Timothy Ward

Male prisoners may also be vulnerable and at risk of assault in the male estate. Vulnerable men may include: BAME males, old males, young males, disabled males, gay males. All these male prisoners as well as those who identify as transgender, have the right to be safe in prison.

8:09    .ııl LTE 89

X    Zine 1st pg.jpg    •••

According to the PREA standards, prison officials must use information from the prisoners' risk assessments "to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a).

Safety

This is important for data analysis and for service planning and development. We believe that when a male is arrested, commits a crime or is imprisoned, biological sex should be recorded. However, this doesn't always happen. Some arrests and convictions of males are recorded in the female data where the male in question has a GRC, or even on the basis of self-reported gender identity. This also happens in prison in respect of incident reporting. This means that male crime is hidden in the female data.

The Public Health Problem

The lack of access to quality health care for female inmates remains a serious issue as countless individuals continue to die or see their health status deteriorate while in prison



Keep Prisons Single Sex was established in 2020 to campaign for the sex-based rights of women in prison to single-sex accommodation and same-sex searching. We also campaign for data on offending to be recorded by sex throughout the criminal justice system

https://kpssinfo.org/

https://www.who.int/news-room/fact-sheets/violence-against-women

EXHIBIT 43


# Assignment 2 - Community Response Zine

Start Assignment

- Due May 4, 2023 by 10am
- Points 10
- Submitting a file upload

Students will create a minizine (booklet) about a community (or individual) response to a social justice related issue. This may be a protest, a rally, individual or collective action, grassroots organization, petition, or something else. While these will be completed primarily during class time, students will be expected to bring at least 6 copies during week 6.

Your minizine should be made using one piece of paper (8.5x11") folded into eights. See **video (https://www.youtube.com/watch?v=Wi1KHjATKwk)** and **template (https://drive.google.com/file/d/1Ny6Bxj_SE0fZNU014XgMQydK8uo7fBgu/view?usp=share_link)**.

Your minizine should include the following components:

- Introduction (brief)
- Overview of the issue being responded to (what, where, when)
- The basic details about the movement/community response (who, how)
- Some more specific details (e.g. strategies used, an image, examples, events, etc)
- Conclusion (main takeaway/impact)
- At least one reference or resource (okay to just put the main URL or provide a book title etc, full APA format not needed)

Please note -- if topic/content is not aligned with social work values & ethics, students may be asked to revise & resubmit the assignment.

**Zine Rubric (404)**

You are currently logged into Student View

Resetting the test student will clear all history for this student, allowing you to view the course as a brand new student.

**Reset Student**

**Leave Student View**

https://canvas.uw.edu/courses/1639782/assignments/8206831                                                           1/2

Harner_000992

Assignment 2 - Community Response Zine

| Criteria | Ratings | Pts |
|---|---|---|
| **Format & topic**<br>Zine is made using one 8.5x11" piece of paper folded into eighths; Topic/content is appropriate, aligned with social work values/ethics, and connection to social justice is clear; zine content is legible; student provided 6+ copies for classmates & submitted PDF online or paper copy to instructor, conversations with peers & feedback throughout process is engaged with appropriately | | 3 pts |
| **Intro/Overview**<br>Opening is brief but appropriate; Overview of the issue being responded to (what, where, when) | | 2 pts |
| **Details**<br>Basic details about movement / community response (who, what, where, when, how) are provided; additional details provide more depth and meaning | | 2 pts |
| **Conclusion**<br>The main takeaway and impact are clearly stated, overall content of zine is tied together nicely in closing statement/section | | 2 pts |
| **References**<br>At least one reference or resource is included (okay to just put the main URL or provide a book title etc, full APA format not needed). Content throughout zine is based on reputable, trustworthy sources and grounded in both empirical data & the lived experiences of the oppressed/marginalized group. | | 1 pts |
| | | Total Points: 10 |

You are currently logged into Student View

*Resetting the test student will clear all history for this student, allowing you to view the course as a brand new student.*

**Reset Student**

**Leave Student View**

Harner_000993

EXHIBIT 44

Ex 12

VHarner | 2023 | TSOCWF 404

| Assignment 2 - Zine - Rubric | | | |
|---|---|---|---|
| **Area** | **Details** | **Comments** | **Points** |
| **Format & Topic** | Zine is made using one 8.5x11" piece of paper folded into eighths; Topic is appropriate, aligned with social work values/ethics, and connection to social justice is clear; zine content is legible; student provided 6+ copies for classmates & submitted PDF online or paper copy to instructor, conversations with peers & feedback throughout process is engaged with appropriately | | ____/3 |
| **Intro / Overview** | Opening is brief but appropriate; Overview of the issue being responded to (what, where, when) | | ____/2 |
| **Details** | Basic details about movement / community response (who, what, where, when, how) are provided; additional details provide more depth and meaning | | ____/2 |
| **Conclusion** | The main takeaway and impact are clearly stated, overall content of zine is tied together nicely in closing statement/section | | ____/2 |
| **Reference** | At least one reference or resource is included (okay to just put the main URL or provide a book title etc, full APA format not needed). Content throughout zine is based on reputable, trustworthy sources and grounded in both empirical data & the lived experiences of the oppressed/marginalized group. | | ____/1 |
| **Total** | | | ____/10 |

Harner_000990

While you may deviate slightly, this is the general layout for your minizine:

| | |
|---|---|
| **1** Introduction | **2** Issue responding to (what) (where) (when) |
| **3** Basic details (who, how) | **4** more specific details (strategies, image, examples, etc) |

CUT CUT CUT CUT CUT CUT CUT CUT

| | |
|---|---|
| Front Cover (title, name, year) | Back Cover |
| **6** Conclusion / Resources / References | **5** Conclusion / main takeaway) |

Harner_000991

EXHIBIT 45

## Assignment 2 - Zine - Rubric

| Area | Details | Comments | Points |
|---|---|---|---|
| Format & Topic | Zine is made using one 8.5x11" piece of paper folded into eights; Topic is appropriate and connection to social justice is clear; zine content is legible; student provided 6+ copies for classmates & submitted PDF online or paper copy to instructor | | _____/1 |
| Intro / Overview | Opening is brief but appropriate; Overview of the issue being responded to (what, where, when) | | _____/3 |
| Details | Basic details about movement / community response (who, what, where, when, how) are provided; additional details provide more depth and meaning | | _____/3 |
| Conclusion | The main takeaway and impact are clearly stated, overall content of zine is tied together nicely in closing statement/section | | _____/2 |
| Reference | At least one reference or resource is included (okay to just put the main URL or provide a book title etc, full APA format not needed) | | _____/1 |
| Total | | | _____/10 |

**Monday, March 9, 2026 at 5:24:33 PM Pacific Daylight Time**

| | |
|---|---|
| **Subject:** | Fwd: Rubric from Fernando |
| **Date:** | Monday, March 9, 2026 at 4:44:11 PM Pacific Daylight Time |
| **From:** | Claudia Arias |
| **To:** | Jennifer Shaw |
| **Attachments:** | 88814.jpg |

---------- Forwarded message ---------
From: **Claudia Arias** <claudiasachwitz@gmail.com>
Date: Mon, Mar 9, 2026 at 4:38 PM
Subject: Rubric from Fernando
To: Claudia Arias <claudiasachwitz@gmail.com>





EXHIBIT 46















EXHIBIT 47



# CODE
## OF ETHICS
OF THE NATIONAL ASSOCIATION OF
SOCIAL WORKERS



**NASW**
National Association of Social Workers

# Contents

Overview

Preamble

Purpose Of The NASW Code Of Ethics

Ethical Principles

Ethical Standards

    1. Social Workers' Ethical Responsibilities To Clients

    2. Social Workers' Ethical Responsibilities To Colleagues

    3. Social Workers' Ethical Responsibilities In Practice Settings

    4. Social Workers' Ethical Responsibilities As Professionals

    5. Social Workers' Ethical Responsibilities To The Social Work Profession

    6. Social Workers' Ethical Responsibilities To The Broader Society

# Code of Ethics of the National Association of Social Workers

## OVERVIEW

The *NASW Code of Ethics* is intended to serve as a guide to the everyday professional conduct of social workers. This *Code* includes four sections. The first section, "Preamble," summarizes the social work profession's mission and core values. The second section, "Purpose of the *NASW Code of Ethics*," provides an overview of the *Code*'s main functions and a brief guide for dealing with ethical issues or dilemmas in social work practice. The third section, "Ethical Principles," presents broad ethical principles, based on social work's core values, that inform social work practice. The final section, "Ethical Standards," includes specific ethical standards to guide social workers' conduct and to provide a basis for adjudication.

*The National Association of Social Workers (NASW) is the largest organization of professional social workers in the world. NASW serves social workers in 55 chapters throughout the United States, Puerto Rico, the Virgin Islands, Guam, and abroad. NASW was formed in 1955 through a merger of seven predecessor social work organizations to carry out three responsibilities:*

- *strengthen and unify the profession*
- *promote the development of social work practice*
- *advance sound social policies.*

*Promoting high standards of practice and protecting the consumer of services are major association principles.*

*Approved by the 1996 NASW Delegate Assembly and revised by the NASW Delegate Assembly in 2020.*

© 2021 National Association of Social Workers. All Rights Reserved.

# Preamble

The primary mission of the social work profession is to enhance human well-being and help meet the basic human needs of all people, with particular attention to the needs and empowerment of people who are vulnerable, oppressed, and living in poverty. A historic and defining feature of social work is the profession's dual focus on individual well-being in a social context and the well-being of society. Fundamental to social work is attention to the environmental forces that create, contribute to, and address problems in living.

Social workers promote social justice and social change with and on behalf of clients. "Clients" is used inclusively to refer to individuals, families, groups, organizations, and communities. Social workers are sensitive to cultural and ethnic diversity and strive to end discrimination, oppression, poverty, and other forms of social injustice. These activities may be in the form of direct practice, community organizing, supervision, consultation, administration, advocacy, social and political action, policy development and implementation, education, and research and evaluation. Social workers seek to enhance the capacity of people to address their own needs. Social workers also seek to promote the responsiveness of organizations, communities, and other social institutions to individuals' needs and social problems.

The mission of the social work profession is rooted in a set of core values. These core values, embraced by social workers throughout the profession's history, are the foundation of social work's unique purpose and perspective:

- service
- social justice
- dignity and worth of the person
- importance of human relationships
- integrity
- competence.

This constellation of core values reflects what is unique to the social work profession. Core values, and the principles that flow from them, must be balanced within the context and complexity of the human experience.

# Purpose of the *NASW Code of Ethics*

Professional ethics are at the core of social work. The profession has an obligation to articulate its basic values, ethical principles, and ethical standards. The *NASW Code of Ethics* sets forth these values, principles, and standards to guide social workers' conduct. The *Code* is relevant to all social workers and social work students, regardless of their professional functions, the settings in which they work, or the populations they serve.

The *NASW Code of Ethics* serves six purposes:

1. The *Code* identifies core values on which social work's mission is based.

2. The *Code* summarizes broad ethical principles that reflect the profession's core values and establishes a set of specific ethical standards that should be used to guide social work practice.

3. The *Code* is designed to help social workers identify relevant considerations when professional obligations conflict or ethical uncertainties arise.

4. The *Code* provides ethical standards to which the general public can hold the social work profession accountable.

5. The *Code* socializes practitioners new to the field to social work's mission, values, ethical principles, and ethical standards, and encourages all social workers to engage in self-care, ongoing education, and other activities to ensure their commitment to those same core features of the profession.

6. The *Code* articulates standards that the social work profession itself can use to assess whether social workers have engaged in unethical conduct. NASW has formal procedures to adjudicate ethics complaints filed against its members.* In subscribing to this *Code*, social workers are required to cooperate in its implementation, participate in NASW adjudication proceedings, and abide by any NASW disciplinary rulings or sanctions based on it.

The *Code* offers a set of values, principles, and standards to guide decision making and conduct when ethical issues arise. It does not provide a set of rules that prescribe how social workers should act in all situations. Specific applications of the *Code* must take into account the context in which it is being considered and the possibility of conflicts among the *Code's* values, principles, and standards. Ethical responsibilities flow from all human relationships, from the personal and familial to the social and professional.

Furthermore, the *NASW Code of Ethics* does not specify which values, principles, and standards are most important and ought to outweigh others in instances when they conflict. Reasonable differences of opinion can and do exist among social workers with respect to the ways in which values, ethical principles, and ethical standards should be rank ordered when they conflict. Ethical decision making in a given situation must apply the informed judgment of the individual social worker and should also consider how the issues would be judged in a peer review process where the ethical standards of the profession would be applied.

Ethical decision making is a process. In situations when conflicting obligations arise, social workers may be faced with complex ethical dilemmas that have no simple answers. Social workers should take into consideration all the values, principles, and standards in this *Code* that are relevant to any situation in which ethical judgment is warranted. Social workers' decisions and actions should be consistent with the spirit as well as the letter of this *Code*.

In addition to this *Code*, there are many other sources of information about ethical thinking that maybe useful. Social workers should consider ethical theory and principles generally, social work theory and research, laws, regulations, agency policies, and other relevant codes of ethics, recognizing that among codes of ethics social workers should consider the *NASW Code of Ethics* as their primary source. Social workers also should be aware of the impact on ethical decision making of their clients' and their own personal values and cultural and religious beliefs and practices. They should be aware of any conflicts between personal and professional values and deal with them responsibly. For additional guidance social workers should consult the relevant literature on professional ethics and ethical decision making and seek appropriate consultation when faced with ethical dilemmas. This may involve consultation with an agency-based or social work organization's ethics committee, a regulatory body, knowledgeable colleagues, supervisors, or legal counsel.

Instances may arise when social workers' ethical obligations conflict with agency policies or relevant laws or regulations. When such conflicts occur, social workers must make a responsible effort to resolve the conflict in a manner that is consistent with the values, principles, and standards expressed in this *Code*. If a reasonable resolution of the conflict does not appear possible, social workers should seek proper consultation before making a decision.

The *NASW Code of Ethics* is to be used by NASW and by individuals, agencies, organizations, and bodies (such as licensing and regulatory boards, professional liability insurance providers, courts of law, agency boards of directors, government agencies, and other professional groups) that choose to adopt it or use it as a frame of reference. Violation of standards in this *Code* does not automatically imply legal liability or violation of the law. Such determination can only be made in the context of legal and judicial proceedings. Alleged violations of the *Code* would be subject to a peer review process. Such processes are generally separate from legal or administrative procedures and insulated from legal review or proceedings to allow the profession to counsel and discipline its own members.

A code of ethics cannot guarantee ethical behavior. Moreover, a code of ethics cannot resolve all ethical issues or disputes or capture the richness and complexity involved in striving to make responsible choices within a moral community. Rather, a code of ethics sets forth values, ethical

principles, and ethical standards to which professionals aspire and by which their actions can be judged. Social workers' ethical behavior should result from their personal commitment to engage in ethical practice. The *NASW Code of Ethics* reflects the commitment of all social workers to uphold the profession's values and to act ethically. Principles and standards must be applied by individuals of good character who discern moral questions and, in good faith, seek to make reliable ethical judgments.

With growth in the use of communication technology in various aspects of social work practice, social workers need to be aware of the unique challenges that may arise in relation to the maintenance of confidentiality, informed consent, professional boundaries, professional competence, record keeping, and other ethical considerations. In general, all ethical standards in this *Code of Ethics* are applicable to interactions, relationships, or communications, whether they occur in person or with the use of technology. For the purposes of this *Code*, "technology-assisted social work services" include any social work services that involve the use of computers, mobile or landline telephones, tablets, video technology, or other electronic or digital technologies; this includes the use of various electronic or digital platforms, such as the Internet, online social media, chat rooms, text messaging, e-mail and emerging digital applications. Technology-assisted social work services encompass all aspects of social work practice, including psychotherapy; individual, family, or group counseling; community organization; administration; advocacy; mediation; education; supervision; research; evaluation; and other social work services. Social workers should keep apprised of emerging technological developments that may be used in social work practice and how various ethical standards apply to them.

Professional self-care is paramount for competent and ethical social work practice. Professional demands, challenging workplace climates, and exposure to trauma warrant that social workers maintain personal and professional health, safety, and integrity. Social work organizations, agencies, and educational institutions are encouraged to promote organizational policies, practices, and materials to support social workers' self-care.

*For information on the NASW Professional Review Process, see NASW Procedures for Professional Review.

# Ethical Principles

The following broad ethical principles are based on social work's core values of service, social justice, dignity and worth of the person, importance of human relationships, integrity, and competence. These principles set forth ideals to which all social workers should aspire.

**Value:** *Service*

**Ethical Principle:** *Social workers' primary goal is to help people in need and to address social problems*

Social workers elevate service to others above self-interest. Social workers draw on their knowledge, values, and skills to help people in need and to address social problems. Social workers are encouraged to volunteer some portion of their professional skills with no expectation of significant financial return (pro bono service).

**Value:** *Social Justice*

**Ethical Principle:** *Social workers challenge social injustice.*

Social workers pursue social change, particularly with and on behalf of vulnerable and oppressed individuals and groups of people. Social workers' social change efforts are focused primarily on issues of poverty, unemployment, discrimination, and other forms of social injustice. These activities seek to promote sensitivity to and knowledge about oppression and cultural and ethnic diversity. Social workers strive to ensure access to needed information, services, and resources; equality of opportunity; and meaningful participation in decision making for all people.

**Value:** *Dignity and Worth of the Person*

**Ethical Principle:** *Social workers respect the inherent dignity and worth of the person.*

Social workers treat each person in a caring and respectful fashion, mindful of individual differences and cultural and ethnic diversity. Social workers promote clients' socially responsible self-determination. Social workers seek to enhance clients' capacity and opportunity to change and to address their own needs. Social workers are cognizant of their dual responsibility to clients and to the broader society. They seek to resolve conflicts between clients' interests and the broader society's interests in a socially responsible manner consistent with the values, ethical principles, and ethical standards of the profession.

**Value:** *Importance of Human Relationships*

**Ethical Principle:** *Social workers recognize the central importance of human relationships.*

Social workers understand that relationships between and among people are an important vehicle for change. Social workers engage people as partners in the helping process. Social workers seek to strengthen relationships among people in a purposeful effort to promote, restore, maintain, and enhance the well-being of individuals, families, social groups, organizations, and communities.

**Value:** *Integrity*

**Ethical Principle:** *Social workers behave in a trustworthy manner.*

Social workers are continually aware of the profession's mission, values, ethical principles, and ethical standards and practice in a manner consistent with them. Social workers should take measures to care for themselves professionally and personally. Social workers act honestly and responsibly and promote ethical practices on the part of the organizations with which they are affiliated.

**Value:** *Competence*

**Ethical Principle:** *Social workers practice within their areas of competence and develop and enhance their professional expertise.*

Social workers continually strive to increase their professional knowledge and skills and to apply them in practice. Social workers should aspire to contribute to the knowledge base of the profession.

# Ethical Standards

The following ethical standards are relevant to the professional activities of all social workers. These standards concern (1) social workers' ethical responsibilities to clients, (2) social workers' ethical responsibilities to colleagues, (3) social workers' ethical responsibilities in practice settings, (4) social workers' ethical responsibilities as professionals, (5) social workers' ethical responsibilities to the social work profession, and (6) social workers' ethical responsibilities to the broader society.

Some of the standards that follow are enforceable guidelines for professional conduct, and some are aspirational. The extent to which each standard is enforceable is a matter of professional judgment to be exercised by those responsible for reviewing alleged violations of ethical standards.

## 1. SOCIAL WORKERS' ETHICAL RESPONSIBILITIES TO CLIENTS

### 1.01 Commitment to Clients

Social workers' primary responsibility is to promote the well-being of clients. In general, clients' interests are primary. However, social workers' responsibility to the larger society or specific legal obligations may, on limited occasions, supersede the loyalty owed clients, and clients should be so advised. (Examples include when a social worker is required by law to report that a client has abused a child or has threatened to harm self or others.)

### 1.02 Self-Determination

Social workers respect and promote the right of clients to self-determination and assist clients in their efforts to identify and clarify their goals. Social workers may limit clients' right to self-determination when, in the social workers' professional judgment, clients' actions or potential actions pose a serious, foreseeable, and imminent risk to themselves or others.

### 1.03 Informed Consent

(a) Social workers should provide services to clients only in the context of a professional relationship based, when appropriate, on valid informed consent. Social workers should use clear and understandable language to inform clients of the purpose of the services, risks related to the services, limits to services because of the requirements of a third-party payer,

relevant costs, reasonable alternatives, clients' right to refuse or withdraw consent, and the time frame covered by the consent. Social workers should provide clients with an opportunity to ask questions.

(b) In instances when clients are not literate or have difficulty understanding the primary language used in the practice setting, social workers should take steps to ensure clients' comprehension. This may include providing clients with a detailed verbal explanation or arranging for a qualified interpreter or translator whenever possible.

(c) In instances when clients lack the capacity to provide informed consent, social workers should protect clients' interests by seeking permission from an appropriate third party, informing clients consistent with their level of understanding. In such instances social workers should seek to ensure that the third party acts in a manner consistent with clients' wishes and interests. Social workers should take reasonable steps to enhance such clients' ability to give informed consent.

(d) In instances when clients are receiving services involuntarily, social workers should provide information about the nature and extent of services and about the extent of clients' right to refuse service.

(e) Social workers should discuss with clients the social workers' policies concerning the use of technology in the provision of professional services.

(f) Social workers who use technology to provide social work services should obtain informed consent from the individuals using these services during the initial screening or interview and prior to initiating services. Social workers should assess clients' capacity to provide informed consent and, when using technology to communicate, verify the identity and location of clients.

(g) Social workers who use technology to provide social work services should assess the clients' suitability and capacity for electronic and remote services. Social workers should consider the clients' intellectual, emotional, and physical ability to use technology to receive services and ability to understand the potential benefits, risks, and limitations of such services. If clients do not wish to use services provided through technology, social workers should help them identify alternate methods of service.

(h) Social workers should obtain clients' informed consent before making audio or video recordings of clients or permitting observation of service provision by a third party.

(i) Social workers should obtain client consent before conducting an electronic search on the client. Exceptions may arise when the search is for purposes of protecting the client or others from serious, foreseeable, and imminent harm, or for other compelling professional reasons.

## 1.04 Competence

(a) Social workers should provide services and represent themselves as competent only within the boundaries of their education, training, license, certification, consultation received, supervised experience, or other relevant professional experience.

(b) Social workers should provide services in substantive areas or use intervention techniques or approaches that are new to them only after engaging in appropriate study, training, consultation, and supervision from people who are competent in those interventions or techniques.

(c) When generally recognized standards do not exist with respect to an emerging area of practice, social workers should exercise careful judgment and take responsible steps (including appropriate education, research, training, consultation, and supervision) to ensure the competence of their work and to protect clients from harm.

(d) Social workers who use technology in the provision of social work services should ensure that they have the necessary knowledge and skills to provide such services in a competent manner. This includes an understanding of the special communication challenges when using technology and the ability to implement strategies to address these challenges.

(e) Social workers who use technology in providing social work services should comply with the laws governing technology and social work practice in the jurisdiction in which they are regulated and located and, as applicable, in the jurisdiction in which the client is located.

## 1.05 Cultural Competence

(a) Social workers should demonstrate understanding of culture and its function in human behavior and society, recognizing the strengths that exist in all cultures.

(b) Social workers should demonstrate knowledge that guides practice with clients of various cultures and be able to demonstrate skills in the provision of culturally informed services that empower marginalized individuals and groups. Social workers must take action against oppression, racism, discrimination, and inequities, and acknowledge personal privilege.

(c) Social workers should demonstrate awareness and cultural humility by engaging in critical self-reflection (understanding their own bias and engaging in self-correction), recognizing clients as experts of their own culture, committing to lifelong learning, and holding institutions accountable for advancing cultural humility.

(d) Social workers should obtain education about and demonstrate understanding of the nature of social diversity and oppression with respect to race, ethnicity, national origin,

color, sex, sexual orientation, gender identity or expression, age, marital status, political belief, religion, immigration status, and mental or physical ability.

(e) Social workers who provide electronic social work services should be aware of cultural and socioeconomic differences among clients' use of and access to electronic technology and seek to prevent such potential barriers. Social workers should assess cultural, environmental, economic, mental or physical ability, linguistic, and other issues that may affect the delivery or use of these services.

## 1.06 Conflicts of Interest

(a) Social workers should be alert to and avoid conflicts of interest that interfere with the exercise of professional discretion and impartial judgment. Social workers should inform clients when a real or potential conflict of interest arises and take reasonable steps to resolve the issue in a manner that makes the clients' interests primary and protects clients' interests to the greatest extent possible. In some cases, protecting clients' interests may require termination of the professional relationship with proper referral of the client.

(b) Social workers should not take unfair advantage of any professional relationship or exploit others to further their personal, religious, political, or business interests.

(c) Social workers should not engage in dual or multiple relationships with clients or former clients in which there is a risk of exploitation or potential harm to the client. In instances when dual or multiple relationships are unavoidable, social workers should take steps to protect clients and are responsible for setting clear, appropriate, and culturally sensitive boundaries. (Dual or multiple relationships occur when social workers relate to clients in more than one relationship, whether professional, social, or business. Dual or multiple relationships can occur simultaneously or consecutively.)

(d) When social workers provide services to two or more people who have a relationship with each other (for example, couples, family members), social workers should clarify with all parties which individuals will be considered clients and the nature of social workers' professional obligations to the various individuals who are receiving services. Social workers who anticipate a conflict of interest among the individuals receiving services or who anticipate having to perform in potentially conflicting roles (for example, when a social worker is asked to testify in a child custody dispute or divorce proceedings involving clients) should clarify their role with the parties involved and take appropriate action to minimize any conflict of interest.

(e) Social workers should avoid communication with clients using technology (such as social networking sites, online chat, e-mail, text messages, telephone, and video) for personal or non-work-related purposes.

(f) Social workers should be aware that posting personal information on professional Web sites or other media might cause boundary confusion, inappropriate dual relationships, or harm to clients.

(g) Social workers should be aware that personal affiliations may increase the likelihood that clients may discover the social worker's presence on Web sites, social media, and other forms of technology. Social workers should be aware that involvement in electronic communication with groups based on race, ethnicity, language, sexual orientation, gender identity or expression, mental or physical ability, religion, immigration status, and other personal affiliations may affect their ability to work effectively with particular clients.

(h) Social workers should avoid accepting requests from or engaging in personal relationships with clients on social networking sites or other electronic media to prevent boundary confusion, inappropriate dual relationships, or harm to clients.

## 1.07 Privacy and Confidentiality

(a) Social workers should respect clients' right to privacy. Social workers should not solicit private information from or about clients except for compelling professional reasons. Once private information is shared, standards of confidentiality apply.

(b) Social workers may disclose confidential information when appropriate with valid consent from a client or a person legally authorized to consent on behalf of a client.

(c) Social workers should protect the confidentiality of all information obtained in the course of professional service, except for compelling professional reasons. The general expectation that social workers will keep information confidential does not apply when disclosure is necessary to prevent serious, foreseeable, and imminent harm to a client or others. In all instances, social workers should disclose the least amount of confidential information necessary to achieve the desired purpose; only information that is directly relevant to the purpose for which the disclosure is made should be revealed.

(d) If social workers plan to disclose confidential information, they should (when feasible and to the extent possible) inform clients about the disclosure and the potential consequences prior to disclosing the information. This applies whether social workers disclose confidential information on the basis of a legal requirement or client consent.

(e) Social workers should discuss with clients and other interested parties the nature of confidentiality and limitations of clients' right to confidentiality. Social workers should review with clients circumstances where confidential information may be requested and where disclosure of confidential information may be legally required. This discussion should occur as soon as possible in the social worker–client relationship and as needed throughout the course of the relationship.

(f) When social workers provide counseling services to families, couples, or groups, social workers should seek agreement among the parties involved concerning each individual's right to confidentiality and obligation to preserve the confidentiality of information shared by others. This agreement should include consideration of whether confidential information may be exchanged in person or electronically, among clients or with others outside of formal counseling sessions. Social workers should inform participants in family, couples, or group counseling that social workers cannot guarantee that all participants will honor such agreements.

(g) Social workers should inform clients involved in family, couples, marital, or group counseling of the social worker's, employer's, and agency's policy concerning the social worker's disclosure of confidential information among the parties involved in the counseling.

(h) Social workers should not disclose confidential information to third-party payers unless clients have authorized such disclosure.

(i) Social workers should not discuss confidential information, electronically or in person, in any setting unless privacy can be ensured. Social workers should not discuss confidential information in public or semipublic areas such as hallways, waiting rooms, elevators, and restaurants.

(j) Social workers should protect the confidentiality of clients during legal proceedings to the extent permitted by law. When a court of law or other legally authorized body orders social workers to disclose confidential or privileged information without a client's consent and such disclosure could cause harm to the client, social workers should request that the court withdraw the order or limit the order as narrowly as possible or maintain the records under seal, unavailable for public inspection.

(k) Social workers should protect the confidentiality of clients when responding to requests from members of the media.

(l) Social workers should protect the confidentiality of clients' written and electronic records and other sensitive information. Social workers should take reasonable steps to ensure that clients' records are stored in a secure location and that clients' records are not available to others who are not authorized to have access.

(m) Social workers should take reasonable steps to protect the confidentiality of electronic communications, including information provided to clients or third parties. Social workers should use applicable safeguards (such as encryption, firewalls, and passwords) when using electronic communications such as e-mail, online posts, online chat sessions, mobile communication, and text messages.

(n) Social workers should develop and disclose policies and procedures for notifying clients of any breach of confidential information in a timely manner.

(o) In the event of unauthorized access to client records or information, including any unauthorized access to the social worker's electronic communication or storage systems, social workers should inform clients of such disclosures, consistent with applicable laws and professional standards.

(p) Social workers should develop and inform clients about their policies, consistent with prevailing social work ethical standards, on the use of electronic technology, including Internet-based search engines, to gather information about clients.

(q) Social workers should avoid searching or gathering client information electronically unless there are compelling professional reasons, and when appropriate, with the client's informed consent.

(r) Social workers should avoid posting any identifying or confidential information about clients on professional Web sites or other forms of social media.

(s) Social workers should transfer or dispose of clients' records in a manner that protects clients' confidentiality and is consistent with applicable laws governing records and social work licensure.

(t) Social workers should take reasonable precautions to protect client confidentiality in the event of the social worker's termination of practice, incapacitation, or death.

(u) Social workers should not disclose identifying information when discussing clients for teaching or training purposes unless the client has consented to disclosure of confidential information.

(v) Social workers should not disclose identifying information when discussing clients with consultants unless the client has consented to disclosure of confidential information or there is a compelling need for such disclosure.

(w) Social workers should protect the confidentiality of deceased clients consistent with the preceding standards.

### 1.08 Access to Records

(a) Social workers should provide clients with reasonable access to records concerning the client. Social workers who are concerned that clients' access to their records could cause serious misunderstanding or harm to the client should provide assistance in interpreting the records and consultation with the client regarding the records. Social workers should limit clients' access to their records, or portions of their records, only in exceptional

circumstances when there is compelling evidence that such access would cause serious harm to the client. Both clients' requests and the rationale for withholding some or all of the record should be documented in clients' files.

(b) Social workers should develop and inform clients about their policies, consistent with prevailing social work ethical standards, on the use of technology to provide clients with access to their records.

(c) When providing clients with access to their records, social workers should take steps to protect the confidentiality of other individuals identified or discussed in such records.

## 1.09 Sexual Relationships

(a) Social workers should under no circumstances engage in sexual activities, inappropriate sexual communications through the use of technology or in person, or sexual contact with current clients, whether such contact is consensual or forced.

(b) Social workers should not engage in sexual activities or sexual contact with clients' relatives or other individuals with whom clients maintain a close personal relationship when there is a risk of exploitation or potential harm to the client. Sexual activity or sexual contact with clients' relatives or other individuals with whom clients maintain a personal relationship has the potential to be harmful to the client and may make it difficult for the social worker and client to maintain appropriate professional boundaries. Social workers— not their clients, their clients' relatives, or other individuals with whom the client maintains a personal relationship—assume the full burden for setting clear, appropriate, and culturally sensitive boundaries.

(c) Social workers should not engage in sexual activities or sexual contact with former clients because of the potential for harm to the client. If social workers engage in conduct contrary to this prohibition or claim that an exception to this prohibition is warranted because of extraordinary circumstances, it is social workers—not their clients—who assume the full burden of demonstrating that the former client has not been exploited, coerced, or manipulated, intentionally or unintentionally.

(d) Social workers should not provide clinical services to individuals with whom they have had a prior sexual relationship. Providing clinical services to a former sexual partner has the potential to be harmful to the individual and is likely to make it difficult for the social worker and individual to maintain appropriate professional boundaries.

## 1.10 Physical Contact

Social workers should not engage in physical contact with clients when there is a possibility of psychological harm to the client as a result of the contact (such as cradling or caressing

clients). Social workers who engage in appropriate physical contact with clients are responsible for setting clear, appropriate, and culturally sensitive boundaries that govern such physical contact.

## 1.11 Sexual Harassment

Social workers should not sexually harass clients. Sexual harassment includes sexual advances; sexual solicitation; requests for sexual favors; and other verbal, written, electronic, or physical contact of a sexual nature.

## 1.12 Derogatory Language

Social workers should not use derogatory language in their written, verbal, or electronic communications to or about clients. Social workers should use accurate and respectful language in all communications to and about clients.

## 1.13 Payment for Services

(a) When setting fees, social workers should ensure that the fees are fair, reasonable, and commensurate with the services performed. Consideration should be given to clients' ability to pay.

(b) Social workers should avoid accepting goods or services from clients as payment for professional services. Bartering arrangements, particularly involving services, create the potential for conflicts of interest, exploitation, and inappropriate boundaries in social workers' relationships with clients. Social workers should explore and may participate in bartering only in very limited circumstances when it can be demonstrated that such arrangements are an accepted practice among professionals in the local community, considered to be essential for the provision of services, negotiated without coercion, and entered into at the client's initiative and with the client's informed consent. Social workers who accept goods or services from clients as payment for professional services assume the full burden of demonstrating that this arrangement will not be detrimental to the client or the professional relationship.

(c) Social workers should not solicit a private fee or other remuneration for providing services to clients who are entitled to such available services through the social workers' employer or agency.

## 1.14 Clients Who Lack Decision-Making Capacity

When social workers act on behalf of clients who lack the capacity to make informed decisions, social workers should take reasonable steps to safeguard the interests and rights of those clients.

### 1.15 Interruption of Services

Social workers should make reasonable efforts to ensure continuity of services in the event that services are interrupted by factors such as unavailability, disruptions in electronic communication, relocation, illness, mental or physical ability, or death.

### 1.16 Referral for Services

(a) Social workers should refer clients to other professionals when the other professionals' specialized knowledge or expertise is needed to serve clients fully or when social workers believe that they are not being effective or making reasonable progress with clients and that other services are required.

(b) Social workers who refer clients to other professionals should take appropriate steps to facilitate an orderly transfer of responsibility. Social workers who refer clients to other professionals should disclose, with clients' consent, all pertinent information to the new service providers.

(c) Social workers are prohibited from giving or receiving payment for a referral when no professional service is provided by the referring social worker.

### 1.17 Termination of Services

(a) Social workers should terminate services to clients and professional relationships with them when such services and relationships are no longer required or no longer serve the clients' needs or interests.

(b) Social workers should take reasonable steps to avoid abandoning clients who are still in need of services. Social workers should withdraw services precipitously only under unusual circumstances, giving careful consideration to all factors in the situation and taking care to minimize possible adverse effects. Social workers should assist in making appropriate arrangements for continuation of services when necessary.

(c) Social workers in fee-for-service settings may terminate services to clients who are not paying an overdue balance if the financial contractual arrangements have been made clear to the client, if the client does not pose an imminent danger to self or others, and if the clinical and other consequences of the current nonpayment have been addressed and discussed with the client.

(d) Social workers should not terminate services to pursue a social, financial, or sexual relationship with a client.

(e) Social workers who anticipate the termination or interruption of services to clients should notify clients promptly and seek the transfer, referral, or continuation of services in relation to the clients' needs and preferences.

(f) Social workers who are leaving an employment setting should inform clients of appropriate options for the continuation of services and of the benefits and risks of the options.

## 2. SOCIAL WORKERS' ETHICAL RESPONSIBILITIES TO COLLEAGUES

### 2.01 Respect

(a) Social workers should treat colleagues with respect and should represent accurately and fairly the qualifications, views, and obligations of colleagues.

(b) Social workers should avoid unwarranted negative criticism of colleagues in verbal, written, and electronic communications with clients or with other professionals. Unwarranted negative criticism may include demeaning comments that refer to colleagues' level of competence or to individuals' attributes such as race, ethnicity, national origin, color, sex, sexual orientation, gender identity or expression, age, marital status, political belief, religion, immigration status, and mental or physical ability.

(c) Social workers should cooperate with social work colleagues and with colleagues of other professions when such cooperation serves the well-being of clients.

### 2.02 Confidentiality

Social workers should respect confidential information shared by colleagues in the course of their professional relationships and transactions. Social workers should ensure that such colleagues understand social workers' obligation to respect confidentiality and any exceptions related to it.

### 2.03 Interdisciplinary Collaboration

(a) Social workers who are members of an interdisciplinary team should participate in and contribute to decisions that affect the well-being of clients by drawing on the perspectives, values, and experiences of the social work profession. Professional and ethical obligations of the interdisciplinary team as a whole and of its individual members should be clearly established.

(b) Social workers for whom a team decision raises ethical concerns should attempt to resolve the disagreement through appropriate channels. If the disagreement cannot be resolved, social workers should pursue other avenues to address their concerns consistent with client well-being.

