UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CLAUDIA ARIAS,<br><br>               Plaintiff,<br>   v.<br><br>UNIVERSITY OF WASHINGTON<br>TACOMA et al.,<br><br>              Defendants. | CASE NO. 3:25-cv-05079-DGE<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT (DKT.<br>NO. 78) |

On May 8, 2026, the Court held a hearing on Defendants' motion for summary judgment. (Dkt. No. 78.)  In accordance with its oral ruling, the Court issues this order GRANTING in part and DENYING in part Defendants' motion for summary judgment.

A.  **Plaintiff's First Amendment Retaliation Claim**

The Court finds that *Oyama v. Univ. of Hawaii*, 813 F.3d 850 (9th Cir. 2015) is controlling and identifies a clearly established right.  At issue in *Oyama* was "the scope of [a] University's authority to deny a teaching candidate's student teaching application on the basis of the candidate's speech."  813 F.3d at 855.  The Court concluded the student speech doctrine

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 1

normally applied in school settings was inapplicable in the university setting.  This is because not present in a university setting are the "key rationales for restricting students' speech," namely, ensuring that "students 'are not exposed to material that may be inappropriate for their level of maturity' and [that they] 'learn whatever lessons the activity is designed to teach.'"  *Id*. at 863 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)).  "The University's purpose was not to teach Oyama any lesson; rather, it was to fulfill the University's *own* mandate of limiting certification recommendations to students who meet the standards for the teaching profession."  *Id*.

As in *Oyama*, here the University of Washington-Tacoma ("UWT") concluded it had concerns about Plaintiff's ability to meet the university's standards to enter a selected field; specifically, UWT's requirements for entering the social work profession.  It emphasized:

> Students graduating from the School of Social Work and Criminal Justice's social welfare program enter a professional field.  The ability to articulate and apply social work values, ethics, and standards, engage in professional communication, and perform self-reflection are fundamental requirements and responsibilities in the social work profession.

(Dkt. No. 105 at 13.)  Because UWT determined Plaintiff refused "to complete the required essays that would allow [Plaintiff] to demonstrate [her] practice readiness," Plaintiff was dismissed from the Bachelor of Arts in Social Welfare ("BASW") program.  (*Id*.)  Therefore, *Oyama*, and not decisions involving the student speech doctrine, is controlling.

*Oyama* concluded that "universities may consider students' speech in making certification decisions, so long as their decisions are based on defined professional standards, and not on officials' personal disagreement with students' views."  813 F.3d at 867–868.  Thus, the Court concludes, it is clearly established that a university may not make certification decisions,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 2

or in this case decisions involving whether a student meets program requirements, based on officials' personal disagreement with a student's view.

For purposes of the present motion, and resolving the disputed material facts in Plaintiff's favor, the Court finds:

Plaintiff's interaction with Defendant Vern Harner on April 20, 2023 was "momentary." (Dkt. No. 102 at 4.)  Plaintiff mentioned she was thinking about focusing her zine project on women's rights and showed Harner her computer screen with a Google search for an article available; she "did not have any article open." (*Id*.; Dkt. No. 108 at 5.)  Harner did not say much but told Plaintiff to make sure the source Plaintiff planned to use was reputable. (*Id*.)  Harner did not tell Plaintiff that her project idea violated social work values and ethics. (*Id*. at 5, 108 at 7–8.)

Either later that day or the next day, Harner identified and reviewed an article that Harner believed Plaintiff had open on her computer.  (Dkt. Nos. 102 at 4; 105 at 199–200.)  Harner believed Plaintiff's planned zine project was on "the issue of 'trans' people sexually assaulting others in prison," a topic Harner found "so many issues with." (Dkt. No. 105 at 199.)  One issue was Plaintiff's alleged reliance on the article as a source, which among other things, Harner identified as being "full of TERF[1] and far right dog whistles and talking points."[2]  (*Id*.)  Harner

---

[1] Though not specifically defined in the record, TERF appears to refer to trans-exclusionary radical feminism.

[2] Harner testified that the article, from the Daily Mail, generally could not be viewed as trustworthy or a quality resource.  However, if Plaintiff "had evaluated that specific article and also her broad topic, if she had been able to provide the evidence to support the claims in it and the - - the fact that it's a widespread issue, then [Harner] would have been able to accept that." (Dkt. No. 108 at 472–473.)  Viewing this testimony in the light most favorable to Plaintiff, it appears Harner would have accepted the topic/subject matter that Harner believed Plaintiff was proposing so long as Plaintiff had been able to identify evidence to support the claims being made.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 3

sought advice from Defendant Claudia Sellmaier, explaining Harner's impressions of Plaintiff to Sellmaier.  (*Id*.)