### 2.04 Disputes Involving Colleagues

(a) Social workers should not take advantage of a dispute between a colleague and an employer to obtain a position or otherwise advance the social workers' own interests.

(b) Social workers should not exploit clients in disputes with colleagues or engage clients in any inappropriate discussion of conflicts between social workers and their colleagues.

### 2.05 Consultation

(a) Social workers should seek the advice and counsel of colleagues whenever such consultation is in the best interests of clients.

(b) Social workers should keep themselves informed about colleagues' areas of expertise and competencies. Social workers should seek consultation only from colleagues who have demonstrated knowledge, expertise, and competence related to the subject of the consultation.

(c) When consulting with colleagues about clients, social workers should disclose the least amount of information necessary to achieve the purposes of the consultation.

### 2.06 Sexual Relationships

(a) Social workers who function as supervisors or educators should not engage in sexual activities or contact (including verbal, written, electronic, or physical contact) with supervisees, students, trainees, or other colleagues over whom they exercise professional authority.

(b) Social workers should avoid engaging in sexual relationships with colleagues when there is potential for a conflict of interest. Social workers who become involved in, or anticipate becoming involved in, a sexual relationship with a colleague have a duty to transfer professional responsibilities, when necessary, to avoid a conflict of interest.

### 2.07 Sexual Harassment

Social workers should not sexually harass supervisees, students, trainees, or colleagues. Sexual harassment includes sexual advances; sexual solicitation; requests for sexual favors; and other verbal, written, electronic, or physical contact of a sexual nature.

## 2.08 Impairment of Colleagues

(a) Social workers who have direct knowledge of a social work colleague's impairment that is due to personal problems, psychosocial distress, substance abuse, or mental health difficulties and that interferes with practice effectiveness should consult with that colleague when feasible and assist the colleague in taking remedial action.

(b) Social workers who believe that a social work colleague's impairment interferes with practice effectiveness and that the colleague has not taken adequate steps to address the impairment should take action through appropriate channels established by employers, agencies, NASW, licensing and regulatory bodies, and other professional organizations.

## 2.09 Incompetence of Colleagues

(a) Social workers who have direct knowledge of a social work colleague's incompetence should consult with that colleague when feasible and assist the colleague in taking remedial action.

(b) Social workers who believe that a social work colleague is incompetent and has not taken adequate steps to address the incompetence should take action through appropriate channels established by employers, agencies, NASW, licensing and regulatory bodies, and other professional organizations.

## 2.10 Unethical Conduct of Colleagues

(a) Social workers should take adequate measures to discourage, prevent, expose, and correct the unethical conduct of colleagues, including unethical conduct using technology.

(b) Social workers should be knowledgeable about established policies and procedures for handling concerns about colleagues' unethical behavior. Social workers should be familiar with national, state, and local procedures for handling ethics complaints. These include policies and procedures created by NASW, licensing and regulatory bodies, employers, agencies, and other professional organizations.

(c) Social workers who believe that a colleague has acted unethically should seek resolution by discussing their concerns with the colleague when feasible and when such discussion is likely to be productive.

(d) When necessary, social workers who believe that a colleague has acted unethically should take action through appropriate formal channels (such as contacting a state licensing board or regulatory body, the NASW National Ethics Committee, or other professional ethics committees).

(e) Social workers should defend and assist colleagues who are unjustly charged with unethical conduct.

## 3. SOCIAL WORKERS' ETHICAL RESPONSIBILITIES IN PRACTICE SETTINGS

### 3.01 Supervision and Consultation

(a) Social workers who provide supervision or consultation (whether in-person or remotely) should have the necessary knowledge and skill to supervise or consult appropriately and should do so only within their areas of knowledge and competence.

(b) Social workers who provide supervision or consultation are responsible for setting clear, appropriate, and culturally sensitive boundaries.

(c) Social workers should not engage in any dual or multiple relationships with supervisees in which there is a risk of exploitation of or potential harm to the supervisee, including dual relationships that may arise while using social networking sites or other electronic media.

(d) Social workers who provide supervision should evaluate supervisees' performance in a manner that is fair and respectful.

### 3.02 Education and Training

(a) Social workers who function as educators, field instructors for students, or trainers should provide instruction only within their areas of knowledge and competence and should provide instruction based on the most current information and knowledge available in the profession.

(b) Social workers who function as educators or field instructors for students should evaluate students' performance in a manner that is fair and respectful.

(c) Social workers who function as educators or field instructors for students should take reasonable steps to ensure that clients are routinely informed when services are being provided by students.

(d) Social workers who function as educators or field instructors for students should not engage in any dual or multiple relationships with students in which there is a risk of exploitation or potential harm to the student, including dual relationships that may arise while using social networking sites or other electronic media. Social work educators and field instructors are responsible for setting clear, appropriate, and culturally sensitive boundaries.

### 3.03 Performance Evaluation

EXHIBIT 48

EXH-2
Oct 13 2025

**University of Washington Tacoma**
**Social Work and Criminal Justice**
**Professional Standards Committee**

The **Professional Standards Committee** (PSC) for the Social Work and Criminal Justice Program, University of Washington Tacoma is a body of faculty whose role is to address concerns that cannot be resolved by those directly involved in the situation.  The PSC determines corrective action and issues sanctions, including up to dismissal from the program.  This is an internal Social Work and Criminal Justice Program review committee for social welfare, social work, and criminal justice students.  Other University procedures can and will be used when appropriate.  Those individuals who are directly involved should make a concerted effort to resolve the concern prior to a referral to the PSC.  Because faculty in the Social Work and Criminal Justice Program serve as gatekeepers for their respective professions, in some cases it is in the best interest of the social work and criminal justice professions as well as in the best interest of the student to realize that their interests and/or abilities seem most appropriate for another profession and program of study.  **If a student fails to comply with sanctions of the PSC within the specified time frame, a recommendation for dismissal from the program will be considered by the PSC.**

## Committee Structure
The PSC will consist of two co-chairs, the Graduate Program Coordinator (GPC), the Child Welfare Training and Advancement Program (CWTAP) Director, the person who referred the student to the PSC, and either the student's Faculty Adviser or a faculty advocate chosen by the student (if desired).

## Chair of the PSC
Two faculty members will co-chair the PSC, one from the Criminal Justice (CJ) faculty and one from the Social Work (SW) faculty.  If the review involves a CJ student, the meeting will be chaired by the CJ co-chair of the PSC.  If the review involves a SW student, the meeting will be chaired by the SW co-chair.  If the conflict occurs with a current co-chair of the PSC, that individual will excuse him/herself from the facilitative role of the PSC and engage as a participant in the efforts of the PSC to address the conflict.  The Director of the Social Work and Criminal Justice Program will select a replacement co-chair if the conflict occurs with a current co-chair of the PSC.

### *Responsibilities of Chair*
1. Review request to convene the PSC.
2. Contact members and coordinate date/time for meeting.
3. Notify the student of the referral, required attendance at the meeting, and the PSC process.
4. Schedule date/time for the PSC meeting as soon as possible after receipt of request to convene.
5. Arrange for a meeting room.
6. Contact PSC members and others involved in the concern (faculty, staff, and students) to inform them of date/time and location for meeting.

Revisions approved by the faculty on May 6, 2016.

Hill_000006

7. Start meeting by explaining the purpose of the PSC and the protocol that will be followed during the meeting.

8. Inform student and PSC members that this meeting is confidential within reasonable limitations.

9. Read the request to convene in order to make sure that those present understand the reason for convening the PSC.  Invite the student and all participants to provide any information they feel is necessary.

10. After the concerns have been discussed and all questions addressed, those present that are not on the PSC will be asked to leave.  PSC members will discuss the issue and decide what sanctions, if any, are warranted.

11. Ask the student and participants to return to the meeting and discuss decisions of the PSC.

12. Inform student that the Chair will send a letter to the student within three business days of the meeting.

13. Write and mail letter to student that clearly delineates the sanctions of the PSC.  A copy of the letter is sent to the Program Administrator for placement in the student's file and to the Program Director.  Be clear in the letter regarding any further action that will be recommended or taken, including dismissal from the program, if the individual fails to adhere to the sanctions.  In the letter, invite the student to respond in writing regarding her/his understanding of the issues and to voice any concerns.

14. Follow up with student, to make sure she/he is adhering to all sanctions of the PSC.  Notify the student that another meeting of the PSC will follow to discuss follow-up recommendations, including dismissal from the program, if sanctions are not met.  Inform the student she/he will be asked to attend the follow-up meeting.

15. All follow-up documentation will be maintained by the Chair.

16. Schedule a follow-up meeting with the PSC and the student for any student who does not adhere to the sanctions within an agreed upon amount of time.  Invite the student to submit a written statement as an alternative to attending, if she/he wishes. **Students who fail to comply with the PSC's sanctions will be considered for removal from the Social Work and Criminal Justice Program**.

17. Meet with the Program Director whenever there is a recommendation from the PSC that a student be removed from the Social Work and Criminal Justice Program.  The purpose of this meeting is to discuss the reason for the decision and what information was used to warrant the conclusion.  After this discussion, the Chair of the PSC and the Program Director will jointly determine whether the PSC's recommendation for student dismissal will be upheld.

18. If the student is dismissed from the Program, the Director of the Program and the Chair will prepare and send written notification to the student to this effect, with a copy to the Program Administrator for placement in the student's file.  The letter will include next steps for the student, such as seeing an advisor to discuss the student's status with the university.  The student may access existing University of Washington procedures, if any apply, to appeal the dismissal if she/he so chooses.

Revisions approved by the faculty on May 6, 2016.

**Hill_000007**

19. Keep a file for each request to convene the PSC and all correspondence regarding the request including letters, documentation, etc. in a locked file cabinet in the Chair's office.  A copy of the file can also be kept in the program office.
20. Whenever a co-chair transitions off the PSC, transfer any related files to the Social Work and Criminal Justice Program Office or one of the current co-chairs.

### *Responsibilities of PSC Members*
1. Attend PSC meetings at request of Chair.
2. Actively participate in the meetings.
3. Assist other members and Chair in developing sanctions.
4. Notify the Chair if student fails to follow through with a sanction such as attending meetings with you, writing and submitting a paper to you, etc.

### Submission of Request to Convene the PSC

If conflicts cannot be resolved between and among students, and/or between and among students, faculty or staff it is appropriate to submit a request to convene the PSC.  In addition, academic expectations also include adhering to academic professional standards and such violations might warrant submitting a request to convene the PSC.  The following are some issues that may warrant a request to convene:

- Student repeatedly exhibits behavior that clearly violates the National Association of Social Workers Code of Ethics (BASW & MSW students) or the Code of Ethics of the Academy of Criminal Justice Sciences (CJ students).
- Student repeatedly engages in behavior that is disorderly or disruptive and interferes with the instructor's ability to teach and/or distracts other students.
- Student repeatedly engages in cheating and plagiarism.  Because this is also a violation of the Student Conduct Code, the appropriate form should also be completed for the Division of Student Affairs.
- Student continues to post derogatory statements about other students, faculty or staff on school-related pages on social media networks such as *Twitter and/or Facebook* after the concern has been discussed with the student.
- Student engages in disrespectful and discriminatory behavior toward other students, faculty or staff, based on race, ethnicity, national origin, color, sex, sexual orientation, gender identity, age, marital status, political belief, religion, immigration status, disability, and/or other factors.
- Student repeatedly fails to meet course requirements.

To set up an appointment with the PSC, complete the attached form and mark the envelope "*Confidential*."  Staff in the Social Work and Criminal Justice Program Office will give your form to the appropriate co-chair of the PSC.

Revisions approved by the faculty on May 6, 2016.

Hill_000008

**Social Work & Criminal Justice Professional Standards Committee
Request to Convene**

**Person or Persons Requesting to Convene the PSC:**

**Date of Request:**

**Brief Description of Unresolved Issue(s):**

**Brief Description of Attempts to Revolve the Issue:**

**Does the other party know that you are requesting a review?**

    **If not, why not?**

**Best ways to reach you**

    **Phone:**                       **Email:**

**Best days/times to meet:**

Confidentiality will be maintained within reasonable limitations.

Revisions approved by the faculty on May 6, 2016.

Hill_000009

EXHIBIT 49



## SCHOOL OF SOCIAL WORK & CRIMINAL JUSTICE
UNIVERSITY *of* WASHINGTON | TACOMA

# Bachelor of Arts in Social Welfare Program Manual

### *For Students Entering Autumn 2022*
Revised September 2022

> *Please Keep This Manual For Your Records*

University of Washington Tacoma
School of Social Work & Criminal Justice
1900 Commerce Street, Box 358425
Tacoma, Washington 98402-3100
http://www.tacoma.uw.edu/social-work
253-692-5820

Sellmaier_000010

## BASW Program

### Table of Contents

Welcome Letter From the Dean ............................................................................. 4

    Mission and Goals of the School of Social Work ...................................... 5
    Program Goals of the UWT BASW Program ............................................. 6
    Council on Social Work Education Core Competencies and Practice Behaviors ....... 7

**Student Advising** .............................................................................................. 9
    Faculty Advisors ..................................................................................... 9
    Office of the Practicum/Field Education ................................................ 9
    Student Services ..................................................................................... 9

**Academic Information** ...................................................................................... 9
    Immunizations - Health Sciences and BASW Program Requirements ..................... 9
    Transfer Credits...................................................................................... 10
    Grading System ...................................................................................... 11
        Non-Decimal Grading Options ....................................................... 13
        Grade Point Average ..................................................................... 14
    Academic Standing and Scholarship...................................................... 15
        Policy on Satisfactory Progress and Low Scholarship in the BASW Program .. 15
        Policy on Readiness for Field Placement........................................ 16

**Other Important Program and University Policies**........................................... 18
    Release of Information from Student Files............................................. 18
    Retaining Your Course Syllabi ................................................................ 18
    Class Participation Statement................................................................ 19

**Graduation Requirements, Checklists, and Ceremonies** ................................. 20
    Application to Graduate ........................................................................ 20
    Required Self-Assessment Survey ......................................................... 20

**Resource Guide Summary** ............................................................................... 21
    Scholarship Funding Information .......................................................... 21
    Opportunities for Involvement............................................................. 21

**Standards of Conduct and Grievance Procedures**........................................... 22
    UW Student Conduct Code................................................................... 22

Sellmaier_000011

Academic Performance and Conduct Which May Result in a Review and Possible Dismissal from the BASW Program ................................................................. 23

Academic Honesty: Cheating and Plagiarsim ....................................................... 24

Essential Skills, Values and Standards of Professional Conduct for Admission to and Continuance in the School of Social Work ...................................................... 25

Policy regarding Dismissal from the BASW Program for Failure in Field Placements ................................................................................................................... 26

Resoulution of Grievances ..................................................................................... 30

Resource Persons Within the School and University ....................................... 31

The Professional Standards Committee ............................................................... 33

**Guide to UWT** ...................................................................................................**33**

COVID – 19 Information......................................................................................... 35

Directory of Important Phone Numbers at UWT.................................................. 36

Sellmaier_000012

## Welcome Letter from the Dean

Welcome to the Bachelor of Arts in Social Welfare (BASW) program at the University of Washington Tacoma. I am proud of our innovative and unique multidisciplinary school that is committed to pillars of academic excellence through research, instruction, and community engagement. Paramount is student success. You will find a community of diverse scholars and leaders who are deeply committed to your personal, intellectual, and professional growth.

The School of Social Work and Criminal Justice affirms social, racial, political, and economic justice and promotes equity and inclusion values. Through our three degree programs, we prepare students to empower individuals and communities to dismantle oppressive system policies and practices and address critical social problems to create a more just and equitable society.

The Bachelor of Arts in Social Welfare (BASW) degree recognizes the importance of synergy between knowledge acquisition and action to develop student competencies in preparation for social welfare practice. Our BASW curriculum provides generative and tailored learning for students to develop deep expertise in their interests and passions. Students assume advocacy and leadership opportunities in an array of cross-disciplinary public and private sectors.

Our society remains at a critical juncture that requires a steadfast commitment to social change and justice. We strongly believe our mission, integration of criminal justice and social work critical thought and values, and collective potential will foster a meaningful and sustained impact on our communities. We look forward to you joining us and advancing our mission, priorities, and values.

Keva M. Miller, Ph.D., LCSW
Dean and Professor

Sellmaier_000013

## Mission and Goals of the School of Social Work and UWT BASW Program

# Mission of the School of Social Work

As members of the University of Washington School of Social Work, we commit ourselves to promoting social and economic justice for poor and oppressed populations and enhancing the quality of life for all. We strive to maximize human welfare through:

- Education of effective social work leaders, practitioners and educators who will challenge injustice and promote a more humane society, and whose actions will be guided by vision, compassion, knowledge and disciplined discovery, and deep respect for cultural diversity and human strengths;

- Research that engenders understanding of complex social problems; illuminates human capacities for problem-solving, and promotes effective and timely social intervention; and

- Public service that enhances the health, well-being, and empowerment of disadvantaged communities and populations at local, national, and international levels.

We embrace our position of leadership in the field of social work and join in partnership with others in society committed to solving human problems in the twenty-first century.

# Mission of the BASW Program

As members of the University of Washington School of Social Work Bachelor of Arts in Social Welfare program, we commit ourselves to promoting social, economic, and racial justice for oppressed populations and enhancing the quality of life for all. We strive to maximize human welfare and health through the education of our students to become:

- Effective change-makers and collaborators towards social, economic, and racial justice
- Skilled in working with diverse individuals, families, and communities with compassion and using a strengths-based lens
- Empowered, skilled, and culturally-responsive social work practitioners
- Able to apply multilevel analysis to understand how institutions, policies, and larger social structures can affect individuals and communities.
- Actively engaged in personal and institutional social justice and antiracism work, critical self-reflection, and practice according to our profession's ethical code and values.
- Able to critically analyze research and evaluation.
- Able to cultivate their own well-being and resilience through self-care and mindfulness
- Self-aware of their own positionality and able to engage with cultural humility and awareness of intersectionality
- Prepared to contribute to the health, well-being, and empowerment of disadvantaged communities and populations

2020 UWT BASW Program Manual                                          Page 5

Sellmaier_000014

- Able to respond flexibly and adapt to working in changing contexts.

We strive to provide equitable pathways to careers in social work for students from under-represented populations, including students of color, first generation college students, students who are immigrants, students with disabilities, undocumented students, LGBTQ+ students, and others with marginalized identities.

## Program Goals of the UWT BASW Program

In addition to the goals it shares with the School as a whole, the UWT BASW Program identifies five over-arching goals:

- To prepare entry-level baccalaureate social workers for generalist practice in a multicultural context that is rooted in knowledge and skills for understanding and solving complex social problems within the values of professional social work.

- To prepare generalist social workers who can be informed and effective leaders able to understand and take action to challenge injustice and promote social and economic justice.

- To foster a comparative and critical examination of social welfare and social work history, policies, research, and practice interventions in the education of social work practitioners dedicated to public service that promotes a more humane society.

- To prepare for graduate education.

- To provide access to social work education to residents of the south Puget Sound Region.

Sellmaier_000015

## Council on Social Work Education Core Competencies and Behaviors For BASW Students

The Council on Social Work Education (CSWE), through its Educational Policies and Standards (EPAS), sets the overall goals for social work education at both the undergraduate and graduate level. These goals are manifested through nine Core Competencies and the multiple Behaviors that accompany them. The Behaviors are measured in the classroom as well as in the field through the field experience. In the field, mastery of Behaviors and the Competencies they reflect is achieved through the development of Learning Activities in the individual field site. The nine Core Competencies and the Behaviors are:

**Competency 1: Demonstrate Ethical and Professional Behavior**
*Behavior A:* Make ethical decisions by applying the standards of the NASW Code of Ethics, relevant laws and regulations, models for ethical decision-making, ethnical conduct of research, and additional codes of ethics as appropriate to context.
*Behavior B:* Use reflection and self-regulation to manage personal values and maintain professionalism in practice situations.
*Behavior C:* Demonstrate professional demeanor in behavior; appearance; and oral, written, and electronic communication.
*Behavior D:* Use technology ethically and appropriately to facilitate practice outcomes.
*Behavior E:* Use supervision and consultation to guide professional judgment and behavior.

**Competency 2: Engage Diversity and Difference in Practice**
*Behavior A:* Apply and communicate understanding of the important of diversity and difference in shaping life experiences in practice at the micro, mezzo, and macro levels.
*Behavior B:* Present as learners and engage clients and constituencies as experts of their own experiences.
*Behavior C:* Apply self-awareness and self-regulation to manage the influence of personal biases and values in working with diverse clients and constituencies.

**Competency 3: Advance Human Rights, and Social, Economic, and Environmental Justice**
*Behavior A:* Apply understanding of social, economic, and environmental justice to advocate for human rights and the individual and system levels.
*Behavior B:* Engage in practices that advance social, economic, and environmental justice.

**Competency 4: Engage in Practice-informed Research and Research-informed Practice**
*Behavior A:* Use practice experience and theory to inform scientific inquiry and research.
*Behavior B:* Apply critical thinking to engage in analysis of quantitative and qualitative research methods and research findings.
*Behavior C:* Use and translate research evidence to inform and improve practice, policy, and service delivery.

---

Sellmaier_000016

**Competency 5: Engage in Policy Practice**

*Behavior A:* Identify social policy at the local, state, and federal level that impacts well-being, service delivery, and access to social services.

*Behavior B:* Assess how social welfare and economic policies impact the delivery of and access to social services.

*Behavior C:* Apply critical thinking to analyze, formulate, and advocate for policies that advance human rights and social, economic, and environmental justice.

**Competency 6: Engage with Individuals, Families, Groups, Organizations, and Communities**

*Behavior A:* Apply knowledge of human behavior and the social environment, person-in-environment, and other multidisciplinary theoretical frameworks to engage with clients and constituencies.

*Behavior B:* Use empathy, reflection, and interpersonal skills to effectively engage diverse clients and constituencies.

**Competency 7: Assess Individuals, Families, Groups, Organizations, and Communities**

*Behavior A:* Collect and organize data and apply critical thinking to interpret information from clients and constituencies.

*Behavior B:* Apply knowledge of human behavior and the social environment, person-in-environment, and other multidisciplinary theoretical frameworks in the analysis of assessment data from clients and constituencies.

*Behavior C:* Develop mutually agreed-on intervention goals and objectives based on the critical assessment of strengths, needs, and challenges with clients and constituencies.

**Competency 8: Intervene with Individuals, Families, Groups, Organizations, and Communities**

*Behavior A:* Critically choose and implement interventions to achieve practice goals and enhance capacities of clients and constituencies.

*Behavior B:* Apply knowledge of human behavior and the social environment, person-in-environment, and other multidisciplinary theoretical frameworks in interventions with clients and constituencies.

*Behavior C:* Use inter-professional collaboration as appropriate to achieve beneficial practice outcomes.

*Behavior D:* Negotiate, mediate, and advocate with and on behalf of diverse clients and constituencies.

**Competency 9: Evaluate Practice with Individuals, Families, Groups, Organizations, and Communities**

*Behavior A:* Select and use appropriate methods for evaluation of outcomes.

*Behavior B:* Apply knowledge of human behavior and the social environment, person-in-environment, and other multidisciplinary theoretical frameworks in the evaluation of outcomes.

*Behavior C:* Critically analyze, monitor, and evaluate intervention and program processes and outcomes.

*Behavior D:* Apply evaluation findings to improve practice effectiveness at the micro, mezzo, and macro levels.

Sellmaier_000017

# Student Advising

To meet the advisement needs of our students, three sources of advising are available: Faculty Advisors, the Practicum Coordinator, and the BASW Advisor. A complete directory of all SSWCJ faculty and staff can be found: http://directory.tacoma.uw.edu/department/social-work-criminal-justice-school

## Faculty Advisors

Each student entering the BASW major is assigned a faculty advisor. Faculty advisors support students by providing advice and mentoring related to educational and professional career choices. Faculty advisors can also support and advocate for students if they experience personal difficulties that are affecting their progress in the program. We recommend students reach out to their faculty advisor at least one time per year.

In addition to their assigned faculty advisor, students can turn to any faculty member regarding specific issues. You may wish to meet with a faculty doing research or practice in an area of interest to you. Such "informal advising" is common and highly encouraged.

As faculty have a range of teaching, research, and community service responsibilities, we encourage you to schedule an appointment to meet them. You can find a full contact list of UWT Social Work faculty at http://directory.tacoma.uw.edu/department/social-work.

## Office of Field Education/Practicum

The Field Coordinator is responsible for the management of field education, advisement, and approval of students for practicum placements. The Field Coordinator also is responsible for liaison and problem-solving with agencies if there are difficulties in the placements, and assignment of grades for the practicum courses.

If you have practicum questions, please contact the Director of Field Education, Chris Barrans at barransc@uw.edu or BASW Field Coordinator, Nancy Kuhuski at nkuhuski@gmail.com

## Student Services

The Social Work Academic Advisor can assist you with information on registration, course scheduling, graduation requirements, and connect you to various campus resources. If you have any questions regarding your records, registration, or need clarification on BASW Program or University policies, requirements, and/or procedures, please consult your Social Work Academic Advisor.

Sellmaier_000018

Students are encouraged to meet with the Social Work Academic Advisor <u>at least</u> once a quarter for course planning and when applying to graduate. To make an appointment, visit https://go.oncehub.com/swcj to use the online scheduling system.

# Academic Information

## Immunizations – BASW Requirements

Students are required to meet the immunization requirements set by University of Washington Health Sciences Immunization Program (HSIP). The School of Social Work and UWT School of Social Work & Criminal Justice do not accept or grant requests for waivers to the Immunization requirements. Information about HSIP requirements, procedures, and fees may be found on the follow web site: http://www.tacoma.uw.edu/social-work/immunizations. Students in the UWT BASW program may access assistance with immunizations through their personal healthcare provider, or through Student Health Services offered through Franciscan Prompt Care clinics.

1. HSIP contracts with a vendor, CastleBranch, to track immunization and TB testing compliance. Social Welfare students are sent instructions for creating their CastleBranch account, including deadlines for meeting HSIP requirements. The tuition students pay quarterly includes an HSIP fee, which covers the cost of overall HSIP program administration. It is the responsibility of each student to ensure each quarter they are in compliance with the Health Sciences Immunization requirement. Students must communicate directly with HSIP through myshots@uw.edu with questions and or concerns related to Immunization requirements.

2. Students who become noncompliant during field education will be suspended from their Field Education site and will not be allowed to return until they are in compliance

3. Any and all time missed from the Field Education site must be made up prior to the end of the quarter.

4. Students will receive an Incomplete if compliance is not attained by the end of the quarter and will not be allowed to participate in Field Education until they become compliant.

5. In addition, a plan to make up all time missed from the Field Education site must be agreed to by the student, Field Instructor and submitted to the Field Faculty for review.

Some field sites, notably medically-related settings, may have additional immunization or health education requirements. These are negotiated through the Affiliation Agreement

Sellmaier_000019

process and are monitored for compliance by the Field Faculty. Students must be in compliance with these requirements in order to begin placement at such a Field Education site.

## Transfer Credits

A Transfer Evaluation Summary is completed for students seeking to transfer. The Office of Student Affairs evaluates all two-year or four-year credits for applicability to the University Admission Requirements and program prerequisites. Courses are evaluated for transfer credit by the Social Work Advisor and/or BASW Program Chair. Final approvals are made by the BASW Program Chair.

Substitution refers to using one course in lieu of another, and approvals for substituting courses are rare. A student wishing to request a course substitution must make a request and provide a copy of the course syllabus they wish to have considered. Please note that students seeking to transfer courses to meet Social Welfare core curriculum requirements must have completed the course(s) at a Council on Social Work Education accredited Social Work Program. For more information, please contact the Social Work Advisor.

**Current Social Welfare majors** are eligible to submit course substitution petitions for review. Students must supply documentation as outlined on the Program Petition for Course Substitution along with the signed form. Please allow a minimum of 7 -10 days for review. Decision notifications will be sent to the student's UW email address. *Only college level transferrable courses are eligible for course substitutions (vocational technical course work is not eligible).*

## Grading System

Sellmaier_000020

## UWT BASW Program Grading Scale:

The University of Washington Tacoma uses a numerical grading system. Instructors may report grades from 4.0 to 0.7 in 0.1 increments and the grade 0.0. The number 0.0 is assigned for failing work or unofficial withdrawal. Grades in the range 0.6 to 0.1 may not be assigned. Grades reported in this range are converted by the Registrar's Office to 0.0. Numerical grades may be considered equivalent to letter grades as follows:

| Numeric grade point equivalent | Letter grade equivalent | Points | Numeric grade point equivalent | Letter grade equivalent | Points |
|---|---|---|---|---|---|
| 4.0 | A | 100-99 | 2.2 | | 72 |
| 3.9 | | 98-97 | 2.1 | C | 71 |
| 3.8 | A- | 96-95 | 2.0 | | 70 |
| 3.7 | | 94-93 | 1.9 | | 69 |
| 3.6 | | 92-91 | 1.8 | C- | 68 |
| 3.5 | | 90-89 | 1.7 | | 67 |
| 3.4 | B+ | 88-87 | 1.6 | | 66 |
| 3.3 | | 86-85 | 1.5 | | 65 |
| 3.2 | | 84-83 | 1.4 | D+ | 64 |
| 3.1 | B | 82-81 | 1.3 | | 63 |
| 3.0 | | 80 | 1.2 | | 62 |
| 2.9 | | 79 | 1.1 | D | 61 |
| 2.8 | B- | 78 | 1.0 | | 60 |
| 2.7 | | 77 | .9 | | 59 |
| 2.6 | | 76 | .8 | D- | 58 |
| 2.5 | | 75 | .7* | | 57 |
| 2.4 | | 74 | .6 – 0.0 | E | 56 |
| 2.3 | C+ | 73 | | | |

*Lowest Passing Grade

UWT School of Social Work & Criminal Justice faculty have agreed to use the point ranges designated on the grading scale for all TSOCWF and T CRIM classes.

The **only** courses students may take on a Satisfactory/Non-Satisfactory basis are general elective courses. Students may select the S/NS grading option through the seventh week of each quarter by completing the transaction on web registration via MyUW.  Fees may apply.

Some courses, such as TSOCWF 415 *Practicum*, are graded on a Credit/No Credit (CR/NC) basis.

Additional information on grades and scholarship rules may be obtained from the Office of the Registrar.

Sellmaier_000021

The following letter grades also may be used:

*N: No grade.* Used only for hyphenated courses (courses not completed in one quarter).

*I: Incomplete.* An Incomplete is given only when the student has extenuating circumstances that may prevent the student from completing the course work (for example, due to an illness or other circumstance beyond the student's control). An incomplete is only considered if the student has been in attendance and has completed satisfactory work up until at least the 8th week of the quarter.

- The student will need to provide their instructor with the reason for the request and a plan for how the student will complete the coursework.

- To obtain credit for the course, undergraduate students must complete their outstanding coursework with a passing grade no later than the last day of the next quarter (not including summer session).

- An Incomplete grade not made up by the end of the next quarter is converted to the grade of 0.0 by the Registrar unless the instructor has indicated, when assigning the Incomplete grade, that a grade other than 0.0 should be recorded if the incomplete work is not completed. The original Incomplete grade is not removed from the permanent record. The student should not re-register for the course as a means of removing the incomplete.

- An instructor may approve an extension of the Incomplete removal deadline by contacting the UWT Registrar no later than the last day of the quarter following the quarter in which the Incomplete grade was assigned. Extensions, which may be granted for up to three additional quarters, must be received before the Incomplete has been converted into a failing grade. In no case can an Incomplete received by an undergraduate be converted to a passing grade after a lapse of one year.

*S: Satisfactory* and *NS: Not-satisfactory grades:* The only courses students may take on a Satisfactory/Non-Satisfactory basis are general elective courses. Students may select the S/NS grading option through the seventh week of each quarter by completing the transaction on web registration via MyUW.  Fees may apply.

- *S: Satisfactory.* grade for courses taken on a satisfactory/not satisfactory basis. An S grade is automatically converted from a numerical grade of 2.0 or above for undergraduates. The grade S may not be assigned directly by the instructor but is a grade conversion by the Office of the Registrar.
- *NS: Not-satisfactory* grade for courses taken on a satisfactory/not satisfactory basis. A grade less than 2.0 for undergraduates is converted to NS. NS is not included in GPA calculations. No credit is awarded for courses in which an NS grade is received.

---

Sellmaier_000022

*CR: Credit* awarded in a course offered on a credit/no credit basis. The minimum performance level required for a CR grade is determined, and the grade is awarded directly, by the instructor. CR is not computed in GPA calculations.

*NC: Credit* not awarded in a course offered on a credit/no credit basis only. The grade is awarded directly by the instructor and is not included in GPA calculations.

*W:* Official withdrawal or drop from a course from the third through the seventh week of the quarter for undergraduates. A number designating the week of the quarter is recorded with the W when a course is dropped. It is not computed in GPA calculations.

*HW:* Grade assigned when an undergraduate is allowed a hardship withdrawal from a course after the seventh week of the quarter. It is not computed in GPA calculations.

## Non-Decimal Grading Options:

*Credit/No Credit-Only as a Grading Option*

With appropriate departmental review and approval, a course may be offered on a credit/no credit-only basis. The standard for granting credit in credit/no credit courses is the demonstration of competence in meeting the course objectives.

*Satisfactory/Not Satisfactory Grading Option*

Certain students are eligible to choose that a limited number of their courses be graded satisfactory/not satisfactory rather than with regular numerical grades. Any student who wishes to register for a course on a satisfactory/not-satisfactory basis should check first with his or her advisor to determine restrictions and eligibility, because colleges and departments vary in their rules concerning this grading option. In no case is a student allowed to register for more than 6 credits (or for one course, if that course is offered for more than 6 credits) on a satisfactory/not-satisfactory basis in a given quarter. No more than 25 satisfactory/not-satisfactory credits may be applied to a four-year undergraduate degree. Such courses may not be used to satisfy University, college, or departmental course requirements including requirements for a minor (i.e., **may be applied only to the general/free elective component of a degree**).

## Grade Point Average (GPA):

The University's cumulative GPA is based solely on courses taken in residence at the University; this includes some, but not all, courses taken through UW Extension. The UW transcript also reflects grades for UW Extension course work that is not residence credit, and the grades for credit by examination. These latter grades do not affect the University cumulative GPA.

Sellmaier_000023

**Computation of GPA:**

The GPA for graduation is computed by dividing the total cumulative grade points by the total graded credits attempted for courses taken in residence at the University. Grade points are calculated by multiplying the number of credits by the numeric value of the grade for each course. The sum of the grade points is then divided by the total graded credits attempted. Courses elected on an S/NS basis are counted as follows: Satisfactory grades are printed on the permanent record as an S and do not count in the quarterly or cumulative GPA, but they do count as credits earned toward graduation. Not-satisfactory grades, NS, do not count in the quarterly and cumulative GPA and do not count as credits earned toward graduation.

The total graded credits attempted, not the credits earned toward graduation, are used in computing the GPA.

**Repeating Courses:**

With the approval of the academic department offering the course, an undergraduate may repeat a course once. Both the original grade and the second grade are computed in the GPA but credit is allowed only once. Veterans receiving benefits must receive approval from the veteran's coordinator in the Office of Veteran and Military Services before repeating a course.

**Change of Grade:**

Except in case of error, no instructor may change a grade that he or she has turned in to the Registrar. A student who finds administrative omissions or errors in a grade report must make application to the Registrar for a review not later than the last day of instruction of the student's next quarter in residence, but in no case after a lapse of two years. Grades used to meet graduation requirements cannot be changed after the degree has been granted. Time spent in military service is not counted as part of the two-year limitation. Students are not automatically notified of grade changes posted after the first of the quarter.

## Academic Standing and Scholarship

### Policy on Satisfactory Progress and Low Scholarship in the BASW Program:

In order to maintain satisfactory progress in the Social Welfare program, an BASW majors must meet the following four criteria:

1. **Maintain a 2.5 cumulative GPA in required Social Welfare courses and a 2.0 cumulative UWT GPA.**

   A student whose Social Welfare cumulative GPA falls below a 2.5 at the end of any quarter will be required to attend a meeting with their faculty advisor and Social Work Advisor.

Sellmaier_000024

If the student continues to earn less than a 2.5 cumulative Social Welfare GPA in subsequent quarters, they may be referred to the Professional Standards Committee.

2. **Earn a minimum 2.0 grade or Credit (in courses taken C/NC) in each required Social Welfare course.**

   Required Social Welfare courses are TSOCWF 300, 301, 310, 311, 312, 320, 390, 402, 404, 405, 406, 414, and 415.

   A student who earns less than a 2.0 in any required Social Welfare course will be placed on academic probation for one or more quarters. A student placed on probation may be asked to retake a required course during the following year. This may delay the student's practicum by one year.

   With the approval of the program, a student may repeat a course once. According to UW policy, if a departmental course is retaken, the grades of the two courses are averaged and credit for the course will be given only once.

   - Veterans receiving benefits must receive approval from the veteran's coordinator in the Office of Student and Enrollment Services before a course is repeated.

3. **Satisfactorily complete the first year required courses before proceeding into the practicum and practicum seminar. (Social Welfare students are guaranteed access to first- and second year TSOCWF required courses.)**

   To begin the practicum (TSOCWF 415) please refer to the Policy on Readiness for Field BASW Placement below.

4. **Complete the program within four years after admission.**

   A student who does not complete the program within four years of admission may be removed from the program and placed in pre-major status.

   A student who begins the program and then withdraws from UWT for more than one year will have to re-apply to the program to be admitted.

   - If re-admitted, the student must meet with the Social Work Advisor to prepare a revised program of studies.
   - The Advisor (in consultation with the BASW Program Chair) will determine which courses may or may not be applicable to the current curriculum and which courses must be completed for the degree.