On April 27, 2023, Plaintiff presented Harner with her draft zine project sometime after 11:30 a.m. (Dkt. No. 102 at 6.)  Harner planned three-to-five minutes with each student that morning.  (Dkt. No. 80 at 6.)  Harner did not identify why Plaintiff's project targeted transgender people or what specific social work standards Harner believed Plaintiff violated.  (Dkt. No. 102 at 6.)  Plaintiff expressed she did not understand why her project was not considered a social justice issue. (*Id*.)  Harner became visibly upset reviewing and discussing the draft zine, eventually throwing their hands in the air and telling Plaintiff, "[t]his is targeting transgender." (*Id*.)  Their interaction ended and at some point Plaintiff asked to meet later that day with Harner, but Harner stated they were unavailable that day.  (*Id*. at 8.)

Sometime in the afternoon of April 27, 2023, Harner contacted the Dean of the School of Social Work (Defendant Keva Miller) to report the interactions with Plaintiff.  (Dkt. No. 80 at 8.)  Based on Harner's description of the events, Miller recommended Harner initiate a PSC referral. (*Id*.)

At 2:12 p.m., Harner sent Plaintiff an email informing her they could not meet that afternoon.  (Dkt. No. 105 at 190.)  Harner directed Plaintiff to contact Sellmaier and Chris Barrans for any further questions or concerns.  (*Id*.)  Harner told Plaintiff her draft project was "harmful and not aligned with social work values & ethics" and attached to the email three links for Plaintiff to review, but did not explain to Plaintiff why the draft project was harmful or not aligned with social work values and ethics.  (*Id*.)  Harner also told Plaintiff further discussion could be had "about the intersection of trans rights and women's rights when that conversation is approached appropriately and in good faith."  (*Id*.)

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 4

By 2:50 p.m., 38 minutes after sending the email to Plaintiff, Harner had completed and emailed a Professional Standards Committee ("PSC") referral form. (Dkt. No. 105 at 196–197, 434.) In their referral, Harner asserted Plaintiff's proposed zine project topic was "extremely anti-trans," that Harner suspected Plaintiff had sent Harner an anonymous email a few weeks prior, that Plaintiff did not believe her proposed topic was misaligned with social work values, and that Plaintiff "sees women's & trans rights as competing issues." (*Id*. at 434.) As to why Harner decided not to inform Plaintiff of the PSC review request, Harner identified they had "connected" Plaintiff with the BASW chair and the faculty advisor and identified that "further escalation may include safety concerns." (*Id*.) Nothing in the record identifies why Harner believed there were safety concerns. The PSC referral form also does not identify any social work standards that were violated.

The PSC convened a meeting on May 16, even after Plaintiff expressed concerns about the fact Harner had not tried to resolve the issue with her first. (Dkt. No. 102 at 11.) No one at the PSC meeting identified which social work standards were violated. (*Id*. at 15.) The PSC committee also declined to identify the specific standards that were violated in email communications with Plaintiff after the PSC meeting. (Dkt. No. 105 at 91, 143.) Only in Plaintiff's termination letter did Defendants identify what social work standards had been violated. (*Id* at 10–11.) The letter also fully credited Harner's description of the events of April 20 and 27. (*Id*. at 11.) It explained that the reason Harner made the PSC referral on April 27 was because Plaintiff had not reconsidered her draft topic and "did not arrange to stop by Dr. Harner's office to discuss the matter further" on April 27. (*Id*.). But the record shows Harner was not available to meet with Plaintiff after class on April 27, that Plaintiff was directed to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 5

speak with others, and that 38 minutes after communicating this information to Plaintiff, Harner submitted a PSC referral alleging a potential safety concern.

Based on the above facts, a jury could find that Harner had a personal disagreement with Plaintiff's views on transgender issues, that this personal disagreement was the motivation for initiating the PSC referral, that Harner's personal disagreement tainted the PSC process, and that Defendants' ultimate decision to withdraw Plaintiff from the PSC program was based on personal disagreements with Plaintiff's views and not on defined professional standards.

Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's First Amendment claim.