   **Notes:**

   1. Exceptions to the satisfactory progress and low scholarship policy or reinstatement to the program must be approved in writing by BASW Program Chair.

   2. The BASW Program Chair may consult with the School of Social Work & Criminal Justice Professional Standards Committee on decisions for suspension from the

Sellmaier_000025

School of Social Work & Criminal Justice based on a student's failure to meet the criteria listed under "Academic Performance and Conduct Which May Result in a Review and Possible Dismissal from the School of Social Work & Criminal Justice."

## Policy on Readiness for BASW Field Placement:

1. Students must pass all their required social work curriculum courses (including TSOCWF 300, 301, 310, 311, 312, 320, 390, 402, 404, 405, 406, 414, and 415) in order to be eligible for field placement. Any course that a student does not pass must be re-taken and passed with a satisfactory grade before the student can start their field placement.

This eligibility requirement does not apply to social work elective courses, or to courses taken to fulfill University-wide graduation requirements. Additionally, students must be in compliance with the Health Sciences Immunization Program requirements for social work students or they will not be allowed to enter or remain in a field placement.

2. If a student has an active "Incomplete" in a required social work course, approval to begin field placement must be made by the Field Coordinator and the instructor for that course. The student must submit a plan for how they will complete the course and the coursework must be completed by no later than the end of the following academic-year quarter, excluding summer). If the student does not complete the course with a passing grade or if they fail to meet the deadline for course completion set with the instructor, they will not be eligible for field placement until the course is retaken and completed with a passing grade.

3. If a student fails a required social work curriculum course (including an "Incomplete" as in #2 above) while they are already in a field education placement, the Field Coordinator, in consultation with the course instructor and the BASW Program Chair will determine whether the student may remain in their field placement.

4. When grades have been submitted each quarter of the junior year (excluding summer), the Field Coordinator will call a meeting of interested faculty to discuss any students of concern. This meeting is not mandatory for faculty, but it is strongly suggested that faculty with student concerns attend. The concerns may center around academic performance (including writing skills) as well as behavioral or attitudinal issues that give the classroom faculty concern about the student's suitability for field placement and that persist even after the instructor has spoken to the student about the behaviors. Behavioral or attitudinal issues might include but are not limited to persistent absences or tardiness, disruptive behavior in class, inappropriate disengagement into technology in class, disrespectful treatment of colleagues, or an unwillingness to critically examine racist, sexist, heterosexist or other discriminatory personal beliefs.

5. Based on these concerns and a consensus of the attending faculty, the student will be asked to meet with a Committee made up of the following: Field Coordinator (convener and

Sellmaier_000026

recorder of results), student's faculty advisor, and at least one faculty member who has expressed a concern. Additional individuals may be included in this meeting if appropriate. The purpose is to be clear with the student about faculty concerns and to develop a plan of correction. Monitoring of progress on this plan will be the responsibility of one of the individuals meeting with the student, as determined by the Committee.

6. Students who are being monitored will be reviewed at the next quarterly group meeting at which time they may:  1) no longer be a concern if they corrected problematic behaviors; 2) be of continuing concern, but are showing progress in altering problematic behaviors; or 3) be of significant concern if they have not made any progress in altering behaviors.  This Committee is vested with the authority to refuse a student permission to enter the field education portion of their degree program.

7. A decision to deny a student permission to enter field placement may be appealed to the BASW Program Chair. The UW Tacoma School of Social Work and Criminal Justice Dean, in consultation with appropriate faculty, will make a final determination of the student's eligibility to enter a field placement.

8. The undergraduate field experience is scheduled to begin during autumn quarter of the senior year. Should a student be delayed in the start of their placement due to one of the areas outlined in this policy, all reasonable efforts will be made to have the student begin a placement in a quarter other than Autumn if it will assist them in progress toward graduation. It must be remembered, however, that the field placement courses are linked to the field seminar courses and synchronization of these two graduation requirements may or may not be possible in any given year. No field placement at the undergraduate level will begin during summer quarter.

APPROVED BY THE FACULTY: 5/10/2012; language adjusted due to SSWCJ bylaw changes 1/8/2021

# Other Important University and Program Policies

Sellmaier_000027

## Release of Information from Student Files - FERPA

The Family Educational Rights and Privacy Act (FERPA) of 1974 protects the privacy of your educational records. However, the following information is considered public or "directory" information and may be released to anyone unless you inform the Office of the Registrar that you do not wish any information released: name, address, telephone number, major field of studies, dates of attendance, degrees and awards received, full-or part-time enrollment status, and educational institutions attended.

*If you do not wish to authorize directory release and do not want your directory information to appear in the published or electronic Student Directory, you must restrict access through MyUW. No information will be released on students that have restricted release of directory information including degrees awarded and dates of attendance. If you later wish to change your authorization and allow release, you must go to the Office of the Registrar in MAT-253 and present photo identification.*

The Program may routinely release the information noted above if you have not restricted your release through the Registrar.

If you need a hardcopy of your official UW transcript in the future, please fill out a Transcript Order form at the Cashier's Window or via MyUW. A processing fee will apply. For more information please visit, http://www.tacoma.uw.edu/enrollment-services/transcripts.

If you want prospective employers or schools to have any of the information noted earlier, then there can be no "holds" on your degree (for example, because a library payment is unpaid, etc.).

If you choose not to give the releases to the University of Washington and/or the School of Social Work & Criminal Justice, you should remember to change the release with the Registrar or provide the School of Social Work & Criminal Justice with separate releases any time you use the University of Washington, or the Program, or its faculty for reference purposes.

## Retaining Your Course Syllabi

It is strongly recommended that you begin your social work career by maintaining a file or notebook of all course descriptions and syllabi for courses you take including practicum contracts and evaluations.
You will find this very helpful in the future if you decide to apply for certification in a specialized area or if the state in which you practice requires this information.

The University's official transcript shows some generic titles for Social Welfare courses that do not always reflect the specific title or content of all of your courses. You can save yourself time (and lost opportunity) if you begin this kind of record keeping now.

2020 UWT BASW Program Manual                                                   Page 19

Sellmaier_000028

## Class Participation Statement

The "Essential Skills, Values and Standards of Professional Conduct" in your degree manual mandates a commitment to professional social work education, values, and ethics. Your attendance and participation are expected in all classes and are an indication of professional commitment.  Social Work Division policy states that failure to participate in at least 70% of on campus delivered class sessions for any given course will result in a meeting, initiated by the instructor, between the student, instructor/s, and faculty advisor to discuss and document the concern. Documentation will be kept in the student file in the School of Social Work and Criminal Justice office. Continued low attendance and/or participation in one or more courses will result in a larger review of the student's appropriateness for continuation in the degree with possible referral to the Professional Standards Committee.

*Revised and approved by UW Tacoma Social Work faculty April 26, 2019.  Effective Autumn 2019*

## Required Self-Assessment Surveys

The School of Social Work relies on student feedback to help us evaluate and improve our courses, curriculum, and practicum requirement. As part of this program evaluation effort, we have developed surveys to measure core competencies in areas defined by our accrediting institution, the Council on Social Work Education (CSWE). The CSWE also requires students in the BASW Program to complete a competency self-assessment survey near the end of their course of study.

In this survey you will be asked to rate the extent to which you think you have achieved competence in each of the practice behaviors listed for the core competencies. Your responses are confidential and will not be part of your permanent record. Please be candid in your responses -- they will not affect your grades and will not be used to evaluate your individual performance. Responses will be anonymized, aggregated and used for program evaluation purposes only.

## Application to Graduate

To qualify for graduation with a Bachelor of Arts in Social Welfare, a student must complete a minimum of 180 credits as outlined above. Please note, students with uncompleted University Admission Requirements or Social Welfare prerequisite requirements must meet with the Social Work Advisor regarding completion and scheduling of those required courses.

Students are encouraged to apply to graduate in the summer or autumn quarter of their senior year by making an appointment with the Social Work Advisor. During the appointment, the formal application to graduate is completed and an analysis of remaining courses and credits is

Sellmaier_000029

conducted. The application is filed with the Graduation Office, which will then monitor the student's progress of completing the courses listed. Students must apply to graduate no later than two weeks into the quarter in which graduation is planned.

Although a student may graduate in any quarter, Commencement is held once a year in June, for everyone graduating during the academic year. If the application is done in time, a student can go through the June ceremony even though coursework is being finished in the summer. However, autumn graduates are eligible for the following spring quarter ceremony.

Students who do not graduate in the planned quarter must notify the Social Work Advisor.

## E-Mail Account and Electronic Communications

As a student of the University of Washington, you are provided with an email account at no charge. For details on how to create your UW email account, visit http://www.tacoma.uw.edu/information-technology/email. Typically, students set up a UW email account at the time they establish a UW NetID. If you need assistance creating your account, visit a UW Tacoma computer lab and a staff member can assist you.

All Social Welfare students are required to maintain a UW email account, be subscribed to the official UW Tacoma BASW listserv, and check their email at <u>least</u> twice each week. The BASW Program uses email as the major means to distribute important information about school programs, class information, deadlines, and other announcements.

Note: All BASW students are automatically subscribed to the UW Tacoma BASW listserv prior to the start of Autumn Quarter.

# Resource Guide Summary

## Scholarship Funding Information

<u>UW Tacoma Scholarship Opportunities:</u>

UW Tacoma provides a variety of scholarships to offset the cost of tuition. To view current postings and download application forms, visit http://www.tacoma.uw.edu/node/36610.

Sellmaier_000030

## Social Work Scholarships for UWT Social Work Students:

As a result of generous donations to the School of Social Work & Criminal Justice Student Scholarship fund the University of Washington Tacoma School of Social Work & Criminal Justice makes scholarships available whenever possible.  These funds will go toward student tuition or supporting costs (i.e., textbooks).  An announcement and call for applicants will go out over the uwtbasw student listserv when funds are available.  The amount and number of scholarships depends upon donations throughout the year.  Other program specific scholarships may be available at different times.  Please check the following link for School of Social Work and Criminal Justice scholarships https://www.tacoma.uw.edu/swcj/scholarships.

## Opportunities for Involvement

## Phi Alpha Honor Society:

A national honor society for social work students, founded in 1960, Phi Alpha's purpose is to provide a closer bond among students of social work and promote humanitarian goals and ideals. Phi Alpha fosters high standards of education for social workers and invites into membership those who have attained excellence in scholarship and achievement in social work. For more information on the Xi Pi Chapter at UWT visit https://www.tacoma.uw.edu/swcj/social-work-honor-society.

## Student Social Work Organization (SSWO):

The Student Social Work Organization (SSWO) is one of the most active organizations on campus. The SSWO's mission is to "empower individuals, groups and communities towards social change by listening, advocating for social justice and serving our community with competence and integrity."  Contact the Center for Student Involvement to get involved https://www.tacoma.uw.edu/involvement or visit https://uw-tacoma.presence.io/organization/student-social-work-organization-2

## National Association of Social Workers (NASW):

*Only national organization serving needs of social work profession. Offers a wide range of professional services, benefits, and opportunities.  Reduced rates for students, by degree level.*

State chapter: 522 N 85th St. Suite B100, Seattle, WA 98103, 206-706-7084, email:  info@nasw-wa.org

Sellmaier_000031

Chapter Website: www.nasw-wa.org/
National address:  750 First Street NE, Ste 700, Washington, DC 2002-4241
Website (includes on-line membership application):  www.naswdc.org/
Toll-free number for membership information:  1-800-742.4089

## UW Alumni Association:

*Provides programming and events linking alumni and students.*
206-543-0540 or 1-800-AUW-ALUM
Website: www.washington.edu/alumni

# Standards of Conduct and Grievance Procedures

## UW Student Conduct Code

*The following is an abbreviated version.  The complete code is available from the Office of the Vice President for Student Affairs, Schmitz 447, or the Washington Administrative Code, Chapter 478-120 (in the UW Tacoma Library).*

Admission to the University carries with it the presumption that students will conduct themselves as responsible members of the academic community.  As a condition of enrollment, all students assume responsibility to observe standards of conduct that will contribute to the pursuit of academic goals and the welfare of the academic community.  That responsibility includes, but is not limited to:
- academic and professional honesty and integrity,
- refraining from actions which would interfere with University functions or endanger the health, safety, or welfare of others, and
- complying with the rules and regulations of the University and its units.

Specific instances of misconduct on campus include, but are not limited to:
- intentionally and substantially disrupting teaching
- physical abuse or threat of harm
- sexual offenses, such as rape, sexual assault or harassment
- malicious damage to or misuse of property
- refusal to comply with lawful order to leave the campus
- possession or use of firearms, explosives, dangerous chemicals, or other dangerous weapons (excluding legal defense sprays)
- unlawful possession, use, distribution, or manufacture of alcohol or controlled substances

2020 UWT BASW Program Manual                                                                Page 23

Sellmaier_000032

- inciting others to engage in unlawful activity.

Violations of these standards may result in a variety of disciplinary actions, including suspension or permanent dismissal from the University.

## Academic Performance and Conduct That May Result in a Review and Possible Dismissal from the BASW Program

Students may be terminated from the UW Tacoma BASW Program for any of the following:

1. Failure to meet or maintain academic standards as established by the University of Washington, the School of Social Work (Seattle), and the UW Tacoma BASW Program in Tacoma. (This is automatic and may take place without a review or further procedure.).

2. Academic cheating, lying, or plagiarism.

3. Behavior judged to be in violation of the NASW Code of Ethics (available at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English) or unprofessional conduct as specified by RCW 18.130.180 Unprofessional Conduct, Regulation of Health Professions-Uniform Disciplinary Act, Revised Code of Washington available at http://app.leg.wa.gov/RCW/default.aspx?cite=18.130.180.*

4. Documented evidence of conviction of a criminal act occurring during the course of study, or which occurred prior to admission to the UW Tacoma BASW Program and became known after admission.

5. Failure to meet the Essential Skills, Values and Standards of Professional Conduct for Admission to and Continuance in the School of Social Work.

* The NASW Code of Ethics is published online https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English. The most recent RCW 18.130.180 is published in the *Revised Code of Washington*, available in the Law Library or in the Government Publications section of Suzzallo, Allen and accessible via the UW Tacoma Library.

### Academic Honesty: Cheating and Plagiarism

**What is academic misconduct?**

Academic misconduct occurs if you present as your own work something that you did not do, or if you intentionally present incorrect data. It is also considered academic misconduct if you help

Sellmaier_000033

someone else present work that is not his or her own. The UWT BASW Program follows UW Tacoma's academic policies. To understand what constitutes academic misconduct, refer to https://www.tacoma.uw.edu/student-conduct/academic-misconduct.

**Plagiarism**

One of the most common forms of cheating is *plagiarism*, using another's words or ideas without proper citation. When students plagiarize, they usually do so in one of the following six ways:

1. *Using another writer's words without proper citation.* If you use another writer's words, you must place quotation marks around the quoted material and identify the source of the quotation.

2. *Using another writer's ideas without proper citation.* When you use another author's ideas, you must indicate with an in-text citation, note, or other means where this information can be found. Your instructors want to know which ideas and judgments are yours and which you arrived at by consulting other sources. Even if you arrived at the same judgment on your own, you need to acknowledge that the writer you consulted also came up with the idea.

3. *Citing your source but reproducing the exact words of a printed source without quotation marks.* This makes it appear that you have paraphrased rather than borrowed the author's exact words.

4. *Borrowing the structure of another author's phrases or sentences without crediting the author from whom it came.* This kind of plagiarism usually occurs out of laziness: it is easier to replicate another writer's style than to think about what you have read and then put it in your own words. The following example is from *A Writer's Reference* by Diana Hacker (New York, 1989, p. 171).
**Original:** *If the existence of a signing ape was unsettling for linguists, it was also startling news for animal behaviorists.*

**Unacceptable borrowing**
*Sign language unsettled linguists and startled animal behaviorists.*

**Unacceptable borrowing of sentence structure:** *If the presence of a sign-language-using chimp was disturbing for scientists studying language, it was also surprising to scientists studying animal behavior.*

**Acceptable paraphrase:** *When they learned of an ape's ability to use sign language, both linguists and animal behaviorists were taken by surprise.*

5. *Borrowing all or part of another student's paper or using someone else's outline to write your own paper.*

Sellmaier_000034

6. *Using a paper writing "service" or having a friend write the paper for you.* Regardless of whether you pay a stranger or have a friend do it, it is a breach of academic honesty to hand in work that is not your own or to use parts of another student's paper.

*Note: The guidelines that define plagiarism also apply to information secured on internet websites. Internet references must specify precisely where the information was obtained and where it can be found.*

You may think that citing another author's work will lower your grade. In some unusual cases this may be true, if your instructor has indicated that you must write your paper without reading additional material. But in fact, as you progress in your studies, you will be expected to show that you are familiar with important work in your field and can use this work to further your own thinking. Your professors write this kind of paper all the time. The key to avoiding plagiarism is that you show clearly where your own thinking ends and someone else's begins. Integrity is essential to effective performance in the profession of Social Work. Social work professionals are entrusted to carry out responsibilities that significantly impact human lives. Upholding academic honesty is consistent with a professional focus on acting with integrity and demonstrates the student's willingness to do so.

# Essential Skills, Values and Standards of Professional Conduct

Essential skills, values and standards of professional conduct in the School of Social Work and Criminal Justice are part of the School's academic standards. They are the requirements necessary to participate fully in all aspects of social work education and the practice of social work. The expectation is that students will possess and develop these skills, values and standards as they progress through all aspects of the program, including in the classroom, in their field placements, and in the professional practice of social work. Attention to them will be paid by faculty responsible for making admissions decisions and for evaluating students' classroom and practicum performance. Violations of these Skills, Values, and Standards of Professional Conduct can also become grounds for dismissal from the program and from the profession. Thus, it is important that they are well understood.

**Essential Skills**

*Motor and Sensory*

Developing the competencies needed to become a social worker is a lengthy and complex process that requires students to participate in the full spectrum of experiences and requirements of the curriculum. The social work student must have sufficient motor abilities to attend class and perform all the responsibilities expected of students in practicum placement, at places such as hospitals and clinics. The student must also have the ability to acquire and integrate new information through the use of their senses to perform the functions that will be

Sellmaier_000035

expected of them both as students and as professional social workers. Students who wish to request reasonable accommodations for meeting the Essential Motor and Sensory Skills requirement should contact the <u>Office of Disability Resources for Students (DRS)</u>. DRS provides services to enrolled students who have a documented permanent or temporary physical, psychological or sensory disability that qualifies them for academic accommodations under the law. The professional activities of social work require that students be grounded in relevant social, behavioral and biological science knowledge and research. This includes knowledge and skills in relationship building, data gathering, assessment, interventions and evaluation of practice.

## *Interpersonal and Communication Skills*

The social work student must demonstrate the interpersonal skills needed to relate effectively to other students, faculty, staff, clients and other professionals. These include compassion, objectivity, integrity and the demonstration of respect for, and consideration of others. The social work student must communicate effectively and sensitively with other students, faculty, staff, clients and other professionals. They must express ideas and feelings clearly and demonstrate a willingness and ability to listen to others. They must have sufficient skills in spoken and written English to understand the content presented in the program.

## Values

For admission to and continuance in the School of Social Work at the University of Washington, students must demonstrate a commitment to the core values of social justice and diversity. These values are critical to social work education and practice.

## *Social Justice*

The social work student must value social justice, which includes promoting equality and human rights and recognizing the dignity of every human being.

## *Diversity*

The social work student must appreciate the value of human diversity. They must serve in an appropriate manner all persons in need of assistance, regardless of the person's age, class, race, religious affiliation (or lack thereof), gender, disability, sexual orientation and/or value system. Social work students must not impose their own personal, religious, sexual, and/or cultural values on their clients. The social work student must know how their values, attitudes, beliefs, emotions and past experiences affect their thinking, behavior and relationships. The student must be willing to examine and change their behavior when it interferes with their working with clients and other professionals. The student must be able to work effectively with others in subordinate positions as well as with those in authority.

## Professional Conduct

Sellmaier_000036

The social work student must abide by the ethical standards of the profession developed by the <u>National Association of Social Workers (NASW) Code of Ethics</u>. In general, the social work student must behave professionally by knowing and practicing within the scope of social work, respecting others, being punctual and dependable, prioritizing responsibilities and completing assignments on time.  The social work student must learn to be resilient in the face of the undesirable effects of stress and avoid burnout by exercising appropriate self-care including the development of cooperative and facilitative relationships with colleagues and peers. **Adapted from the NASW Code of Ethics:**

### *Privacy and Confidentiality*

- (a) Social work students and professionals should not solicit private information from clients unless it is essential to providing services or conducting social work evaluation or research.
- (a) Social work students and professionals may disclose confidential information when appropriate with valid consent from a client or a person legally authorized to consent on behalf of a client.
- (b) Social work students and professionals should protect the confidentiality of all information obtained in the course of professional service unless sharing confidential information is necessary to preventing serious, foreseeable, and imminent harm to a client or other identifiable person.

### *Sexual Relationships and Physical Contact*

- (a) Under no circumstances should social work students and professionals engage in sexual activities or sexual contact with current or former clients, whether such contact is consensual or forced.
- (b) Social work students and professionals should not engage in sexual activities or sexual contact with clients' relatives or other individuals with whom clients maintain a close personal relationship when there is a risk of exploitation or potential harm to the client.
- (c) Social work students and professionals —not their clients, their clients' relatives, or other individuals with whom the client maintains a personal relationship—assume the full burden for setting clear, appropriate, and culturally sensitive boundaries.
- (d) Social work students and professionals should not engage in physical contact with clients when there is a possibility of psychological harm to the client as a result of the contact (such as hugging or massaging clients). Social workers who engage in appropriate physical contact with clients are responsible for setting clear, appropriate, and culturally sensitive boundaries that govern such physical contact.

Sellmaier_000037

*Respect*

- (a) Social work students and professionals should treat colleagues and clients with respect and should represent accurately and fairly the qualifications, views, and obligations of colleagues.
- (b) Social work students and professionals should avoid unwarranted negative criticism of colleagues and clients in communications with others. Unwarranted negative criticism may include demeaning comments that refer to level of competence or to individuals' attributes such as race, ethnicity, national origin, color, sex, sexual orientation, gender identity or expression, age, marital status, political belief, religion, immigration status, and mental or physical disability.

*Unethical Conduct of Colleagues*

- (a) Social workers should take adequate measures to discourage, prevent, expose, and correct the unethical conduct of colleagues.
- (b) Social workers should be knowledgeable about established policies and procedures for handling concerns about colleagues' unethical behavior. Social workers should be familiar with national, state, and local procedures for handling ethics complaints. These include policies and procedures created by NASW, licensing and regulatory bodies, employers, agencies, and other professional organizations.
- (c) Social workers who believe that a colleague has acted unethically should seek resolution by discussing their concerns with the colleague when feasible and when such discussion is likely to be productive.

Approved by SSW Faculty Council, June 2011. Updated November 2018 to reflect gender-inclusive language.

## Dismissal for Failure in Field Policy

If a field placement (TSOCWF 415) is discontinued at any point prior to the end of the placement due to unsatisfactory performance, the student will receive a grade of "no credit" for that quarter and no field hours for that quarter will be credited to the student's overall required total. With the approval of the Field Faculty, and in consultation with the student's faculty advisor, students are allowed to repeat a Field Education placement for which they have received a grade of "no credit" at a different placement site one time only. The conditions of the second placement (e.g., total number of hours to be repeated; when the new placement can begin) are at the discretion of the Field Faculty, in consultation with the student's faculty advisor. If the second placement also is discontinued due to unsatisfactory performance, the student will be dismissed from the BASW program.

Because the undergraduate field course (TSOCWF 415) is done in tandem with Field Seminar courses, dismissal from field placement may result in the student having to withdraw from the Field Seminar and delay completion of the practicum until the following academic year.

Sellmaier_000038

## Procedures

1) If a student is dismissed from a practicum placement for unsatisfactory performance, they will receive a grade of "no credit" for the quarter, and will meet with the assigned Field Faculty member, along with the student's faculty advisor. If those two roles are one in the same, the student may bring a different social work faculty member to the meeting. The purpose of the meeting will be twofold: a) to discuss the behaviors and conditions that led to the student being dismissed from the placement; and b) determine whether a second attempt at a practicum placement is warranted, and to create a plan that will demonstrate the student's changed behaviors to make the new placement successful.

2) The student may appeal the grade of "no credit" to the BASW Program Chair in the same manner prescribed for appeal of classroom grades. There is no grade appeal beyond the Dean.

3) The Field Faculty member will attempt to re-place the student at a different agency and may inform the agency of the conditions under which the original placement was discontinued. The Field Faculty member will have the authority to determine the number of hours which the student must repeat, when the new placement can begin, and other logistics related to the re-placement of the student. The student will be informed in writing by the Field Faculty member that this will be their final opportunity to be successful in a field placement, and that an additional dismissal from a field placement will result also in dismissal from the BASW Program.

4) If the student is discontinued from the second placement for unsatisfactory performance, they will be dismissed from the BASW program and the student will receive a written notification from the program to this effect.

5) The student may appeal the dismissal from the BASW program to the BASW Program Chair who will, in consultation with the Social Work members of the Faculty Council determine whether the student's dismissal is warranted. The student may access other existing University of Washington procedures, if any apply, to appeal the dismissal if she/he so chooses.

6) The UW Tacoma School of Social Work & Criminal Justice may revise this policy at any time. Students will be notified of changes via e-mail and through the program's website. This policy is effective upon approval by program faculty.

Approved by AG: 7/22/15
Approved by Social Work faculty: 9/17/15
Approved by full faculty: 9/25/2015
Effective: Autumn quarter, 2015

Sellmaier_000039

## Resolution of Grievances

There are two different avenues to redress a grievance, depending on whether the grievance is academic (including practicum) or related to discrimination or unfair treatment. **The UW Tacoma BASW Program as well as the University encourages the resolution of grievances at the lowest level. In addition, although the process will generally be followed in the order described below, no one phase in the process is required before another may be utilized.** If resolution of a grievance does not occur at a particular level, the appropriate referrals can be identified and discussed. It is against University policy to penalize or retaliate against any party for participation in grievance resolution.

### Academic grievance:

An academic grievance may be resolved by discussing the issue with the faculty member/instructor concerned, secondly with your faculty advisor and third with the BASW Program Chair. For academic issues within practicum, resolution may be sought by discussion with the Practicum Instructor or Liaison; secondly with the Practicum Coordinator; and third with the BASW Program Chair. Finally, students may bring their concern to the Dean. Students also may discuss the issue with the University Ombudsman if they so choose.

The BASW Program Chair may refer an academic grievance to the Professional Standards Committee (described in the pages that follow this section) or an appropriate University office.

### Discrimination/unfair treatment grievance:

Students and employees of the University are protected by the University's equal opportunity policies (see the following section). If you believe that you have been discriminated against or unfairly treated — on the basis of race, color, creed, religion, national origin, sex, sexual or political orientation, age, marital status, disability, or disabled-veteran or Vietnam-era-veteran status — procedures exist within the BASW Program and the University for the resolution of such a grievance. Students also have access to the complaint procedures in state and federal agencies as allowed by law. Be aware that there may be time limitations on the filing of a formal complaint with an external agency.

*Within the UW Tacoma BASW Program*: Discuss the issue and seek resolution with the individual involved. If the issue is unresolved, students should follow the same steps outlined above under "Academic Grievance."

When you discuss a complaint with any of the individuals named above (instructor, faculty advisor, BASW Program Chair, etc.), you can expect confidentiality. If, however, your complaint is about sexual harassment, the individual to whom you reported the complaint is legally obligated to report your complaint to the University. (The student can decide whether or not to follow up with the University representative.)

Sellmaier_000040

*Within the University*:  Resolution of discrimination or unfair treatment complaints may be sought through the University Ombudsman, and then either through the Office of the Vice Chancellor for Student and Enrollment Services, or the University Complaint Investigation & Resolution Office (UCIRO)—depending on whether the complaint is about a student or a university employee.  Complaints about students are directed to the Vice Chancellor for Student and Enrollment Services; complaints about University employees (which includes faculty) are directed to UCIRO.  (The UCIRO may refer you to a more appropriate University office.)  At these offices, resolution may be sought through informal conciliation or a formal complaint procedure.

The University Ombudsman uses education, consultation, conciliation, or mediation to reach a mutually satisfactory resolution of a dispute, or if a resolution does not occur, can identify and discuss appropriate referral options.

## Resource Persons within the BASW Program and the University:

**BASW Program Chair (Interim)**
**Social Work Division Chair**
Claudia Sellmaier
WCG 223A
253.692.5623
sellmaic@uw.edu

**Dean of the School of Social Work and Criminal Justice (UW Tacoma)**
UW Tacoma
Keva Miller
WCG 203
253.692.5620
sswcjdean@uw.edu

**Dean of the School of Social Work**
Edwina Uehara
Room 210C/4516 University Way
206.685.2480, Room 210C
eddi@uw.edu

**Director of Field Education**
Chris Barrans
WCG-203J
253.692.5823
barransc@uw.edu

Sellmaier_000041

**University Ombudsman**
Chuck Sloan
206 Condon Hall
206.543.6028
ombuds@uw.edu

**UW Tacoma Ombudsman**
Chuck Sloane
CAR 219
253.692.4476
ombuds@uw.edu

**Vice Chancellor for Student Affairs**
Mentha Hynes-Wilson
MAT-352
253.692.4801
hynes@uw.edu

**University Complaint Investigation and Resolution Office (UCIRO)**
1415 NE 45th, Room 405
206.616.2028
uciro@uw.edu

Sellmaier_000042

## Professional Standards Committee

The **Professional Standards Committee** (PSC) for the School of Social Work & Criminal Justice, University of Washington Tacoma is a body of faculty and staff whose role is to address concerns that cannot be resolved by those directly involved in the situation. The PSC determines corrective action and issues sanctions, including up to dismissal from the program. This is an internal School of Social Work & Criminal Justice review committee for social welfare, social work, and criminal justice students.

Other University procedures can and will be used when appropriate. Those individuals who are directly involved should make a concerted effort to resolve the concern prior to a referral to the PSC. Because faculty in the School of Social Work & Criminal Justice serve as gatekeepers for their respective professions, in some cases it is in the best interest of the social work and criminal justice professions as well as in the best interest of the student to realize that their interests and/or abilities seem most appropriate for another profession and program of study.

**If a student fails to comply with sanctions of the PSC within the specified time frame, a recommendation for dismissal from the program will be considered by the PSC.** The Professional Standards Committee referral form can be found here: https://www.tacoma.uw.edu/sites/default/files/2020-09/professional-standards-committee_160506.pdf

## Guide to University of Washington Tacoma

Web site links are available at www.tacoma.uw.edu

### Office of Student Affairs:
*Room: MAT 253*
*Phone: 253.692.4913*
- Registration information
- transcript request forms
- new and replacement student ID cards
- UW Tacoma undergraduate applications
- grade information
- low and high scholarship information
- residency classification information
- statement of attendance and/or certification of GPA for auto insurance, loan deferments, enrollment
- degree verification statements
- international services--information for international students and visiting scholars, including immigration regulations

2020 UWT BASW Program Manual                                              Page 34

Sellmaier_000043

- MyUW web registration information and assistance
- registration for time conflicts and S/NS
- late registration and late adds
- re-registration if canceled
- hardship withdrawal petitions
- registration and tuition fees petitions
- withdrawal for the quarter
- address changes
- name changes
- reinstatement for prior quarters (if canceled for non-payment of tuition for example)
- student health insurance coverage applications
- Veteran's Benefits (located in TLB 307A)

## Financial Aid:
- Financial Aid
- Student Loans
- Emergency Student Loans
- Work study opportunities
- Tuition Payment Plan installments
- Financial Aid Consortium Agreements
- Scholarship Information

Sellmaier_000044

# Special Information regarding COVID-19

UW Tacoma follows established public health and safety guidelines intended to reduce the impact and spread of COVID-19 in the broader community while at the same time understanding that individual decisions have collective impact. We strive to ensure maximum feasible access for students, and to recognize student academic work so that any disruption as a result of a UW Tacoma decision does not disadvantage their future academic progress, including admission to their preferred major in the months or years to come.

**If you think you have COVID-19 or have come in contact with someone who has been diagnosed with COVID-19:**

- **Stay home.** Do not go to school or work. Avoid public places.
- **Call your health provider** and follow their advice. Students can also use <u>CHI Virtual Urgent Care</u>.
- **Email Dr. Bernard Anderson,** Associate Vice Chancellor for Student Life, at <u>bander48@uw.edu</u>, to learn of available support services and the procedure for academic accommodation.

Students must abide by the UW Face Mask Policy: <u>https://www.ehs.washington.edu/face-covering-requirements</u>

Students should follow recommended guidelines for safe distancing and hand washing/sanitation.

For up-to-date information regarding Covid protocols at UW Tacoma, visit
<u>https://www.tacoma.uw.edu/chancellor/covid-19</u>

Sellmaier_000045

## Directory of Important Phone Numbers at UWT

| | | |
|---|---|---|
| Admissions | MAT 251 | 253.692.4742 |
| Campus Safety and Security | DOU-180 | 253.692.4416 |
| (911 for emergency assistance) | | |
| Campus Safety Escorts | | 253.692.4416 |
| Career Development and Education | MAT 106 | 253.692.4421 |
| Computer Lab | WG 108 | 253.692.HELP (4357) |
| Copy/Mail Center | MAT 053 | 253.692.5787 |
| Counseling Services | MAT 354 | 253.692.4522 |
| Office of the Chancellor | GWP 312 | 253.692.5646 |
| Disability Resources | MAT 354 | 253.692.4522 |
| Financial Aid | MAT 213 | 253.692.4374 |
| Library | SNO & TLB | 253.692.4440 |
| Office of Equity & Inclusion | WCG 102 | 253.692.4776 |
| Social Work & Criminal Justice | WCG 203 | 253.692.5820 |
| Student Advocacy & Support | MAT 209 | 253.692.5934 |
| Student Engagement | MAT 103 | 253.692.4481 |
| Student & Enrollment Services | MAT 352 | 253.692.4501 |
| University Book Store | 1754 Pacific Ave. | 253.692.4300 |
| Teaching and Learning Center | SNO 260 | 253.692.4417 |
| The Pantry | DOU 104 | 253.692.4776 |
| UW Tacoma Registrar | MAT 253 | 253.692.4913 |
| Veterans & Military Services | TLB 307A | 253.692.5813 |

*When using campus phones, dial the last 5 digits of numbers listed above, i.e. 2-5820 for School of Social Work & Criminal Justice.*

*A complete campus directory is accessible via www.tacoma.uw.edu.*

Sellmaier_000046

# EXHIBIT 50

Ex 28



# Transgender and Gender Nonconforming People

## ISSUE STATEMENT

*Gender identity* is a person's inherent sense of being a girl or woman, a boy or man, a blend of these, or an alternative gender; this term refers to a person's internal identity acquired and defined in relation to social norms (National Academies of Science, Engineering, and Medicine, 2011). Transgender is a broad term used to describe those whose gender, gender identity, or gender expression is in some sense different from, or transgresses social norms for, their birth-assigned sex. Terms such as transgender not only are used as overarching descriptors of a population, but also function as identity categories. Transgender includes those who identify as being transgender, transsexual, cross-dressers, androgynous, bigender, agender, no gender, multigender, genderqueer, and a growing number of people who do not identify as belonging to any sex or gender category at all; others affirm their identity within the sex binary of male or female and do not identify with the transgender label. Moreover, although there are transgender-identified people with medically diagnosed intersex conditions, most people with intersex conditions do not self-identify as transgender (Intersex Society of North America, n.d.).

Transgender and gender nonconforming (TGNC) people experience gender identity as different from the sex assigned to them at birth. One's gender identity is considered innate and therefore just as "biological" or "natal" as other components of sex, and although most people's gender identity is congruent with their biological sex (also known as a cisgender identity), some experience their gender identity to be discordant (Lev, 2004). Although gender identity is usually established in childhood, individuals may become aware that their gen-der identity is not in full alignment with their biological sex during childhood, adolescence, or adulthood. The developmental pathway of gender identity, for some, includes a progression through multiple stages of awareness, exploration, expression, and identity integration (American Psychological Association, 2015).

In 2011, using state-level data, the Williams Institute estimated the number of transgender people in the United States at 300 per 100,000 (Gates, 2011). Although there continues to be an absence of systematic data collection as to the number of TGNC individuals in the United States, estimates have the TGNC population at up to 1,333 per 100,000 or approximately 4 million people in the United States (Meier & Labuski, 2013). Analyses of census and other administrative data indicate that the number of transgender people who identify as transgender has increased over time. A recent survey suggests that at least 1 percent of millennials identify as transgender (Jones & Cox, 2015).

Some transgender people experience a profound sense of mismatch between their physical body and their gender identity. The fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association [APA], 2013) identifies this affective and cognitive distress as gender dysphoria (GD). This label replaced the diagnosis "gender identity disorder" in an effort to focus on the dysphoria as a clinical symptom rather than the person's gender identity as the diagnosis or problem (APA, 2013). Even with this change, labeling transgender people with a psychiatric diagnosis continues to be problematic in that it pathologizes a normal variation in human development (Moleiro & Pinto, 2015).

Harner_002544

There have been many debates about whether the GD diagnosis is increasing stigma and negative public sentiment or facilitating access to medical treatment (Lev, 2013). At the same time, a diagnosis is needed for insurance to cover medically necessary treatment. Such treatments (including cross-gender hormone therapy, electrolysis, or surgical and other procedures, as clinically indicated) are often an integral part of aligning the physical body with the experienced sense of self (Joel et al., 2015). There has been a growing movement to create a medical diagnosis outside of the mental health category within the next version of the International Classification of Diseases (ICD)-11 (Drescher, Cohen-Kettenis, & Winter, 2012). Until such a diagnosis is created, the GD diagnosis will continue to serve a narrow purpose.