### B. Breach of Contract Claim

The Court's earlier ruling (Dkt. No. 49 at 20) should not be construed as limiting Plaintiff's breach of contract claim only to the extent it relates to the First Amendment retaliation claim. The Court's inartful wording was meant to prohibit Plaintiff from asserting a breach of contract claim premised on her dismissed religious discrimination claims. To the extent Plaintiff bases her claim on certain provisions of the Program Manual and other incorporated publications, the Court finds Plaintiff stated a claim that, though not a model of clarity, sufficiently put Defendants on notice of her claim. Plaintiff asserted Harner did not comply with Manual language requiring that "individuals who are directly involved should make a concerted effort to resolve the concern prior to a referral to the PSC" (Dkt. No. 56 at 22) and stated in her breach of contract claim that UWT failed to "follow[] the policy measures it had implemented and promised [Plaintiff]" (*id*. at 36). Plaintiff also identified UWT's Mission Statement, Race & Equity Initiative, and Diversity Blueprint (*id*. at 3) and other "fundamental principles of inclusion and expression embodied in its own written policies and promises" (*id*. at 4–6) and

asserted UWT violated its promise to "conform[] with academic standards espoused in governing documents as expressed above in the factual allegations" (*id*. at 36).

"Washington courts recognize that 'the relationship between a student and a university is primarily contractual in nature,' with the 'specific terms to be found in the university bulletin and other publications.'" *Brown v. Columbia Basin Community College*, No. 18755-1-III, 2001 WL 518329, at *8 (Wash. App. Ct. May 15, 2001) (quoting *Marquez v. Univ. of Wash.*, 648 P.2d 94, 96 (Wash. App. Ct. 1982)). And although elements of contract law provide a basic framework, "this does not mean that contract law must be rigidly applied in all its aspects. The student-university relationship is unique, and it should not be and can not be stuffed into one doctrinal category." *Becker v. Washington State University*, 266 P.3d 893, 900 (Wash. Ct. App. 2011) (cleaned up). Based on the fact courts afford wide latitude and discretion "to educational institutions in academic matters, and the fact that such agreements are often not integrated, 'the standard is that of reasonable expectations—what meaning the party making the manifestation . . . should reasonably expect the other party to give it.'" *Id*. (quoting *Marquez*, 648 P.2d at 97). Moreover,

> The decision to award or not award a degree, and based upon what criteria, is one uniquely within the academic sphere. The courts should abstain from interference in this process unless arbitrary and capricious decision making or bad faith is present. Decisions arrived at honestly and with due consideration are not arbitrary and capricious.

*Maas v. Corp. of Gonzaga University*, 618 P.2d 106, 110 (Wash. Ct. App. 1980); *Brown*, 2001 WL 518329, at *8.

Here, the PSC guidelines found in the Program Manual directs that individuals, in this case Harner, involved in a concern "should make a concerted effort to resolve the concern prior to referral to the PSC." (Dkt. No. 105 at 275, 313.) UWT also acknowledges it has "the

obligation to maintain conditions conducive to freedom of inquiry and expression to the maximum degree compatible with the orderly conduct of its functions." (*Id*. at 362.)

These provisions give rise to a reasonable expectation that a student, such as Plaintiff, would not face sanctions based on a professor's personal disagreement with the student's views on transgender issues and that the student would be given the opportunity to resolve a concern before being referred to the PSC.[3]

Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's breach of contract claim.

### C. **Tortious Interference Claim**

To prevail on a tortious interference claim under Washington law, a plaintiff must show "(1) [t]he existence of a valid contractual relationship or business expectancy, (2) that defendants had knowledge of that relationship, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) that defendants interfered for an improper purpose or used improper means, and (5) resultant damage." *Travelers Casualty & Surety Co. of America v. Decker*, 756 F. Supp. 3d 1097, 1104 (W.D. Wash. 2024) (citations omitted). However, "[r]ecovery for tortious interference with a contractual relation requires that the interferor be an intermeddling third party; a party to a contract cannot be held liable in tort for

---

[3] As for the Welcome Letter from the Dean (Dkt. No. 105 at 283); Mission of the BASW Program (*id*. at 285); Vision, Mission, and Values; Diversity Blueprint (*id*. at 352), Statement of Ethical Principles (*id*. at 392), and Statement on Diversity (*id*. at 395), the court concludes those statements are aspirational in nature and do not support Plaintiff's breach of contract claim. *See e.g.*, *Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012) ("Language in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable"), *affirmed in Knelman v. Middlebury College*, 570 Fed. App'x 66 (2nd Cir. 2014).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 8

interference with that contract." *Houser v. City of Redmond*, 586 P.2d 482, 484 (Wash. 1978) (en banc).