In an effort to reduce barriers to accessing medical treatment, an increasing number of providers of transgender medical care are using an informed consent model (Deutsch, 2016). This model strengthens the patient–medical provider relationship, removes the dual role of mental health provider as both a clinician and a gatekeeper, and clarifies the role of the mental health provider as a member of the interdisciplinary team. However, when present, insurance coverage can vary widely and insurers may continue to require mental health assessments before authorizing some surgical benefits.

Although the number of private insurance companies providing coverage for sex reassignment surgery is limited, an increasing number of large private sector employers have taken steps to actively remove exclusions on transgender health care from their employer-provided plans (Human Rights Campaign [HRC], 2016b; Thaler, 2007). Through persistent advocacy from the allied health professions, as well as many civil rights groups and transgender activists, federal agencies are implementing policies and regulations that promote equity among lesbian, gay, and bisexual (LGB) and TGNC people. In April 2016, the U.S. Department of Health and Human Services (HHS) issued a regulation regarding implementation of the Patient Protection and Affordable Care Act (ACA) Section 1557 prohibition against sex discrimination, which extends to gender identity; with transgender-specific exclusions now prohibited in nearly all health plans in the United States, equity in coverage of health services is required. The regulation extends to all Marketplace, Medicare, and Medicaid plans, as well as to TriCare and most self-insured health benefits plans. Medically necessary transition-related services for transgender people must be covered without exclusion, when similar medically necessary services are covered for others (Transgender Law Center, 2016; HHS, 2015). In 2011, the U.S. Department of Veterans Affairs, Veterans Health Administration (VA, VHA) released the Providing Health Care for Transgender and Intersex Veterans Directive (VHA Directive 2011-024), which established policy and developed guidance related to accessing transition-specific health care for transgender and intersex patients enrolled in the VHA; in 2013 the directive was reissued (VHA Directive 2013-003). VHA is currently working on updating the directive and may begin permitting access to gender confirmation surgeries (Shane, 2016; VA, VHA, 2016). On June 30, 2016, the U.S. Department of Defense (DOD) announced that, effective immediately, the U.S. military will have a policy allowing for open transgender service. And, beginning on October 3, 2016, transgender service members are eligible for access to transition-specific health care. In addition, a training program is being developed and all service members will be required to complete the trainings (DOD, 2016).

Barriers to care persist, and many TGNC people experience discrimination, ranging from subtle to severe, when accessing housing, health care, employment, education, public assistance, and other social services (Grant et al., 2011). Healthy People 2020 found significant health disparities for transgender people, including lack of insurance or coverage for transition-related care; lack of U.S. Food and Drug Administration approval for transgender hormonal therapies; major disparities in treatment, testing, and prevention, despite increasing data that transgender people are at risk for higher rates of HIV and other infectious diseases such as tuberculosis and hepatitis; violence and murder; suicide and mental health issues; lack of public health infrastructure,

Harner_002545

including trained providers and data collection; high levels of substance abuse and lack of treatment; and high levels of tobacco use and lack of treatment (HHS, Healthy People 2020, 2016).

A severe lack of competent health providers, including mental health and primary care providers, indicates that those with health care coverage have limited access to competent providers. Despite changes in the ACA, insurance administrators continue to limit the range of covered transition-related care. Currently, no population-based surveys collecting data on transgender or gender minority youths exist (Gender Identity in U.S. Surveillance [GenIUSS] Group, 2014). This gap affects the health and wellness of TGNC people. One startling example is data on TGNC people living with HIV/AIDS in the United States. While recognizing the gaps in population measurement, the Centers for Disease Control and Prevention (CDC) has found a higher prevalence of HIV within the transgender community, with transgender women less likely to be on antiretroviral therapy or having achieved viral suppression. Racial and ethnic disparities exist within the transgender community as well, with black transgender women more likely to test HIV positive than other races or ethnicities. Furthermore, few health care providers receive adequate training or are knowledgeable about transgender people's health issues and their unique needs (CDC, 2016).

Social determinants affecting the health of TGNC individuals are rooted in oppression and discrimination. Examples include legal discrimination in access to health insurance, employment, housing, marriage, adoption, and retirement benefits; lack of laws protecting against bullying in schools; lack of social programs targeted to and appropriate for LGB and TGNC youths, adults, and elders; and shortage of health care and behavioral health care providers who are knowledgeable and culturally competent in LGB and TGNC health (HHS, 2016). TGNC people continue to experience dismissal from jobs, eviction from housing, and denial of services, even by police officers and medical emergency professionals; inequities in educational settings and other forms of TGNC-related discrimination may contribute to the significant economic disparities of TGNC people (Movement Advancement Project, 2015). No federal laws currently protect individuals from discrimination on the basis of gender identity or gender expression; however, the U.S. Equal Employment Opportunity Commission (EEOC) interprets and enforces Title VII's prohibition of sex discrimination as forbidding any employment discrimination based on gender identity or sexual orientation, and this will be applied regardless of any contrary state or local laws. In addition, a number of federal agencies have issued clear guidance that such discrimination is considered sex discrimination (Office of Personnel Management, 2015; EEOC, 2016).

Despite increased public awareness, no individual or community faces more social judgment and stigma, verbal harassment, and physical violence than TGNC people, often in tandem with racial and ethnic discrimination (Jones & Cox, 2015; Juang, 2006; National Black Justice Coalition, 2016). Many transgender children and youths face harassment and violence in school environments, and those who do not feel safe or valued at school cannot reach their potential (D'Augelli, Grossman, & Starks, 2006; GenIUSS Group, 2014). Many jurisdictions, including states and school districts, have policies or guidance against bullying, with an increasing number having policies ensuring that TGNC children and youths are welcomed in school and school-sanctioned programs. In May 2016, the U.S. Department of Education and the U.S. Department of Justice (DOJ) released guidance clarifying that Title IX of the Education Amendments of 1972 states that schools receiving federal money may not discriminate based on a student's sex, including a student's transgender status. The guidance makes clear that both federal agencies treat a student's gender identity as the student's sex for purposes of enforcing Title IX (DOJ, 2016). However, the backlash generated by such policies is an indicator of a continuing lack of understanding. There are also still too few support resources for TGNC children, their parents, or surrounding social institutions, leaving transgender youths particularly vulnerable to so-called "reparative therapy," which evidence has discounted as both harm-

Harner_002546

ful and unethical (CSWE, 2016; NASW, 2015a, 2015b; Substance Abuse and Mental Health Services Administration, 2015). Restrooms, the most mundane of public and workplace amenities, often become sites of harassment and confrontation, with access often denied and increasingly used as a vehicle for codifying discrimination in state-level public access laws (HRC, 2016a; Transgender Law Center, 2005). Although the federal government, numerous local jurisdictions, and many employers across the country have policies ensuring access to restrooms and other facilities consistent with gender identity, these policies are a continuously contested patchwork of policy and law.

Few studies or resources exist regarding aging and the transgender population. Residential and care facilities pose familiar barriers such as sex segregation and lack of culturally competent caregivers at a time of life when transgender individuals may be unable to advocate for themselves; many older transgender people may also fear abuse and neglect, whether aging in place or in residential care facilities. Transgender people report higher rates of disability, general poor health, depression, anxiety, loneliness, and suicidal ideation, with the prospect of entering their later years with little to no social or community supports. Although gaps remain, there is a growing movement toward supportive residential and social programs that are affirming to LGB and TGNC individuals, couples, and families (Cook-Daniels, 1997; Services and Advocacy for Gay, Lesbian, Bisexual, and Transgender Elders, 2016).

A host of institutional settings in the United States are hostile to transgender people, especially those that are segregated by sex, many of which require transgender individuals to have undergone genital surgery to be placed according to their gender identity. One in five transgender people in the United States have experienced discrimination when seeking a home, and more than one in 10 have been evicted from their homes, because of their gender identity. Many homeless shelters and other facilities have updated policies to welcome transgender individuals, but many still refuse to house clients according to gender identity, placing individuals at risk of sexual propositions,

harassment, and assault. Sex-based dress codes affect youths in particular, who are often disciplined and ejected from the facilities for violating such policies (National Center for Transgender Equality, 2016).

Although many states still require proof of genital or other surgery before altering the sex marker on birth certificates or driver licenses, the Social Security Administration (SSA) issued a policy to replace the requirement of medical certification of sex reassignment surgery with the option of providing a passport or birth certificate with the accurate gender or a medical certification that the person has received appropriate clinical treatment (SSA, Program Operations Manual System, 2013; U.S. Department of State, Bureau of Consular Affairs, 2010).

Inaccurate identity documentation is a common barrier to employment, housing, and appropriate services from gender-segregated facilities. The increased vulnerability—to violence and harassment, to loss of social support and mounting despair—suggests that policies that prevent changing documentation to align with gender identity represent serious barriers to health and well-being.

Some jurisdictions have begun to implement policies that address the needs of transgender individuals, often as a result of protracted legal battles. However, those incarcerated in jails and prisons in most jurisdictions still face familiar barriers to accessing gender-appropriate facilities; access to ongoing hormone therapy and other transgender transition-related procedures, including surgery; as well as solitary confinement just because of who they are (Correctional Association of New York, 2015; Sylvia Rivera Law Project, 2007; Thaler, 2007). In recent years, these concerns have gained national attention. For example, regulations to implement the Prison Rape Elimination Act of 2003 (PREA) (P.L.108-79) include specific provisions aimed at protecting transgender prisoners.

Clients benefit from treatment with clinicians who have expertise in transgender and gender nonconformity concerns, with standards of care for treatment indicating the use of approaches responsive to a variety of identities and to individual clinical presentations. Mental and medical health providers are often

Harner_002547

unaware of co-occurring disorders, resulting in delays in treatment for transgender people (Tom Waddell Health Center, 2001; World Professional Association for Transgender Health [WPATH], 2011). Lack of appropriately trained service providers, including mental health providers, makes it hard to obtain culturally competent legal, medical, and advocacy services (Testa et al., 2012; Xavier, Honnold, & Bradford, 2007). Social workers are frontline providers of mental health and other services for many transgender individuals, yet most schools of social work have little to no content in their curricula on transgender concerns.

One step toward a trained and competent health workforce is the field guide issued by the Joint Commission (2014), designed for use by hospitals to create a more welcoming, safe, and inclusive environment that contributes to improved health care quality for LGB and transgender patients and their families.

## POLICY STATEMENT

NASW asserts that discrimination and prejudice directed against any individuals on the basis of gender identity or gender expression, whether actual or perceived, are damaging to the social, emotional, psychological, physical, and economic well-being of the affected individuals, as well as society as a whole. NASW supports, promotes, and affirms the following.

### Social Work Education and Professional Development

■ policies in schools of social work that ensure inclusion and equity for all TGNC people, infusion of relevant practice examples and content across all areas of the curriculum, and equal opportunity for research and field practice of relevance to and for TGNC people

■ development and provision of culturally competent training for all personnel and volunteers within private and public schools of social work

■ culturally competent continuing education programs focused on micro, mezzo, and macro practice with TGNC children, youths, and adults and their families across the life course, including the role of social workers in provision of transgender transition-related health care, ethical practice, and holistic assessment and effective interventions and community resources.

### Antidiscrimination

■ full human rights and the end to all public and private discrimination on the basis of gender identity and gender expression, whether actual or perceived, and regardless of assigned sex at birth, including denial of access to employment, housing, public accommodations, education, appropriate treatment in gender-segregated facilities matching self-identification, familial status, appropriate medical care and mental health care coverage and appropriate identity documents

■ repeal of discriminatory legislation and regulations and the passage of legislation, regulations, and institutional policy to protect the rights, legal benefits, and privileges of people of all gender identities and expressions

■ inclusion of nondiscrimination policy in all public and private agencies that train or employ social workers, to include "sexual orientation, gender identity or expression," provision of a safe and affirmative work space and learning environment; use of respectful address (asserted name, pronouns); access to facilities, service, and programs in accordance with the client's or staff member's self-identified gender identity; transgender-inclusive health care access and health insurance options; use of transgender-inclusive language and communications

■ development and funding of supportive and knowledgeable practice environments for clients and colleagues

■ active outreach, recruitment, mentoring, and leadership development of TGNC people to the profession of social work

■ condemnation of the teaching of social work students in CSWE-accredited programs to use reparative or conversion therapy approaches,

Harner_002548

and an end to the use of reparative or conversion therapies by professional social workers.

## Public Awareness and Advocacy

■ safe and secure educational environments, at all levels of education, in which children, youths, and adults may obtain an education free from discrimination, harassment, violence, and abuse and are afforded confidentiality and access to culturally competent staff and volunteers

■ convening of, and participation in, coalitions with other professional associations and progressive organizations to lobby on behalf of the civil rights for all people of diverse gender expression and identity, with recognition of the transgender individuals who experience multiple intersections of oppression based on racism, poverty, heterosexism, cissexism, ageism, ableism, and mental and behavioral health status

■ implementation of nondiscrimination and antibullying policies, with specific inclusion of TGNC youths and adults, in all educational, housing, health, and social welfare programs and institutions

■ development of programs, training, and information that promote proactive efforts to eliminate psychological, social, and physical harm directed toward TGNC people

■ development of evidence-driven programs within schools, child and youth services, child welfare, and older adult agencies that educate students, faculty, and staff about the range of gender diversity and the needs of TGNC people across the life span

■ development and implementation of policies ensuring that transgender individuals placed in sex-segregated rooms or facilities are placed according to their self-identified gender identity, including in jails and prisons, foster care, group homes and residential treatment centers, homeless and domestic violence shelters, substance abuse and recovery programs, and elder care services and housing

■ increased public and private funding for education, treatment services, and research on behalf of people of diverse gender expression and gender identity.

## Health and Mental Health Services

■ open availability of comprehensive health, psychological, and social support services for transgender people and their families that are respectful and inclusive, and provided by skilled, educated professionals who have been trained to work effectively with TGNC people

■ the right of all individuals to have transgender inclusive, comprehensive health insurance including medically necessary transition-related services

■ referral to licensed medical specialists in accordance with WPATH's internationally accepted standards of care

■ development of transgender health programs using the informed consent model of care that include professional social work as an interdisciplinary component of trans-affirmative integrated health care settings

■ implementation of a national database and annual comprehensive reports on violence against TGNC people to include hate crimes, bullying, and youth violence and discrimination

■ implementation and funding of programs to address the education, housing, employment, health, and mental health needs of adults and youths who are struggling with their gender identity and who are thus at high risk of suicide, vulnerable to violence or assault, at increased risk of HIV/AIDS, or otherwise at risk

■ implementation of electronic confidential record systems that capture asserted names, pronouns, and options for capturing sex assigned at birth; legal or asserted sex; and asserted gender identities, including the mandate for federal, state, and local agencies to collect data about individuals' sex and gender

■ implementation of a new, more appropriate medical diagnosis within the ICD-11 with sub-

Harner_002549

sequent elimination of the GD diagnosis from the DSM-5

▪ inclusion of TGNC individuals in health surveys and data collection, census data, and public health monitoring data at state and national levels through inclusion of questions on gender identity (independent of sexual orientation).

## Legal and Political Action

▪ passage of federal regulation to simplify sex change policies to allow licensed mental health and medical providers to certify a sex change for the purpose of changing the gender marker on legal documentation

▪ implementation by federal policies enacted to comply with PREA

▪ passage of laws at the local, state, and federal levels that prohibit use of reparative or conversion therapies by professionally trained social workers or people using the title of social worker

▪ legal recognition of TGNC individuals, including identity documents that reflect the gender with which they identify in life and in death, regardless of assigned sex at birth or subsequent surgical or other medical interventions

▪ passage of federal laws that will prohibit discrimination against, protect the civil rights of, and preserve the well-being of TGNC individuals in education, public accommodations, housing, inheritance and pensions, employment, legal document identification, relationship and familial status, health and other types of insurance, child custody, property, and other areas.

## REFERENCES

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Arlington, VA: American Psychiatric Publishing.

American Psychological Association. (2015). Guidelines for psychological practice with transgender and gender nonconforming people. *American Psychologist, 70,* 832–864.

Centers for Disease Control and Prevention. (2016). *HIV among transgender people.* Retrieved from http://www.cdc.gov/hiv/group/gender/transgender/

Cook-Daniels, L. (1997). Lesbian, gay male, bisexual and transgendered elders: Elder abuse and neglect issues. *Journal of Elder Abuse & Neglect, 9*(2), 35–49.

Correctional Association of New York. (2015). *Women in Prison Project (WIPP) brochure.* Retrieved from http://www.correctional association.org/resource/wipp-brochure-2014

Council on Social Work Education. (2016). *Position statement on conversion/reparative therapy.* Retrieved from http://www.cswe.org/File.aspx?id=85010

D'Augelli, A. R., Grossman, A. H., & Starks, M. T. (2006). Childhood gender atypicality, victimization, and PTSD among lesbian, gay, and bisexual youth. *Journal of Interpersonal Violence, 21,* 1462–1482.

Deutsch, M. B. (2016). *Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people* (2nd ed.). Retrieved from Center of Excellence for Transgender Health Web site: http://transhealth.ucsf.edu/protocols

Drescher, J., Cohen-Kettenis, P., & Winter, S. (2012). Minding the body: Situating gender identity diagnoses in the ICD-11. *International Review of Psychiatry, 24,* 568–577.

Gates, G. (2011). *How many people are lesbian, gay, bisexual, and transgender?* Retrieved from http://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-How-Many-People-LGBT-Apr-2011.pdf

Gender Identity in U.S. Surveillance Group. (2014). *Best practices for asking questions to identify transgender and other gender minority respondents on population-based surveys.* Los Angeles: UCLA School of Law, Williams Institute.

Grant, J., Mattet, L., Tasnis, J., Harrison, J., Herman, J., & Kersling, M. (2011). *Injustice at every turn: A report of the National Transgender Discrimination Survey.* Retrieved from http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_summary.pdf

Harner_002550

Human Rights Campaign. (2016a). *Anti-transgender legislation*. Retrieved from http://www.hrc.org/resources/unprecedented-onslaught-of-state-legislation-targeting-transgender-american

Human Rights Campaign. (2016b). *Finding insurance for transgender-related healthcare*. Retrieved from http://www.hrc.org/resources/finding-insurance-for-transgender-related-healthcare

Intersex Society of North America. (n.d.). *What's the difference between being transgender or transsexual and having an intersex condition?* Retrieved from http://www.isna.org/faq/transgender

Joel, D., Zohar, B., Tavor, I., Wexler, N., Gaber, O., Stein, Y., et al. (2015). Sex beyond the genitalia: The human brain mosaic. *Proceedings of the National Academy of Sciences, 112*(50), 15468–15473.

Joint Commission. (2014). *Advancing effective communication, cultural competence, and patient- and family-centered care for the lesbian, gay, bisexual, and transgender (LGBT) community*. Retrieved from https://www.jointcommission.org/lgbt/

Jones, R., & Cox, D. (2015). *How race and religion shape millennial attitudes on sexuality and reproductive health: Findings from the 2015 Millennials, Sexuality, and Reproductive Health Survey*. Washington, DC: Public Religion Research Institute.

Juang, R. M. (2006). Transgendering the politics of recognition. In S. Stryker & S. Whittle (Eds.), *The transgender studies reader* (pp. 706–717). New York: Routledge.

Lev, A. I. (2004). *Transgender emergence: Therapeutic guidelines for working with gender-variant people and their families*. Binghamton, NY: Haworth Clinical Practice Press.

Lev, A. I. (2013). Gender dysphoria: Two steps forward, one step back. *Clinical Social Work Journal, 41*, 288–296.

Meier, S., & Labuski, C. M. (2013). The demographics of the transgender population. In A. K. Baumle (Ed.), *International handbook of the demography of sexuality* (pp. 289–327). New York: Springer.

Moleiro, C., & Pinto, N. (2015). Sexual orientation and gender identity: Review of concepts, controversies and their relation to psychopathology classification systems. *Frontiers in Psychology, 6*, 1511. doi:10.3389/fpsyg.2015.01511

Movement Advancement Project. (2015). *Paying an unfair price: The financial penalty of being transgender in America*. Retrieved from http://www.lgbtmap.org/unfair-price-transgender

National Academies of Science, Engineering, and Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding*. Washington, DC: National Academies Press.

National Association of Social Workers. (2015a). *Code of ethics of the National Association of Social Workers*. Washington, DC: Author.

National Association of Social Workers. (2015b). *Sexual orientation change efforts and conversion therapy with LGBT persons: Position statement*. Washington, DC: Author.

National Black Justice Coalition. (2016). *National Transgender Discrimination Survey*. Retrieved from http://nbjc.org/issues/transgender-equality

National Center for Transgender Equality. (2016). *Housing and homelessness*. Retrieved from http://www.transequality.org/issues/housing-homelessness

Office of Personnel Management. (2015). *Addressing sexual orientation and gender identity discrimination in federal civilian employment: A guide to employment rights, protections, and responsibilities*. Retrieved from https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/addressing-sexual-orientation-and-gender-identity-discrimination-in-federal-civilian-employment.pdf

Prison Rape Elimination Act of 2003, P.L.108-79, 117 Stat. 972 (Sept. 4, 2003). Retrieved from https://www.congress.gov/108/plaws/publ79/PLAW-108publ79.pdf

Services and Advocacy for Gay, Lesbian, Bisexual, and Transgender Elders. (2016). *Transgender aging*. Retrieved from https://www.sageusa.org/issues/transgender.cfm

Shane, L. (2016). *New rule would allow VA sex reassignment surgery to transgender vets*. Retrieved from http://www.militarytimes.com/story/veterans/2016/06/02/va-rule-sex-reassignment-surgery/85326564/

Harner_002551

Social Security Administration, Program Operations Manual System. (2013). *RM 10212.200 changing numident data for reasons other than name change*. Retrieved from https://secure.ssa.gov/poms.nsf/lnx/0110212200

Substance Abuse and Mental Health Services Administration. (2015). *Ending conversion therapy: Supporting and affirming LGBTQ youth* (HHS Publication No. [SMA] 15-4928). Rockville, MD: Author.

Sylvia Rivera Law Project. (2007). *It's war in here: A report on the treatment of transgender and intersex people in New York State men's prisons*. Retrieved from http://srlp.org/files/warinhere.pdf

Testa, R. J., Sciacca, L. M., Wang, F., Hendricks, M. L., Goldblum, P., Bradford, J., & Bongar, B. (2012). Effects of violence on transgender people. *Professional Psychology: Research and Practice, 43*, 452–459.

Thaler, C. (2007). *Putting transgender health care myths on trial*. Retrieved from http://www.lambdalegal.org/publications/putting-transgender-health-care-myths-on-trial

Tom Waddell Health Center. (2001). *Protocols for hormonal reassignment of gender*. Retrieved from http://www.dph.sf.ca.us/chn/Hlth Ctrs/HlthCtrDocs/TransGendpro tocols.pdf

Transgender Law Center. (2005). *Peeing in peace: A resource guide for transgender activists and allies*. San Francisco: Author.

Transgender Law Center. (2016). *Fact sheet: Nondiscrimination under Section 1557 of the Affordable Care Act*. Retrieved from http://transgenderlawcenter.org/wp-content/uploads/2016/05/2016-05-13-ACA-1557-Fact-Sheet-final.pdf

U.S. Department of Defense. (2016). *In-service transition for transgender service members* (DOD Instruction 1300.28). Retrieved from http://www.defense.gov/Portals/1/features/2016/0616_policy/DoD-Instruction-1300.28.pdf

U.S. Department of Health and Human Services. (2015). *Section 1557 of the Patient Protection and Affordable Care Act*. Retrieved from http://www.hhs.gov/civil-rights/for-individuals/section-1557/

U.S. Department of Health and Human Services, Healthy People 2020. (2016). *Lesbian, gay, bisexual, and transgender health*. Retrieved from https://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health

U.S. Department of Justice. (2016). *U.S. departments of justice and education release joint guidance to help schools ensure the civil rights of transgender students*. Retrieved from https://www.justice.gov/opa/pr/us-departments-justice-and-education-release-joint-guidance-help-schools-ensure-civil-rights

U.S. Department of State, Bureau of Consular Affairs. (2010). *Gender transition applicants*. Retrieved from https://travel.state.gov/content/passports/en/passports/information/gender.html

U.S. Department of Veterans Affairs, Veterans Health Administration. (2016). *Providing health care for transgender and intersex veterans* (VHA Directive 2013-003). Retrieved from http://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=2863

U.S. Equal Employment Opportunity Commission. (2016). *What you should know about EEOC and the enforcement protections for LGBT workers*. Retrieved from https://www.eeoc.gov/eeoc/newsroom/wysk/enforcement_protections_lgbt_workers.cfm

World Professional Association for Transgender Health. (2011). *Establishing standards of care for gender identity disorders*. Retrieved from http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1347&pk_association_webpage=4233

Xavier, J., Honnold, J. A., & Bradford, J. (2007). *The health, health-related needs, and lifecourse experiences of transgender Virginians*. Richmond: Virginia Department of Health.

*Policy statement approved by the NASW Delegate Assembly, January 2017. This policy statement supersedes the policy statement on Transgender and Gender Identity Issues approved by the Delegate Assembly in August 2008. For further information, contact the National Association of Social Workers, 750 First Street, NE, Suite 800, Washington, DC 20002-4241. Telephone: 202-408-8600; e-mail: press@socialworkers.org*

Harner_002552

# EXHIBIT 51

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLAUDIA ARIAS, an individual,

Plaintiff,

v.

STATE OF WASHINGTON – UNIVERSITY OF WASHINGTON TACOMA ("UWT"), a state educational institute; VERN HARNER, officially and individually; CLAUDIA SELLMAIER, officially and individually; ANDREA HILL, officially and individually; KEVA MILLER, officially and individually; and ELAVIE NDURA, officially and individually,

Defendants.

CASE NO.  3:25-cv-05079-DGE

**UNIVERSITY OF WASHINGTON TACOMA'S ("UWT") RESPONSES TO ARIAS' FIRST SET OF REQUESTS FOR ADMISSIONS PROPOUNDED TO STATE OF WASHINGTON - UWT**

TO:        CLAUDIA ARIAS, Plaintiff;

AND TO:    JOAN K. MELL of III Branches Law, PLLC.

Defendant University of Washington ("UW" or "Defendant") hereby responds and objects to Plaintiff's First Set of Requests for Admissions to Defendant University of Washington Tacoma.

UNIVERSITY OF WASHINGTON TACOMA'S ("UWT") RESPONSES TO ARIAS' FIRST SET OF REQUESTS FOR ADMISSIONS PROPOUNDED TO STATE OF WASHINGTON - UWT - 1
CASE NO. 3:25-cv-05079-DGE

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

## REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1.:**  The attached document at **Exhibit A** is a true and correct copy of a mission statement for UWT.

**ANSWER:**  Denied.

**REQUEST FOR ADMISSION NO. 2.:**   **Exhibit B** is a true and correct copy of University of Washington's Home Page on "Race & Equity at the UW" for UWT.

**ANSWER:** Denied.  By way of further answer, the University admits that Exhibit B was the landing page for the UW's Race and Equity Initiative website until 2024.

**REQUEST FOR ADMISSION NO. 3.:**   **Exhibit C** is a true and correct copy of a Diversity Blueprint for UWT.

**ANSWER:**  Defendant admits that Exhibit C is a true and correct copy of the 2022-2026 Diversity Blueprint for the University of Washington, inclusive of the University of Washington Tacoma. Except as expressly admitted, denied.

**REQUEST FOR ADMISSION NO. 4.:**   **Exhibit D** is a true and correct copy of a Student Conduct Policy for Academic Misconduct and Behavioral Misconduct for UWT.

**ANSWER:**  Defendant admits that Exhibit D is a true and correct copy of Student Governance Policy 209 Conduct Policy for Academic Misconduct and Behavioral Misconduct for the University of Washington, inclusive of the University of Washington Tacoma.  Except as expressly admitted, denied.

**REQUEST FOR ADMISSION NO. 5.:**  **Exhibit E** is a true and correct copy of a Role and Mission Statement for UWT.

UNIVERSITY OF WASHINGTON TACOMA'S ("UWT")
RESPONSES TO ARIAS' FIRST SET OF REQUESTS FOR
ADMISSIONS PROPOUNDED TO STATE OF
WASHINGTON - UWT - 2
CASE NO. 3:25-cv-05079-DGE

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

**ANSWER:**  Defendant admits that Exhibit E is a true and correct copy of Regent Policy No. 1 – Role and Mission of the University, applicable to all three campuses, including the University of Washington Tacoma.  Except as expressly admitted, denied.

**REQUEST FOR ADMISSION NO. 6.:**   **Exhibit F** is a true and correct copy of a Statement of Ethical Principles for UWT.

**ANSWER:**   Defendant admits that Exhibit F is a true and correct copy of Regent Policy No. 2 – Statement of Ethical Principles, applicable to all three campuses, including the University of Washington Tacoma.   Except as expressly admitted, denied.

**REQUEST FOR ADMISSION NO. 7.:**   **Exhibit G** is a true and correct copy of a Statement on Diversity for UWT.

**ANSWER:** Defendant admits that Exhibit G is a true and correct copy of UW Regent Policy No. 33 – Statement on Diversity, applicable to all UW campuses, inclusive of UWT. Except as expressly admitted, denied.

DATED this 18th day of February, 2026.

Respectfully submitted,

SUMMIT LAW GROUP, PLLC
Attorneys for University of Washington Tacoma,
Vern Harner, Claudia Sellmaier, Andrea Hill, and
Keva Miller

By *s/Seth J. Berntsen*
Seth J. Berntsen, WSBA No. 30379
Rebecca R. Singleton, WSBA No. 57719
*sethb@summitlaw.com*
*rebeccas@summitlaw.com*

UNIVERSITY OF WASHINGTON TACOMA'S ("UWT")
RESPONSES TO ARIAS' FIRST SET OF REQUESTS FOR
ADMISSIONS PROPOUNDED TO STATE OF
WASHINGTON - UWT - 3
CASE NO. 3:25-cv-05079-DGE

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused a true and correct copy of the foregoing to be served, as indicated, upon the following:

Joan K. Mell
III Branches Law, PLLC
1019 Regents Blvd, Suite 204
Fircrest, WA 98466
(253) 566-2510
joan@3brancheslaw.com

☐ US Mail, First Class
☐ By Legal Messenger
☒ Via Email
☐ Via CM/ECF

DATED this 18th day of February, 2026.

_s/Dominique Barrientes_
Dominique Barrientes, Legal Assistant
_dominiqueb_@summitlaw.com

UNIVERSITY OF WASHINGTON TACOMA'S ("UWT")
RESPONSES TO ARIAS' FIRST SET OF REQUESTS FOR
ADMISSIONS PROPOUNDED TO STATE OF
WASHINGTON - UWT - 4
CASE NO. 3:25-cv-05079-DGE

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

EXHIBIT 52

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
COUNTY OF PIERCE

| | |
|---|---|
| CLAUDIA ARIAS, an individual,<br><br>                                    Plaintiff,<br><br>                    v.<br><br>STATE OF WASHINGTON – UNIVERSITY OF WASHINGTON TACOMA ("UWT"), a state educational institute; VERN HARNER, officially and individually; CLAUDIA SELLMAIER, officially and individually; ANDREA HILL, officially and individually; and KEVA MILLER, officially and individually,<br><br>                                    Respondents. | No. 3:25-cv-05079<br><br>ARIAS' FIRST SET OF REQUESTS FOR ADMISSIONS PROPOUNDED TO STATE OF WASHINGTON - UWT |

TO: State of Washington by and through University of Washington at Tacoma

AND TO ITS ATTORNEYS: Seth J. Berntsen and Rebecca R. Singleton

Pursuant to Rules of Civil Procedure 26, and 36, you are served with Arias' First Set of Requests for Admissions Propounded to the Defendant State/UWT. Return the answers and responses under oath to III Branches Law, PLLC, 1019 Regents Blvd., Suite 204, Fircrest, WA 98466 within thirty (30) days of service.

**INSTRUCTIONS**

1.    The following requests for admissions shall be answered to in the space provided.  These requests for admissions are continuing in nature and you must supplement your answers

CLAUDIA ARIAS FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED TO UWT - 1 of 6
CASE NO.: 3:25-cv-05079-DGE

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

pursuant to CR 26(e). Supplemental responses should follow the same format. A word version of the document accompanies service to allow the responding party to interlineate a complete response as needed.

2. If you object or otherwise decline to answer any of the following Requests for Admissions fully and completely, set forth with specificity the exact grounds upon which you rely so as to permit the Court to determine the legal sufficiency of your objection, and provide the most responsive information you are willing to provide without a Court Order.

3. If you claim that any of the Requests for Admissions call for information protected by the attorney-client privilege, work product doctrine, or other applicable privilege, set forth with specificity the grounds upon which you rely so as to permit the Court to determine the legal sufficiency of your objection, and provide the most responsive information you are willing to provide without a court order.

4. If you are unable to answer any of the following Requests for Admissions fully and completely, after exercising due diligence to secure the information necessary to make full and complete answers, so state. In addition, answer each of the Requests for Admissions to the fullest extent possible, specifying your knowledge, and your inability to answer the remainder, and state whatever information or knowledge you may have concerning the unanswered portions of each Requests for Admissions.

## DEFINITIONS

1. The term "You", "Your", means the respondent, the State of Washington-UWT, and all agents, attorneys, other representatives, and all other persons acting or purporting to act on its behalf.

2. The term "UWT" means University of Washington Tacoma.

CLAUDIA ARIAS FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED TO UWT - 2 of 6
CASE NO.: 3:25-cv-05079-DGE

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

3.      The term "person" means any individual, firm, partnership, joint venture, corporations, proprietorship, association, or any other organization or entity.

4.      The terms "and" and "or" shall each be construed disjunctively or conjunctively so as to require the broadest possible answer in response to any request.

5.       The term "all" and "each" shall both be construed as all and each.

6.      The term "including" shall mean including, but not limited to.

7.      The terms "relating to", "relate to", and "related to", mean consisting of, identifying, concerning, referring to, alluding to, responding to, in connection with, commenting on, in response to, about, regarding, explaining, discussing, showing, describing, studying, reflecting, analyzing or constituting.

8.      The term "concerning" means, without limitation, the following concepts:  relating to, referring to, discussing, describing, pertaining to, analyzing, evaluating, estimating, containing, studying, surveying, projecting, recording, criticizing, reporting, commenting, reflecting, dealing with, evidencing or constituting, or otherwise involving, in whole or in part.

9.      The word "communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).  The meaning is inclusive of written, oral telephonic, digital, or other utterances of any nature whatsoever, shared, shown, and/or transferred between and/or among any person(s) such as statements, inquiries, discussions, conversations, dialogues, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, emails, faxes, notations, telegrams, diary entries, Facebook messages, blog posts, instagrams, tweets, advertisements, interviews, and all other documents as defined.  The phrase "communication between" is defined to include instances where one party addresses the other

CLAUDIA ARIAS FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED TO UWT - 3 of 6
CASE NO.: 3:25-cv-05079-DGE

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

party, but the other party does not respond, as well and instances in which the other party responds.

10.    The term "parties" or "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party means the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

## OBJECTIONS

These admissions do not seek disclosure of attorney-client communications or invasion of any other privileges protected under law.  However, in the event you object to answering any request for admission, in whole or in part, state your objection and the factual and legal reasons supporting the objection with particularity.  Any objection necessitating the entry of a confidentiality or protective order shall be communicated to us prior to the thirty (30) day deadline for answering and should not delay your timely responses to these requests for admissions.  If you object to answering only part of a request for admission, then specify the part to which you object and answer the remainder.  For any request for admission that you are denying, state the basis and factual predicate for denying the request for admission.  ANY OBJECTION THAT IS NOT ASSERTED MAY BE DEEMED TO HAVE BEEN WAIVED.

## REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1.:**  The attached document at **Exhibit A** is a true and correct copy of a mission statement for UWT.


**Admit_____**                    **Deny_____**


**REQUEST FOR ADMISSION NO. 2.:**   **Exhibit B** is a true and correct copy of University of Washington's Home Page on "Race & Equity at the UW" for UWT.

CLAUDIA ARIAS FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED TO UWT - 4 of 6
CASE NO.: 3:25-cv-05079-DGE

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

**Admit**_____                    **Deny**_____

**REQUEST FOR ADMISSION NO. 3.:**  **Exhibit C** is a true and correct copy of a Diversity Blueprint for UWT.

**Admit**_____                    **Deny**_____

**REQUEST FOR ADMISSION NO. 4.:**    **Exhibit D** is a true and correct copy of a Student Conduct Policy for Academic Misconduct and Behavioral Misconduct for UWT.

**Admit**_____                    **Deny**_____

**REQUEST FOR ADMISSION NO. 5.:**  **Exhibit E** is a true and correct copy of a Role and Mission Statement for UWT.

**Admit**_____                    **Deny**_____

**REQUEST FOR ADMISSION NO. 6.:**  **Exhibit F** is a true and correct copy of a Statement of Ethical Principles for UWT.

**Admit**_____                    **Deny**_____

**REQUEST FOR ADMISSION NO. 7.:**  **Exhibit G** is a true and correct copy of a Statement on Diversity for UWT.

CLAUDIA ARIAS FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED TO UWT - 5 of 6
CASE NO.: 3:25-cv-05079-DGE

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

**Admit**_____       **Deny**_____

Dated this 6th day of February, 2026 at Fircrest, Washington.

III Branches Law, PLLC

_____
Joan K. Mell, WSBA #21319
Attorney for Claudia Arias

CLAUDIA ARIAS FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED TO UWT - 6 of 6
CASE NO.: 3:25-cv-05079-DGE

# Exhibit A

# STUDENT SUCCESS AND INSTITUTIONAL MISSION AND EFFECTIVENESS

### 1.A.1. The institution's mission statement defines its broad educational purposes and its commitment to student learning and achievement.