Here, Plaintiff asserts (1) a contractual relationship with Consejo Counseling and Referral Services ("Consejo") based on the executed May 18, 2023 internship offer and (2) that UWT interfered with that relationship. (Dkt. Nos. 111 at 23; 108 at 1125.) However, the Court concludes UWT was not a third party to Plaintiff's relationship with Consejo. Rather, Plaintiff's internship was dependent on Plaintiff's relationship with UWT. (Dkt. No. 86 at 3) ("It was appropriate for the internship to end [because it] was dependent upon her continued enrollment in an undergraduate or graduate degree program."). Based on *Houser*, UWT cannot be considered an "intermeddling third party" to Plaintiff's internship with Consejo.

As for Plaintiff's claimed future "business expectancy in bachelor's level employment" (Dkt. No. 111 at 23), it fails for the same reasons the interference with a contractual relationship claim fails: UWT was not an intermeddling third party in any future business expectancy. In addition, while such a claim "does not require the existence of an enforceable contract or breach of one to support an action," *Commodore v. University Mechanical Contractors, Inc.*, 839 P.2d 314, 322 (Wash. 1992), it does require "a relationship between parties contemplating a contract, with at least a reasonable expectation of fruition," *Scymanski v. Dufault*, 491 P.2d 1050, 1055 (Wash. 1971). Here, the record is void of any evidence that an employer was contemplating a future employment relationship with Plaintiff prior to her removal from the BASW Program.[4] In fact, Consejo disclaimed it ever promised Plaintiff future employment upon graduation. (*See*

---

[4] Plaintiff argued at the hearing that Consejo subsequently hired Plaintiff after her withdrawal from the BASW program. But any employment negotiated after her removal from the BASW program does not alter the fact that Consejo identified no employment discussions were had before her removal.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 9

Dkt. Nos. 85 at 2; 86 at 2.)  And the mere hope of future employment upon graduation is not an expectancy.  *See*, *e.g.*, *Dube v. Likins*, 167 P.3d 93, 101 (Ariz. App. Ct. 2007) ("[Plaintiff's] only allegation is that he has been unable 'to find employment even though he graduated with a 4.0 [grade point average].'  This statement merely suggests that [Plaintiff] had a 'hope' of employment after graduation rather than an expectancy because he has not identified any prospective relationship.").

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's claim for tortious interference with a contractual relationship or business expectancy.

### D. Motion to Strike (Dkt. No. 112 at 5–6)

The Court GRANTS the motion to strike as follows:

- The Court strikes Dkt. No. 104, exhibit 45, pages 2 and 3.  This document was not previously disclosed.

- The Court strikes Dkt. No. 10, exhibit 54.  This document is not relevant and carries no legal weight in this matter.

- The Court strikes the declarations of Elijah Visintainer and Amie Ichikawa (Dkt. Nos. 100 and 106).  These witnesses were not previously disclosed.

- As for the request to strike various paragraphs of Plaintiff's declaration, while some of them contain conclusory statements, speculate as to the conduct or motives of other individuals, or contain clearly irrelevant commentary, the Court utilized its ability to parse through and consider only specific facts contained in those paragraphs.  The Court, therefore, denies as MOOT the remaining requests to strike.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 10

### E. **Motion for Leave to File Unredacted Documents (Dkt. No. 120)**

On April 24, 2026, Plaintiff moved for leave to file unredacted versions of two documents that were intended to be part of her response; the Court previously ordered these documents be treated as confidential.  (Dkt. No. 120.)  Because this motion was filed well after briefing on Defendants' motion for summary judgment was due and because the Court did not rely on the proposed exhibits to rule on Defendants' motion for summary judgment, this motion is DENIED as MOOT.

### F. **Conclusion**

In summary, the Court GRANTS Defendants' motion (Dkt. No. 78) for summary judgment on Plaintiff's tortious interference claim and DENIES Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation and Plaintiff's breach of contract claims.

This Order constitutes a final order on Defendants' motion for summary judgment, and no further order will be issued on Defendants' motion for summary judgment.  Although the Court stated during the hearing that it would issue a more complete order, this order sufficiently outlines the basis for its rulings.

The Court also DENIES as moot Plaintiff's motion (Dkt. No. 120) to file redacted documents.

Dated this 11th day of May, 2026.

David G. Estudillo
United States District Judge

.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) - 11