Reflecting its vision and values, the University of Washington's mission statement highlights the institution's service to higher education and its unflagging commitment to the success of its students. Formulated in February 1981 and last modified 11 July 2019, this mission statement constitutes the UW Board of Regents' Policy No. 1:

"The primary mission of the University of Washington is the preservation, advancement, and dissemination of knowledge. The University preserves knowledge through its libraries and collections, its courses, and the scholarship of its faculty. It advances new knowledge through many forms of research, inquiry and discussion; and disseminates it through the classroom and the laboratory, scholarly exchanges, creative practice, international education, and public service. As one of the nation's outstanding teaching and research institutions, the University is committed to maintaining an environment for objectivity and imaginative inquiry and for the original scholarship and research that ensure the production of new knowledge in the free exchange of facts, theories, and ideas.

To promote their capacity to make humane and informed decisions, the University fosters an environment in which its students can develop mature and independent judgment and an appreciation of the range and diversity of human achievement. The University cultivates in its students both critical thinking and the effective articulation of that thinking.

As an integral part of a large and diverse community, the University seeks broad representation of and encourages sustained participation in that community by its students, its faculty, and its staff. It serves both non-traditional and traditional students. Through its three-campus system and through continuing education and distance learning, it extends educational opportunities to many who would not otherwise have access to them."

Plntffs000429

1.B.1. The institution demonstrates a continuous process to assess institutional effectiveness, including student learning and achievement and support services. The institution uses an ongoing and systematic evaluation and planning process to inform and refine its effectiveness, assign resources, and improve student learning and achievement.

Assessing institutional effectiveness at the University of Washington is a continuous process undertaken to support its mission. As a public institution of higher education, the University methodically assesses student learning and achievement outcomes, as well as its practices, structures, and systems. These systematic assessment practices generate data that allow the University to inform and refine its efforts on all fronts.

With respect to student learning and achievement, systematic assessment at the University is conducted at various levels.

**Course-level Assessment**
Reviews of instruction by students and colleagues are required through Section 24-57 of the Faculty Code. Instructors may choose to engage the mid-quarter and end-of-quarter student course evaluation instruments through the Office of Educational Assessment's (OEA's) IASystem or tools developed on their own or by their department, college, or school. In addition to systematic reviews of instruction, instructors implement a range of other assessments at their own discretion and/or through their participation in myriad faculty-development programs. These efforts are described at greater length in Standard 1.C.1.

**Department-level Assessment**
At the department level, performance-based measures (e.g., capstone courses, projects, portfolios, national exams) as well as perception-based measures (e.g., senior surveys, employer surveys) are used to assess the extent to which learning occurs in the major. In addition, all departments as well as schools and colleges that are not departmentalized participate in an academic program review every ten years, which involves an assessment of the unit's undergraduate and graduate curricula by internal and external referees. The UW is home to 90+ undergraduate and graduate programs that are accredited by a specialized accrediting body to ensure alignment with field and disciplinary quality standards.

All departments have curriculum committees that use assessment information, as well as information about national trends in their field/discipline, budgetary constraints, and staff expertise, to review and revise, as necessary, their unit's curriculum. Routine curricular reviews help align course offerings with student learning goals, and in turn, course goals are mapped onto departmental and college goals. Approaches to

Plntffs000430

# Exhibit B



**HOME**    ADVISORY COMMITTEE    ACTIONS AND UPDATES ▾    CAMPUS PROGRAMS    RESOURCES    STORIES

# RACE & EQUITY AT THE UW

**This page has been archived and is not updated.**

This page is kept only for reference, research, or recordkeeping purposes and is no longer updated. If you need assistance, please contact Office of Minority Affairs and Diversity at cpromad@uw.edu.

Anti-racism and equity must be at the core of everything we do. We reaffirm this commitment: that together we continue to combat the racism and inequities, both individual and institutional, that persist at the University of Washington and throughout our society.

President Ana Mari Cauce launched the UW Race & Equity Initiative in 2015 with a challenge: that all of us — students, faculty, staff and university leadership — take personal responsibility for addressing our own biases and transforming the University culture to make it more equitable.

To improve and sustain equity, inclusion and belonging for all at the UW, as well as in the local, regional and global communities we serve, we must directly confront bias and racism at the individual, institutional and systemic levels. We approach this in three key ways:

**Confronting individual bias and racism**                                                                    ⌄

Progress begins with each of us. We start by not being part of the problem — by acknowledging that we are not all the same, and that recognizing, valuing and celebrating our differences makes our University and our world stronger. Every person has biases, but when we learn to identify, question and interrupt our own biases, then we can change our attitudes and our interactions for the better. We are all teachers and learners when it comes to advancing a more equitable and just discourse that leads to change.

The Race & Equity Initiative works to foster the difficult but necessary conversations and personal learning experiences that will help us interrupt bias and take action to improve equity.

**Transforming institutional policies and practices**                                                        >
**Accelerating systemic change**                                                                              >



## Equity Focus: story hub

Students, faculty and staff across our three campuses are working hard to advance diversity, equity, inclusion and belonging at the UW. Visit our Equity Focus page to read about UW community members who are making a difference.

READ STORIES >

## Campus programs

Programs and initiatives that advance the goals of race and equity abound throughout the University's campuses, colleges and schools.

VIEW PROFILES >





## Anti-racism resources

Looking to learn more, get involved, take action? Find a wealth of resources, both within and beyond the UW, for learning about equity and working to achieve it.

READ MORE >



### Campus climate survey results

As part of our commitment to transparency and inclusion, the UW completed its largest-ever campus climate survey across all campuses. Current students, faculty and staff can view executive summaries and campus-level reports. *A NetID login is required.*

Read reports >



### Race and equity is a tri-campus effort

Find resources for the UW Bothell and UW Tacoma campuses.

UW Bothell >

UW Tacoma >



### Diversity Blueprint

The 2022–26 Diversity Blueprint presents the framework that guides the University of Washington toward its goals of diversity, equity, inclusion and belonging. UW academic and administrative units are expected to align their DEI plans with the Blueprint.

Read more >



*"Our most effective work of building a culture of inclusion and belonging that celebrates diversity is done together, but it begins when we embrace our individual capacity to create impact within and beyond our University community."*

**Ana Mari Cauce** // *UW President*

## Advisory committee co-chairs



**Rickey Hall**

Vice President for Minority Affairs and University Diversity Officer

Advisory committee >

**Ed Taylor**

Vice Provost and Dean, Undergraduate Academic Affairs

# Exhibit C



# DIVERSITY BLUEPRINT 2022–2026



## ACTIONS TOWARD ACCESS, INCLUSION, AND EQUITY



**W** UNIVERSITY *of* WASHINGTON

Plntffs000431

**DIVERSITY BLUEPRINT 2022–2026**

# TABLE OF CONTENTS

**MESSAGE FROM THE PRESIDENT** — **1**

**MESSAGE FROM THE CHANCELLOR, UW BOTHELL** — **2**

**MESSAGE FROM THE CHANCELLOR, UW TACOMA** — **3**

**MESSAGE FROM THE DIVERSITY COUNCIL CHAIRS** — **4**

**GOALS** — **5**

**GOAL 1:** CULTIVATE AN ACCESSIBLE, INCLUSIVE, AND EQUITABLE CLIMATE — **5**

**GOAL 2:** ATTRACT, RETAIN, AND GRADUATE A DIVERSE AND EXCELLENT STUDENT BODY — **6**

**GOAL 3:** ATTRACT AND RETAIN DIVERSE ACADEMIC PERSONNEL — **7**

**GOAL 4:** ATTRACT AND RETAIN DIVERSE STAFF — **8**

**GOAL 5:** DEVELOP PLACE-BASED EDUCATION AND ENGAGEMENT TO ADVANCE ACCESS, INCLUSION, AND EQUITY — **9**

**GOAL 6:** IMPROVE ACCOUNTABILITY AND TRANSPARENCY AT ALL LEVELS — **10**

**EXAMPLES OF PAST DIVERSITY SEED GRANT AWARDEES AND PROJECTS** — **11**

Plntffs000432

UNIVERSITY *of* WASHINGTON

# MESSAGE FROM THE PRESIDENT

The mission of our great public University is inseparably entwined with creating a culture and climate that are accessible, inclusive and equitable. In that spirit, I acknowledge that our campuses sit on the land of the Coast Salish peoples, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations. I also acknowledge and honor the Tribal nations across Washington State and the many Indigenous peoples who are part of our University of Washington community and the diverse urban and rural communities within our state and region.

In the 12 years since the UW Diversity Council first responded to our community's need for a plan to guide us toward our goals for diversity and inclusion with the development of the first Diversity Blueprint, much has changed. The COVID-19 pandemic upended and transformed our lives, both exposing and exacerbating systemic inequities, from who can most easily take part in remote learning to who is most likely to suffer the effects of the virus. In this same period, we bore witness to the horrific manifestations of deeply-rooted racism and bigotry, from the murder of George Floyd to violence against people of Asian descent to attacks on centers of Jewish life and other tragedies too numerous to name.

Throughout this period of upheaval, our commitment to making progress on our goals of hiring, enrolling, retaining and cultivating success for a broadly diverse population of faculty, staff and students has only deepened. With this third iteration of the Diversity Blueprint, we seek to advance these goals in ways that enable our multiple campuses, units, schools, colleges and departments to take meaningful action and increase accountability and transparency. This new blueprint especially emphasizes the need for a tri-campus approach as we work to more rigorously explore place-based education and engagement, including honest reflection on how our own histories and systems have contributed to various forms of exclusion.

There is — and will always be — work ahead to collectively build a community that lives up to our aspirations, aspirations that should and will continue to evolve with the times. We have made significant strides over the past 12 years, including increasing the number of underrepresented faculty in tenure or tenure track positions by 22 percent over the last five years. We've also expanded education and training about diversity, equity, and inclusion and developed new resources and programming to ensure that the UW is a welcoming place for diverse students to live and learn and for faculty and staff to thrive professionally. But these achievements are not the endpoint; rather, they should inspire us to recognize that change is possible through intention and leadership.

I offer my deep thanks to Rickey Hall, Vice President for the Office of Minority Affairs and Diversity and University Diversity Officer, and Chadwick Allen, Associate Vice Provost for Faculty Advancement, as well as the students, faculty and staff serving on the Diversity Council for their leadership and dedication to this project. Their work is essential to our mission of service, learning and discovery, and it's our shared responsibility to put these invaluable tools to good use.



Ana Mari Cauce, Ph.D.
President, University of Washington
Professor of Psychology

1

Plntffs000433

UNIVERSITY *of*
WASHINGTON
BOTHELL

# MESSAGE FROM THE CHANCELLOR , UW BOTHELL

Since its founding, the UW Bothell campus community has prioritized its goal to provide a widely diverse student population with access to a UW education and the Husky experience, with the many opportunities and resources that entails.

This blueprint articulating the UW's tri-campus commitment to ongoing diversity work is a call for us to be clear about our intentions, to inspire engagement and to drive forward broader and more targeted, sustained and measurable action. It is a call I know the UW community, including the Bothell campus, will answer with enthusiasm and dedication.

In its current strategic plan, Expanding Access, Achieving Excellence, the UW Bothell campus recommits to strengthening diversity, equity and a sense of belonging among students, faculty and staff alike. One of three top strategic plan priorities, this work is naturally connected to a second priority: enhancing engagement on our campus and within the community. These two are, in turn, intertwined with our third priority of advancing cross-disciplinary teaching and scholarship so that we can address today's most pressing problems and issues.

With the publication of this tri-campus blueprint, we must renew our investment in the hard work that comes with ambitious goals, including needs assessments, reviews of ongoing initiatives and programs, and measurable goal setting. It is also a pivotal moment in our shared work as a University, a moment when we need to stay keenly focused on what always matters most: the many people and communities our work serves.

What has struck me most about the UW Bothell community since my arrival in Fall 2021, — and in looking back over its now more than 30-year history — is the sense of mutual care and service this community embodies. I experience it again and again with each staff member, faculty person, community partner or student I meet. And that is what gives me confidence that we can make real change happen here.

I believe that diversity and equity and inclusion — the call to welcome and support everyone because of who they are and where they come from — is the challenge of our time; and I am convinced UW Bothell is absolutely invested in making it happen.

UW Bothell has been committed to diversity issues and action from its very founding, and we have much to be proud of in our history. Yet there is still so much work to be done. This work is vital for our campus and our communities, and will require the efforts of each one of us — a willingness to listen, to ponder, and to make changes where they are needed.

This is how transformation happens. It's how we choose to step up, each day. I am excited to bring my full attention and energy to creating real-world, real-life action plans with partners across the Bothell campus, the UW and our region.



Kristin G. Esterberg, Ph.D.
Chancellor, University of Washington Bothell
Professor of Sociology

2

Plntffs000434

**DIVERSITY BLUEPRINT 2022–2026**

UNIVERSITY *of* WASHINGTON
TACOMA

# MESSAGE FROM THE CHANCELLOR , UW TACOMA

The University of Washington Tacoma is home to a very diverse student body — 59 percent students of color, 34 percent underrepresented students, 54 percent who are the first in their family to go to college. I am very proud that we serve this population and provide a UW education to the South Sound community.

Back in 2010, I had the honor of leading the creation of the University of Washington's first Diversity Blueprint and spearheading the incorporation of diversity, equity and inclusion goals in UW's "Two Years to Two Decades" (2Y2D) strategic planning effort. I have focused much of my career on advancing educational excellence and inclusion and the work of the Diversity Blueprint represents a core value for me.

While the last two years of living in a pandemic have affected us all, they have had a larger impact on some populations, including many of the students we serve. This work will ensure that we maintain the gains we have achieved in recruiting a diverse body of students, faculty and staff and helping them succeed, despite the setbacks.

This third iteration of the Diversity Blueprint will continue to challenge us to advance our own work in the areas of diversity, equity, access, and inclusion on our campus. We recently opened an expanded home for the Center for Equity & Inclusion (CEI), and are developing our first-ever dedicated space on the Tacoma campus for our Indigenous community. In addition, the UW Tacoma Climate Monitoring Committee is helping to ensure that we continue to make progress on the important findings from the 2019 UW Climate Survey and make our campus an even more welcoming and inclusive community for learning, living, and working.

I am grateful to be part of a University that values the hard work necessary to be a national leader in diversity and holds itself accountable to these goals.



Sheila Edwards Lange, Ph.D.
Chancellor, University of Washington Tacoma
Professor of Practice, Educational Leadership and Policy Studies

3

Plntffs000435

## MESSAGE FROM THE DIVERSITY COUNCIL CHAIRS

The University of Washington's Diversity Blueprint 2022–2026: Actions toward Access, Inclusion, and Equity outlines a set of high-level, aspirational goals for our tri-campus community. These goals provide an overarching framework, rather than a step-by-step guide, to assist individual academic and administrative units in designing local strategic action plans appropriate to their specific contexts and needs.

Although we have made real progress since 2010, when the Diversity Council launched its first Blueprint, much work remains to be done, and our goals continue to evolve. The 2022–2026 version updates five of the six goals from the 2017–2021 Blueprint, renewing and deepening our commitments to making the UW more inclusive and more equitable for students, staff, and academic personnel from diverse backgrounds, as well as our commitments to improving transparency and accountability. This latest version also reflects a fuller understanding of our community's needs for access to relevant resources. Our new goal challenges us to move beyond simply assessing diversity needs across our three campuses by prompting us to develop opportunities for place-based education and engagement. What does it mean for students, staff, and faculty to learn and work in specific places with specific histories? How can we enhance both a sense of belonging and a sense of responsibility by increasing our knowledge of our local and regional environments?

Academic and administrative units are asked to create local plans for action, but not without central resources. Since 2017, the Blueprint has been supported by focused workshops and by the Diversity Seed Grants program. Both will continue. For 2022, we are adding a new, online set of resources with links to materials relevant to localizing each goal.

The work we do to advance access, inclusion, and equity — individually, but especially collectively — will help make us a more excellent university.

On behalf of the Diversity Council,



Rickey L. Hall
Vice President for Minority Affairs & Diversity
University Diversity Officer

Chadwick Allen
Associate Vice Provost for Faculty Advancement
Russell F. Stark University Professor

Plntffs000436

# GOAL 1: CULTIVATE AN ACCESSIBLE, INCLUSIVE, AND EQUITABLE CLIMATE

The University must actively work to create and maintain learning, working, living, and healthcare spaces in which students, faculty, and staff from diverse backgrounds believe they can thrive.

Our goal is to foster a welcoming climate that is accessible, inclusive, and equitable across our research, healthcare, virtual, and campus environments.

### EXAMPLES OF LOCALIZING GOAL 1 IN ACADEMIC AND ADMINISTRATIVE UNITS:

> Regularly monitor climate at appropriate levels of scale — within departments, colleges, and schools; within programs and centers; within student, faculty, post-doc, and staff cohorts; within administrative units or sub-units — through focused surveys that will augment and complement the University-wide Climate Survey, through town hall meetings and facilitated discussions, through interviews, or through other instruments for gathering diverse perspectives.

> Regularly publish findings of unit-level climate surveys and other instruments, and discuss results with appropriate stakeholders.

> Acknowledge and develop plans to address concerns about equity, access, inclusion, or other issues relevant to unit climate raised by students, faculty, post-docs, staff, or community partners.

> Assess the culture of meetings within the unit. Are norms, conventions, and procedures for conducting the unit's business well known and well understood? Is there consensus that norms, conventions, and procedures are effective for all participants? Are meetings welcoming and inclusive of multiple perspectives?

> Engage the practices of inclusive design to design offices, facilities, and other physical and virtual spaces that are accessible to all. Ensure that physical and virtual spaces are representative of all those who visit, study, live, or work in them.

> Regularly offer education and training within the unit that addresses anti-racism, sovereignty, equity, broad diversity, neurodiversity, access, belonging, and other relevant DEI topics.

> Regularly review unit level policies and practices to ensure they are not having a disparate impact on members of particular groups.

> Regularly seek opportunities to purchase goods and services from minority-owned, women-owned, small, local, and diverse businesses.

5

Plntffs000437

# GOAL 2: ATTRACT, RETAIN, AND GRADUATE A DIVERSE AND EXCELLENT STUDENT BODY

The University must continue to actively recruit and support a diverse body of undergraduate, graduate, and professional students.

The University must increase its capacity to serve students from communities that are underrepresented in higher education, including students who identify as Indigenous, Black, and People of Color; students from low- and modest-income families; students who identify as disabled, LGBTQ+, veterans, and alumni of foster care; international students; transfer students; and students who are part of recent immigrant populations.

## EXAMPLES OF LOCALIZING GOAL 2 IN ACADEMIC AND ADMINISTRATIVE UNITS:

> Establish collaborative relationships with central recruitment and outreach services to better coordinate K–12 pathway programs, pathway programs with two-year and tribal colleges, and other initiatives that connect potential students to the University.

> Work with Advancement and external communities to increase scholarship and fellowship funding to better support underrepresented and marginalized students both from our local communities and from locations outside the state of Washington.

> Regularly review disaggregated data on student retention and graduation rates to identify gaps and areas of concern and to design intervention strategies to better support students from diverse backgrounds.

> Strengthen undergraduate retention by enhancing advising strategies within majors, minors, and certificate programs — such as early warning and intervention systems — for underrepresented, veteran, first-generation, and low-income students.

> Develop and strengthen relationships with existing pathway initiatives to encourage underrepresented, veteran, LGBTQ+, first-generation, and low-income students from UW and other regional colleges and universities to attend graduate or professional school at the UW.

> Design, support, and actively participate in preparatory programs that put underrepresented undergraduates on the path to graduate and professional schools.

> Increase collaboration with the Graduate School so that units can contact, host, and recruit students interested in their graduate-level programs.

> Strengthen graduate student retention by enhancing departmental support in a variety of areas, including mentorship, funding, professional development, and accessibility for underrepresented, veteran, and first-generation graduate students, as well as graduate students with disabilities.

Plntffs000438

# GOAL 3: ATTRACT AND RETAIN DIVERSE ACADEMIC PERSONNEL

The University must increase efforts to recruit faculty, post-docs, librarians, and other academic personnel from backgrounds that are underrepresented in higher education, including those who identify as Indigenous, Black, and People of Color.

The University must increase efforts to retain diverse faculty at all ranks and to support the success of diverse academic personnel across the full arcs of their careers.

### EXAMPLES OF LOCALIZING GOAL 3 IN ACADEMIC AND ADMINISTRATIVE UNITS:

> Create and then annually revise or affirm a five-year hiring plan that is explicitly aligned with the unit's diversity mission and goals for equity and inclusion.

> In consultation with the Office for Faculty Advancement, the ADVANCE Center for Institutional Change, the Center for Health Equity, Diversity, & Inclusion, and other university-wide resources, create and then annually revise or affirm unit-specific protocols for recruiting faculty, post-docs, and other academic personnel. Relevant areas include: effective composition of search committees; appropriate uses of available data; processes for vetting language used in position descriptions and job advertisements; outreach efforts to increase the diversity of applicant pools; processes for designing and vetting evaluation criteria; procedures for interviews, and so forth.

> Commit to regularly assessing the effectiveness of unit-specific practices and protocols for recruiting faculty, post-docs, and other academic personnel. Unit leadership commits to debriefing the search committee at the conclusion of every search in order to determine what worked well and what requires ongoing improvement. Unit leadership also commits to organizing more thorough audits of faculty searches in order to assess how well specific protocols and practices are working across specific searches and over time.

> Create an annual curriculum of unit-wide education that addresses effective strategies for recruiting and retaining a diverse and inclusive faculty.

> Create regular procedures for onboarding new faculty, across all ranks, that include specific attention to issues of concern for colleagues from underrepresented or minoritized backgrounds.

> Create mentoring and professional development opportunities at appropriate levels of scale — within or across departments, colleges, schools, laboratories, clinics, research centers, and campuses — that explicitly address issues of concern for colleagues from underrepresented or minoritized backgrounds.

> Create and/or support opportunities for faculty and post-docs from diverse backgrounds to build community on and off campus.

7

Plntffs000439

# GOAL 4: ATTRACT AND RETAIN DIVERSE STAFF

The University must increase efforts to recruit staff from backgrounds that are underrepresented in higher education, including staff who identify as Indigenous, Black, and People of Color.

The University must increase efforts to retain diverse staff at all ranks and to support the success of diverse staff across the full arcs of their careers.

### EXAMPLES OF LOCALIZING GOAL 4 IN ACADEMIC AND ADMINISTRATIVE UNITS:

> Regularly engage the Staff Diversity Hiring Toolkit and other HR diversity resources.

> Actively work to create diverse hiring pools for all staff positions by advertising job announcements and position descriptions through diverse publications, websites, lists, and social media platforms.

> Create an annual curriculum of unit-wide education that addresses effective strategies for recruiting and retaining a diverse and inclusive staff.

> Create regular procedures for onboarding new staff that include specific attention to issues of concern for colleagues from underrepresented or minoritized backgrounds.

> Co-create annual professional development plans with each staff member in the unit.

> Create mentoring teams within and across units to help staff members achieve their professional development goals.

> Work toward a goal of 100 percent staff participation in DEI education and training.

> Create and/or support opportunities for staff from diverse backgrounds to build community on and off campus.

8

Plntffs000440

## GOAL 5: DEVELOP PLACE–BASED EDUCATION AND ENGAGEMENT TO ADVANCE ACCESS, INCLUSION, AND EQUITY

The University must provide all students, staff, and faculty with opportunities to better understand the environments in which their learning and work lives take place.

In particular, the University must rigorously explore its histories of racial, ethnic, and other forms of exclusion and actively engage the histories of the diverse communities within which its Seattle, Bothell, and Tacoma campuses are located.

### EXAMPLES OF LOCALIZING GOAL 5 IN ACADEMIC AND ADMINISTRATIVE UNITS:

> Develop protocols for Land Acknowledgement that recognize specific campus locations as well as the University's mission to serve the entire state of Washington.

> Develop understandings of the histories of the three UW campuses that directly address issues of Indigenous sovereignty and issues of access, equity, and inclusion for underrepresented and minoritized communities. Incorporate these understandings into relevant curricula and programming.

> Develop understandings of the histories of colleges, schools, programs, centers, and administrative units that directly address issues of access, equity, and inclusion.

> Develop understandings of the history of student activism on our campuses and of the history of activism in our local communities. Incorporate these understandings into relevant curricula and programming.

> Orient new students, staff, and faculty to their local communities and to their local environments as well as to their campuses.

> Encourage students, staff, and faculty to become involved with their local communities and with their local environments through service learning, internship, outreach, and volunteer opportunities.

> Encourage faculty to incorporate place- and community-based approaches within their undergraduate, graduate, and professional curricula and assignments.

> Explore the histories, interpretations, and impacts of monuments, artworks, street names, building names, and other material features of our campus spaces and of our research and healthcare environments.

> Develop procurement strategies that foster business equity by prioritizing women- and minority-owned businesses in our local communities.

Plntffs000441

# GOAL 6: IMPROVE ACCOUNTABILITY AND TRANSPARENCY AT ALL LEVELS

University leadership must commit to working toward established goals for diversity, equity, access, and inclusion.

Leaders at all levels must accept accountability by implementing new initiatives to achieve these goals; ensure that best practices are disseminated across all three campuses and across all of our research, healthcare, and virtual environments; and make clear the University community's responsibility for advancing diversity, equity, access, and inclusion.

### EXAMPLES OF LOCALIZING GOAL 6 IN ACADEMIC AND ADMINISTRATIVE UNITS:

> Develop, implement, and make public an action plan for diversity, equity, access, and inclusion within the unit that is aligned with the University's mission and values. The plan should establish a set of clear goals, and it should state who in the unit is responsible for advancing each goal.

> Conduct an annual audit of the unit's performance in terms of recruitment, retention, utilization of diverse suppliers, use of inclusive design, and other equity and inclusion practices. Make all findings public in an accessible report or dashboard.

> Produce an annual "state of diversity, equity, access, and inclusion" report that reviews the unit's progress on its action plan.

> Establish an annual "community engagement and justice award" to recognize programs or individuals who have significantly advanced the goals of the unit's action plan for diversity, equity, access, and inclusion.

**10**

# EXAMPLES OF PAST DIVERSITY SEED GRANT AWARDEES AND PROJECTS

A full list of Diversity Seed Grant Awardees can be found at
**https://www.washington.edu/diversity/diversity-blueprint/seed-grants/awardees/**

## INTERDISCIPLINARY ARTS AND SCIENCES, TACOMA

> **Awarded Fall 2017**

> **Project Title: Arts and Cultures Across American Borders: An Event Series**

> **Blueprint Goal(s) Addressed: Cultivate an inclusive campus climate; Attract, retain, and graduate a diverse and excellent student body**

This project will consist of a series of events showcasing the art, thought and writing of people who have immigrated, migrated or crossed borders to come to the United States mainland. Along with the events, these topics of "border-crossing" will be explored in a set of classes at UW Tacoma during the coming academic year.

## BIOLOGY, BOTHELL

> **Awarded Spring 2018**

> **Project Title: UW–Bothell Biology Leadership Organization of Underrepresented Mentors (BLOUM)**

> **Blueprint Goal(s) Addressed: Attract, Retain, and Graduate a Diverse and Excellent Student Body**

The Biology Department at UW Bothell will use their Seed Grant funds to create a mentoring program targeting 1st or 2nd year undergraduates in the Biology program who are from historically underrepresented groups in STEM fields, matching them (both in and out of the classroom) with peers that have recently and successfully completed introductory courses.

## THE WHOLE U

> **Awarded Fall 2018**

> **Project Title: The Whole U Speaker Series: Understanding Health and Wellness Through the Lens of Equity**

> **Blueprint Goal(s) Addressed: Cultivate an Inclusive Campus Climate; Attract, Retain, and Graduate a Diverse and Excellent Student Body; Attract and Retain a Diverse Faculty; Attract and Retain a Diverse Staff; Assess Tri–Campus Diversity Needs; and Improve Accountability and Transparency**

The Whole U Speaker Series: Understanding Health and Wellness Through the Lens of Equity is a five-part series that engages the UW community in research-backed conversations on issues of equity in healthcare and wellness, covering topics of mental and physical health, educational and occupational wellness, and access to marrow transplants.

Plntffs000443

## EXAMPLES OF PAST DIVERSITY SEED GRANT AWARDEES AND PROJECTS

### BURKE MUSEUM OF NATURAL HISTORY AND CULTURE

> **Awarded Spring 2019**

> **Project Title: Intro to Equity, Inclusion, and Decolonization at the Burke**

> **Blueprint Goal(s) Addressed: Cultivate an Inclusive Campus Climate; Attract, Retain, and Graduate a Diverse and Excellent Student Body; Attract and Retain a Diverse Staff; and Attract and Retain a Diverse Faculty**

In preparation for the opening of the New Burke, the Burke Museum will develop a training program for staff, volunteers, and Board members, intended to create a museum-wide shared understanding of equity and inclusion—with a particular emphasis on understanding decolonization at the Burke—that will guide operations at every level.

### BROTHERHOOD INITIATIVE

> **Awarded Fall 2019**

> **Project Title: Brotherhood Initiative Leadership Retreat**

> **Blueprint Goal(s) Addressed: Cultivate an Inclusive Campus Climate; Attract, Retain, and Graduate a Diverse and Excellent Student Body**

The Brotherhood Initiative leadership retreat provides an out of classroom opportunity for additional leadership development and community bonding that focus on identity development and that will increase a sense of belonging among men of color at the University of Washington.

### SCHOOL OF EDUCATION UNIVERSITY OF WASHINGTON TACOMA

> **Awarded Spring 2020**

> **Project Title: Indigenizing Educational Leadership through Tribally Based Cohorts**

> **Blueprint Goal(s) Addressed: Cultivate an Inclusive Campus Climate; Attract, Retain, and Graduate a Diverse and Excellent Student Body; Assess Tri–Campus needs**

In an effort to honor place, center Indigenous perspectives and ways of being this Indigenizing Educational Leadership through Tribally Based Cohorts project will integrate tribal practices through the use of tribal art, Indigenous knowledge keepers and community celebrations.

Plntffs000444

# EXAMPLES OF PAST DIVERSITY SEED GRANT AWARDEES AND PROJECTS

## UNIVERSITY OF WASHINGTON BOTHELL INFORMATION TECHNOLOGY

> **Awarded Fall 2020**

> **Project Title: Bias & Technology Discussion Series**

> **Blueprint Goal(s) Addressed: Cultivate an Inclusive Campus Climate; Attract, Retain, and Graduate a Diverse and Excellent Student Body; Attract and Retain a Diverse Faculty**

The proliferation of technology in all aspects of our work, research, teaching and learning raises questions about the impacts of bias in technology. Join UW Bothell IT for a screening of the documentary Coded Bias by Shalini Kantayya and a discussion series on the intersection of technology, equity, justice, bias and discrimination.

## THE INFORMATION SCHOOL

> **Awarded Spring 2021**

> **Project Title: High School to iSchool "iTech Inclusion Modules Project"**

> **Blueprint Goal(s) Addressed: Cultivate an Inclusive Campus Climate; Attract, Retain, and Graduate a Diverse and Excellent Student Body**

The iTech Inclusion Module Project is a library of innovative teaching modules in a wide range of technology topics produced by INFO students to introduce middle & high school students to Informatics and Freshman Direct Admission at the UW. The 40-minute modules can be used individually or as a series in HS classrooms or for workshops and outreach.

## HARBORVIEW MEDICAL CENTER INTERPRETER SERVICES DEPARTMENT

> **Awarded Spring 2021**

> **Project Title: Afghan Caseworker Cultural Mediator (CCM) Medical Interpreter Training and Certification**

> **Blueprint Goal(s) Addressed: Attract and Retain a Diverse Staff**

HMC's Interpreter Services Department is hiring an Afghan Caseworker Cultural Mediator (CCM) to serve new arrivals. Attracting and retaining diverse staff to serve this new community is vital. The grant will provide the CCM with training and national certification as a medical interpreter, expediting hiring bilingual/bicultural staff to serve the Afghan community and promote equitable health care

Plntffs000445

For more information or resources, visit
**www.washington.edu/diversity/diversity-blueprint**.

For questions about the University of Washington
Diversity Blueprint, email the University of
Washington Diversity Council at **dcstaff@uw.edu**.



UNIVERSITY *of* WASHINGTON

Plntffs000446

# Exhibit D

Printed on: 4/29/2025 at 22:03. For more information visit University Policy and Rules Office, www.washington.edu/rules.

# UW POLICY DIRECTORY

## SGP 209 Student Conduct Policy for Academic Misconduct and Behavioral Misconduct

## 1. Policy and Authority

### A. Policy

The University of Washington (University) is a public institution responsible for providing instruction in higher education, for advancing knowledge through scholarship and research, and for providing related services to the community. As a center of learning, the University also has the obligation to maintain conditions conducive to the freedom of inquiry and expression to the maximum degree compatible with the orderly conduct of its functions. For these purposes, the University is governed by rules, regulations, procedures, policies, and standards of conduct that safeguard its functions and protect the rights and freedoms of all members of the University community.

This policy is adopted in compliance with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, as amended by the Violence Against Women Reauthorization Act of 2013 (Clery Act), and the Administrative Procedure Act (Chapter 34.05 RCW).

### B. Purpose

The purpose of this policy is to describe the University's agency-level policies and procedures regarding student conduct and student discipline of the rules set forth in Chapter 478-121 WAC, Student Conduct Code for the University of Washington, related to reports of the prohibited conduct under the code and to describe the University's current approach to implementation of the code and its practices, procedures, and methods of action based upon that approach for student conduct proceedings alleging misconduct under the code, except for prohibited conduct covered by *Student Governance and Policies*, Chapter 210, Student Conduct Policy for Discriminatory and Sexual Harassment, Intimate Partner Violence, Sexual Misconduct, Stalking, and Retaliation, which will be addressed under that policy.

### C. Advisory Committee on Student Conduct

The Advisory Committee on Student Conduct is charged and authorized with reviewing and evaluating conduct processes and outcomes and making recommendations to the Faculty Council on Student Affairs for potential revisions to policies and procedures. The committee is chaired by a faculty representative nominated by the Faculty Council on Student Affairs and approved by the Faculty Senate.

### D. Intersection of the Student Conduct Code and Related Student Conduct Policies

If the reported conduct involves common issues or parties that would potentially fall under both Student Governance and Policies, Chapter 210 and this policy, the University may conduct one conduct proceeding.

In addition, reports that may constitute "Abuse of Others" under WAC 478-121-103 will be addressed under *Student Governance and Policies*, Chapter 210, if the report involves discriminatory or sexual harassment, intimate partner violence, sexual misconduct, or is part of a course of conduct that meets the definition of stalking.

Plntffs000184

If the reported conduct involves common issues or parties that would potentially fall under both *Student Governance and Policies*, Chapter 210 and this policy, the University may, in its discretion, conduct one conduct proceeding, provided that the conduct arises out of the same incident or series of incidents.

### E. Intersection and Coordination with Related Policies

The following and other University policies may intersect with this policy:

- Workplace Violence web page, which prohibits acts or threatened acts of violence.

For students who are also University employees, where reported conduct involves the potential violation of the student conduct code and other related University policies, the University will assess the appropriate process through which to respond to the reported conduct and evaluate whether a single fact finding and/or conduct proceeding may be conducted that encompasses all relevant conduct and policies.

## 2. University Assistance and Resources

### A. Reports to the University

The University encourages individuals who are affected by prohibited conduct under this policy to report the conduct to the University as described in Section 4, Reporting Options, below.

### B. Information about University and Community Services

The University and/or local communities offer a variety of services including counseling, healthcare, victim advocacy, legal assistance, VISA and immigration assistance, and student financial aid assistance for students involved in conduct proceedings under this policy. Information about resources is available on the Student Conduct website or from a conduct officer.

### C. Disability Accommodations

For students who are experiencing impacts of a medical or mental health condition or whose experience has affected an existing condition, University disability services offices can evaluate and provide reasonable accommodations. See *Student Governance and Policies*, Chapter 208, Reasonable Accommodations for Students. For contact information see resources on the Student Conduct website.

## 3. Privacy and Confidentiality

### A. Privacy and Confidentiality Meanings

The University is committed to protecting the privacy of all individuals who are involved in any report or conduct proceeding under this policy. "Privacy" and "confidentiality" have distinct meanings under this policy.

Privacy means that information related to a report of prohibited conduct will be shared with a limited circle of University employees who "need to know" in order to assist in assessing and responding to a report. See Section 17 for more information about privacy and records.

Confidentiality exists in the context of laws that protect certain relationships, including with medical and clinical care providers, mental health providers, and counselors, all of whom may engage in confidential communications under Washington State law. Other examples include licensed medical, clinical, or mental-health professionals, physicians, nurses, physicians' assistants, psychologists, psychiatrists, professional counselors, and those performing services under their supervision. The University has designated University employees who have the ability to have such confidential communications as "Confidential Employees."

Plntffs000185

## B. Communications with Confidential Employees and Related Records

Communications between patients and University healthcare providers, and related medical records, have additional protections under University policies, state licensing requirements, and state and/or federal law.

Generally, the provider cannot reveal that information to any third party except:

- If the patient gives written consent for its disclosure;

- If there is risk of imminent harm to the patient or another identified person;

- If there is reason to suspect that a minor or an elderly person is in danger of being abused or neglected;

- If a court of law orders the release of certain information about a patient; or

- If the patient files a lawsuit or other legal action against the University or its employees, agents, or officers contesting the provision of services, information contained in the provider's records could be released to University attorneys if relevant to the action.

More information about confidentiality may be obtained from the healthcare provider.

## C. Reporting Suspected Child Abuse

In accordance with Executive Order No. 56, Reporting Suspected Child Abuse or Neglect, all University employees and volunteers who have reasonable cause to believe that a child has suffered abuse or neglect must immediately report the suspected abuse or neglect to law enforcement or the Department of Social and Health Services. A child is any individual under the age of 18 years old.

## D. Clery Act Reporting

Under the Clery Act, the University must maintain a daily crime log, publish an annual security report that includes aggregate statistics about reports of certain potential criminal offenses and provide those statistics to the United States Department of Education. Clery Act reporting does not include any personally identifying information about individuals involved in an incident.

The Clery Act also requires the University to issue timely warnings to the University community about certain crimes that have been reported and may continue to pose a serious or continuing threat to students and employees. Consistent with the Clery Act, the University withholds the names and other personally identifying information of complainants, including information likely to disclose the location of the complainant, when issuing timely warnings to the University community.

# 4. Reporting Options

## A. Reporting Academic Misconduct or Behavioral Misconduct Under This Policy

Reports of prohibited conduct under this policy should be made to:

UW Seattle Community Standards & Student Conduct
Email: CSSC@uw.edu

Except allegations of academic misconduct, which should be reported to the dean of the appropriate school or college at the UW Seattle or their authorized delegates. For more information refer to the Community Standards and Student Conduct website.

UW Bothell Student Conduct Office
Email: UWB-StudentConduct@uw.edu

UW Tacoma Student Conduct Office
Email: UWT-StudentConduct@uw.edu

Plntffs000186

## B. Reporting Discriminatory and Sexual Harassment, Intimate Partner Violence, Sexual Misconduct, Stalking, and Retaliation

Reports of sexual misconduct, intimate partner violence, discriminatory and sexual harassment, stalking, and retaliation related to such reports should be made in accordance with *Student Governance and Policies*, Chapter 210, Student Conduct Policy for Discriminatory and Sexual Harassment, Intimate Partner Violence, Sexual Misconduct, Stalking, and Retaliation.

## C. Reporting to Law Enforcement

Prohibited conduct under this policy may also violate criminal law and may be reported directly to law enforcement. If an individual impacted by the conduct chooses to make a report to law enforcement, the individual may also make a report to the University. See the Student Conduct website for contact information regarding UW safety resources.

## D. Amnesty for Alcohol or Other Drug Violations

A conduct officer may elect not to initiate a conduct proceeding regarding alcohol or other drug violations against a student who, while in the course of helping another student seek medical assistance, admits to the unlawful possession or use of alcohol or drugs, provided that the possession was for personal consumption and the use did not place the health or safety of any other person at risk. The University may initiate an assessment or educational discussion or pursue other nondisciplinary options regarding alcohol or other drug use.

## E. Informal Settlements

The University may conduct informal settlements or other alternative resolution of reports.

# 5.  Standards of Conduct and Application of the Student Conduct Code

## A. Statement of Authority

Pursuant to Chapter 34.05 RCW and the authority granted by RCW 28B.20.130, the Board of Regents of the University of Washington has established rules regarding student conduct and student discipline (code) that are set forth in Chapter 478-121 WAC, Student Conduct Code for the University of Washington.

## B. Standards of Conduct

By way of further interpretation, in determining what types of conduct would be prohibited under WAC 478-121-100 through 478-121-173, the University applied guiding principles that can be summarized as follows: Admission to the University carries with it the presumption that students will conduct themselves as responsible members of the University community. As a condition of enrollment, all students assume responsibility to observe standards of conduct that will contribute to the pursuit of academic goals and to the welfare of the University community. That responsibility includes, but is not limited to:

1.  Practicing high standards of academic and professional honesty and integrity;

2.  Refraining from any conduct that would violate the rights, privileges, and property of others;

3.  Refraining from any conduct that would substantially disrupt or materially interfere with University operations;

4.  Refraining from any conduct that could reasonably cause harm to or endanger the health, safety, or welfare of other persons; and

5.  Complying with the rules, regulations, procedures, policies, standards of conduct, and orders of the University and its schools, colleges, departments, units, and programs.

Plntffs000187

## C. General Application of the Student Conduct Code

Under WAC 478-121-020, the conduct code applies to all students from the time of admission through the actual conferral of a degree, including any period between terms of enrollment.

The disciplinary sanctions specified in WAC 478-121-210, up to and including suspension or dismissal, may be imposed on any student or student organization found responsible for prohibited conduct set forth in WAC 478-121-100 through 478-121-173 and as described in relevant University policies.

## D. Jurisdiction of the University

Under WAC 478-121-040, the scope of the University's jurisdiction includes reports that prohibited conduct occurred:

1. On any University premises or in connection with any University-sponsored program or activity, regardless of the location of the program or activity; or

2. Off campus (i.e., conduct that does not occur on University premises or in the context of a University-sponsored program or activity) where: the University reasonably determines that the conduct adversely affects a University interest, or has continuing adverse effects or may create a hostile environment on University premises or in the context of a University-sponsored program or activity.

Nothing in this conduct code shall be construed to limit academic action that may be taken by schools, colleges, or programs against a respondent based on an established violation of Chapter 478-121 WAC that demonstrates a failure to meet the academic and/or professional standards of the school, college, or program.

If a respondent withdraws from the University (or fails to reenroll) while a conduct proceeding is pending, the University may move forward with the conduct proceeding, and if so, the respondent will be provided with a continued opportunity to participate.

The conduct officer will determine whether the University has jurisdiction based on the information available through the report and initial assessment.

# 6. Definitions for Conducting Proceedings

Under WAC 478-121-050, for the purposes of the conduct code, the following definitions apply:

## A. Attorney

"Attorney" is a person permitted to practice law in Washington State.

## B. Complainant

A "complainant" is the person who is the subject of the prohibited conduct, whether or not that person made a report that a violation of the code or this policy had been committed against them.

## C. Conduct Hold

A "conduct hold" refers collectively to administrative notes on a student's record, such as registration holds, degree holds, and transcript holds, that enable the conduct officer to monitor the registration and enrollment status of a student for the purpose of administering the code.

## D. Conduct Officer

"Conduct officer" is an individual who has the authority to initiate conduct proceedings under the code, including initiating conduct proceedings, completing fact finding, and issuing initial orders. A "conduct officer" under the code is considered a "presiding officer" under Chapter 34.05 RCW for the purpose of conducting a brief adjudicative proceeding.

Plntffs000188

## E. Conduct Proceedings

"Conduct proceedings" refers to brief adjudicative proceedings and full adjudicative proceedings, collectively, under Chapter 34.05 RCW.

## F. FERPA

"FERPA" refers to the federal Family Educational Rights and Privacy Act (20 U.S.C. Sec. 1232g) and its implementing regulations (34 C.F.R. Part 99).

## G. Full Hearing

"Full hearing" refers to the hearing that occurs when a matter is designated as being appropriate for a full adjudicative proceeding, consistent with Part V of Chapter 478-121 WAC and Section 14 of this policy.

## H. Hearing Officer

A "hearing officer" is a "presiding officer" in a full hearing for the purpose of conducting a full adjudicative proceeding under Chapter 34.05 RCW.

## I. Presiding Officer

"Presiding officer" refers to conduct officers and hearing officers collectively.

## J. Respondent

A "respondent" is any student or student organization reported to have engaged in or charged with prohibited conduct under the conduct code.

## K. Review Coordinator

A "review coordinator" is an individual who may be appointed to a review panel as a non-voting member who manages the administrative review process.

## L. Review Panel

"Review panel" is a panel of reviewing officers selected from the pool of reviewing officers appointed to conduct administrative reviews under Parts IV or V of Chapter 478-121 WAC and Section 13 and/or Section 15 of this policy. The review panel may also include a "review coordinator."

## M. Reviewing Officers

"Reviewing officers" are those who conduct administrative reviews for the purpose of full adjudicative proceedings or brief adjudicative proceedings under Chapter 34.05 RCW.

## N. Student

A "student" is any person enrolled in or taking courses at or through the University, either full-time or part-time, including credit, noncredit, online, and nondegree courses, and any person who has been notified of acceptance for admission by the University. A student who withdraws from a course or from the University, graduates, or completes courses after the date of an alleged violation, or who is not enrolled for a particular quarter or quarters, but has a continuing relationship with the University, is still considered a student for purposes of the conduct code and this policy.

## O. Student Organization

"Student organization" is a group of students that has complied with the requirements for University recognition or who otherwise are granted any rights or privileges by the University as a University affiliate. Student organizations include, but are not limited to, athletic teams or clubs, registered student organizations (RSOs), University service clubs, and sororities and fraternities.

Plntffs000189

### P. University Community

The "University community" includes all University students, employees, guests of and visitors to the University, and other individuals affected by the conduct of a University student.

### Q. University Official

"University official" is an employee of the University performing his or her assigned administrative, professional, or paraprofessional duties.

### R. University Premises

"University premises" includes all of the University's campus buildings, grounds, and facilities, all of its extension and research locations, and all other University-leased, -owned, or -managed buildings, grounds, and facilities, including its global learning centers and study abroad program sites, as well as University-sponsored and/or -hosted online platforms.

## 7.  Prohibited Conduct

### A. General Application

Prohibited conduct under this policy includes, but is not limited to the conduct as described in WAC 478-121-100 through 478-121-173 and other relevant University policies, including this policy and *Student Governance and Policies*, Chapter 210, Student Conduct Policy for Discriminatory and Sexual Harassment, Intimate Partner Violence, Sexual Misconduct, Stalking, and Retaliation.

### B. Aiding, Assisting, and Attempting

Under WAC 478-121-113, students may also be found responsible for prohibited conduct if they:

1.  Aid or assist another student or student organization in the commission of prohibited conduct;

2.  Request, hire, or encourage another person to commit prohibited conduct, either intending that the other person commit the prohibited conduct or with the knowledge that the other person intends to commit the prohibited conduct; or

3.  Attempt to commit prohibited conduct.

### C. Academic Misconduct

Under WAC 478-121-107, academic misconduct includes:

1.  "Cheating," which includes, but is not limited to:

    a.  The use of unauthorized assistance in taking quizzes, tests, or examinations, or completing assignments;

    b.  The acquisition, use, or distribution of unpublished materials created by another student without the express permission of the original author(s);

    c.  Using online sources, such as solution manuals, without the permission of the instructor to complete assignments, exams, tests, or quizzes; or

    d.  Requesting, hiring, or otherwise encouraging someone to take a course, exam, test, or complete assignments for a student.

2.  "Falsification," which is the intentional use or submission of falsified data, records, or other information including, but not limited to, records of internship or practicum experiences or attendance at any required event(s), or scholarly research.

Plntff-000190

3. "Plagiarism," which is the submission or presentation of someone else's words, composition, research, or expressed ideas, whether published or unpublished, without attribution. Plagiarism does not encompass unacknowledged submission or presentation of information that is generally known and widely accepted by educated members of a discipline. Plagiarism includes, but is not limited to:

   a. The use, by paraphrase or direct quotation, of the published or unpublished work of another person without full and clear acknowledgment; or

   b. The unacknowledged use of materials prepared by another person or acquired from an entity engaging in the selling of term papers or other academic materials.

4. Unauthorized collaboration.

5. Engaging in behavior specifically prohibited by an instructor in the course of class instruction or in a course syllabus.

6. Multiple submissions of the same work in separate courses without the express permission of the instructor(s).

7. Taking deliberate action to destroy or damage another's academic work in order to gain an advantage for oneself or another.

8. The recording of instructional content without the express permission of the instructor(s), unless approved as a disability accommodation, and/or the dissemination or use of such unauthorized records.

## D. Behavioral Misconduct

### 1) Abuse of Others

Under WAC 478-121-103, abuse of others includes assault and other forms of physical abuse of any person, or any conduct intended to threaten bodily harm or to endanger the health or safety of any person.

### 2) Abuse of the Student Conduct Process

Under WAC 478-121-105, abuse of the student conduct process includes:

a. Attempting to influence the impartiality or participation of any presiding officer or any reviewing officer;

b. Influencing or attempting to influence another person to commit an abuse of the student conduct process; or

c. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in the conduct process.

   This provision does not apply to reports made or information provided in good faith, even if the respondent is ultimately found not responsible in that conduct matter.

### 3) Acts of Dishonesty

Under WAC 478-121-110, acts of dishonesty include:

a. Knowingly furnishing false information to any University official;

b. Impersonating, or providing false information in the name of, any University official;

c. Forging, altering, or misusing any University document or record, or instrument of identification;

d. Falsely claiming an academic credential; and

**e.** Providing dishonest or misleadingly incomplete information or answers on application forms or in response to other official University requests for information.

### 4) Alcohol Violations

Under WAC 478-121-115, includes the unlawful possession, use, distribution, or manufacture of alcohol.

### 5) Computer Abuses

Under WAC 478-121-117, computer abuses include, but are not limited to:

**a.** Unauthorized use of University computer resources;

**b.** Use of another person's University user name and/or password;

**c.** Use of University computing facilities and resources to interfere with the work of another student, an instructor, or other University official;

**d.** Use of University computing facilities or resources to send intimidating, harassing, or threatening messages;

**e.** Use of a computer or software to interfere with normal operations of the University's computing systems.

**f.** Use of the University's computing facilities or resources in violation of any law, including copyright laws; and

**g.** Any violation of the University's computer use policies.

### 6) Creating a Public Nuisance in Neighboring Communities

Under WAC 478-121-120, in furtherance of the University's interest in maintaining positive relationships with its surrounding communities, the University shall have the authority to hold students accountable under the student conduct code and this policy for misconduct within any residential or commercial communities adjacent to a University campus. Conduct proceedings may be initiated if the University is made aware that a student or student organization has been contacted by a law enforcement agency regarding, and is determined to have engaged in, conduct that is in violation of a state statute or municipal ordinance and has a direct quality of life impact on community residents or businesses, including, but not limited to, creating a public nuisance due to noise, residential disturbance, intentional destruction of property, urinating in public, or criminal trespass.

**a.** A first minor violation under Section 7.D.6 above, will not subject the student or student organization to sanctions under the student conduct code or this policy; however, the student or student organization may receive a letter regarding the expectations of University community members as residents in the area. This letter shall constitute a warning that repeated misconduct under this subsection may result in the imposition of disciplinary sanctions.

**b.** A second violation of this subsection will result in the initiation of conduct proceedings under the student conduct code and this policy

### 7) Disruption or Obstruction

Under WAC 478-121-125, disruption or obstruction includes materially and substantially obstructing or disrupting, through words or conduct, the teaching or learning environment of any University educational setting, or any University functions or activities.

An instructor has the authority to exclude a student from any individual class session or other academic activity in which the student is materially disruptive or obstructive and may also make a report in accordance with the student conduct code and this policy. See Section 4 for Reporting Options.

### 8) Drug Violations

Plntffs000192

Under WAC 478-121-127, the possession, use, distribution, or manufacture of controlled substances (as defined in Chapter 69.50 RCW or 21 U.S.C. Sec. 802) on University premises or during University-sponsored activities where such possession, use, distribution, or manufacture is illegal under federal, state, or local law is prohibited. This includes the possession, use, distribution, or growing of marijuana in all forms during University-sponsored activities or on University premises, including University housing.

## 9) Failure to Comply

Under WAC 478-121-130, failure to comply includes, but is not limited to:

**a.** Any failure to comply with the directions of any University officials acting in the performance of their duties;

**b.** Any failure to identify oneself to University officials when requested to do so; or

**c.** Any failure to comply with the rules, regulations, procedures, policies, standards of conduct, or any order or directive of the University or any of its schools, colleges, and departments.

## 10) Harassment or Bullying

Under WAC 478-121-133, harassment or bullying is language or conduct that is unwelcome and sufficiently severe, persistent, or pervasive such that it could reasonably be expected to create an intimidating, hostile, or offensive environment, or has the purpose or effect of unreasonably interfering with a person's academic or work performance, or a person's ability to participate in or benefit from the University's programs, services, opportunities, or activities when viewed through both an objective and subjective standard. This includes harassment or bullying that occurs through electronic means, such as electronic media, the internet, social networks, blogs, cell phones, or text messages.

## 11) Hazing

Under WAC 478-121-135, hazing includes any method of initiation into a student organization or living group, or any pastime or amusement engaged in with respect to such an organization or living group, that causes, or is likely to cause, bodily danger or physical harm, or serious mental or emotional harm, to any student or other person. Hazing activities may include, but are not limited to, encouraging or promoting the abuse of alcohol; striking another person whether by use of any object or any part of one's body; causing someone to experience excessive fatigue or physical and/or psychological shock; and causing someone to engage in degrading or humiliating games or activities that create a risk of serious mental, emotional, and/or physical harm. Consent of a victim or victims is not a defense to an allegation of hazing.

When assessing "hazing," the agency's interpretation of the code is that hazing does not include generally accepted practice, training, and conditioning activities, or activities reasonably designed to test a participant's ability to meet eligibility requirements for established athletic events such as intramural or club sports, intercollegiate athletics, or other similar contests or competitions.

## 12) Possession or Use of Firearms, Explosives, Dangerous Chemicals, or Other Dangerous Weapons

Under WAC 478-121-143, this prohibition includes unauthorized possession or use of firearms, explosives, dangerous chemicals, or other dangerous weapons or instrumentalities on University premises, unless specifically authorized by the University President or delegee.

Firearms include, but are not limited to, what are commonly known as air guns or rifles, BB guns, and pellet guns, and any instrument used in the propulsion of shot, shell, bullets, or other harmful objects by the:

- Action of gunpowder or other explosives;

- Action of compressed air; or

- Power of springs or other forms of propulsion.

  This includes the exhibition or display of a replica of a dangerous weapon prohibited under this subsection if done in a manner and at a time or place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons.

## 13) Retaliation

Under WAC 478-121-147, retaliation includes engaging or attempting to engage in any action, directly or indirectly, including through a third party, that is intended to harass, intimidate, threaten, harm or improperly influence any person because they:

a.  Make, or intend to make, a report, complaint, grievance, or allegation of prohibited conduct under any University policy or rule, or under any law;

b.  Participate in and/or cooperate with conduct proceedings; or

c.  Appear as a witness.

## 14) Theft

Under WAC 478-121-160, theft is the taking of property or services without express permission of the owner. This includes, but is not limited to, taking, possessing, or aiding another to take University property or services, or property belonging to members of the University community.

## 15) Unauthorized Keys, Entry, or Use

Under WAC 478-121-163, unauthorized keys, entry, or use includes but is not limited to:

a.  Unauthorized possession, duplication, or use of keys (including conventional keys, key cards, or alphanumeric passcodes) to any University premises;

b.  Unauthorized entry upon or use of University premises or property; or

c.  Providing keys to an unauthorized person or providing access to an unauthorized person.

## 16) Unauthorized Recording

Under WAC 478-121-165, unauthorized recording includes, but is not limited to:

a.  Making audio, video, digital recordings, or photographic images of a person without that person's consent in a location where that person has a reasonable expectation of privacy; or

b.  Storing, sharing, publishing, or otherwise distributing such recordings or images by any means.

When such recordings may fall within WAC 478-121-153, sexual exploitation, they will be addressed in accordance with that provision and related policies.

## 17) Vandalism

Under WAC 478-121-167, vandalism includes maliciously damaging or misusing University property, or the property of any member of the University community.

## 18) Violation of Disciplinary Sanctions

Under WAC 478-121-170, violation of disciplinary sanctions includes the violation of any term or condition of any final order issued under this conduct code or the failure to complete a disciplinary sanction in the specified time frame.

## 19) Violation of Law

Under WAC 478-121-173, violation of law includes when a student has been convicted of a crime under any federal, state, or local law that adversely affects a University interest.

Plntffs000194

# 8. Conduct Proceedings

## A. Form of Adjudicative Proceeding

Under WAC 478-121-200, all conduct proceedings under the student conduct code and this policy shall be conducted in accordance with Chapter 34.05 RCW, Administrative Procedure Act, and constitutional due process. If there is an irresolvable conflict between the student conduct code and the Administrative Procedure Act or constitutional due process, the Administrative Procedure Act or constitutional due process shall supersede the student conduct code.

In applying the student conduct code and this policy, due consideration shall be given to the fact that the conduct process is administrative and not judicial in nature and that the rules of civil procedure only apply to the extent set forth in the conduct code or in Chapter 34.05 RCW. In formal proceedings pursuant to RCW 34.05.413 through 34.05.476, the University adopts the model rules of procedure Chapter 10-08 WAC, Model Rules of Procedure. In the case of a conflict between the model rules of procedure and Chapter 478-121 WAC, the procedural rules adopted in the code shall govern.

Informal settlements may be conducted under the authority of RCW 34.05.060.

## B. Brief Adjudicative Proceedings

Under WAC 478-121-203, when conduct proceedings have been designated as brief adjudicative proceedings under the student conduct code, they will be conducted in accordance with RCW 34.05.482 through 34.05.494 and the parties will receive notice as set forth in WAC 478-121-235.

## C. Conversion to Full Adjudicative Proceeding

Under WAC 478-121-205, prior to the conclusion of a brief adjudicative proceeding, the conduct officer shall make any inquiries necessary to ascertain whether the proceeding should be converted to a full adjudicative proceeding under RCW 34.05.413 through 34.05.476, of the Administrative Procedure Act. If converted, the conduct officer will take steps necessary to initiate a full hearing and a hearing officer will be assigned.

To the extent feasible, the conduct officer's record will be included in the record for the full hearing. The time of commencement of the full hearing shall be considered to be the time of commencement of the original conduct proceeding.

If not converted by the conduct officer, the parties will be given an opportunity to request a full hearing through the administrative review process per WAC 478-121-320 through 478-121-345.

## D. Full Adjudicative Proceeding

Under WAC 478-121-207, if it becomes apparent that a full adjudicative proceeding is necessary, is in the public interest, or is more appropriate to resolve issues affecting the participants, a full hearing will be held in accordance with WAC 478-121-400 through 478-121-427 that is in compliance with RCW 34.05.413 through 34.05.476.

The following are factors that may be considered as guidelines to determine whether the issues and interests involved warrant a full adjudicative proceeding:

1. If a respondent has been placed on emergency suspension;

2. If a respondent has been charged with hazing; or

3. If a respondent has been charged with a felony offense related to the alleged conduct under Washington State criminal code.

A disciplinary sanction of suspension or dismissal will not be imposed on a respondent without the University completing a full hearing, unless those sanctions were applied as a term of an informal settlement.

Plntffs000195

# 9. Disciplinary Sanctions

## A. Applicable Disciplinary Sanctions

Sanctions are intended to provide educational opportunities and accountability while also reducing the likelihood of future prohibited conduct. Sanctions may include administrative, educational, and restorative components. Some conduct, however, is so egregious in nature, or so damaging to the educational environment that it requires more serious sanctions, including suspension or dismissal.

Under WAC 478-121-210, one or more of the following disciplinary sanctions may be imposed for any violation of this conduct code:

### 1) Disciplinary Reprimand

A respondent may be issued a written disciplinary reprimand.

### 2) Disciplinary Probation

A respondent may be placed on disciplinary probation (meaning formal conditions are imposed on the respondent's continued attendance). The time period for the disciplinary probation and any conditions shall be specified. Failure to fulfill conditions of the disciplinary probation in a timely manner will extend the probationary period (and the conditions) and may result in additional disciplinary sanctions.

### 3) Restitution

A respondent may be required to make restitution for damage or other loss of property and for injury to persons. The University may put a conduct hold in place if the respondent fails to pay or to make in writing University-approved arrangements to pay restitution.

### 4) Loss of Privileges

A respondent may be denied specified privileges for a designated period of time such as the privilege to participate in a particular campus activity and may be restricted from any or all University premises for a specific duration.

### 5) Suspension

A respondent may be suspended (i.e., temporarily separated) from the University for a specified period of time. Conditions of suspension may be imposed and will be specified. Except as otherwise specified in the final order, all conditions must be fulfilled before the end of the suspension period. Failure to fulfill all conditions of suspension in a timely manner will extend the suspension period and any conditions, and may result in additional disciplinary sanctions. The University may put a conduct hold in place during the suspension period.

### 6) Dismissal

A respondent may be dismissed (i.e., permanently separated) from the University.

### 7) Sanctions for Hazing

In addition to other sanctions, a student who is found responsible for participating in hazing of another shall forfeit any entitlement to state funded grants, scholarships, or awards for a specified period of time.

## B. Possible Factors for Determining Sanctions

In determining an appropriate sanction for a violation of the student conduct code, factors that may be considered include, but are not limited to:

- The seriousness, severity, persistence, or pervasiveness of the prohibited conduct;

- The nature or violence (if applicable) of the prohibited conduct;

- The impact on the complainant and/or University community;

- The respondent's past disciplinary record with the University;

Plntffs000196

- Whether the respondent has accepted responsibility for the prohibited conduct;

- The maintenance of a safe, nondiscriminatory and respectful environment conducive to learning; and/or

- Any other mitigating, aggravating, or compelling factors that the presiding officer determines to be relevant and admissible.

  The use of alcohol or drugs by a respondent will not be considered a mitigating factor in imposing discipline.

  If a respondent withdraws from the University (or fails to reenroll) before completing a sanction, the sanction must be completed prior to or upon the respondent's reenrollment, depending on the nature of the sanction. Completion of disciplinary sanctions may be considered in applications for readmission to the University.

## C. Effective Date of Sanctions

Under WAC 478-121-213, sanctions will be implemented when a final order becomes effective in the University's conduct proceeding. An initial order that becomes a final order because no administrative review was requested or initiated becomes effective on the day after the period for requesting review has expired.

# 10. Initiating Conduct Proceedings

## A. Authority to Initiate Conduct Proceedings and Delegations of Authority in Conduct Proceedings

Under WAC 478-121-215, the following University officials may initiate conduct proceedings under the conduct code and this policy:

- The Vice President for Student Life at UW Seattle;

- The chancellors at UW Bothell and Tacoma;

- Deans of a school or college (including the graduate school) at UW Seattle; and

- Deans or directors of any school or program at UW Bothell or Tacoma.

  The above named University officials may delegate the authority to one or more individuals to initiate conduct proceedings, engage in fact finding, hold hearings, and issue initial orders under the conduct code and this policy. They may also establish student or student/faculty/staff hearing bodies to advise or to act for them in conduct proceedings.

  For the purpose of completing administrative reviews under Parts IV and V under the student conduct code:

1. The Chair of the Faculty Senate will appoint one or more faculty to be included in a pool of available reviewing officers; and

2. The President, Vice President for Student Life at UW Seattle, or the chancellors at the UW Bothell and Tacoma campuses may appoint one or more students to be included in a pool of available reviewing officers.

   Review Panels, composed of multiple reviewing officers, may be created to complete administrative reviews under Parts IV and V of the student conduct code and Sections 13 and 15 of this policy. Review panels may also include a review coordinator.

## B. Appointment of Reviewing Officers

Under WAC 478-121-217, faculty and students may be appointed to the pool of available reviewing officers at any time by a University official with authority to appoint such individuals. The appointment will be for a specific term, which may be extended at the discretion of a University official with authority to appoint such individuals, and will include any training and other conditions of service.

Faculty candidates for reviewing officers are identified and approved through the same process as used for membership on Faculty Senate councils and are appointed by the Chair of the Faculty Senate.

Plntffs000197

Student candidates will be identified in collaboration with student governance. To be eligible to serve on a review panel, students must be full-time and in good standing with the University.

Efforts will be made to ensure the pool includes available reviewing officers representing the UW Seattle, UW Bothell, and UW Tacoma campuses.

## C. Selection of Review Panels

Under WAC 478-121-220, for each administrative review, an odd number of available reviewing officers will be selected from the pool, based on availability, to form the review panel. Faculty or students may be selected to serve on review panels for conduct proceedings under this policy, but the majority of panel members must be faculty. Those selected for the panel will designate a faculty member of the panel to act as chair, with efforts made that the chair be a representative from the campus where the respondent is enrolled.

## D. Training for Presiding Officers and Reviewing Officers

The individuals who are selected to serve as presiding officers and reviewing officers will receive, at a minimum, annual training on the issues related to prohibited conduct under this policy and on conducting conduct proceedings.

## E. Disqualification and Substitution of Presiding Officers and Reviewing Officers

Under WAC 478-121-223, any presiding officer or reviewing officer is subject to disqualification for bias, prejudice, interest, or any other applicable cause. Any party may petition for the disqualification of an individual promptly after receipt of notice indicating that the individual will preside or, if later, promptly upon discovering facts establishing grounds for disqualification. The individual whose disqualification is requested shall determine whether to grant the petition, stating facts and reasons for the determination. An appropriate individual will then be substituted as a presiding or reviewing officer.

If a party requests the disqualification of a presiding officer and that request is denied, the denial of the request may be raised as a reason for seeking administrative review.

## F. Initiating Conduct Proceedings

Under WAC 478-121-225, conduct proceedings may be initiated when the University receives any direct or indirect report of conduct that may violate the student conduct code or this policy, which may include, but is not limited to, a police report, an incident report, a witness statement, other documentation, or a verbal or written report from a complainant, witness, or other third party.

Conduct matters may be initiated under the conduct code regardless of whether or not the incident in question is the subject of criminal or civil proceedings.

## G. Decision Not to Initiate a Conduct Proceeding

Under WAC 478-121-227, if the conduct officer decides not to initiate a conduct proceeding when requested by a complainant who, otherwise, would be a party to the proceeding, the conduct officer will provide the complainant with a written decision, including a brief statement of the reasons and of any other options for review.

## H. Timeframe for Completion and Extension for Good Cause

As a matter of internal management of the agency, typically, the period from commencement of a conduct proceeding through the service of an initial order in brief adjudicative proceedings or conversion to a full hearing will not exceed 60 calendar days. This guideline is intended to enhance efficiency, but is not intended to adversely affect the rights or procedures available to the complainant and respondent under Chapter 34.05 RCW. This time frame may be extended for good cause.

"Good cause" is interpreted as including factors such as whether additional time is necessary to ensure the integrity and completeness of the fact finding, to comply with a request by external law enforcement for temporary delay to gather evidence for a criminal investigation, to accommodate the availability of witnesses, to account for University breaks or vacations, to account for the complexities of a case, including the number of witnesses or volume of information provided, or to comply with Chapter 34.05 RCW.

Plntffs000198

## I. Coordination with Law Enforcement

If the University has initiated a conduct proceeding and the conduct is also subject to a criminal investigation, the University will make reasonable efforts to work cooperatively with the law enforcement agency, but the University will not unduly delay its own process. At the request of law enforcement, the conduct officer may delay the process temporarily while law enforcement is gathering evidence. The conduct officer will promptly resume the process when notified that law enforcement has completed the evidence-gathering stage of its criminal investigation.

## J. Conduct Hold on Student Record

Under WAC 478-121-230, a conduct office or other designated University official may place a conduct hold on the student's record if the student is the respondent in a pending report of prohibited conduct, a pending conduct proceeding under the student conduct code and this policy, or in conjunction with a disciplinary sanction under the code. A conduct hold may restrict the student from registering for classes, requesting an official transcript, or receiving a degree from the University until the hold has been removed. If a conduct hold is put in place pending or during a conduct proceeding, the student will be notified of the hold and be advised how to raise an objection about the hold or request that it be made less restrictive. The hold will remain in place until lifted by the conduct office or other designated University official with authority to do so.

Implementation of any conduct hold does not assume any determination of, or create any expectation of, responsibility for prohibited conduct under the conduct code and this policy.

Typically, a conduct hold will be lifted when circumstances change, where the hold is no longer necessary, or at the completion of a conduct proceeding. If a conduct hold is necessary to monitor a sanction, per Section 9, notification of the hold will be incorporated into the initial order or final order.

## K. Parties

Under WAC 478-121-233, the parties to a conduct proceedings are the University and the respondent. In addition, the University may designate other individuals, such as a complainant, as a party to conduct proceedings under this policy, or allow individuals to intervene in conduct proceedings.

Typically, faculty who refer an allegation of academic misconduct for conduct proceedings under the code and this policy would not be designated as a party.

## L. Interim Protective Measures

Under WAC 478-121-235, after receiving a report of prohibited conduct, the University may implement interim protective measures that impact a respondent at any time prior to the conclusion of a conduct proceeding. When implemented, the respondent will be advised on how to raise an objection about the interim measure or request that it be made less restrictive. Interim measures will remain in place until lifted or modified by a University official with authority to do so.

Interim protective measures are designed to limit contact between the respondent and others who have been impacted by the alleged conduct, avoid repeated prohibited conduct, if occurring, or potential retaliation against a complainant, an individual who reported, other specified persons, and/or a specific student organization. The specific interim protective measure(s) implemented will vary depending on the circumstances of each report.

If an interim protective measure is implemented, the respondent will be notified. Implementation of any interim measure does not assume any determination of, or create any expectation of, responsibility for prohibited conduct under the conduct code or this policy. A respondent who fails to comply with any interim protective measures may, however, be charged with a "failure to comply" pursuant to WAC 478-121-130. Interim protective measures typically remain in place for the entire conduct proceeding unless circumstances change and there is no longer a need for a specific interim protective measure.

Following are examples of interim protective measures:

### 1) A No-Contact Directive

A no-contact directive is a University directive prohibiting the respondent from having direct or indirect contact, by any means, with a complainant, an individual who reported, other specified persons, and/or a specific student organization. A no contact directive is a common interim protective measure that is put in place by the conduct officer. When a no-contact directive is put in place, the respondent is notified.

Plntffs000199

## 2) Housing Reassignments

In accordance with University housing agreements, a student may be reassigned to other University housing under certain circumstances as necessary.

## 3) Limiting the Respondent's Access to, or Limiting Participation in, Identified University-Controlled Buildings, Programs, or Activities

University employees or others with authority over the building, program, or activity are typically consulted regarding appropriate interim protective measure and/or may implement the interim protective measure.

## 4) Changes to Class Schedules, Assignments, or Test Schedules

This may include moving the respondent to a different class time or section. Efforts are made to avoid an impact on the respondent's academic progress.

## 5) Emergency Suspension

Authority to place a student on emergency suspension is set forth in Section 10.M below.

Certain interim protective measures may also be put in place as a condition of a sanction, per Section 9 above, and notification of the condition will be incorporated into the initial or final order.

# M. Emergency Authority of the University

Under WAC 478-121-237, if there is reasonable cause to believe that a student's conduct represents a threat to the health, safety, or welfare of the University or any member of the University community, or poses an ongoing threat of substantially disrupting or materially interfering with University activities or operations, the president, the president's delegate, the vice president for Student Life for UW Seattle or delegates, and the chancellors of the UW Bothell and Tacoma campuses or delegates, may immediately suspend that student from participation in any or all University functions, privileges, or locations.

In such an emergency situation, the University official placing the student on emergency suspension shall issue a written order to be served upon the student describing the terms of the emergency suspension and the reasons for the emergency suspension. The order shall advise the student how to raise an objection about the emergency suspension or request that it be made less restrictive. The University may also put a conduct hold in place during the emergency suspension period.

The order shall be effective immediately. The proceeding shall then be referred to the appropriate conduct office and the proceeding shall proceed as quickly as feasible. The emergency suspension shall remain in effect until lifted or revised by a University official with authority to do so or until a final order is entered in the proceeding. Once a final order is entered in the proceeding, any emergency suspension shall be lifted and the sanction, if any, will be imposed.

To the extent permissible under applicable law, the complainant or other member of the University community may also be provided with notice of the respondent's emergency suspension and any terms of the emergency suspension that directly relate to that individual.

# N. Service of Notices, Filings, and Orders; and Time Limits

Service of all University notices will be sent via electronic mail (email) addressed to the party's University-issued email address. An alternative email address may be provided to the conduct officer in writing. Service by email is complete at the moment the email is sent to the email address. In the alternative, service may also be accomplished by personal service or by posting it in the United States mail, properly addressed, and postage prepaid. Service by mail is complete upon deposit in the United States mail. If there is no email on record, service may also be accomplished by personal service or by posting it in the United States mail, properly addressed, and postage prepaid. Service by mail is complete upon deposit in the United States mail.

The parties are permitted to file documents with the conduct officer via email or other electronic means as determined by the conduct officer. Receipt of such documents will be the date of the email. When documents must be shared with other parties, the conduct officer will be responsible for delivery of such documents, as above.

Plntffs000200

In computing any period of time under the conduct code and this policy, the day of service of any order, notice, or other document is not counted. The last day of the applicable period of time is counted. If the last day of the applicable period of time falls on a Saturday, Sunday, or official state holiday (which includes the day after Thanksgiving), the period ends on the next business day. When the period of time prescribed or allowed is less than seven days, intermediate Saturdays, Sundays, and holidays shall be excluded in the computation.

The time limit for seeking an administrative review of an initial order is based upon the date of service of the initial order.

University students and employees have an ongoing obligation to update their physical and email addresses via MyUW. Others involved in the conduct proceeding who are not affiliated with the University have an obligation to notify the conduct officer of any change to their physical or email addresses.

## O. Participation of Advisors and Attorneys

Under WAC 478-121-243, the parties to conduct proceedings may, at their own expense, be accompanied by an advisor of their choice, including an attorney, throughout the conduct proceedings. In a brief adjudicative proceeding, an advisor may provide support and advice, but an advisor may not speak on behalf of the student or disrupt or interfere with any aspect of the brief adjudicative proceeding, as determined by the conduct officer. In a full adjudicative proceeding, including any prehearing matters, if the party's advisor is an attorney, the attorney may advise and represent the party, but the advisor may not disrupt or interfere with any aspect of the proceeding, as determined by the hearing officer or reviewing officer(s).

Advisors should make themselves reasonably available and the University will not unduly delay the conduct proceeding based on the advisor's or attorney's unavailability. Advisors may be asked to meet with a University administrator in advance of any participation in the proceeding to learn about the process and the expectations of the role.

## P. Consolidation

Under WAC 478-121-245, if there are multiple conduct proceedings involving common issues or parties, the parties may request, or the presiding officer may decide, to consolidate the proceedings. This decision is within the sole discretion of the presiding officer.

## Q. Burden of Proof

Under WAC 478-121-247, the burden of proof in conduct proceedings rests with the University.

## R. Disability Accommodation

The University provides reasonable accommodation to individuals involved in the conduct process, including interpreter services for deaf and hard of hearing, in accordance with relevant federal and state laws and University policies. To request disability accommodation, contact a disability services office (see resources available on the Student Conduct website).

# 11. Evidence

## A. Evidence in Conduct Proceedings

Under WAC 478-121-250, the following evidentiary provisions apply to conduct proceedings under the student conduct code and this policy. In applying the code, due consideration shall be given to the fact that the conduct process is administrative and not judicial in nature and that rules of evidence only apply to the extent set forth in the code or in Chapter 34.05 RCW. This policy also provides guidance regarding the University's interpretation of those rules.

While brief adjudicative proceedings do not require the application of rules of evidence, the conduct officer will be guided by the principles underlying the Washington State Rules of Evidence when they do not conflict with the code or relevant University policies.

## B. Relevant Evidence, Hearsay, and Character Evidence

Under WAC 478-121-253, evidence, including hearsay, is admissible if, in the judgment of the presiding officer, it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs. Findings may be based on such evidence even if it would be inadmissible in a civil trial. In a full hearing, however, the hearing officer shall not base a finding exclusively on such inadmissible evidence unless the hearing officer determines that doing so would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence. The basis for this determination shall appear in the initial order.

The presiding officer will determine the admissibility and relevance of all evidence, including that offered by the parties and/or witnesses, and shall exclude evidence that is excludable on constitutional or statutory grounds or on the basis of evidentiary privilege recognized in the courts of this state. The presiding officer may exclude from consideration evidence that is not relevant. The presiding officer may also exclude from consideration evidence that is immaterial or unduly repetitious.

In general, the presiding officer will not consider statements of personal opinion or statements as to any individual's general reputation or any character trait, unless the presiding officer considers such evidence to be relevant and admissible.

The presiding officer may take judicial notice of some material that was not offered as evidence by the parties. In full adjudicative proceedings, the process for taking judicial notice is set forth in RCW 34.05.452.

## C. Prior or Subsequent Conduct of the Respondent

Under WAC 478-121-255, prior or subsequent conduct of the respondent may be considered in determining opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. The presiding officer will determine the relevance and admissibility of this evidence.

## D. Experts

Under WAC 478-121-260, presiding officers may consult medical, forensic, technological, or other experts when expertise on a topic is needed in order to achieve a fuller understanding of the issues under investigation. This information will be summarized in the initial order.

Generally, results of polygraph examinations are not considered relevant, even if offered voluntarily.

## E. Self-Incriminating Evidence

Under WAC 478-121-263, no student shall be compelled to give self-incriminating evidence and a negative inference will not be drawn from a refusal to participate at any stage of the conduct proceeding. The presiding officer may, however, proceed with the conduct proceeding and reach a finding based on other available and admissible evidence.

## F. Criminal Conviction

Under WAC 478-121-265, the presiding officer may accept a conviction of a crime under any federal, state, or local law as the evidentiary basis for establishing prohibited conduct under the code when the elements of that crime establish prohibited conduct under the student conduct code and this policy that adversely affects a University interest.

## G. Law Enforcement Records

When available to the University, information provided by law enforcement, or through law enforcement records, may be considered in the University's conduct proceedings.

## H. Medical or Counseling Records

In general, an individual's medical and counseling records are confidential and not accessible to the conduct officer unless the individual voluntarily chooses to share those records. In those instances, the information, if determined to be relevant, may be shared with other parties or witnesses and will become part of the record. Individuals who are considering submitting such records are urged to consult with the conduct officer prior to providing such records to learn more about how those records may be shared and retained.

Plntffs000202

# 12.  Brief Adjudicative Proceedings

## A. Notice of Conduct Proceeding and Investigative Interview

Under WAC 478-121-300, the conduct officer will provide notice to the parties, in writing, of the commencement of conduct proceedings, which will include information on how to petition for disqualification of the conduct officer.

The notice will include:

- A brief description of the alleged misconduct;

- The specific section(s) of the student conduct code allegedly violated; and

- Information about the range of sanctions that may be imposed in a conduct proceeding.

The conduct officer will also schedule an investigative interview with the respondent as part of the fact-finding process.

## B. Fact Finding

Under WAC 478-121-305, before taking action in a brief adjudication proceeding, the conduct officer shall give each party an opportunity to be informed of the agency's view of the matter and to explain the party's view of the matter. This process includes, without limitation, conducting fact finding and providing the parties with the opportunity to participate in the conduct proceeding by explaining the process to the parties and allowing them to review the allegations, provide evidence, identify witnesses with relevant knowledge, respond to evidence provided by others, and provide the conduct officer with suggested questions for others (collectively, "fact finding").

As part of the fact finding process and prior to its completion, the conduct officer will notify and provide the opportunity to meet separately with the complainant, the respondent, and third-party witnesses. Each party will also be asked to identify witnesses, and provide other relevant information, such as documents, communications, photographs, and other evidence. The conduct officer is responsible for gathering reasonably available evidence and information.

If a party fails to respond to notices or does not participate in the conduct proceeding at any stage of the proceeding, the University may move forward with the conduct proceeding without the participation of a party.

## C. Standard of Proof

Under WAC 478-121-310, the applicable standard of proof is the "preponderance of evidence" standard. This means that, in order for a respondent to be held responsible for a violation of the student conduct code and this policy, the conduct officer must conclude, based on all of the evidence in the record, that it is more likely than not that the respondent engaged in an act or acts of conduct prohibited by the code.

## D. Initial Order

Under WAC 478-121-315, at the conclusion of the fact finding, the conduct officer will prepare an initial order. If the respondent is found responsible, the conduct officer will impose a sanction. The conduct officer will serve the initial order to the parties, simultaneously and in writing. The initial order will include a brief written statement of the reasons for the decision and an explanation of how to request administrative review of the initial order and the time frame to do so.

# 13.  Brief Adjudicative Proceeding Administrative Review

## A. Requesting Administrative Review

Under WAC 478-121-320, a party may request administrative review of the initial order based on the grounds as set forth in WAC 478-121-325.

A request for administrative review must be submitted in writing to the conduct officer within 21 days of the date of service of the initial order. The party requesting the review will be provided with an opportunity to explain the reasons for seeking review. If one of the grounds is to consider newly discovered evidence, that evidence must also be provided with the request for review.

If an administrative review is not requested within 21 days of service of the initial order, the initial order shall become the final order.

## B. Grounds for Administrative Review

Under WAC 478-121-325, a party may request administrative review for any or all of the following reasons:

- To determine whether there was a material error that substantially affected the outcome of the fact finding or sanctioning;

- To consider newly discovered evidence, not reasonably available during the fact finding, that could substantially impact the outcome;

- To determine whether the sanction(s) imposed were appropriate for the violation committed and were not excessively lenient or excessively severe; or

- To determine whether the issue and interests involved warrant a full hearing.

## C. Notice of Administrative Review

Under WAC 478-121-330, if administrative review is requested, the University will provide the parties notice, in writing, of the date the administrative review will be initiated and the identities of the reviewing officer(s) selected for the review panel. The parties will also be provided with information on how to petition for disqualification of any reviewing officer(s).

Other parties will be provided with a copy of the request for administrative review and notice of how to submit a written response. Responses must be submitted within five business days of service of the notice of administrative review.

## D. Procedures for Administrative Review

Under WAC 478-121-335, when the reviewing officer(s) conducts an administrative review, the review is based on:

1. The conduct officer's record and fact finding;

2. Information submitted to the review panel in the request for review or response to request for review; and

3. Newly discovered evidence, if the basis for seeking administrative review is that newly discovered evidence has become available; however the review of newly discovered evidence is limited to determining whether the newly discovered evidence warrants remanding the matter for further proceedings.

   Decisions by a panel of reviewing officers will be determined by majority vote.

## E. Order from Administrative Review

Under WAC 478-121-340, within 20 days after the request is submitted, the review panel will issue an order, which will include the outcome, any sanction, and a brief statement of the reasons for the outcome. All parties will receive simultaneous, written notification of the outcome of the review.

The reviewing officer(s) may reach one of the following results:

- Conclude there is no basis for remand or alteration of sanctions, and issue a final order disposing of the proceeding;

- Remand for further fact finding or review if newly discovered evidence may have impacted the result or if the record demonstrates material error;

- Increase or reduce the sanction(s) and issue a final order, if the increased sanction does not warrant a full hearing; or

- Conclude whether the proceeding should be converted to a full adjudicative proceeding and, if so, take steps necessary to initiate a full hearing.

If the review panel does not issue an order within 20 days after the request is submitted, the request for review is deemed to be denied.

Plntffs000204

## F. Process Following Remand from Administrative Review or Conversion

Under WAC 478-121-345, if the proceeding is remanded or converted to a full adjudicative proceeding following administrative review, the initial order will be rescinded and the reviewing officer(s) will describe, in writing, the reasons for the remand or conversion.

Following remand, additional proceedings will be conducted as necessary to address the reasons for the remand or conversion and will be conducted in accordance with the relevant sections of the code.

# 14. Full Adjudicative Proceedings and Full Hearings

## A. Notice of Full Hearing

Under WAC 478-121-400, the hearing officer shall set the time and place of the full hearing and give not less than seven days advance written notice to all parties and to all persons who have filed written petitions to intervene in the matter. The notice will include information on how to petition for disqualification of the hearing officer.

## B. Prehearing Conferences

Under WAC 478-121-403, hearing officers upon their own motion or upon request of a party may direct the parties or their representatives to engage in a prehearing conference or conferences to consider:

- Simplification of issues;

- The necessity or desirability of amendments to the pleadings, if any;

- The possibility of obtaining stipulations, admissions of fact and admissions of the genuineness of documents which will avoid unnecessary proof;

- Limitations on the number and consolidation of the examination of witnesses;

- Procedural matters;

- Distribution of written testimony and exhibits to the parties prior to the hearing;

- Such other matters as may aid in the disposition or settlement of the proceeding.

  Prehearing conferences may be held by telephone conference call or at a time and place specified by the hearing officer.

  Following prehearing conferences, the hearing officers shall issue an order. Orders are effective when they are served. Hearing officers may, at their discretion, hold more than one prehearing conference and issue orders modifying any prehearing order.

  In any full hearing, hearing officers may, in their discretion, conduct a conference prior to the taking of testimony, or may recess the hearing for such conference, for the purpose of carrying out the purpose of this provision. The hearing officer shall state on the record the results of such conference.

## C. Record for the Full Hearing

Under WAC 478-121-205, the conduct officer's record will be included in the record for the full hearing. Prior to the hearing, the conduct officers' record is provided the parties for review. The parties are given the opportunity, typically finalized through the prehearing conference, to request that evidence be included in or excluded from the record.

Under WAC 478-121-253, the hearing officer will determine the admissibility and relevance of all evidence, including that offered by the parties and/or witnesses.

## D. Discovery

Under WAC 478-121-405, discovery, including depositions, interrogatories, requests for production, entry onto land for inspection or other purposes, and physical and mental examinations, is not available in conduct proceedings under the student conduct code and this policy.

## E. Subpoenas

Under WAC 478-121-407, the hearing officer may issue subpoenas. The parties may also request that the hearing officer issue subpoenas or a party's attorney of record may also issue a subpoena in whose behalf the witness is required to appear at a full hearing. The requesting party is responsible for serving the subpoena upon the witness. In the discretion of the hearing officer, and where the rights of the parties will not be prejudiced thereby, such testimony may be by telephone or other electronic means.

## F. Protective Orders

Under WAC 478-121-410, the hearing officer may enter protective orders, which limit the admissibility of evidence or condition it on specified criteria necessary to protect a party or a witness from annoyance, embarrassment, oppression, or undue burden or expense, or to comply with any applicable law.

## G. Pleadings, Briefs, and Motions

Under WAC 478-121-413, at appropriate stages of full adjudicative proceedings, the hearing officer will give all parties full opportunity to submit and respond to pleadings, motions, objections, and offers of settlement, including motions for summary judgment.

At appropriate stages of full adjudicative proceedings, the hearing officer may give all parties full opportunity to file briefs, proposed findings of fact and conclusions of law, and proposed initial or final orders.

The hearing officer has the discretion to decide and dispose of all issues raised in accordance with this section.

## H. Communications with Hearing Officer

Under WAC 478-121-415, all communications with the hearing officer, except for communications necessary to procedural aspects of maintaining an orderly process, must be in the presence of, or with a copy to, all other parties. Ex parte communications received by the hearing officer must be placed on the record, and all other parties must be informed of the ex parte communication and given an opportunity to respond on the record.

## I. Standard of Proof in Full Hearings

Under WAC 478-121-417, the applicable standard of proof is the "preponderance of evidence" standard. This means that, in order for a respondent to be held responsible for prohibited conduct under the student conduct code and this policy, the hearing officer must conclude, based on all of the evidence in the record, that it is more likely than not that the respondent engaged in an act or acts of prohibited conduct.

## J. Continuances

Under WAC 478-121-420, the hearing officer has the discretion to grant postponements, continuances, extensions of time, and adjournments or upon a request of any party, if the party shows good cause.

A request for a continuance may be oral or written. If all parties do not agree to the continuance, the hearing officer may schedule a prehearing conference to receive argument or may rule on the request without argument.

## K. Testimony under Oath or Affirmation

Under WAC 478-121-423, in a full hearing, all testimony of parties and witnesses shall be made under oath or affirmation.

## L. Remote Participation

Under WAC 478-121-425, at the discretion of the hearing officer, and where the rights of the parties will not be prejudiced thereby, all or part of any hearing, including the testimony of witnesses, may be conducted by telephone or other electronic means. Each party in the hearing must have an opportunity to participate effectively in, to hear, and if technically and economically feasible, to see the entire proceeding while it is taking place. Such measures may be taken to accommodate concerns raised by a complainant, a respondent, or any witness.

Plntffs000206

## M. Procedure in Full Hearing

To the extent necessary for full disclosure of all relevant facts and issues, the hearing officer of a full hearing shall afford to all parties the opportunity to respond, present evidence, and argument, conduct cross-examination, and submit rebuttal evidence, except as restricted by a limited grant of intervention or by the prehearing order.

A complainant or respondent may request, and the hearing officer has the discretion to order, that the respondent may not ask questions of a complainant, but, instead, be allowed to submit written questions to the hearing officer, who will ask any relevant and appropriate questions submitted. The hearing officer has the discretion to accept, reject, or rephrase any question submitted.

## N. Initial Order from Full Hearing

Under WAC 478-121-427, at the conclusion, the hearing officer will issue an initial order, which shall include all matters required by RCW 34.05.461(3). The hearing officer will serve the initial order to the parties, simultaneously and in writing. The initial order will include an explanation of how to request administrative review of the initial order and the time frame to do so.

If an administrative review is not requested within 21 days of service of the initial order, the initial order shall become the final order.

## 15.  Administrative Review from Full Hearings

### A. Requesting Administrative Review from a Full Hearing

Under WAC 478-121-430, a party may request administrative review of the initial order based on the grounds as set forth in WAC 478-121-433.

A request for administrative review must be submitted in writing to the hearing officer within 21 days of the date of the initial order. If one of the grounds is to consider newly discovered evidence, that evidence must be provided with the request for review.

If an administrative review is not requested within 21 days the initial order shall become the final order.

### B. Grounds for Administrative Review from a Full Hearing

Under WAC 478-121-433, a party may request administrative review for any or all of the following reasons:

- To determine whether there was a material error that substantially affected the outcome of the fact finding or sanctioning;

- To consider newly discovered evidence, not reasonably available during the fact finding, that could substantially impact the outcome;

- To determine whether the sanction(s) imposed were appropriate for the violation committed and were not excessively lenient or excessively severe; or

- Any other grounds that would warrant modification, withdrawal, or reversal of the order.

### C. Notice of Administrative Review from a Full Hearing

Under WAC 478-121-435, if administrative review is requested, the University will provide the parties notice, in writing, of the date the administrative review will be initiated and the identities of the reviewing officer(s) selected for the review panel. The parties will also be provided with information on how to petition for disqualification of any reviewing officer(s).

Other parties will be provided with a copy of the request for administrative review and notice of how to submit a written response. Responses must be submitted within five business days of service of the notice of administrative review.

### D. Procedures for Administrative Review from a Full Hearing

Under WAC 478-121-437, when the reviewing officer(s) conducts an administrative review, the reviewing officer(s) shall:

Plntffs000207

1. Personally consider the whole record or such portions of it as may be cited by the parties;

2. Exercise all the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing, except to the extent that the issues subject to review are limited by a provision of law or by the reviewing officer(s) upon notice to all the parties;

3. Afford each party an opportunity to present written argument and may afford each party an opportunity to present oral argument to explain the party's position but any such argument shall not be considered as evidence;

4. Review information submitted to the review panel in the request for review or response to request for review; and

5. Review newly discovered evidence, if the basis for seeking administrative review is that newly discovered evidence has become available; however the review of newly discovered evidence is limited to determining whether the newly discovered evidence warrants remanding the matter for further proceedings.

In reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officers' opportunity to observe the witnesses.

Decisions by the reviewing officer(s) will be determined by majority vote.

## E. Communications with Reviewing Officers

Under WAC 478-121-440, all communications with reviewing officers, except for communications necessary to procedural aspects of maintaining an orderly process, must be in the presence of, or with a copy to, all other parties. Ex parte communications received by reviewing officers must be placed on the record, and all other parties must be informed of the ex parte communication and given an opportunity to respond on the record.

## F. Order from Administrative Review of Full Hearing

Under WAC 478-121-443, within 30 calendar days of receipt of all response(s) submitted by the parties or oral argument (if any), whichever is later, the reviewing officer(s) will issue an order, which will include the outcome, any sanction, and a brief statement of the reasons for the outcome. All parties will receive simultaneous, written notification of the outcome of the review.

The reviewing officer(s) may reach one of the following results:

- Conclude there is no basis for remand or alteration of sanctions, and issue a final order disposing of the proceeding;

- Remand for further fact finding or review if newly discovered evidence may have impacted the result or if the record demonstrates material error with instructions to the presiding officer who entered the initial order;

- Increase or reduce the sanction(s) and issue a final order disposing of the proceeding; or

- Issue a final order disposing of the proceeding or remand the matter for further proceedings on any other grounds that would warrant modification, withdrawal, or reversal of the order, with instructions to the presiding officer who entered the initial order.

When issuing orders under this section, the order shall include, or incorporate by reference to the initial order, all matters required by RCW 34.05.461(3).

The reviewing officer will serve the order to the parties, simultaneously and in writing.

## G. Process Following Remand from Administrative Review of a Full Hearing

Under WAC 478-121-445, if the proceeding is remanded, the initial order will be rescinded and the reviewing officer(s) will describe, in writing, the reasons for the remand. Following remand, additional proceedings will be conducted as necessary to address the reasons for the remand.

At the conclusion, the hearing officer will issue an initial order, which shall include all matters required by RCW 34.05.461(3). The hearing officer will serve the initial order to the parties, simultaneously and in writing. The initial order will include an explanation of how to request administrative review of the initial order and the time frame to do so.

Plntffs000208

If an administrative review is not requested within 21 days of service of the initial order, the initial order shall become the final order.

## H. Judicial Review

Once a final order has been issued by the University, complainants or respondents may seek judicial review as set forth in Chapter 34.05 RCW, the Washington State Administrative Procedure Act. The time limit for seeking judicial review of a final order is set forth in RCW 34.05.542.

# 16.  Reconsideration of Final Orders in Full Adjudicative Proceedings

## A. Reconsideration of Final Orders

Under WAC 478-121-447, within ten days of the service of a final order or within ten days of the date an initial order becomes a final order, any party may file a request for reconsideration. The request shall be directed to the officer(s) who issued the final order and state in writing specific reasons for the request. Upon receipt, the officer(s) shall promptly serve all other parties with a copy of the request for reconsideration.

Unless the request for reconsideration is automatically deemed to have been denied under WAC 478-121-450, the request shall be disposed of by the officer(s) who issued the final order, if reasonably available. The disposition shall be in the form of a written order denying the request, granting the request and dissolving or modifying the final order, or granting the request and setting the matter for further hearing.

## B. Denial of Request for Reconsideration

Under WAC 478-121-450, the request for reconsideration is automatically deemed to have been denied if, within twenty days from the date the request for reconsideration is timely submitted, the officer(s) who issued the final order does not either:

1.  Dispose of the request; or

2.  Serve the parties with a written notice specifying the date by which the request will be acted upon.

# 17.  Privacy and Records

## A. Privacy in Full Hearings

Under WAC 478-121-453, in accord with the Family Educational Rights and Privacy Act (FERPA), (20 U.S.C. Sec. 1232g) and its implementing regulations (34 C.F.R. Part 99), all meetings or reviews conducted under the student conduct code and this policy generally will be held in closed session out of respect for the privacy of all the students involved.

In a full hearing, the hearing officer may close parts of a hearing under any provision of law expressly authorizing closure or under a protective order entered by the hearing officer pursuant to applicable rules and the hearing officer may order the exclusion of witnesses upon a showing of good cause.

Students may, at their sole discretion, waive their rights under FERPA in writing. The scope of any FERPA waiver and any protective order entered by the hearing officer will determine who can have access to information that would otherwise be protected from disclosure by FERPA, including without limitation who can be present at any hearing held in a full adjudicative proceeding under the code and this policy. If the hearing is open to public observation, the hearing officer shall conduct the hearing in a room that will accommodate a reasonable number of observers. The hearing officer may issue a protective order to exclude from the hearing any persons who are disruptive of the proceedings and may limit the number and activities of the observers as necessary to protect the safety of the participants and observers and to assure a fair hearing.

To ensure the privacy of all students involved, no cameras or recording devices shall be permitted except for the official recording by the University; however, if FERPA or other federal or state law implicated by RCW 34.05.040 does not preclude it, then any party, at the party's expense, may cause a reporter approved by the agency to prepare a transcript from the agency's record, or cause additional recordings to be made during the hearing if the making of the additional recording does not cause distraction or disruption. If a party intends to make a recording of the proceeding, the party shall advise the hearing officer prior to the prehearing conference so that any issues related to making an additional recording can be addressed prior to the full hearing.

## B. General Recordkeeping

Under WAC 478-121-500, records related to conduct proceedings shall be maintained consistent with RCW 34.05.476 and 34.05.494, University records retention policies, and other relevant policies.

## C. Disciplinary Record

Under WAC 478-121-510, any final order resulting from conduct proceedings shall become a part of the respondent's disciplinary record. Student disciplinary records are "education records" as defined by FERPA and may only be disclosed consistent with FERPA and Chapter 478-140 WAC.

This may include, but is not limited to, releasing to the alleged victim of a crime of violence or a non-forcible sex offense the final results of the conduct proceeding conducted by the University involving the student who is alleged to have engaged in that crime or offense.

# 18.  University Resources

For all University resources related to this policy please refer to the University of Washington Student Conduct website.

*S-B 186, May 19, 2017 [effective August 18, 2017] with Presidential approval; RC, October 17, 2017.*

Plntffs000210

**Exhibit E**

Printed on: 4/29/2025 at 22:05. For more information visit University Policy and Rules Office, www.washington.edu/rules.

# UW POLICY DIRECTORY

## Role and Mission of the University

Founded 4 November 1861, the University of Washington is one of the oldest state-supported institutions of higher education on the Pacific coast. The University is comprised of three campuses: the Seattle campus is made up of sixteen schools and colleges whose faculty offer educational opportunities to students ranging from first-year undergraduates through doctoral-level candidates; the Bothell and Tacoma campuses, each developing a distinctive identity and undergoing rapid growth, offer diverse programs to undergraduates and to graduate students.

The primary mission of the University of Washington is the preservation, advancement, and dissemination of knowledge. The University preserves knowledge through its libraries and collections, its courses, and the scholarship of its faculty. It advances new knowledge through many forms of research, inquiry and discussion; and disseminates it through the classroom and the laboratory, scholarly exchanges, creative practice, international education, and public service. As one of the nation's outstanding teaching and research institutions, the University is committed to maintaining an environment for objectivity and imaginative inquiry and for the original scholarship and research that ensure the production of new knowledge in the free exchange of facts, theories, and ideas.

To promote their capacity to make humane and informed decisions, the University fosters an environment in which its students can develop mature and independent judgment and an appreciation of the range and diversity of human achievement. The University cultivates in its students both critical thinking and the effective articulation of that thinking.

As an integral part of a large and diverse community, the University seeks broad representation of and encourages sustained participation in that community by its students, its faculty, and its staff. It serves both non-traditional and traditional students. Through its three-campus system and through continuing education and distance learning, it extends educational opportunities to many who would not otherwise have access to them.

The academic core of the University of Washington Seattle campus is its College of Arts and Sciences; the teaching and research of the University's many professional schools provide essential complements to these programs in the arts, humanities, social sciences, and natural and mathematical sciences. Programs in law, oceanography and fisheries, library science, and aeronautics are offered exclusively (in accord with state law) by the University of Washington. In addition, the University of Washington has assumed primary responsibility for the health science fields of dentistry and public health, and offers education and training in medicine for a multi-state region of the Pacific Northwest and Alaska. The schools and colleges of built environments, business, education, engineering, environment, information, nursing, pharmacy, public policy, and social work have a long tradition of educating students for service to the region and the nation. These schools and colleges make indispensable contributions to the state and, with the rest of the University, share a long tradition of educating undergraduate and graduate students toward achieving an excellence that well serves the state, the region, and the nation.

*BR, February 1981; February 1998; AI, December 2001; BR, July 11, 2013; RC, September 23, 2016; RC, September 20, 2017; [formerly numbered Regent Policy No. 5] BR, July 11, 2019.*

Plntffs000183

# Exhibit F

Printed on: 4/29/2025 at 22:09. For more information visit University Policy and Rules Office, www.washington.edu/rules.

# UW POLICY DIRECTORY

## Statement of Ethical Principles

The faculty, staff, and students of the University of Washington are heirs to a 150-year commitment to honesty and integrity in conducting our mission of education, research, and public service. As trustees of that legacy, it is our responsibility to hold ourselves and one another to the highest ethical standards, guiding our quests for the discovery and dissemination of knowledge and the conduct of other University affairs with a deep respect for the rules and societal standards that define the right way to conduct our work.

This Statement of Ethical Principles is intended to form a foundation for applying the various detailed regulations and ethics programs to which members of the University community are subject. The Statement should be used as a general guide in making ethical decisions in all situations, especially those where the right answer may not be immediately apparent.

## 1. Conflicts of Interest and Commitment

All regents, faculty, senior officials, and staff hold positions of trust, and we should conduct our activities accordingly. We must avoid activities that would compromise the public's confidence in the University's integrity or that would impair our independence and objectivity of judgment in the discharge of our responsibilities to the University. We should demonstrate sensitivity in identifying potential conflicts of interest, whether of a financial, personal, or professional nature. Conflicts of interest must be disclosed, reviewed, and appropriately managed or eliminated in accordance with the reporting and other provisions of applicable University and regulatory agency policies.

## 2. Respect and Civility

The University community is diverse in ethnicity, gender, age, religion, sexual orientation, political belief, and in many other ways. As members of this community, each of us must help establish and maintain a culture of tolerance and respect for the dignity and perspectives of others and promote civility in our discourse and behavior towards one another.

## 3. Accountability

We should hold ourselves accountable to each other, to the University, and to the public for our actions and our omissions. Our duty includes an obligation to report suspected violations of laws, regulations, or University policies to appropriate University officials and to avoid retaliation against others who in good faith report such violations.

## 4. Stewardship and Use of Authority

As stewards of University resources, we each have a responsibility to ensure that all assets under our control are used prudently, ethically, and for their designated purposes. We must avoid waste of University funds, property, or facilities or their diversion for non-University purposes. Similarly, we must be careful to use the authority delegated to us so that it serves institutional, rather than personal, objectives.

Plntffs000211

## 5. Seeking Guidance

Whenever we, as members of the University community, are uncertain about the best way to handle a situation, we should consult with our supervisors, the Executive Director of Internal Audit, University legal counsel, or other appropriate resources.

*BR, June 7, 2012; [formerly numbered Regent Policy No. 14] July 11, 2019.*

---

For related information, see:

- *Board of Regents Governance*, Regent Policy No. 10, "Customs and Protocols of the Board of Regents"

- *Board of Regents Governance*, Regent Policy No. 11, "Policy Regarding Regent Conflicts of Interest"

Plntffs000212

# Exhibit G

Printed on: 4/29/2025 at 22:12. For more information visit University Policy and Rules Office, www.washington.edu/rules.

# UW POLICY DIRECTORY

## Statement on Diversity

The Board of Regents of the University of Washington hereby reaffirms the University's long-standing commitment to diversity, equity, and inclusion on its campuses. This commitment was first enunciated by the Board at its meeting on June 13, 1975 ("Special Educational Opportunities for Minorities and Women"), was reasserted at its meeting on February 9, 1979 (Regent Policy No. 32, "Policy on Admission"), and then again at its meeting on January 16, 1998.

Now, as on earlier occasions, the Regents recognize the important place the University of Washington occupies as Washington's largest institution of higher education and as one of the world's leading public research universities. At the University of Washington, diversity, equity, and inclusion are integral to excellence. We value and honor diverse experiences and perspectives, strive to create welcoming and respectful learning environments, and promote access, opportunity, and justice for all.

The state of Washington has a compelling interest in making sure that the University is accessible to talented students, faculty, and staff from all social identities. The knowledge that the University of Washington is open to qualified students, faculty members, and staff from all groups, and thus serves all parts of the community equitably, helps to sustain the social fabric of the state.

University of Washington students, and the society they will serve and help to lead, require the very best education this institution can provide. Among the educational resources the University has to offer are a diverse student body, a diverse faculty, and a diverse staff. With the guidance and support of members of the faculty and the staff, students educate each other in the classroom and in many informal settings: they challenge one another's assumptions, they broaden one another's range of experience, and they teach one another to see the world from varied perspectives. Although the University seeks diversity of many kinds, the University particularly acknowledges the acute need to remove barriers to the recruitment, retention, and advancement of talented students, faculty members, and staff from underrepresented populations.

We therefore direct the President, the University administration, and the faculty to continue to advance diversity, equity, and inclusion on the University of Washington's campuses, in all ways consistent with the laws of the state of Washington and the federal government.

*BR, January 16, 1998; September 13, 2018; [formerly numbered Regent Policy No. 11] July 11, 2019.*

———————

For related information, see:

- *Board of Regents Governance*, Regent Policy No. 32, "Policy on Admission"

- *Board of Regents Governance*, Regent Policy No. 34, "Policy on Financial Aid, Including Scholarships, Grants, and Fellowships, to Promote Student Diversity at the University of Washington"

Plntffs000213

**CERTIFICATE OF SERVICE**

I, Jennifer Shaw, certify as follows:

On February 6, 2026, I e-mailed *Plaintiffs' First Set of Requests for Admissions Propounded to State of Washington - UWT* to:

Seth Bernsten
Rebecca Singleton
**Summit Law Group, PLLC**
315 Fifth Avenue South, Suite 1000
Seattle, WA 98104-2682
sethb@summitlaw.com
rebeccas@summitlaw.com
paigeh@summitlaw.com
dominiqueb@summitlaw.com

*Attorneys for Defendants UWT, Harner, Sellmaier, Hill, and Miller*

I certify under penalty of perjury under the laws of the State of Washington that the above information is true and correct.

DATED February 6, 2026, at Fircrest, Washington.

III Branches Law, PLLC

_____
Jennifer Shaw
Receptionist

EXHIBIT 53

Case 3:25-cv-05079-DGE    Document 105    Filed 03/17/26    Page 398 of 446    𝓮𝔁 𝓵

9/17/25, 3:26 PM          Essential Skills, Values and Standards of Professional Conduct | School of Social Work & Criminal Justice | University of Washingto...

The Wayback Machine - https://web.archive.org/web/20230322200633/https://www.tacoma.uw.e...



# SCHOOL OF SOCIAL WORK & CRIMINAL JUSTICE

# ESSENTIAL SKILLS, VALUES AND STANDARDS OF PROFESSIONAL CONDUCT

*Essential skills, values and standards of professional conduct* for admission to and continuance in the School of Social Work are part of the School's academic standards. They are the physical, cognitive, emotional and character requirements necessary to participate fully in all aspects of social work education and the practice of social work. The expectation is that students will possess and develop these skills, values and standards as they progress through all aspects of the program, including in the classroom, in their field placements, and in the professional practice of social work.  Attention to them will be paid by faculty responsible for making admissions decisions and for evaluating students' classroom and practicum performance. Violations of these Skills, Values, and Standards of Professional Conduct can also become grounds for dismissal from the program and from the profession. Thus, it is important that they are well understood.

## ESSENTIAL SKILLS

**Motor and Sensory.** Developing the competencies needed to become a social worker is a lengthy and complex process that requires students to participate in the full spectrum of experiences and requirements of the curriculum. The social work student must have sufficient motor abilities to attend class and perform all the responsibilities expected of students in

Case 3:25-cv-05079-DGE    Document 105    Filed 03/17/26    Page 399 of 446

9/17/25, 3:26 PM          Essential Skills, Values and Standards of Professional Conduct | School of Social Work & Criminal Justice | University of Washingto...

practicum placement, at places such as hospitals and clinics. The student must also have the ability to acquire and integrate new information through the use of their senses to perform the functions that will be expected of them both as students and as professional social workers. Students who wish to request reasonable accommodations for meeting the Essential Motor and Sensory Skills requirement should contact the Office of Disability Resources for Students (DRS). DRS provides services to enrolled students who have a documented permanent or temporary physical, psychological or sensory disability that qualifies them for academic accommodations under the law. The professional activities of social work require that students be grounded in relevant social, behavioral and biological science knowledge and research. This includes knowledge and skills in relationship building, data gathering, assessment, interventions and evaluation of practice.

**Interpersonal and Communication Skills** The social work student must demonstrate the interpersonal skills needed to relate effectively to other students, faculty, staff, clients and other professionals. These include compassion, objectivity, integrity and the demonstration of respect for, and consideration of others. The social work student must communicate effectively and sensitively with other students, faculty, staff, clients and other professionals. They must express ideas and feelings clearly and demonstrate a willingness and ability to listen to others. They must have sufficient skills in spoken and written English to understand the content presented in the program.

# VALUES

For admission to and continuance in the School of Social Work at the University of Washington, students must demonstrate a commitment to the core values of social justice and diversity. These values are critical to social work education and practice.

**Social Justice**. The social work student must value social justice, which includes promoting equality and human rights and recognizing the dignity of every human being.

**Diversity.** The social work student must appreciate the value of human diversity. They must serve in an appropriate manner all persons in need of assistance, regardless of the person's age, class, race, religious affiliation (or lack thereof), gender, disability, sexual orientation and/or value system. Social work students must not impose their own personal, religious, sexual, and/or cultural values on their clients. The social work student must know how their values, attitudes, beliefs, emotions and past experiences affect their thinking, behavior and relationships. The student must be willing to examine and change their behavior when it

Case 3:25-cv-05079-DGE    Document 105    Filed 03/17/26    Page 400 of 446

9/17/25, 3:26 PM                Essential Skills, Values and Standards of Professional Conduct | School of Social Work & Criminal Justice | University of Washingto...

interferes with their working with clients and other professionals.  The student must be able to work effectively with others in subordinate positions as well as with those in authority.

# PROFESSIONAL CONDUCT

The social work student must abide by the ethical standards of the profession developed by the <u>National Association of Social Workers (NASW) Code of Ethics</u>. In general, the social work student must behave professionally by knowing and practicing within the scope of social work, respecting others, being punctual and dependable, prioritizing responsibilities and completing assignments on time.  The social work student must learn to be resilient in the face of the undesirable effects of stress and avoid burnout by exercising appropriate self-care including the development of cooperative and facilitative relationships with colleagues and peers.

***Adapted from the NASW Code of Ethics:***

**Privacy and Confidentiality**

(a) Social work students and professionals should not solicit private information from clients unless it is essential to providing services or conducting social work evaluation or research.

(a) Social work students and professionals may disclose confidential information when appropriate with valid consent from a client or a person legally authorized to consent on behalf of a client.

(b) Social work students and professionals should protect the confidentiality of all information obtained in the course of professional service unless sharing confidential information is necessary to preventing serious, foreseeable, and imminent harm to a client or other identifiable person.

**Sexual Relationships & Physical Contact**

(a) Under no circumstances should social work students and professionals engage in sexual activities or sexual contact with current or former clients, whether such contact is consensual or forced.

(b) Social work students and professionals should not engage in sexual activities or sexual contact with clients' relatives or other individuals with whom clients maintain a close personal relationship when there is a risk of exploitation or potential harm to the client.

(c) Social work students and professionals —not their clients, their clients' relatives, or other individuals with whom the client maintains a personal relationship—assume the full burden for setting clear, appropriate, and culturally sensitive boundaries.

(d) Social work students and professionals should not engage in physical contact with clients when there is a possibility of psychological harm to the client as a result of the contact (such as hugging or massaging clients). Social workers who engage in appropriate physical contact with clients are responsible for setting clear, appropriate, and culturally sensitive boundaries that govern such physical contact.

### Respect

(a) Social work students and professionals should treat colleagues and clients with respect and should represent accurately and fairly the qualifications, views, and obligations of colleagues.

(b) Social work students and professionals should avoid unwarranted negative criticism of colleagues and clients in communications with others. Unwarranted negative criticism may include demeaning comments that refer to level of competence or to individuals' attributes such as race, ethnicity, national origin, color, sex, sexual orientation, gender identity or expression, age, marital status, political belief, religion, immigration status, and mental or physical disability.

### Unethical Conduct of Colleagues

(a) Social workers should take adequate measures to discourage, prevent, expose, and correct the unethical conduct of colleagues.

(b) Social workers should be knowledgeable about established policies and procedures for handling concerns about colleagues' unethical behavior. Social workers should be familiar with national, state, and local procedures for handling ethics complaints. These include policies and procedures created by NASW, licensing and regulatory bodies, employers, agencies, and other professional organizations.

(c) Social workers who believe that a colleague has acted unethically should seek resolution by discussing their concerns with the colleague when feasible and when such discussion is likely to be productive. . . .

Approved by SSW Faculty Council, June 2011. Updated November 2018 to reflect gender-inclusive language.

# CONTACT

School of Social Work & Criminal Justice

 swcj@uw.edu

 253-692-5820

OFFICE HOURS: M-F 9 AM -5 PM

f SWCJ  (O) SWCJ  in  SWCJ  f Student Social Work Organization
f Criminal Justice League

UWNetID login



UW Seattle | UW Bothell

© 2023 University of Washington Tacoma
1900 Commerce Street, Tacoma, WA 98402-3100
Contact us | Terms of Use | Privacy Policy

EXHIBIT 54

**RESOLUTION AGREEMENT BETWEEN
THE UNITED STATES OF AMERICA AND
COLUMBIA UNIVERSITY**

## I.   DEFINITIONS

The terms used in this Agreement shall have the following meaning:

a.  "Assistant Attorney General" means the Assistant Attorney General for the Office of Civil Rights within the United States Department of Justice.

b.  "Columbia" or "University" means Columbia University, the legal name of which is The Trustees of Columbia University in the City of New York.

c.  "Ed." means the United States Department of Education.

d.  "Ed. OCR" means the United States Department of Education's Office of Civil Rights.

e.  "EEOC" means the United States Equal Employment Opportunity Commission.

f.  "GSA" means the General Services Administration.

g.  "HHS" means the United States Department of Health and Human Services.

h.  "HHS OCR" means United States Department of Health and Human Services' Office for Civil Rights.

i.  "Investigations" means those inquiries opened by HHS OCR, Ed. OCR, and the United States Department of Justice.

j.  "Parties" means Columbia and the United States of America.

k.  "NIH" means the National Institutes of Health.

l.  "Non-Terminated Grants" means those grants awarded to Columbia or its researchers and faculty which were not enumerated in the United States' March 7,

1

10, or 14, 2025 correspondence notifying Columbia of certain grant and contract terminations but upon which Columbia has nevertheless not received payment.

m. "SIPA" means Columbia's School for International and Public Affairs.

n. "Released Claims" means any claim or liability under any statute or at common law related to the allegations in the March 7, 10, and 14, 2025 grant and contract termination letters, the May 22, 2025 Notice of Violation, or the facts and events under review in the Investigations arising under Title VI, Title VII, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, or the False Claims Act, 31 U.S.C. § 3729 *et seq.* "Released Claims" also incorporates by reference the separate agreement between Columbia and the U.S. Equal Employment Opportunity Commission ("EEOC") regarding Columbia's potential liabilities for violation of Title VII (attached and incorporated herein as Exhibit A) ("EEOC Agreement").

o. "Title VI" means Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

p. "Title VII" means Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

q. "Title IX" means Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*

r. "Terminated Grants" means awards made to Columbia or its faculty and researchers and enumerated in or covered by the United States' March 7, 10, and 14, 2025 correspondence notifying Columbia of certain award terminations.

s. "UJB" means the University Judicial Board, a disciplinary body comprised of

2

faculty and administrative staff members, housed within Columbia's Office of the Provost.

    t.    "United States" means the United States of America.

## II.    INTRODUCTION

1.    The United States and Columbia (collectively, the "Parties") desire to avoid the burdens and risks of protracted litigation. This Agreement is not an admission in whole or in part by either party, and Columbia expressly denies liability regarding the United States' allegations or findings.

2.    This Agreement shall become effective upon execution by all the Parties (the "Effective Date").

3.    The duration of this Agreement will be three years to the day from the Effective Date.

## III.    RELIEF

4.    This Agreement applies to the relationship between the United States and Columbia and does not bind Columbia or the United States with regard to any other person or entity.

5.    No provision of this Agreement, individually or taken together, shall be construed as giving the United States authority to dictate faculty hiring, University hiring, admission decisions, or the content of academic speech.

6.    This Agreement represents the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understanding of the Parties with respect to the subject matter hereof. Nothing in this Agreement prohibits the United States from bringing actions against Columbia for future violations of Title VI or Columbia's violations of any other provision of federal law on the same basis it would bring similar actions against other institutions.

7.    In consideration for entering into this Agreement the United States shall restore to Columbia those Terminated Grants by HHS or NIH upon the Effective Date of this Agreement. The Terminated Grants by Ed. and any other terminated contracts are excluded from this provision.

8. The United States shall further:

    a. In the ordinary course, and as soon as reasonably practicable, enable the drawdown of overdue payments on Non-Terminated Grants, timely process payments for Non-Terminated and Terminated Grants as submitted in the ordinary course, timely renew relevant non-competitive grants in the ordinary course and consistent with past practice, and confirm that Non-Terminated Grants will not be withheld or terminated in the future in relation to the conduct covered under this Agreement;

    b. Treat Columbia as eligible for further grants, contracts, and awards in the ordinary course, without disfavored treatment;

    c. Close pending Investigations or compliance reviews regarding Columbia's compliance with Title VI, Section 1557 of the Affordable Care Act, or other statutes, pending as of the Effective Date of this Agreement, including those related to the Released Claims. This provision incorporates by reference the separate EEOC Agreement attached as Exhibit A regarding any investigation or alleged violation of Title VII. Nothing in this Agreement prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, defunding or litigation related to Columbia's actions occurring after the Effective Date of this Agreement. Nothing in this Agreement or the EEOC Agreement affects in any way EEOC's right to bring, process, investigate, litigate, or otherwise seek relief in any charge filed by individual charging parties or third parties that may later be filed against Columbia, in accordance with standard EEOC procedures; and

4

d. Within 14 days of the Effective Date, notify Middle States Commission on Higher Education of the United States' release of liability in relation to the Released Claims.

## IV.    AGREEMENT BETWEEN THE PARTIES

9.    With the exception of actions to enforce this Agreement, the United States agrees not to institute any civil action or other adverse agency action against Columbia, its officers, Trustees, directors, and employees (the "Columbia Releasees") related to the Released Claims. The United States releases the Columbia Releasees from any liability related to the Released Claims. The United States is not releasing Columbia or the Columbia Releasees from any other liability.

10.    In settlement and compromise of the Released Claims in this Agreement Columbia shall pay the United States the sum of Two Hundred Million Dollars ($200,000,000), payable in equal installments. The first payment shall be made within five (5) business days of the Effective Date, and each subsequent installment payment shall be made on the anniversary of the Effective Date for each year of the term of this Agreement. In addition, pursuant to the terms of the EEOC Agreement, incorporated by reference herein and attached as Exhibit A, Columbia will pay Twenty-One Million Dollars ($21,000,000) into a claims fund and undertake the obligations as outlined in the EEOC Agreement.

11.    No later than 30 days after the Effective Date of this Agreement, Columbia shall designate an Administrator who shall be answerable to Columbia's President and who shall be principally responsible for coordinating and overseeing compliance with this Agreement and shall be given sufficient supervisory authority and access to resources within Columbia to direct implementation of this Agreement. Once selected, this Administrator shall be responsible for making regular reports to a Resolution Monitor to be described in Section VI of this Agreement

5

(hereinafter "Resolution Monitor"), as well as Columbia's submissions and its public reports described in Section VII of this Agreement. This role shall be maintained and staffed throughout the duration of this Agreement. Columbia may change this Administrator during the term of the Agreement and shall provide the United States with notice that the Administrator has changed within 14 days of the new Administrator's taking office. In the event the Administrator resigns, Columbia shall not permit the position to remain open for an unreasonable amount of time. In the event of a vacancy in the Administrator position, the President of Columbia will be responsible for exercising the duties of the Administrator.

12.    Consistent with Columbia's announcement on March 21, 2025, Columbia shall maintain its Senior Vice Provost focused on promoting excellence in regional studies. As part of this role, the Senior Vice Provost, acting with the authority of the Office of the Provost, will conduct a thorough review of the portfolio of programs in regional areas across the University, starting with the Middle East. This review includes the Center for Palestine Studies; the Institute for Israel and Jewish Studies; Middle Eastern, South Asian, and African Studies; the Middle East Institute; the Tel Aviv and Amman global hubs; the School of International and Public Affairs Middle East Policy major; and other University programs focused on the Middle East. In this role, the Senior Vice Provost will:

    a. Review the educational programs to ensure the educational offerings are comprehensive and balanced;

    b. Review all aspects of leadership and curriculum;

    c. Steward the creation of new programs to address the full range of fields;

    d. Partner with the Vice Provost for Faculty Affairs and the schools to create a standard review process for the hiring of non-tenured faculty across the University;

e. Review the processes for approving curricular changes; and

f. Make recommendations to the President and Provost, in accordance with academic procedures, about any necessary changes, academic restructuring, or investments that will ensure academic excellence and complementarity across all programs in the given academic areas.

13.     Columbia shall, consistent with its announcement on March 21, 2025, appoint new faculty members with joint positions in both the Institute for Israel and Jewish Studies and the departments or fields of economics, political science, or SIPA. These faculty members will contribute to a robust and intellectually diverse academic environment.

14.     To further support Jewish life and the wellbeing of Jewish students on campus, Columbia will add an additional administrator ("Student Liaison"), reporting to the head of University Life, who will serve as a liaison to students concerning antisemitism issues, advise the University's agreement Administrator and other University leaders and make recommendations to University leaders about ways to improve and to support Jewish students.

15.     Columbia shall not maintain programs that promote unlawful efforts to achieve race-based outcomes, quotas, diversity targets, or similar efforts. For example, Columbia will not provide benefits or advantages to individuals on the basis of protected characteristics in any school, component, division, department, foundation, association or element within the entire Columbia University system. Columbia and each of its schools, components, divisions, and departments, including but not limited to professional and graduate schools, will comply with and follow antidiscrimination laws, including Title VI and Title IX of the Education Amendments of 1972. Columbia agrees to comply with all applicable laws, including Title VI, Title VII, and Title IX, and Section 1557 of the Affordable Care Act, regarding the treatment of individuals. Accordingly, Columbia will provide a timely report to the Resolution Monitor

7

summarizing its compliance with this obligation, including an assurance that Columbia has acted responsibly to ensure its programs do not promote unlawful DEI goals.

16. Columbia shall maintain merit-based admissions policies. Columbia may not, by any means, unlawfully preference applicants based on race, color, or national origin in admissions throughout its programs. No proxy for racial admission will be implemented or maintained. Columbia may not use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discrimination.

17. Nothing in this Agreement prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, or litigation into Columbia's future admissions practices to ensure that those practices are in full compliance with all applicable laws and not a proxy for prohibited discrimination.

18. Columbia shall provide the Resolution Monitor and the United States with admissions data consistent with 34 C.F.R. § 100.6 and similar regulations showing both rejected and admitted students broken down by race, color, grade point average, and performance on standardized tests, in a form permitting appropriate statistical analyses by October 1 of each year of the Agreement. Admissions data will also be subjected to a comprehensive audit by the Resolution Monitor. Non-individualized, statistical information regarding enrolled students shall be made available to the public each year for the Term of the Agreement, including the composition of the class broken down by race, color, national origin, grade point average, and performance on standardized tests.

19. Columbia shall provide that all hiring and promotion practices for faculty and administrative roles are grounded solely in individual qualifications and academic and professional merit, and shall not use of race, color, sex, or national origin as a factor—implicit or explicit—in hiring decisions across all schools, departments, and programs. The use of

8

indirect methods or criteria that serve as a substitute for race conscious hiring or promotion practices is also prohibited. Nor may Columbia use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discriminatory practices in hiring or promotion. All data related to faculty and administrative staff hiring and promotion practices shall be shared with the Resolution Monitor by July 15 every year for the term of the Agreement. Hiring data will also be subjected to a comprehensive audit by the Resolution Monitor.

20.    Columbia will uphold its commitment to Title IX of the Education Amendments of 1972 by providing safe and fair opportunities for women including single-sex housing for women who request such housing and all-female sports, locker rooms, and showering facilities.

21.    Columbia will undertake a comprehensive review of its international admissions processes and policies and will ensure that international student-applicants are asked questions designed to elicit their reasons for wishing to study in the United States.

22.    Processes will be established to provide that all students, international and domestic, are committed to the longstanding traditions of American universities, including civil discourse, free inquiry, open debate, and the fundamental values of equality and respect. Students will also agree not to engage in discrimination, harassment, and other violations of Columbia policy. Columbia will also develop training materials to socialize all students to campus norms and values more broadly. The Resolution Monitor shall review such processes by October 1, 2025, and regularly thereafter. Moreover, Columbia will examine its business model and take steps to decrease financial dependence on international student enrollment. The reforms should be made durable by adoption of any necessary organizational and personnel changes.

23.    Columbia will comply with all legal requirements related to the Student and

9

Exchange Visitor Program ("SEVIS" Program) and comply with all requests for immigration information consistent with the requirements of the program. Columbia will promptly provide the United States, upon request, with all disciplinary actions involving student visa-holders resulting in expulsions or suspensions, and arrest records that Columbia is aware of for criminal activity, including trespass or other violation of law, to the extent permitted by FERPA. Disciplinary actions will be determined without regard to immigration status. The University will provide the Resolution Monitor with anonymized statistical data sufficient to evaluate compliance with the foregoing sentence.

24. Columbia will comply with all foreign gift and contract reporting obligations, including under Section 117 of the Higher Education Act. Columbia will comply with reasonable and lawful requests from the United States for information related to foreign funding sources.

25. Columbia will, as needed, engage experts on laws and regulations regarding sanctions enforcement, anti-money laundering, and prevention of terrorist financing (including laws and regulations applicable to sanctioned countries and individuals) and will adopt, modify and enforce policies and procedures designed to ensure compliance with such laws and regulations applicable to Columbia.

26. As Columbia understands the critical importance of the effectiveness and impartiality of its disciplinary processes outlined in Columbia's announcement on March 21, 2025, to ensure an efficient and fair process for student discipline and the right to a safe and nondiscriminatory educational environment, Columbia's UJB and rules process will be housed in and administered by the Office of the Provost. Each UJB panel will be comprised solely of faculty and administrative staff members. All panel members will undergo a rigorous vetting and conflict review process to ensure objectivity, impartiality, and a commitment to following

10

and enforcing Columbia's rules and policies. The Provost will have final approval of all panel members and appellate Deans. Final determination of appeals of disciplinary decisions will remain with the University President. The University will not provide the UJB panel members with information about respondents' immigration status and the UJB will not consider respondents' immigration status in its deliberation or sanctioning.

27.    Consistent with Columbia's March 21, 2025 commitments, Columbia shall maintain the following University policies and rules:

   a.  Demonstrations and other protest activities that occur inside academic buildings and places where academic activities take place present a direct impediment to maintaining Columbia's core academic mission. Such protests in academic buildings, and other places necessary for the conduct of University activities, are not acceptable under the Rules of University Conduct because of the likelihood of disrupting academic activities.

   b.  All demonstration activity is subject to the University's anti- discrimination and anti-harassment policies.

   c.  All individuals who engage in protests or demonstrations, including those who wear face masks or face coverings must, when asked, present their University identification to the satisfaction of a University delegate or Public Safety Officer. Individuals who fail to comply with these policies will be subject to discipline, being escorted off campus, and detention for trespass where appropriate.

   d.  Face masks or face coverings are not allowed for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws. Face masks or face coverings are always allowed

11

for religious or medical reasons.

e. Student groups are subject to discipline for discriminatory conduct or other violations of University policy. Columbia's Office of Institutional Equity will enforce existing policy and processes for discipline of all student groups stemming from discriminatory conduct and retains the ability to sanction student groups for discriminatory conduct including by defunding, suspending, or de-recognizing them. The Office of University Life will enforce existing policy and processes for discipline of student groups unrelated to claims of discriminatory conduct, and retains the ability to defund, suspend, or de-recognize groups in the event of a violation.

28. Columbia will impartially implement and apply University rules and policies, including prompt and consistent enforcement of disciplinary rules and policies without regard to identity or ideology.

29. Columbia will evenly implement its institution-wide policies on harassment and discrimination under Title VI.

30. Columbia shall ensure that its trainings for employees covers Columbia's relevant obligations under this Agreement.

31. Columbia's recent enhancement to campus safety will be maintained for the duration of the Agreement:

a. Columbia will maintain for the duration of the Agreement at least 36 trained and certified special officers, directly and through service providers, with the ability to remove individuals from campus and/or arrest them when appropriate. Columbia's existing 2015 Memorandum of Understanding with the New York Police Department ("NYPD") or similar successor Agreement will remain in full

12

force and effect, ensuring that the NYPD can provide additional security assistance when needed.

b. Nothing in this Agreement shall be construed to prevent Columbia from adopting at its discretion additional safety and security measures that go beyond these terms.

32. Columbia will maintain retaliation reporting procedures and protections, in accordance with federal, state, and local laws. Columbia will ensure that these procedures and protections will apply to those reporting noncompliance with this Agreement.

33. No later than 30 days after the Effective Date of this Agreement, Columbia shall establish procedures by which any member of the Columbia community can report allegations of noncompliance with the reforms detailed in this Agreement to the Administrator and the Resolution Monitor. Any such reporter shall be fully protected from any adverse actions for so reporting.

## V.    DISPUTE RESOLUTION

33. If either Party reasonably believes that the other is in violation of the terms of this Agreement, including those reporting obligations outlined in Section VII, it shall provide prompt written notice to the other Party and identify with specificity the portion or portions of this Agreement about which it has concerns, with a copy of such notice to be provided to the Resolution Monitor.

34. Following receipt of such notice, Columbia or the United States shall respond in writing within 5 business days of receipt, and a copy of such response provided to the Resolution Monitor.

35. Within 10 business days of receipt of the written response identified in the preceding paragraph, the Parties shall attempt to resolve informally the disputes identified in

13

the notices and response materials, including by affording the notified party a reasonable opportunity to cure. The Parties shall engage in good faith efforts to resolve the issue before seeking further action.

36.    If after the expiration of the 10 business days following the deadline to produce the response as set forth above resolution of the issue(s) has not been achieved, the United States or Columbia may commence, initiate, or institute a non-binding Arbitration before a single Arbitrator, selected from a panel of six arbitrators denoted in the attached Exhibit B to be selected and chosen by the Parties. Within 60 days of the commencement of the Arbitration, the Arbitrator shall issue a non-binding, advisory only, Reasoned Decision, which shall be confidential and entirely inadmissible in any subsequent legal proceedings. The non-binding, advisory only, Reasoned Decision shall have no evidentiary weight whatsoever, shall be inadmissible in any proceeding, including civil claims in a court of competent jurisdiction or any appeals or appellate proceedings, and shall have no preclusive effect of any kind. The Parties agree that in the Reasoned Decision, the Arbitrator may (1) address whether or not the Agreement has been breached; (2) address questions regarding the interpretation and meaning of the Agreement or any provision thereof; and (3) may recommend appropriate remedies, if any. Neither party shall have any right or entitlement to appeal or seek further relief or remedies from the non-binding, advisory only, Reasoned Decision or any part thereof.

37.    Subject only to the non-binding alternative dispute resolution mechanisms set forth in this section, nothing about or contained in this Agreement shall limit, impair, or prevent either party to this Agreement from initiating any proceeding in any court of competent jurisdiction to enforce this Agreement or seek remedies for the breach thereof, including injunctive relief. All rights of the parties to pursue any applicable remedy in law or equity in a court of competent jurisdiction shall be preserved to the maximum extent permitted by

14

applicable law. Additionally, nothing about or contained in this Agreement shall limit, impair, or prevent any party to this Agreement from pursuing appellate rights and remedies of any order, judgment, ruling, verdict, or outcome of proceedings initiated or commenced in a court of competent jurisdiction.

38.     After the issuance of the non-binding, advisory only, Reasoned Decision, or the expiration of 60 days following initiation or commencement of the non-binding Arbitration, whichever is earlier, either Party shall be entitled to commence a civil action in a court of competent jurisdiction.

39.     The Assistant Attorney General shall have discretion and authority to initiate and conduct reasonable compliance audits, reviews, inquiries, or investigations to the maximum extent ordinarily permitted by Title VI. If the Assistant Attorney General determines that Columbia has breached any term or provision of this Agreement, the Assistant Attorney General shall issue a written notice to Columbia identifying any breach or deficiencies pursuant to Paragraph 33. Upon receipt of notice from the Assistant Attorney General, the dispute resolution mechanisms and provisions in this Agreement shall apply. Subject to the dispute resolution provisions above, nothing about this Agreement shall limit or preclude either party from initiating a civil action sounding in law or equity for any appropriate measure of damages or relief, including injunctive relief, in a court of competent jurisdiction and nothing about this Agreement shall limit, impair, or preclude either party's appellate rights or rights of appeal.

VI.     MONITORING

40.     The Parties agree to the selection of Bart M. Schwartz of Guidepost Solutions as a Resolution Monitor for this Agreement. If it becomes necessary for the Parties to select a different Resolution Monitor, Columbia and the United States will together select a Resolution

15

Monitor, acceptable to both Parties, to assess and report on Columbia's compliance with the obligations contained in this Agreement. The Parties have agreed to use a direct contracting process in selecting the Resolution Monitor. This process will be implemented in a manner consistent with this Agreement, including the requirement that the Resolution Monitor be jointly selected and acceptable to both United States and Columbia. The Resolution Monitor, and any team members employed by the Resolution Monitor, will be comprised of individuals of the highest ethics. In the event the Parties cannot agree on a Resolution Monitor within 60 days after a good faith effort, an arbitrator selected by the Parties from the list in Exhibit B shall select the Resolution Monitor.

41.    The Resolution Monitor will be appointed for the duration of this Agreement. The Resolution Monitor's responsibility is to monitor Columbia's compliance with this Agreement, in accordance with its terms, limited to the period beginning on the Effective Date of the Agreement and ending upon the Agreement's termination. The Parties may change the identity of the Resolution Monitor during this term by mutual Agreement.

42.    Columbia will bear all reasonable fees and costs of the Resolution Monitor. The United States and Columbia recognize the importance of ensuring that the fees and costs borne by Columbia are reasonable, and accordingly fees and costs will be one factor to be considered in selecting the Resolution Monitor. If any dispute arises regarding the reasonableness or payment of the Resolution Monitor's fees and costs, the Parties and the Resolution Monitor shall adhere to the dispute resolution mechanisms of this Agreement. The same provisions above regarding the inadmissibility and non-binding, non-preclusive effect of any decision by the Arbitrator and the rights of the parties to pursue all available claims and remedies before a court of competent jurisdiction, including rights of appeal, shall apply to disputes regarding reasonableness or payment of the Resolution Monitor's fees and costs.

43.     The Resolution Monitor, at any time after its initial selection, may request to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Resolution Monitor by this Agreement. Any person or entity hired or otherwise retained by the Resolution Monitor to assist in furthering any provision of this Agreement will be subject to the provisions of this Agreement. The Resolution Monitor will notify the Parties in writing if the Resolution Monitor wishes to select such additional persons or entities. The notice will identify and describe the qualifications of the person or entity to be hired or employed and the monitoring task to be performed. If the Parties agree with the Resolution Monitor's proposal, the Resolution Monitor will be authorized to hire or employ such additional persons or entities. The Parties have ten (10) business days to disagree with any such proposal. If the Parties are unable to reach agreement within ten business days of receiving notice of the disagreement, the disagreement shall be resolved through the dispute resolution provisions of this Agreement.

44.     Should the United States or Columbia determine that the Resolution Monitor's individual members, agents, employees, or independent contractors failed to satisfactorily perform the duties required by this Agreement, the United States or Columbia may propose replacement of the Resolution Monitor, and/or any individual members, agents, employees, or independent contractors.

45.     As described in Paragraph 11, the Administrator shall make semi-annual reports to the Resolution Monitor sufficient to evidence Columbia's compliance with the obligations contained in this Agreement. Columbia shall propose a format for reports within a reasonable time following the Effective Date, subject to the Resolution Monitor and the United States' reasonable approval. The Resolution Monitor will review the reports and may request additional information and/or conduct reviews or audits as necessary to determine whether the

17

information in the reports is accurate and whether Columbia has complied with the obligations in this Agreement. Compliance reviews and audits will contain the elements necessary for reliability and comprehensiveness. Compliance reviews and audits may be conducted using sampling and compilation data where appropriate. The Resolution Monitor will produce to the Parties a draft report concerning each compliance assessment within fifteen (15) business days after the end of each assessment.

46.    The Resolution Monitor may make recommendations to the Parties regarding actions necessary to ensure timely substantial and effective compliance with the obligations of this Agreement. Such recommendations may include a recommendation to change, modify, or amend a provision of this Agreement, a recommendation for additional training in any area related to this Agreement, or a recommendation to seek technical assistance. In addition to such recommendations, the Resolution Monitor may also, at the agreement of the Parties and based on the Resolution Monitor's reviews, provide technical assistance consistent with the Resolution Monitor's responsibilities under this Agreement. For the avoidance of doubt, and notwithstanding any other provision in this Agreement, neither the Resolution Monitor nor the Arbitrators utilized as part of the dispute resolution mechanism described in Section V have the authority, on behalf of the United States or its agencies, to make a final determination regarding Columbia's compliance with the relevant law or to initiate any enforcement action for a violation of Title VI or any federal statute.

47.    The Resolution Monitor will maintain regular contact with the Parties to ensure effective and timely communication regarding the status of Columbia's compliance with its obligations under this Agreement. The Resolution Monitor will not be liable for any claim, lawsuit, or demand arising out of the Resolution Monitor's performance pursuant to this Agreement brought by non-parties to this Agreement.

18

48. To facilitate its work, the Resolution Monitor may conduct on-site visits and assessments upon reasonable prior notice to Columbia.

49. Subject to applicable confidentiality laws (*i.e.*, the Federal Educational Rights & Privacy Act ("FERPA"), 20 U.S.C. § 1232g) and all applicable privileges, the Resolution Monitor will have timely access to interview all Agreement-related individuals, and visit all Agreement-related facilities, trainings, transcripts of Agreement-related meetings and disciplinary hearings, and reviews, and the scene of any occurrence that the Resolution Monitor in consultation with the Parties reasonably deems necessary to carry out the duties assigned to the Resolution Monitor by this Agreement. The Resolution Monitor will cooperate with Columbia to access people, scenes, and facilities in a reasonable manner that, consistent with the Resolution Monitor's responsibilities, minimizes interference with daily operations.

50. Columbia will ensure that the Resolution Monitor will have access to all Columbia documents and data related to the Agreement that the Resolution Monitor, in consultation with the Parties, reasonably deems necessary to carry out the duties assigned to the Resolution Monitor by this Agreement, except any documents or data protected by work product, the attorney-client privilege or other applicable privilege (together "privilege"). Any disputes about privilege that the Resolution Monitor cannot resolve shall be resolved through the dispute resolution provisions of this Agreement.

51. The United States and its consultants and agents will have access to all Columbia staff, employees, facilities, documents, and data related to the Agreement, to the extent not unreasonable and upon reasonable advance notice and in coordination with legal counsel for Columbia, except any documents or data protected by work product, the attorney-client privilege or other applicable privilege (together "privilege"). If the United States objects to Columbia's privilege classifications, the United States may seek resolution of the propriety of

19

the assertion from the Resolution Monitor. Any disputes about privilege that the Resolution Monitor cannot resolve shall be resolved through the dispute resolution provisions of this Agreement.

52.    The Resolution Monitor and the United States will provide Columbia with reasonable notice of a request for copies of documents. Upon such request, Columbia will provide copies in a timely manner (electronic, where readily available) of the requested documents to the Resolution Monitor and the United States, unless withheld as privileged or otherwise withheld pursuant to law as described above.

53.    Further, nothing in this Agreement shall be interpreted to conflict with Columbia's obligations regarding student records pursuant to FERPA, 20 U.S.C. § 1232g. The Resolution Monitor and the United States will maintain all confidential or non-public information provided by Columbia in a confidential manner. This Agreement will not be deemed a waiver of any privilege or right Columbia may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document.

## VII.    REPORTING

54.    During the pendency of this Agreement, beginning in October 2025, Columbia shall issue public semi-annual reports comprehensively documenting its progress and activities in implementing this Agreement in a format to be agreed upon with the Resolution Monitor and the United States. On the date that Columbia publicizes such reports, it shall furnish a copy of the same to the Resolution Monitor and the United States specifically including, but not limited to, the Assistant Attorney General.

## VIII.    GENERAL PROVISIONS

55.    Columbia shall bear all costs associated with implementing the terms of this

20

Agreement. The Parties shall bear their own costs, expenses, and attorney's fees in this litigation and in connection with this Agreement, except that the Parties shall retain the right to seek costs for any matter which in the future may arise from this Agreement.

56.     If any provision of this Agreement is found to be unlawful, only the specific provision in question will be affected and the other provisions will remain in full force and effect.

57.     This Agreement may be executed in multiple counterparts, each of which together shall be considered an original but all of which shall constitute one Agreement. The Parties agree to be bound by electronic and facsimile signatures.

58.     This Agreement is enforceable only by the Parties and those released herein, the Columbia Releasees. No other person or entity is, or is intended to be, a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no other person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. The Agreement does not create a private right for action for any non-party. The Parties agree to defend the terms of this Agreement should they be challenged in this or any other forum.

Done this 23rd Day of July, 2025, IN WITNESS WHEREOF, we have caused our signatures to be

hereunto affixed:

_____
Attorney General Pamela Bondi
For: The Department of Justice

_____
Secretary Linda E. McMahon
For: The Department of Education

_____
For: The Trustees of Columbia
University in the City of New York

_____
Secretary Robert F. Kennedy, Jr.
For: The Department of Health and Human
Services

22

EXHIBIT 55

| | assigned reading. | 6. After reading the material, what questions are you left with? How can we continue to "dig deeper"? What intersectional issues/impacts are not discussed in the material?<br><br>7. What is one other material/resource from *outside* our class that relates to this material? |
|---|---|---|
| **Assignment 2 - Community Response Zine (10 pts)** | Primarily done in class, due week 6 | Students will create a mini-zine (booklet) about a community response to a social justice related issue. This may be a protest, a rally, individual or collective action grassroots organization, petition, or something else. While these will be completed primarily during class time, students will be expected to bring at least 6 copies on Thursday during week 6.<br><br>Your minizine should be made using one piece of paper (8.5x11") folded into eights. See video and template.<br><br>Your minizine should include the following components:<br><br>• Introduction (brief)<br>• Overview of the issue being responded to (what, where, when)<br>• The basic details about the movement/community response (who, how)<br>• Some more specific details (e.g. strategies used, an image, examples, events, etc)<br>• Conclusion (main takeaway/impact)<br>• At least one reference or resource (okay to just put the main URL or provide a book title etc, full APA format not needed) |
| **Assignment 3 - Worksheets (5 worksheets, 4 pts each; total of 20 points)** | Weeks 1-10 | Students will complete multiple worksheets throughout the quarter. Weekly worksheets will be provided in class. To earn credit for these, submit the worksheet (hard copy with handwritten responses or submit PDF/DOC on Canvas) by 8pm on the Thursday of the corresponding week. Students must be present in class at least 1 of the days (Tuesday or Thursday) of the week for which they complete worksheets. A maximum of 20 points (4pts/worksheet) can be earned. |
| **Assignment 4 – Final Paper (25pts)**<br><br>**Draft (5 pts)** | Workshop in class during weeks 7-9.<br><br>Draft due by Thursday, 8am, during Week 8<br><br>Final due by 8pm on Monday, May 29 | The final paper will be scaffolded throughout weeks 7-9. Students should be prepared to discuss their papers with peers in class during week 10. Each student will choose one area of oppression, justice, or liberation from the list found below.<br>• Ableism<br>• Ageism<br>• Classism<br>• Environmental Justice<br>• Food Justice<br>• Gender Justice<br>• Health Justice<br>• Housing Justice<br>• Indigenous Sovereignty<br>• Nativism<br>• Racial Justice<br>• Sexism<br>• Trans Liberation<br>Students will write a 5-7 page paper (7 paragraphs total) exploring their chosen topic. Use APA format to cite academic or otherwise appropriate |

EXHIBIT 55b



Vern Harner <vharner@uw.edu>

## 404 Mini Zine Assignment

2 messages

**Vern Harner** <vharner@uw.edu>                                    Thu, Jun 20, 2024 at 1:16 PM
To: "Keva M. Miller" <KevaMill@uw.edu>

Hi Dean Miller,
Here is the mini zine assignment -- I've also attached the rubric and example zine I provided students.

| Assignment 2 - Community Response Zine (10 pts) | Primarily done in class, due week 6 | Students will create a mini-zine (booklet) about a community (or individual) response to a social justice related issue. This may be a protest, a rally, individual or collective action, grassroots organization, petition, or something else. While these will be completed primarily during class time, students will be expected to bring at least 6 copies on Thursday during week 6.<br><br>Your minizine should be made using one piece of paper (8.5x11") folded into eights. See video and template.<br><br>Your minizine should include the following components:<br><br>• Introduction (brief)<br>• Overview of the issue being responded to (what, where, when)<br>• The basic details about the movement/community response (who, how)<br>• Some more specific details (e.g. strategies used, an image, examples, events, etc)<br>• Conclusion (main takeaway/impact)<br>• At least one reference or resource (okay to just put the main URL or provide a book title etc, full APA format not needed)<br><br>Please note -- if topic/content is not aligned with social work values & ethics, students may be asked to revise & resubmit the assignment. |

--
**Vern Harner, PhD**
Assistant Professor | UWT School of Social Work & Criminal Justice
Co-Chair | LGBTQ Caucus of Faculty/Students in Social Work
VernHarner.com | pronoun: they
Schedule a time to chat by clicking here

Phone: 253-692-5701
Email: vharner@uw.edu
Office: WCG 233

Latest publication: Trans Patient Preferences When Discussing Gender in Health Care Settings, *JAMA Network Open*

**2 attachments**

 **Copy of 404 Zine Rubric & Template - updated version (4).pdf**
175K

 **404 zine example (3).pdf**
5226K

**Keva M. Miller** <kevamill@uw.edu>                                    Thu, Jun 20, 2024 at 1:36 PM
To: Vern Harner <vharner@uw.edu>

Thank you! This is helpful! Enjoy the rest of your day!

**KEVA M. MILLER, Ph.D., M.S.S.W**
Dean & Professor
School of Social Work & Criminal Justice

Harner_000880

University of Washington Tacoma

1900 Commerce Street

Tacoma, WA 98402-3100

Phone: 253.692.5820 Fax: 253.692.5825

www.tacoma.uw.edu/uwt/swcj



---

**From:** Vern Harner <vharner@uw.edu>
**Sent:** Thursday, June 20, 2024 1:16 PM
**To:** Keva M. Miller <kevamill@uw.edu>
**Subject:** 404 Mini Zine Assignment

[Quoted text hidden]

Harner_000881

EXHIBIT 56

EXHIBIT 57

EXHIBIT 58

**Social Work & Criminal Justice Professional Standards Committee**
**Request to Convene**

**Person or Persons Requesting to Convene the PSC:**

Vern Harner

**Date of Request:**

27 April 2023

**Brief Description of Unresolved Issue(s):**

Claudia Arias (404B student) has proposed an extremely anti-trans topic for class project, I strongly suspect she is the student who sent anonymous email, draft project was full of transphobic language

**Brief Description of Attempts to Revolve the Issue:**

two in-person conversations re: topic have taken place — student does not believe the topic is not aligned w/ social work values and sees women's & trans rights as competing issues

**Does the other party know that you are requesting a review?**

**If not, why not?**

No — developing issue, have connected student to BASW chair & faculty advisor, further escalation may include safety concerns

**Best ways to reach you**

**Phone:**

253·692·5701

**Email:**

vharner@uw.edu

**Best days/times to meet:**

April 28, May 1, May 2-5

Confidentiality will be maintained within reasonable limitations.

Revisions approved by the faculty on May 6, 2016.

Harner_000003

EXHIBIT 59

4XA

- 4-20-23 Thurs PPtx Week 4          See Slide (32)
  4 sexism and misogony
Slide 35  i. Brainstorm & choose topic  (something your unfamiliar with)
  2. How do we defined primary sources?
  3. How do we actually make this zine?
          Identifying a Topic

specific way
folks respond △
systems of ▱  specific population
oppression      time period
form of Justice

Slide 38 Finding Primary Sources
  (women & social movements in the U.S.
          Tues Discussion  4/25/23  TUESDAY 11:30
  Zine Brought to class on Thursday @ approx 12pm for Rvu.
    class was excused early some students remained. Remain
  in class if you want feedback.

Zine week 5                    4/27/23  Thursday
  Thursday's pp provides other potential Topics.
Zine                due    5/4/23 thursday

Going By the Initial information

Why couldn't my professor schedule to speak more
in terms as to what I did wrong.

✱A professor should be able to openly speak about topics
        Not just walk away or embarass or humiliate Student
As a Social worker we are to treat everyone equal.

Plntffs000434

EXHIBIT 60

EXHIBIT 61

EXHIBIT 62

EXHIBIT 63

EXHIBIT 64

EXHIBIT 65

EXHIBIT 66

EXHIBIT 67

EXHIBIT 68

EXHIBIT 69